UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN RE

LYONDELL CHEMICAL COMPANY, ET AL.,

       Debtors.

EDWARD S. WEISFELNER, AS TRUSTEE OF
THE LB CREDITOR TRUST,

       Plaintiff,

      -against-

MORGAN STANLEY & CO., INCORPORATED,
SOLELY IN ITS CAPACITY AS CUSTODIAN,
TRUSTEE, AGENT, REPRESENTATIVE OR
NOMINEE, MORGAN STANLEY / RETAIL,
SOLELY IN ITS CAPACITY AS CUSTODIAN,
TRUSTEE, AGENT, REPRESENTATIVE OR
NOMINEE, BENEFICIAL HOLDERS OF
ACCOUNTS HELD IN THE NAME OF MORGAN
STANLEY & CO., INCORPORATED,
BENEFICIAL HOLDERS OF ACCOUNTS HELD
IN THE NAME OF MORGAN STANLEY /
RETAIL, STATE STREET BANK & TRUST,
FIDUCIARY – STATE STREET BANK, STATE
STREET BANK – TRUST CUSTODY, STATE
STREET BANK – IBT/BGI, STATE STREET BANK
– SPDR'S, STATE STREET BANK & TRUST
CO/IBT, TRANSFEREES OF STATE STREET
BANK & TRUST, TRANSFEREES OF FIDUCIARY
– STATE STREET BANK, TRANSFEREES OF
STATE STREET BANK – TRUST CUSTODY,
TRANSFEREES OF STATE STREET BANK –
IBT/BGI, TRANSFEREES OF STATE STREET
BANK – SPDR'S, TRANSFEREES OF STATE
STREET BANK & TRUST CO/IBT, CREDIT
SUISSE SECURITIES US, SOLELY IN ITS
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,
REPRESENTATIVE OR NOMINEE, CREDIT
SUISSE SECURITIES/IA, SOLELY IN ITS
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,
REPRESENTATIVE OR NOMINEE, BENEFICIAL

Chapter 11

Case No. 09-10023 (REG)

(Jointly Administered)

JUDGE HOLWELL

10 CIV 8827

Adv. Pro. No. _____

NOTICE OF REMOVAL OF
ACTION PURSUANT TO 28
U.S.C. § 1452 AND 12 U.S.C.
§ 632



RECEIVED
NOV 22 2010
U.S.D.C. S.D. N.Y.
CASHIERS

HOLDERS OF ACCOUNTS HELD IN THE NAME                    :
OF CREDIT SUISSE SECURITIES US,                          :
BENEFICIAL HOLDERS OF ACCOUNTS HELD                     :
IN THE NAME OF CREDIT SUISSE                             :
SECURITIES/IA, BEAR STEARN SECURITIES                   :
CORP, TRANSFEREES OF BEAR STEARN                        :
SECURITIES CORP, DEUTSCHE BANK                          :
SECURITIES, SOLELY IN ITS CAPACITY AS                   :
CUSTODIAN, TRUSTEE, AGENT,                              :
REPRESENTATIVE OR NOMINEE, BENEFICIAL                   :
HOLDERS OF ACCOUNTS HELD IN THE NAME                    :
OF DEUTSCHE BANK SECURITIES, INC., JPM                  :
CHASE BANK, N.A., SOLELY IN ITS CAPACITY                :
AS CUSTODIAN, TRUSTEE, AGENT,                           :
REPRESENTATIVE OR NOMINEE, BENEFICIAL                   :
HOLDERS OF ACCOUNTS HELD IN THE NAME                    :
OF JPM CHASE BANK, N.A., JP MORGAN                      :
SECURITIES, SOLELY IN ITS CAPACITY AS                   :
CUSTODIAN, TRUSTEE, AGENT,                              :
REPRESENTATIVE OR NOMINEE, BENEFICIAL                   :
HOLDERS OF ACCOUNTS HELD IN THE NAME                    :
OF JP MORGAN SECURITIES, NATIONAL                       :
FINANCIAL SERVICES, TRANSFEREES OF                      :
NATIONAL FINANCIAL SERVICES, BROWN                      :
BROTHERS HARRIMAN, TRANSFEREES OF                       :
BROWN BROTHERS HARRIMAN, JPMORGAN                       :
CHASE BK/IA, SOLELY IN ITS CAPACITY AS                  :
CUSTODIAN, TRUSTEE, AGENT,                              :
REPRESENTATIVE OR NOMINEE, BENEFICIAL                   :
HOLDERS OF ACCOUNTS HELD IN THE NAME                    :
OF JPMORGAN CHASE BK/IA, NORTHERN                       :
TRUST COMPANY, TRANSFEREES OF                           :
NORTHERN TRUST COMPANY, BNP PARIBAS                     :
SEC CORP, TRANSFEREES OF BNP PARIBAS                    :
SEC CORP, JPM BNK/CORR CL SVCS, SOLELY                  :
IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,                  :
AGENT, REPRESENTATIVE OR NOMINEE,                       :
BENEFICIAL HOLDERS OF ACCOUNTS HELD                     :
IN THE NAME OF JPM BNK/CORR CL SVCS,                    :
PNC BANK, N.A., TRANSFEREES OF PNC BANK,                :
N.A., TD AMERITADE CLEAR, TRANSFEREES                   :
OF TD AMERITRADE CLEAR, FIRST CLEARING,                 :
LLC, TRANSFEREES OF FIRST CLEARING, LLC,                :
CALYON SECURITIES (USA), TRANSFEREES OF                 :
CALYON SECURITIES (USA), BARCLAYS                       :
CAPITAL INC., SOLELY IN ITS CAPACITY AS                 :

CUSTODIAN, TRUSTEE, AGENT,                    :
REPRESENTATIVE OR NOMINEE, BENEFICIAL         :
HOLDERS OF ACCOUNTS HELD IN THE NAME          :
OF BARCLAYS CAPITAL INC., SG AMERICAS         :
SEC LLC, SOLELY IN ITS CAPACITY AS            :
CUSTODIAN, TRUSTEE, AGENT,                    :
REPRESENTATIVE OR NOMINEE, BENEFICIAL         :
HOLDERS OF ACCOUNTS HELD IN THE NAME          :
OF SG AMERICAS SEC LLC, BEAR STEARNS
SECURITIES CORP. F/A/O FNY SEC/HLW
GROUP, CIBC WORLD MARKETS,
TRANSFEREES OF CIBC WORLD MARKETS,
JPM/PUBLIC EMP RET., SOLELY IN ITS
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,
REPRESENTATIVE OR NOMINEE, BENEFICIAL
HOLDERS OF ACCOUNTS HELD IN THE NAME
OF JPM/PUBLIC EMP RET., WELLS FARGO
BANK, N.A., SOLELY IN ITS CAPACITY AS
CUSTODIAN, TRUSTEE, AGENT,
REPRESENTATIVE OR NOMINEE, WELLS
FARGO INVESTMENT LLC, SOLELY IN ITS
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,
REPRESENTATIVE OR NOMINEE, BENEFICIAL
HOLDERS OF ACCOUNTS HELD IN THE NAME
OF WELLS FARGO BANK, N.A., BENEFICIAL
HOLDERS OF ACCOUNTS HELD IN THE NAME
OF WELLS FARGO INVESTMENT LLC,
COMERICA BANK, TRANSFEREES OF
COMERICA BANK, SCOTTRADE, INC.,
TRANSFEREES OF SCOTTRADE, INC., AG
EDWARDS & SONS, SOLELY IN ITS CAPACITY
AS CUSTODIAN, TRUSTEE, AGENT,
REPRESENTATIVE OR NOMINEE, BENEFICIAL
HOLDERS OF ACCOUNTS HELD IN THE NAME
OF AG EDWARDS & SONS, JP MORGAN SEC
INC WF, SOLELY IN ITS CAPACITY AS
CUSTODIAN, TRUSTEE, AGENT,
REPRESENTATIVE OR NOMINEE, BENEFICIAL
HOLDERS OF ACCOUNTS HELD IN THE NAME
OF JP MORGAN SEC INC WF, U.S. TRUST
COMPANY NA, TRANSFEREES OF U.S. TRUST
COMPANY NA, WACHOVIA BANK N.A.,
SOLELY IN ITS CAPACITY AS CUSTODIAN,
TRUSTEE, AGENT, REPRESENTATIVE OR
NOMINEE, BENEFICIAL HOLDERS OF
ACCOUNTS HELD IN THE NAME OF

WACHOVIA BANK N.A., EDWARD D. JONES,
TRANSFEREES OF EDWARD D. JONES,
SUMITOMO TRUST & BANKING,
TRANSFEREES OF SUMITOMO TRUST &
BANKING, SWISS AMERICAN SECURITIES,
TRANSFEREES OF SWISS AMERICAN
SECURITIES, ROBERT W. BAIRD & CO.,
TRANSFEREES OF ROBERT W. BAIRD & CO.,
BGC INTERNATIONAL BROKER DEALER
CREDIT ACCOUNT, AMALGAMATED BANK,
AMALGAMATED BANK CRGO, TRANSFEREES
OF AMALGAMATED BANK, TRANSFEREES OF
AMALGAMATED BANK CRGO, TD
WATERHOUSE CANADA, TRANSFEREES OF TD
WATERHOUSE CANADA, H&R BLOCK
FINANCIAL ADVISORS, TRANSFEREES OF H&R
BLOCK FINANCIAL ADVISORS, DOFT & CO.,
INC. FIRM ACCOUNT, ELISABETH H. DOFT,
KDC MERGER ARBITRAGE MASTER, JMS LLC,
SCOTIA CAPITAL, TRANSFEREES OF SCOTIA
CAPITAL, LINSCO/PRIVATE CORP.,
TRANSFEREES OF LINSCO/PRIVATE CORP.,
PENSON FIN SERV INC., TRANSFEREES OF
PENSON FIN SERV INC., MUGC MTBJ PT33,
NATIONAL CITY BANK, TRANSFEREES OF
NATIONAL CITY BANK, CANTOR CLEARING
SERVICES, TRANSFEREES OF CANTOR
CLEARING SERVICES, JPM/PCS SHARED SVCS,
SOLELY IN ITS CAPACITY AS CUSTODIAN,
TRUSTEE, AGENT, REPRESENTATIVE OR
NOMINEE, BENEFICIAL HOLDERS OF
ACCOUNTS HELD IN THE NAME OF JPM/PCS
SHARED SVCS, MJR PARTNERS, TRACK DATA
CORPORATION, SOUTHWEST SECURITIES,
INC., TRANSFEREES OF SOUTHWEST
SECURITIES, INC., BEAR STEARNS & CO. F/A/O
GABELLI ASSOCIATES, MORGAN KEEGAN &
CO., TRANSFEREES OF MORGAN KEEGAN &
CO., SUNTRUST BANK, TRANSFEREES OF
SUNTRUST BANK, THE FIFTH THIRD BANK,
TRANSFEREES OF THE FIFTH THIRD BANK,
BEAR STEARNS SECURITIES CORP. – FIRST NY
SECURITIES / BRITALLY CAPITAL, BMO
NESBITT BURNS, BMO NESBITT BURNS SA,
TRANSFEREES OF BMO NESBITT BURNS,
TRANSFEREES OF BMO NESBITT BURNS SA,

BANK OF NOVA SCOTIA TAX, BANK OF NOVA
SCOTIA WMF/CDS, TRANSFEREES OF BANK
OF BANK OF NOVA SCOTIA TAX,
TRANSFEREES OF BANK OF NOVA SCOTIA
WMF/CDS, BAR/CAP EQUITY FINAN, SOLELY
IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,
AGENT, REPRESENTATIVE OR NOMINEE,
BENEFICIAL HOLDERS OF ACCOUNTS HELD
IN THE NAME OF BAR CAP/EQUITY FINAN,
MTBJ PT 13, JP MORGAN SEC INC SL, SOLELY
IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,
AGENT, REPRESENTATIVE OR NOMINEE,
BENEFICIAL HOLDERS OF ACCOUNTS HELD
IN THE NAME OF JP MORGAN SEC INC SL,
CROWELL WEEDON AND CO. OMNIBUS
ACCOUNT, CROWELL WEEDON & CO., STERN
AGEE & LEACH, TRANSFEREES OF STERN
AGEE & LEACH, WEDBUSH MORGAN
SECURITIES, TRANSFEREES OF WEDBUSH
MORGAN SECURITIES, BANK OF TOKYO –
MITSUBISHI, TRANSFEREES OF BANK OF
TOKYO – MITSUBISHI, D.A. DAVIDSON & CO.,
TRANSFEREES OF D.A. DAVIDSON & CO.,
PRIMEVEST FINANCIAL SERVICES,
TRANSFEREES OF PRIMEVEST FINANCIAL
SERVICES, CHARLES SCHWAB & CO. INC.
REORGANIZATION, BELLSOUTH
HEALTHCARE S&P 400, OPTIONSXPRESS, INC.,
TRANSFEREES OF OPTIONSXPRESS, INC.,
STIFEL NICOLAUS, AS CUSTODIAN FOR JOHN
J. SAUERACKER, KEYBANK NATIONAL
ASSOCIATION, TRANSFEREES OF KEYBANK
NATIONAL ASSOCIATION, STEPHENS INC.,
TRANSFEREES OF STEPHENS INC., DENIS P.
KELLEHER, RBC DOMINION SECURITIES,
TRANSFEREES OF RBC DOMINION
SECURITIES, CDS CLEARING DEPOSIT,
TRANSFEREES OF CDS CLEARING DEPOSIT,
ABBEY NATIONAL SECURITIES,
TRANSFEREES OF ABBEY NATIONAL
SECURITIES, CUSTODIAL TRUST COMPANY,
SOLELY IN ITS CAPACITY AS CUSTODIAN,
TRUSTEE, AGENT, REPRESENTATIVE OR
NOMINEE, BENEFICIAL HOLDERS OF
ACCOUNTS HELD IN THE NAME OF
CUSTODIAL TRUST COMPANY, ALPINE

ASSOCIATES, REGIONS BANK, TRANSFEREES
OF REGIONS BANK, PULSE TRADING INC.,
AMERICAN ENTERPRISE INVESTMENT
SERVICES, TRANSFEREES OF AMERICAN
ENTERPRISE INVESTMENT SERVICES,
MIZOHO TRUST & BANKING CO.,
TRANSFEREES OF MIZOHO TRUST & BANKING
CO., UNION BANK OF CALIFORNIA NA,
TRANSFEREES OF UNION BANK OF
CALIFORNIA NA, TRUSTMARK NATIONAL
BANK, TRANSFEREES OF TRUSTMARK
NATIONAL BANK, NBCN INC., TRANSFEREES
OF NBCN INC., OP&F / INTECH, DAVID R.
JOHNSEN AND AMALIA G. JOHNSEN (JT TEN
WROS), COMM. BANK OF KANSAS,
TRANSFEREES OF COMM. BANK OF KANSAS,
OHIO CARPENTERS MIDCAP, FTB/TEACHERS
OF OHIO, SERS/SSGA PASS, SACRAMENTO
EMPLOYEES RETIREMENT SYSTEM RUSSELL,
TIMBER HILL LLC, TRANSFEREES OF TIMBER
HILL LLC, INTERNATIONAL BROKERAGE
RETAIL EQUITY, TRANSFEREES OF
INTERNATIONAL BROKERAGE RETAIL
EQUITY, A&B DB - ANCHOR, FOLIO (FN)
INVESTMENTS, INC., TRANSFEREES OF FOLIO
(FN) INVESTMENTS, INC., IRA FBO, JANET F.
ROSS VFTC AS CUSTODIAN, RICKERT C.
HENRIKSEN AND ZHEYLA M. HENRIKSEN
COMMUNITY PROPERTY, KERMIT R. MEADE,
FERRIS, BAKER WATTS, TRANSFEREES OF
FERRIS, BAKER WATTS, THE ANTI- CRUELTY
SOCIETY, ROOFER'S LOCAL 9 PENSION FUND
– HARRIS, WALTER E. HENDRICKS, BURL
SWAFFORD AND RUTH SWAFFORD JT TEN,
CATO ENTERPRISES LLC ARBITRAGE
ACCOUNT, GULF STREAM MARKETING INC.,
VINCENT DE CICCO, AND JOHN DOES 1-500,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE** that, on this date, Morgan Stanley & Co. Incorporated; State

Street Bank & Trust Company (improperly sued as "State Street Bank & Trust, Fiduciary – State

Street Bank, State Street Bank – Trust Custody, State Street Bank – IBT/BGI, State Street Bank

– SPDR's, State Street Bank & Trust Co/IBT"); Credit Suisse Securities (USA) LLC (improperly

sued as "Credit Suisse Securities US" and "Credit Suisse Securities/IA"); J.P. Morgan Clearing

Corp. (f/k/a Bear Stearns Securities Corp. and improperly sued as "Bear Stearn Securities

Corp"); Deutsche Bank Securities Inc. (improperly sued as "Deutsche Bank Securities");

JPMorgan Chase Bank, N.A. (improperly sued as "JPM Chase Bank, N.A."); J.P. Morgan

Securities LLC (f/k/a J.P. Morgan Securities Inc., f/k/a Bear, Stearns & Co.) (improperly sued as

"JPMorgan Securities"); National Financial Services LLC; Brown Brothers Harriman & Co.

(improperly sued as "Brown Brothers Harriman"); BNP Paribas Securities Corp.; TD Ameritrade

Clearing, Inc. (improperly sued as "TD Ameritade Clear"); PNC Bank, N.A. (in its capacity as

PNC Bank, N.A. and as successor-by-merger to National City Bank); Barclays Capital, Inc.; SG

Americas Securities, LLC (improperly sued as "SG Americas SEC LLC"); Edward Jones

(improperly sued as "Edward D. Jones"); Amalgamated Bank; Scotia Capital Inc. (improperly

sued as "Scotia Capital"); Doft and Co., Inc.; Elisabeth H. Doft; Mitsubishi UFJ Trust &

Banking Corporation (U.S.A.) (improperly sued as "MUGC MTBJ PT33" and "MTBJ PT 13");

MJR Partners; SunTrust Bank; BMO Nesbitt Burns Inc. (improperly sued as "BMO Nesbitt

Burns"); BMO Nesbitt Burns Trading Corp. S.A. (improperly sued as "BMO Nesbitt Burns

SA"); Bank of Tokyo-Mitsubishi UFJ Trust Company (improperly sued as "Bank of Tokyo –

Mitsubishi"); RBC Dominion Securities; Union Bank, N.A. (f/k/a Union Bank of California,

N.A.); and Ferris, Baker Watts, Incorporated (improperly sued as "Ferris, Baker Watts")

(collectively, the "Removing Defendants"), by their undersigned counsel, file this Notice of

Removal pursuant to 28 U.S.C. § 1452 and 12 U.S.C. § 632, removing this entire action from the

Supreme Court of the State of New York, County of New York ("New York State Court"), to the

United States District Court for the Southern District of New York ("Court" or "New York

District Court"). This Court has original jurisdiction over this matter pursuant to 28 U.S.C.

§ 1334(b) and 12 U.S.C. § 632. Removal to this Court and referral to the United States

Bankruptcy Court for the Southern District of New York are appropriate pursuant to 28 U.S.C. §

157(a). *See* 28 U.S.C. § 157(a); Standing Order M61 Referring to the Bankruptcy Judges for the

Southern District of New York Any or All Proceedings Arising Under Title 11, dated July 10,

1984 (Ward, Acting C.J.).

In support of this Notice of Removal, the Removing Defendants state as follows:

## THE COMPLAINT

1.    On or about October 22, 2010, the Plaintiff commenced a civil action by filing a

summons and complaint in the New York State Court, captioned *Weisfelner v. Morgan Stanley

& Co., et al.*, Index No. 651829/2010 (the "Complaint"). Purportedly invoking New York state

fraudulent transfer law, Plaintiff seeks to set aside and recover as fraudulent transfers

approximately $5.9 billion allegedly transferred to shareholders of Lyondell Chemical Company

("Lyondell Chemical") in exchange for their shares in Lyondell Chemical. Plaintiff claims that

those alleged transfers were made in connection with the acquisition of Lyondell Chemical by

Basell AF S.C.A. ("Basell"), thereafter renamed LyondellBasell Industries AF S.C.A. ("LBI").

Plaintiff alleges that Lyondell Chemical was rendered insolvent as a result of the debt it incurred

to repay the bank loans that funded the transfers to the Lyondell Chemical shareholders, and that

it did not receive reasonably equivalent value or fair consideration in exchange. Compl. ¶¶ 1-2,

455-59.

2.        Pursuant to 28 U.S.C. § 1446(a) and Fed. R. Bank. P. 9027(a), a copy of the

Summons and Complaint is attached as Exhibit A.  According to the Complaint, Plaintiff has

brought the claims asserted therein as Trustee, for and on behalf of the beneficiaries of a creditor

trust known as the LB Creditor Trust.  Compl. ¶ 2.  On information and belief, the LB Creditor

Trust was formed pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization for

Lyondell Chemical, LBI and affiliated debtors (the "Lyondell Debtors") confirmed earlier this

year by the United States Bankruptcy Court for the Southern District of New York (the

"Bankruptcy Court").  The Chapter 11 case for the Lyondell Debtors ("Lyondell Chapter 11

Case") remains active and pending before the Bankruptcy Court.

3.        Pursuant to the Lyondell Plan and the Bankruptcy Court's Confirmation Order,[1]

Plaintiff is purporting to bring the fraudulent transfer claims in the Complaint as the successor

representative allegedly authorized to prosecute those claims.  The same claims were previously

commenced against a purported defendant class consisting of the former Lyondell Chemical

shareholders in the Lyondell Chapter 11 Case by the Official Committee of Unsecured Creditors

(represented by Plaintiff as then Committee counsel) appointed in that Chapter 11 Case.  That

prior action was brought on behalf of the Lyondell Debtors' bankruptcy estates pursuant to

section 544(b) of the Bankruptcy Code.  That provision grants a bankruptcy estate the power to

avoid pre-bankruptcy transfers of the debtor's property that are voidable under applicable state

law by the debtor's unsecured creditors, and to recover the transferred property for the benefit of

the debtor's creditors.  *See* 11 U.S.C. §§ 544(b), 550.

---

[1] The term "Confirmation Order" refers to the Findings of Fact, Conclusions of Law, and Order
Pursuant to Section 1129 of the Bankruptcy Code and Rule 3020 of the Federal Rules of
Bankruptcy Procedure Confirming Third Amended Joint Chapter 11 Plan of Reorganization for
the LyondellBasell Debtors, dated April 23, 2010, entered by the Bankruptcy Court in the
Lyondell Chapter 11 Case.

4.     The Bankruptcy Code, however, contains a clear and absolute exception applicable to state-law fraudulent transfer claims: a transfer may not be avoided if, as with each of the payments to the former Lyondell Chemical shareholders that Plaintiff seeks to avoid and recover in this action, it is a "settlement payment" made to complete a securities transaction. *See id.* § 546(e). This limitation reflects a strong congressional policy "'to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries,'" thus "ensur[ing] settlement finality, and therefore market stability." *See In re Enron Creditors Recovery Corp.*, 422 B.R. 423, 429 (S.D.N.Y. 2009) (quoting H.R. Rep. 97-420, at 2 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 583, 583); *see also Contemporary Indus. Corp. v. Frost*, 564 F.3d 981 (8th Cir. 2009) (holding that payments made to shareholders in exchange for their shares in a leveraged buyout were settlement payments protected from avoidance under 11 U.S.C. § 546(e)).

5.     In the Complaint, Plaintiff, as Trustee of the LB Creditor Trust, seeks to pursue what it describes as state-law avoidance claims against the former Lyondell Chemical Shareholders, pursuant to provisions of the Lyondell Plan that purport to provide for the contribution of such avoidance claims to the LB Creditor Trust following the purported abandonment of such actions by the Lyondell Debtors. Compl. ¶¶ 3, 14; Plan § 5.8(b). Plaintiff seeks to recover for the benefit of various creditors of the Lyondell Debtors whose claims were allegedly not paid in full from other consideration distributed under the Lyondell Plan. Compl. ¶¶ 3, 14. The beneficiaries of the LB Trust thus allegedly include creditors with (a) unpaid trade claims against LyondellBasell; (b) unpaid, unsecured funded debt claims against LyondellBasell; and (c) senior secured deficiency claims and unpaid, subordinated secured deficiency claims against LyondellBasell. Lyondell Plan, Art. § 5.8; Confirmation Order ¶ 28; Compl. ¶ 3.

- 4 -

**GROUNDS FOR REMOVAL**

6.     Removal is appropriate here on two independent bases. First, removal is appropriate under 28 U.S.C. § 1452(a), because this Court has bankruptcy jurisdiction under 28 U.S.C. § 1334(b). Second, removal is appropriate under the Edge Act, 12 U.S.C. § 632, because several of the Defendants, including but not limited to many of the Removing Defendants, are national banks and this action arises out of transactions involving international banking.

**A.     BANKRUPTCY JURISDICTION**

7.     Under 28 U.S.C. § 1452(a), "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under § 1334 of this title."

8.     Under 28 U.S.C. § 1334(b), this Court has jurisdiction to hear all civil proceedings that "aris[e] under title 11, or aris[e] in or [are] related to cases under title 11" of the United States Code, which is the Bankruptcy Code.

9.     This action "arises in" the Lyondell Chapter 11 Case and "aris[es] under" the Bankruptcy Code. Plaintiff's avoidance claims "arise in" the Lyondell Chapter 11 Case because (among other reasons) such claims are asserted by Plaintiff as the successor purportedly authorized under the Lyondell Plan to prosecute the same avoidance claims that were previously commenced by the Lyondell Debtors' bankruptcy estates in the Lyondell Chapter 11 Case pursuant to section 544(b) of the Bankruptcy Code. They also "arise in" the Lyondell Chapter 11 Case because the threshold question of whether the Lyondell Debtors' bankruptcy estates could purport to "abandon" their avoidance powers under section 544(b) and thereby allow their creditors to bring the same fraudulent transfer claims under state law, in an effort to circumvent

the restrictions imposed by Congress on such claims under section 546(e), could arise only in connection with a bankruptcy proceeding: the Lyondell Debtors' Chapter 11 Case.

10.    Plaintiff's claims also "aris[e] under" the Bankruptcy Code because (among other reasons) they were previously brought pursuant to the statutory avoiding powers under section 544(b) of the Bankruptcy Code. *See, e.g., Carlton v. Baww, Inc.*, 751 F.2d 781, 787 (5th Cir. 1985). Furthermore, because section 544(b) provides the exclusive cause of action for asserting state-law avoidance claims in connection with bankruptcy cases—subject to the specific limitations imposed by Congress, including the bar on avoiding settlement payments under section 546(e)—the avoidance claims asserted in the Complaint arise under the Bankruptcy Code. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003) ("When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law."); *see also Contemp. Indus. Corp.*, 564 F.3d at 988 (holding that debtor's state-law claims to recover payments made to shareholders in exchange for their shares were preempted by section 546(e)).

11.    For the same reasons (among others), this case is "related to" the Lyondell Chapter 11 Case in that it has a close nexus to the bankruptcy proceedings and Lyondell Plan. Furthermore, the avoidance claims are brought by Plaintiff as Trustee of the LB Creditor Trust, a creature of the Lyondell Plan formed to implement the Plan for the benefit of creditors of the Lyondell Debtors, and the action may require interpretation of the provisions of the Lyondell Plan on which Plaintiff bases his authority to bring these claims. *See Rahl v. Bande*, 316 B.R. 127, 133 (S.D.N.Y. 2004) ("A proceeding may have a 'significant connection' with a Chapter 11 bankruptcy case subsequent to confirmation of a plan when resolution of the dispute requires the interpretation of the plan of reorganization and the implementation of that plan."); *see also Luan*

*Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 229 (2d Cir. 2002); *Krys*

*v. Sugrue, at* al, No. 08 Civ. 3065, 2008 WL 4700920, at *6 (S.D.N.Y. 2008) ("The claims being

asserted do not belong to the litigation trust personally, but rather, are precisely those causes of

action that were transferred by the PlusFunds Debtors to the SPhinX Trust pursuant to the

PlusFunds Plan"); *Kirschner v. Bennett, et al*, No. 07 Civ. 8165, 2008 WL 1990669, at *5

(S.D.N.Y. May 7, 2008) (causes of action transferred by debtor's creditors and shareholders to

trustee pursuant to plan and trust agreement conferred "related to" jurisdiction).

12.    Finally, the Lyondell Plan provides for broad retention of jurisdiction over post-

confirmation matters arising out of or related to the Lyondell Chapter 11 Case. *See* Lyondell

Plan § 12.1 ("The Bankruptcy Court shall retain exclusive jurisdiction over all matters arising

under, arising out of, or related to the Chapter 11 Cases and the Plan . . . for, among other things,

. . . (l) [t]o hear and determine disputes or issues arising in connection with the interpretation,

implementation, or enforcement of the Plan . . .; (m) [t]o recover all assets of the Debtors and

property of the Debtors' estates, wherever located . . . ; [and] (s) [t]o hear and determine any

other matter related to the Plan and not inconsistent with the provisions of the Bankruptcy

Code."); *see also Krys v. Sugrue,* 2008 WL 4700920, at *6 (concluding that the same retention of

jurisdiction language as that in Section 12.1(s) of the Plan "confers broad post-confirmation

jurisdiction on the Bankruptcy Court").

### B.    EDGE ACT JURISDICTION

13.    The Edge Act provides that the district courts of the United States have original

jurisdiction over "all suits of a civil nature at common law or in equity to which any corporation

organized under the laws of the United States shall be a party, arising out of transactions

involving international or foreign banking, . . . or out of other international or foreign financial

operations . . . ." 12 U.S.C. § 632.

14.    The Edge Act further provides that "any defendant in any such suit may, at any

time before the trial thereof, remove such suits from a State court into the district court of the

United States for the proper district by following the procedure for the removal of causes

otherwise provided by law." *Id.*

15.    Removing Defendants JPMorgan Chase Bank, N.A. (sued herein as "JPM Chase

Bank, N.A."); PNC Bank, N.A.; Amalgamated Bank; SunTrust Bank; and Union Bank, N.A.

(f/k/a Union Bank of California, N.A.) are national banking associations incorporated under the

laws of the United States.  Compl. ¶¶ 25, 41, 81, 110, 161.

16.    Other Defendants, including Wells Fargo Bank, N.A.; Comerica Bank; U.S. Trust

Company N.A.; Wachovia Bank N.A.; The Fifth Third Bank; Keybank National Association;

Regions Bank; and Trustmark National Bank (collectively, with JPMorgan Chase Bank, N.A.;

PNC Bank, N.A.; Amalgamated Bank; SunTrust Bank; and Union Bank of California N.A.,

herein referred to as the "National Bank Defendants"), also are national banking associations

incorporated under the laws of the United States.  Compl. ¶¶ 58, 60, 68, 70, 112, 140, 154, 163.

17.    Furthermore, this action is a suit "of a civil nature at common law or in equity"

that arises out of transactions involving "international or foreign banking" or "other international

or foreign financial operations."  Plaintiff's claims against the National Bank Defendants (and

other Defendants) arise out of the alleged acquisition of Lyondell Chemical by Basell, a

Luxembourg entity that was led by financier Leonard Blavatnik.  Compl. ¶ 1; *id.* ¶ 228

(Blavatnik is the founder, Chairman, and President of an entity known as Access Industries, an

international industrial group).  That transaction involved international banking, as the $5.9

billion in payments made to the Lyondell Chemical shareholders (including payments to the

National Bank Defendants "solely in [their] capacity as custodian, trustee, agent, representative

or nominee on behalf of beneficial holders of Lyondell shares," *see, e.g.*, Compl. ¶ 25) were

funded with secured loans provided by a group of United States and foreign banks.  Compl. ¶¶

397-400 & n.18-20.

18.    Among the secured lenders identified in the Complaint is Citibank, N.A., a

national banking association incorporated under the laws of the United States, which allegedly

served as "predecessor administrative agent" "collateral agent," and in "other capacities" in the

alleged acquisition at issue.  Compl. ¶ 198.

19.    For these (and other reasons), this Court has jurisdiction over this matter pursuant

to 12 U.S.C. § 632, and this matter may be removed to this Court.  *See Corporacion Venezolana*

*de Fomento v. Vintero Sales Corp.*, 629 F.2d 786 (2d Cir. 1980) (allegations that federally

chartered bank wrongfully allowed Venezuelan corporation to draw down on letter of credit

involved "international or foreign banking"); *In re Lloyd's American Trust Fund Litig.*, 928 F.

Supp. 333, 338 (S.D.N.Y. 1996) (allegations related to Citibank's operating bank trust accounts

"for the benefit of and on instructions from individuals and entities all over the world" sufficient

for Edge Act removal); *Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 213

(S.D.N.Y. 2005) (claim involving stock purchase transaction of international bank removable

under Edge Act as an "international financial operation").

**TIMELINESS**

20.    The Complaint was filed on October 22, 2010.  The Removing Defendants have

timely filed this notice of removal within 30 days of receipt, through service or otherwise, of a

copy of the initial pleading in accordance with 28 U.S.C. § 1446(b) and Fed. R. Bankr. P.

9027(a)(3).

21.    The Removing Defendants will promptly serve a copy of this Notice on counsel

for Plaintiff and (to the extent they have entered an appearance or are otherwise known) counsel

for other parties to the removed case and will file a copy of this Notice with the Clerk of the New

York State Court in accordance with the terms of 28 U.S.C. § 1446(d) and Fed. R. Bankr.

9027(b) and (c).

## CORE PROCEEDING

22.    As required under Fed. R. Bankr. P. 9027(a)(1), the Removing Defendants state

that the claims asserted against them are core, within the meaning of 28 U.S.C. § 157(b)(2).

**WHEREFORE**, the Removing Defendants[2] respectfully request that this Court accept

this Notice of Removal of Action and grant them such other and further relief as the Court deems

just and proper.

Dated:    November 22, 2010                              Respectfully Submitted,

                                                        WILMER CUTLER PICKERING
                                                        HALE AND DORR LLP

                                        By: _____
                                                        Philip D. Anker

---

[2] In addition to the Removing Defendants defined herein, the Complaint names various other
purported defendants that may appear to have some connection to the Removing Defendants, but
which do not appear to be legal entities or which are not named with sufficient specificity to
identify the particular legal entities in question. *See, e.g.,* Compl. ¶ 16 ("Beneficial Holders of
Accounts Held in the Name of Morgan Stanley"). Without prejudice to any defenses that such
purported defendants are not legal entities capable of being sued and/or are not named with
sufficient specificity in the Complaint (all of which defenses are reserved), to the extent the
Court may determine that the Defendants to this action include any other legal entities affiliated
with the Removing Defendants identified above, it is intended that this notice of removal shall
apply to such affiliated defendants as well. The Removing Defendants and all such purportedly
affiliated defendants reserve all rights and defenses in this action, including but not limited to the
defense of lack of personal jurisdiction.

Peter J. Macdonald
Ross E. Firsenbaum
Pamela K. Bookman

399 Park Avenue
New York, New York 10022
Tel.: (212)-230-8800
Fax: (212)-230-8888

*- and -*

Craig Goldblatt
Joel Millar

1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202)-663-6000
Fax: (202)-663-6363

*Attorneys for Defendants Morgan Stanley
& Co. Incorporated; State Street Bank &
Trust Company (improperly sued as "State
Street Bank & Trust, Fiduciary – State
Street Bank, State Street Bank – Trust
Custody, State Street Bank – IBT/BGI, State
Street Bank – SPDR's, State Street Bank &
Trust Co/IBT"); Credit Suisse Securities
(USA) LLC (improperly sued as "Credit
Suisse Securities US" and "Credit Suisse
Securities/IA"); J.P. Morgan Clearing
Corp. (f/k/a Bear Stearns Securities Corp.
and improperly sued as "Bear Stearn
Securities Corp"); Deutsche Bank
Securities Inc. (improperly sued as
"Deutsche Bank Securities"); JPMorgan
Chase Bank, N.A. (improperly sued as
"JPM Chase Bank, N.A."); J.P. Morgan
Securities LLC (f/k/a J.P. Morgan
Securities Inc., f/k/a Bear, Stearns & Co.)
(improperly sued as "JPMorgan
Securities"); National Financial Services
LLC; Brown Brothers Harriman & Co.
(improperly sued as "Brown Brothers
Harriman"); BNP Paribas Securities
Corp.; TD Ameritrade Clearing, Inc.
(improperly sued as "TD Ameritade*

- 11 -

Clear"); PNC Bank, N.A. (in its capacity as
PNC Bank, N.A. and as successor-by-
merger to National City Bank); Barclays
Capital, Inc.; SG Americas Securities, LLC
(improperly sued as "SG Americas SEC
LLC"); Edward Jones (improperly sued as
"Edward D. Jones"); Amalgamated Bank;
Scotia Capital Inc. (improperly sued as
"Scotia Capital"); Doft and Co., Inc.;
Elisabeth H. Doft; Mitsubishi UFJ Trust &
Banking Corporation (U.S.A.) (improperly
sued as "MUGC MTBJ PT33" and "MTBJ
PT 13"); MJR Partners; SunTrust Bank;
BMO Nesbitt Burns Inc. (improperly sued
as "BMO Nesbitt Burns"); BMO Nesbitt
Burns Trading Corp. S.A. (improperly sued
as "BMO Nesbitt Burns SA"); Bank of
Tokyo-Mitsubishi UFJ Trust Company
(improperly sued as "Bank of Tokyo –
Mitsubishi"); RBC Dominion Securities;
Union Bank, N.A. (f/k/a Union Bank of
California, N.A.); and Ferris, Baker Watts,
Incorporated (improperly sued as "Ferris,
Baker Watts")

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------- X


| | |
|---|---|
| EDWARD S. WEISFELNER, AS TRUSTEE OF THE LB CREDITOR TRUST,<br><br>                              Plaintiff,<br><br>            -against- | Plaintiff designates New York County as the place of Trial |

EDWARD S. WEISFELNER, AS TRUSTEE OF THE LB
CREDITOR TRUST,                                          :      Plaintiff designates
                                                        :      New York County
                                                        :      as the place of Trial
                                  Plaintiff,            :
                          -against-                     :
                                                        :      Index No.:
MORGAN STANLEY & CO., INCORPORATED, SOLELY IN          :
ITS CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,             :
REPRESENTATIVE OR NOMINEE, MORGAN STANLEY /            :
RETAIL, SOLELY IN ITS CAPACITY AS CUSTODIAN,           :      **SUMMONS**
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,             :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE             :
NAME OF MORGAN STANLEY & CO., INCORPORATED,            :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE             :
NAME OF MORGAN STANLEY / RETAIL, STATE STREET          :
BANK & TRUST, FIDUCIARY – STATE STREET BANK,           :
STATE STREET BANK – TRUST CUSTODY, STATE               :
STREET BANK - IBT/BGI, STATE STREET BANK – SPDR'S,     :
STATE STREET BANK & TRUST CO/IBT, TRANSFEREES          :
OF STATE STREET BANK & TRUST, TRANSFEREES OF           :
FIDUCIARY – STATE STREET BANK, TRANSFEREES OF          :
STATE STREET BANK – TRUST CUSTODY,                     :
TRANSFEREES OF STATE STREET BANK - IBT/BGI,            :
TRANSFEREES OF STATE STREET BANK – SPDR'S,             :
TRANSFEREES OF STATE STREET BANK & TRUST               :
CO/IBT, CREDIT SUISSE SECURITIES US, SOLELY IN ITS     :
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,                 :
REPRESENTATIVE OR NOMINEE, CREDIT SUISSE               :
SECURITIES/IA, SOLELY IN ITS CAPACITY AS               :
CUSTODIAN, TRUSTEE, AGENT, REPRESENTATIVE OR           :
NOMINEE, BENEFICIAL HOLDERS OF ACCOUNTS HELD           :
IN THE NAME OF CREDIT SUISSE SECURITIES US,            :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE             :
NAME OF CREDIT SUISSE SECURITIES/IA, BEAR STEARN       :
SECURITIES CORP, TRANSFEREES OF BEAR STEARN            :
SECURITIES CORP, DEUTSCHE BANK SECURITIES,             :
SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,          :
AGENT, REPRESENTATIVE OR NOMINEE,  BENEFICIAL          :
HOLDERS OF ACCOUNTS HELD IN THE NAME OF                :

DEUTSCHE BANK SECURITIES, INC., JPM CHASE BANK,    :
N.A., SOLELY IN ITS CAPACITY AS CUSTODIAN,    :
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,    :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE    :
NAME OF JPM CHASE BANK, N.A., JP MORGAN    :
SECURITIES, SOLELY IN ITS CAPACITY AS CUSTODIAN,    :
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,    :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE    :
NAME OF JP MORGAN SECURITIES, NATIONAL    :
FINANCIAL SERVICES, TRANSFEREES OF NATIONAL    :
FINANCIAL SERVICES, BROWN BROTHERS HARRIMAN,    :
TRANSFEREES OF BROWN BROTHERS HARRIMAN,    :
JPMORGAN CHASE BK/IA, SOLELY IN ITS CAPACITY AS    :
CUSTODIAN, TRUSTEE, AGENT, REPRESENTATIVE OR    :
NOMINEE, BENEFICIAL HOLDERS OF ACCOUNTS HELD    :
IN THE NAME OF JPMORGAN CHASE BK/IA, NORTHERN    :
TRUST COMPANY, TRANSFEREES OF NORTHERN TRUST    :
COMPANY, BNP PARIBAS SEC CORP, TRANSFEREES OF    :
BNP PARIBAS SEC CORP, JPM BNK/CORR CL SVCS,    :
SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,    :
AGENT, REPRESENTATIVE OR NOMINEE, BENEFICIAL    :
HOLDERS OF ACCOUNTS HELD IN THE NAME OF JPM    :
BNK/CORR CL SVCS, PNC BANK, N.A., TRANSFEREES OF    :
PNC BANK, N.A., TD AMERITADE CLEAR, TRANSFEREES    :
OF TD AMERITRADE CLEAR, FIRST CLEARING, LLC,    :
TRANSFEREES OF FIRST CLEARING, LLC, CALYON    :
SECURITIES (USA), TRANSFEREES OF CALYON    :
SECURITIES (USA), BARCLAYS CAPITAL INC., SOLELY    :
IN ITS CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,    :
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS    :
OF ACCOUNTS HELD IN THE NAME OF BARCLAYS    :
CAPITAL INC., SG AMERICAS SEC LLC, SOLELY IN ITS    :
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,    :
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS    :
OF ACCOUNTS HELD IN THE NAME OF SG AMERICAS    :
SEC LLC, BEAR STEARNS SECURITIES CORP. F/A/O FNY    :
SEC/HLW GROUP, CIBC WORLD MARKETS,    :
TRANSFEREES OF CIBC WORLD MARKETS, JPM/PUBLIC    :
EMP RET., SOLELY IN ITS CAPACITY AS CUSTODIAN,    :
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,    :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE    :
NAME OF JPM/PUBLIC EMP RET.,  WELLS FARGO BANK,    :
N.A., SOLELY IN ITS CAPACITY AS CUSTODIAN,    :
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,    :
WELLS FARGO INVESTMENT LLC, SOLELY IN ITS    :
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,    :

REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS  :
OF ACCOUNTS HELD IN THE NAME OF WELLS FARGO      :
BANK, N.A., BENEFICIAL HOLDERS OF ACCOUNTS       :
HELD IN THE NAME OF WELLS FARGO INVESTMENT       :
LLC, COMERICA BANK, TRANSFEREES OF COMERICA      :
BANK, SCOTTRADE, INC., TRANSFEREES OF            :
SCOTTRADE, INC., AG EDWARDS & SONS, SOLELY IN    :
ITS CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,       :
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS    :
OF ACCOUNTS HELD IN THE NAME OF AG EDWARDS &     :
SONS, JP MORGAN SEC INC WF, SOLELY IN ITS        :
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,           :
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS    :
OF ACCOUNTS HELD IN THE NAME OF JP MORGAN SEC    :
INC WF, U.S. TRUST COMPANY NA, TRANSFEREES OF    :
U.S. TRUST COMPANY NA, WACHOVIA BANK N.A.,       :
SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,    :
AGENT, REPRESENTATIVE OR NOMINEE, BENEFICIAL     :
HOLDERS OF ACCOUNTS HELD IN THE NAME OF          :
WACHOVIA BANK N.A., EDWARD D. JONES,             :
TRANSFEREES OF EDWARD D. JONES, SUMITOMO         :
TRUST &  BANKING, TRANSFEREES OF SUMITOMO        :
TRUST &  BANKING, SWISS AMERICAN SECURITIES,     :
TRANSFEREES OF SWISS AMERICAN SECURITIES,        :
ROBERT W. BAIRD & CO., TRANSFEREES OF ROBERT W.  :
BAIRD & CO., BGC INTERNATIONAL BROKER DEALER     :
CREDIT ACCOUNT, AMALGAMATED BANK,                :
AMALGAMATED BANK CRGO, TRANSFEREES OF            :
AMALGAMATED BANK, TRANSFEREES OF                 :
AMALGAMATED BANK CRGO, TD WATERHOUSE             :
CANADA, TRANSFEREES OF TD WATERHOUSE             :
CANADA, H&R BLOCK FINANCIAL ADVISORS,            :
TRANSFEREES OF H&R BLOCK FINANCIAL ADVISORS,     :
DOFT & CO., INC. FIRM ACCOUNT, ELISABETH H. DOFT, :
KDC MERGER ARBITRAGE MASTER, JMS LLC, SCOTIA     :
CAPITAL, TRANSFEREES OF SCOTIA CAPITAL,          :
LINSCO/PRIVATE CORP., TRANSFEREES OF             :
LINSCO/PRIVATE CORP., PENSON FIN SERV INC.,      :
TRANSFEREES OF PENSON FIN SERV INC., MUGC MTBJ   :
PT33, NATIONAL CITY BANK, TRANSFEREES OF         :
NATIONAL CITY BANK, CANTOR CLEARING SERVICES,    :
TRANSFEREES OF CANTOR CLEARING SERVICES,         :
JPM/PCS SHARED SVCS, SOLELY IN ITS CAPACITY AS   :
CUSTODIAN, TRUSTEE, AGENT, REPRESENTATIVE OR     :
NOMINEE, BENEFICIAL HOLDERS OF ACCOUNTS HELD     :
IN THE NAME OF JPM/PCS SHARED SVCS, MJR          :

PARTNERS, TRACK DATA CORPORATION, SOUTHWEST   :
SECURITIES, INC., TRANSFEREES OF SOUTHWEST   :
SECURITIES, INC., BEAR STEARNS & CO. F/A/O GABELLI   :
ASSOCIATES, MORGAN KEEGAN & CO., TRANSFEREES   :
OF MORGAN KEEGAN & CO., SUNTRUST BANK,   :
TRANSFEREES OF SUNTRUST BANK, THE FIFTH THIRD   :
BANK, TRANSFEREES OF THE FIFTH THIRD BANK, BEAR   :
STEARNS SECURITIES CORP. – FIRST NY SECURITIES /   :
BRITALLY CAPITAL, BMO NESBITT BURNS, BMO   :
NESBITT BURNS SA, TRANSFEREES OF BMO NESBITT   :
BURNS, TRANSFEREES OF BMO NESBITT BURNS SA,   :
BANK OF NOVA SCOTIA TAX, BANK OF NOVA SCOTIA   :
WMF/CDS, TRANSFEREES OF BANK OF BANK OF NOVA   :
SCOTIA TAX, TRANSFEREES OF BANK OF NOVA SCOTIA   :
WMF/CDS, BAR/CAP EQUITY FINAN, SOLELY IN ITS   :
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,   :
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS   :
OF ACCOUNTS HELD IN THE NAME OF BAR   :
CAP/EQUITY FINAN, MTBJ PT 13, JP MORGAN SEC INC   :
SL, SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,   :
AGENT, REPRESENTATIVE OR NOMINEE, BENEFICIAL   :
HOLDERS OF ACCOUNTS HELD IN THE NAME OF JP   :
MORGAN SEC INC SL, CROWELL WEEDON AND CO.   :
OMNIBUS ACCOUNT, CROWELL WEEDON & CO., STERN   :
AGEE & LEACH, TRANSFEREES OF STERN AGEE &   :
LEACH, WEDBUSH MORGAN SECURITIES,   :
TRANSFEREES OF WEDBUSH MORGAN SECURITIES,   :
BANK OF TOKYO – MITSUBISHI, TRANSFEREES OF   :
BANK OF TOKYO – MITSUBISHI, D.A. DAVIDSON & CO.,   :
TRANSFEREES OF D.A. DAVIDSON & CO., PRIMEVEST   :
FINANCIAL SERVICES, TRANSFEREES OF PRIMEVEST   :
FINANCIAL SERVICES, CHARLES SCHWAB & CO. INC.   :
REORGANIZATION, BELLSOUTH HEALTHCARE S&P 400,   :
OPTIONSXPRESS, INC., TRANSFEREES OF   :
OPTIONSXPRESS, INC., STIFEL NICOLAUS, AS   :
CUSTODIAN FOR JOHN J. SAUERACKER, KEYBANK   :
NATIONAL ASSOCIATION, TRANSFEREES OF KEYBANK   :
NATIONAL ASSOCIATION, STEPHENS INC.,   :
TRANSFEREES OF STEPHENS INC., DENIS P. KELLEHER,   :
RBC DOMINION SECURITIES, TRANSFEREES OF RBC   :
DOMINION SECURITIES, CDS CLEARING DEPOSIT,   :
TRANSFEREES OF CDS CLEARING DEPOSIT, ABBEY   :
NATIONAL SECURITIES, TRANSFEREES OF ABBEY   :
NATIONAL SECURITIES, CUSTODIAL TRUST COMPANY,   :
SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,   :
AGENT, REPRESENTATIVE OR NOMINEE, BENEFICIAL   :

HOLDERS OF ACCOUNTS HELD IN THE NAME OF          :
CUSTODIAL TRUST COMPANY, ALPINE ASSOCIATES,      :
REGIONS BANK, TRANSFEREES OF REGIONS BANK,       :
PULSE TRADING INC., AMERICAN ENTERPRISE          :
INVESTMENT SERVICES, TRANSFEREES OF AMERICAN     :
ENTERPRISE INVESTMENT SERVICES, MIZOHO TRUST &   :
BANKING CO., TRANSFEREES OF MIZOHO TRUST &        :
BANKING CO., UNION BANK OF CALIFORNIA NA,         :
TRANSFEREES OF UNION BANK OF CALIFORNIA NA,       :
TRUSTMARK NATIONAL BANK, TRANSFEREES OF          :
TRUSTMARK NATIONAL BANK, NBCN INC.,               :
TRANSFEREES OF NBCN INC., OP&F / INTECH, DAVID R. :
JOHNSEN AND AMALIA G. JOHNSEN (JT TEN WROS),     :
COMM. BANK OF KANSAS, TRANSFEREES OF COMM.        :
BANK OF KANSAS, OHIO CARPENTERS MIDCAP,           :
FTB/TEACHERS OF OHIO, SERS/SSGA PASS,             :
SACRAMENTO EMPLOYEES RETIREMENT SYSTEM           :
RUSSELL, TIMBER HILL LLC, TRANSFEREES OF TIMBER   :
HILL LLC, INTERNATIONAL BROKERAGE RETAIL          :
EQUITY, TRANSFEREES OF INTERNATIONAL             :
BROKERAGE RETAIL EQUITY, A&B DB – ANCHOR,         :
FOLIO (FN) INVESTMENTS, INC., TRANSFEREES OF      :
FOLIO (FN) INVESTMENTS, INC., IRA FBO, JANET F.   :
ROSS VFTC AS CUSTODIAN, RICKERT C. HENRIKSEN      :
AND ZHEYLA M. HENRIKSEN COMMUNITY PROPERTY,      :
KERMIT R. MEADE, FERRIS, BAKER WATTS,             :
TRANSFEREES OF FERRIS, BAKER WATTS, THE ANTI-     :
CRUELTY SOCIETY, ROOFER'S LOCAL 9 PENSION FUND    :
– HARRIS, WALTER E. HENDRICKS, BURL SWAFFORD     :
AND RUTH SWAFFORD JT TEN, CATO ENTERPRISES LLC    :
ARBITRAGE ACCOUNT, GULFSTREAM MARKETING          X
INC., VINCENT DE CICCO, AND JOHN DOES 1-500,

                              Defendants.
--------------------------------------------------------------------------

5

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your Answer or, if the Complaint is not served with this Summons, to serve a Notice of Appearance on the Plaintiff's undersigned attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after service is complete, if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The action will be heard in the Supreme Court of the State of New York in and for the County of New York. Pursuant to CPLR § 503, venue is proper in New York County because it is the county in which the plaintiff resides.

Dated: New York, New York
      October 22, 2010

                        EDWARD S. WEISFELNER,
                        AS TRUSTEE OF THE LB CREDITOR TRUST

                        By: __/s/ Sigmund S. Wissner-Gross_____
                            Sigmund S. Wissner-Gross
                            May Orenstein
                            BROWN RUDNICK LLP
                            Seven Times Square
                            New York, NY 10036
                            (212) 209-4800

                            -and-

                            Steven D. Pohl
                            BROWN RUDNICK LLP
                            One Financial Center
                            Boston, MA 02111
                            (617) 856-8200

                            *Counsel for Edward S. Weisfelner, as*
                            *Trustee of the LB Creditor Trust*

To:

AG Edwards & Sons, solely in its capacity as
Custodian, Trustee, Agent, Representative or Nominee
Attn: Wells Fargo,
c/o Corporation Service Company,
80 State Street
Albany, New York 12207

Abbey National Securities
400 Atlantic Street
Stamford, CT 06901

Amalgamated Bank
275 7th Avenue
New York, New York 10001

Alpine Associates
100 Union Avenue, Suite 7
Cresskill, NJ 07626

American Enterprise Investment Services
70400 AXP Financial Center
Minneapolis, Minnesota 55474

Amalgamated Bank CRGO
275 7th Avenue
New York, New York 10001

Bank of Nova Scotia Tax
1 Liberty Plaza #26
New York, New York 10006

Anti-Cruelty Society
157 West Grand Avenue
Chicago, Illinois 60610
Attn: Dan Overstreet

Bank of Tokyo - Mitsubishi
1251 Avenue of the Americas
New York, New York 10020

Transferees of Bank of Nova Scotia
WMF/CDS
1 Liberty Plaza #26
New York, New York 10006

Barclays Capital Inc., solely in its capacity as
Custodian, Trustee, Agent, Representative or
Nominee
200 Park Avenue
New York, New York 10166

Bear Stearns & Co. F/A/O Gabelli Associates
1 Metrotech Center
Brooklyn, New York 11201
Attn: Prime Broker Desk

Bear Stearns Securities Corp.
c/o JP Morgan
270 Park Avenue
New York, New York 10017

Transferees of Bear Stearns Securities Corp.
c/o JP Morgan
270 Park Avenue
New York, New York 10017

Bear Stearns Securities Corp. F/A/O FNY
SEC/HLW Group
1 Metrotech Center North
Brooklyn, NY 11201
Attn: Prime Broker Account

Bellsouth Healthcare S&P 400
Bank of New York Mellon
One Wall Street
New York, New York 10286

Beneficial Holders of Accounts Held in the
Name of AG Edwards & Sons
Attn: Wells Fargo,
c/o Corporation Service Company,
80 State Street
Albany, New York 12207

Beneficial Holders of Accounts Held in the
Name of Barclays Capital Inc.
200 Park Avenue
New York, New York 10166

Beneficial Holders of Accounts Held in the
Name of Credit Suisse Securities/IA
11 Madison Avenue
New York, New York 10010

Beneficial Holders of Accounts Held in the
Name of Deutsche Bank Securities
60 Wall Street
New York, New York 10005

Beneficial Holders of Accounts Held in the
Name of JP Morgan SEC Inc. SL
270 Park Avenue
New York, New York 10017

BGC International Broker Dealer
Credit Account
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

BMO Nesbitt Burns SA
c/o Michael G. Zeiss
c/o The Corporation
430 Park Avenue, 15th Floor
New York, New York 10022

Transferees of BMO Nesbitt Burns SA
c/o Michael G. Zeiss
c/o The Corporation
430 Park Avenue, 15th Floor
New York, New York 10022

Transferees of Abbey National Securities
400 Atlantic Street
Stamford, CT 06901

Bear Stearns Securities Corp. – First NY
Securities / Britally Capital
1 Metrotech Center
Brooklyn, New York 11201
Attn: Prime Broker Desk

Deutsche Bank Securities, solely in its
capacity as Custodian, Trustee, Agent,
Representative or Nominee
60 Wall Street
New York, New York 10005

First Clearing, LLC
c/o Corporation Service Company
80 State Street, Albany
New York 12207

Beneficial Holders of Accounts Held in the
Name of JP Morgan SEC Inc. WF
270 Park Avenue
New York, New York 10017

JPM Bnk/Corr CL Svcs, solely in its capacity
as Custodian, Trustee, Agent, Representative
or Nominee
270 Park Avenue
New York, New York 10017

Beneficial Holders of Accounts Held in the
Name of JPM/Public Emp Ret.
270 Park Avenue
New York, New York 10017

Keybank National Association
575 Fifth Avenue
New York, New York 10017

Beneficial Holders of Accounts Held in the
Name of Morgan Stanley & Co., Incorporated
1585 Broadway
New York, New York 10036

Transferees of Keybank National Association
575 Fifth Avenue
New York, New York 10017

Beneficial Holders of Accounts Held in the
Name of SG Americas SEC LLC
1221 Avenue of the Americas, 6th Floor
New York, New York 10020

Primevest Financial Services
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Beneficial Holders of Accounts Held in the
Name of Wells Fargo Investment LLC
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Sumitomo Trust & Banking
Sumitomo Mitsui Banking Corporation
277 Park Avenue
New York, New York 10172

BMO Nesbitt Burns
c/o Michael G. Zeiss
c/o The Corporation
430 Park Avenue, 15th Floor
New York, New York 10022.

Wedbush Morgan Securities
1212 Avenue of the Americas, #1901
New York, New York 10036

Burl Swafford and Ruth Swafford JT Ten
7110 Eudora Street
Dallas, Texas 75230

Brown Brothers Harriman
140 Broadway
New York, New York 10005

Cantor Clearing Services
Cantor Prime Services
110 East 59th Street
New York, New York 10022

Cato Enterprises LLC Arbitrage Account
#2 Woodland Drive
Cranbury, New Jersey 08512

CDS Clearing Deposit
85 Richmond Street West
Toronto, Ontario, M5H 2C9

Comm. Bank of Kansas

CIBC World Markets
425 Lexington Avenue
New York, New York 10017

Transferees of Comm. Bank of Kansas

Comerica Bank
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Credit Suisse Securities/IA, solely in its
capacity as Custodian, Trustee, Agent,
Representative or Nominee
11 Madison Avenue
New York, New York 10010

Credit Suisse Securities US, solely in its
capacity as Custodian, Trustee, Agent,
Representative or Nominee
11 Madison Avenue
New York, New York 10010

Beneficial Holders of Accounts Held in the
Name of Credit Suisse Securities US
11 Madison Avenue
New York, New York 10010

Crowell Weedon and Co. Omnibus Account
c/o National Registered Agents, Inc.
875 Avenue of the Americas S-501
New York, New York 10001

Custodial Trust Company, solely in its
capacity as Custodian, Trustee, Agent,
Representative or Nominee
101 Carnegie Center
Princeton, New Jersey 08540

D.A. Davidson & Co.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Beneficial Holders of Accounts Held in the
Name of Custodial Trust Company
101 Carnegie Center
Princeton, New Jersey 08540

David R. Johnsen and Amalia G. Johnsen
(JT TEN WROS)
1011 13th Street
Wilmette, Illinois 60091

Elisabeth H. Doft
Doft & Co. Inc.
55 E. 59th Street, Suite 12A
New York, New York 10022

Doft & Co., Inc. Firm Account
55 E. 59th Street,  Suite 12A
New York, New York 10022

A&B DB – Anchor

Edward D. Jones
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

JPM/PCS Shared Svcs, solely in its capacity as
Custodian, Trustee, Agent, Representative or
Nominee
270 Park Avenue
New York, New York 10017

Fiduciary – State Street Bank
1230 Avenue of the Americas, 18th-19th Floors,
New York, New York 10020

Transferees of Edward D. Jones
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Folio (FN) Investments, Inc.
8180 Greensboro Drive
8th Floor
McLean, Virginia 22102

H&R Block Financial Advisors
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Gulfstream Marketing Inc.
26 Bartow Point
Savannah, Georgia 34104

Swiss American Securities
12 East 49th Street
New York, New York 10017

Hee Young K. Choi Roth IRA
TD Ameritrade Clearing Custodian
3518 Glenlake Drive
Glenview, IL 60025

Beneficial Holders of Accounts Held in the
Name of JP Morgan Securities
270 Park Avenue
New York, New York 10017

International Brokerage Retail Equity

Beneficial Holders of Accounts Held in the
Name of JPM Bnk/Corr CL Svcs
270 Park Avenue
New York, New York 10017

JP Morgan SEC Inc. SL, solely in its capacity
as Custodian, Trustee, Agent, Representative
or Nominee
270 Park Avenue
New York, New York 10017

Ohio Carpenters Midcap
c/o State Street Bank
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111

JPM Chase Bank, N.A., solely in its capacity
as Custodian, Trustee, Agent, Representative
or Nominee
270 Park Avenue
New York, New York 10017

Denis P. Kelleher
c/o Wall Street Investment Services
17 Battery Place, 11th Floor
New York, New York 10004

JP Morgan SEC Inc. WF, solely in its capacity
as Custodian, Trustee, Agent, Representative
or Nominee
270 Park Avenue
New York, New York 10017

Morgan Keegan & Co.
535 Madison Avenue, 10th Floor
New York, New York 10022

JP Morgan Securities, solely in its capacity as
Custodian, Trustee, Agent, Representative or
Nominee
270 Park Avenue
New York, New York 10017

Beneficial Holders of Accounts Held in the
Name of JPM Chase Bank, N.A.
270 Park Avenue
New York, New York 10017

JPM/Public Emp Ret. , solely in its capacity as
Custodian, Trustee, Agent, Representative or
Nominee
270 Park Avenue
New York, New York 10017

Transferees of Morgan Keegan & Co.
535 Madison Avenue, 10th Floor
New York, New York 10022

KDC Merger Arbitrage Master
Kellner DiLeo & Company
900 Third Avenue, Suite 1000
New York, New York 10022

Mizoho Trust & Banking Co.
Mizuho Trust and Banking Co., Ltd,
1-2-1, Yaesu, Chuo-ku
Tokyo 103-8670
Japan

Kermit R. Meade
6 Pellington Court
Pine Brook, New Jersey 07058

Morgan Stanley / Retail, solely in its capacity
as Custodian, Trustee, Agent, Representative
or Nominee
1585 Broadway
New York, New York 10036

Linsco/Private Corp.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011
(Attn: LPL Financial)

Beneficial Holders of Accounts Held in the
Name of Morgan Stanley / Retail
1585 Broadway
New York, New York 10036

MJR Partners
55 East 59th Street, Room 12A
New York, New York 10022

MUGC MTBJ PT33
Mitsubishi UFJ Trust and
Banking Corporation (USA)
420 Fifth Avenue, 6th Floor
New York, New York 10018

Morgan Stanley & Co., Incorporated, solely in
its capacity as Custodian, Trustee, Agent,
Representative or Nominee
1585 Broadway
New York, New York 10036

Transferees of Northern Trust Company
65 East 55th Street
New York, New York 10022

MTBJ PT 13
Mitsubishi UFJ Trust and
Banking Corporation (USA)
420 Fifth Avenue, 6th Floor
New York, New York 10018

Transferees of NBCN INC.
250 Yonge Street, Suite 1900
Toronto, Ontario M5B 2L7
Canada

National City Bank
c/o PNC Bank
340 Madison Avenue
New York, New York 10017

Optionsxpress, Inc.
c/o Rong Nie
228 Park Avenue S #85556
New York, New York 10003

NBCN INC.
250 Yonge Street, Suite 1900
Toronto, Ontario M5B 2L7
Canada

RBC Dominion Securities
46579 Expedition Drive, Suite 200
Montréal, MD H3C 3A9
Canada

13

OP&F/Intech

Transferees of Primevest Financial Services
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

PNC Bank, N.A.
340 Madison Avenue
New York, New York 10017

Roofer's Local 9 Pension Fund - Harris
66 Connecticut Boulevard
East Hartford, Connecticut 06108

Pulse Trading Inc.
2 Liberty Square, 2nd Floor
Boston, MA 02109

Transferees of Scotia Capital
c/o Lawrence Jacob
One Liberty Plaza
165 Broadway
New York, New York 10006

Regions Bank
c/o Regions Financing Corporation
1900 Fifth Avenue North
Birmingham, Alabama 35203

SERS/SSGA PASS
c/o State Street Global Advisors
One Lincoln Street
State Street Financial Center
Boston, Massachusetts 02111

Robert W. Baird & Co.
c/o National Registered Agent, Inc.
875 Avenue of the Americas, Suite 501
New York, New York 10001

State Street Bank – Trust Custody
1230 Avenue of the Americas, 18th-19th
Floors, New York, New York 10020

Sacramento Employees Retirement
System Russell
980 9th Street, Suite 1800
Sacramento, California 95814

State Street Bank –SPDR's
1230 Avenue of the Americas, 18th-19th
Floors, New York, New York 10020

Scottrade, Inc.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

State Street Bank & Trust Co/IBT
1230 Avenue of the Americas, 18th-19th
Floors, New York, New York 10020

14

SG Americas SEC LLC, solely in its capacity
as Custodian, Trustee, Agent, Representative
or Nominee
1221 Avenue of the Americas, 6th Floor
New York, New York 10020

Transferees of State Street Bank –SPDR's
1230 Avenue of the Americas, 18th-19th
Floors, New York, New York 10020

State Street Bank & Trust
1230 Avenue of the Americas, 18th-19th Floors,
New York, New York 10020

Transferees of State Street Bank & Trust
Co/IBT
1230 Avenue of the Americas, 18th-19th
Floors, New York, New York 10020

State Street Bank -IBT/BGI
1230 Avenue of the Americas, 18th-19th Floors,
New York, New York 10020

Transferees of Stern Agee & Leach
2 Grand Central Tower
140 East 45th Street, 18th Floor
New York, New York 10017

Stephens Inc.
65 East 55th Street
New York, New York 10022

Transferees of Sumitomo Trust & Banking
Sumitomo Mitsui Banking Corporation
277 Park Avenue
New York, New York 10172

Stifel Nicolaus, as Custodian for John J.
Saueracker
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

TD Waterhouse Canada
c/o Corporation Service Company
80 State Street
New York, New York 12207

SunTrust Bank
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Vincent De Cicco
2821 NE 40th Street
Lighthouse Point, Florida 33064

The Fifth Third Bank
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Beneficial Holders of Accounts Held in the
Name of Wachovia Bank N.A.
Attn: Wells Fargo
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Timber Hill LLC
Timber Hill LLC / IBG LLC
8 Greenwich Office Park
Greenwich, Connecticut 06831

Wells Fargo Bank, NA, solely in its capacity
as Custodian, Trustee, Agent, Representative
or Nominee
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Transferees of Amalgamated Bank
275 7th Avenue
New York, New York 10001

JMS LLC
4715 13th Avenue
Brooklyn, New York 11219

Transferees of American Enterprise
Investment Services
70400 AXP Financial Center
Minneapolis, Minnesota 55474

Penson Fin Serv Inc.
546 Fifth Avenue
New York, New York 10036

Transferees of Bank of Nova Scotia Tax
1 Liberty Plaza #26
New York, New York 10006

Transferees of Amalgamated Bank CRGO
275 7th Avenue
New York, New York 10001

Transferees of Bank of Tokyo - Mitsubishi
1251 Avenue of the Americas
New York, New York 10020

Bank of Nova Scotia WMF/CDS
1 Liberty Plaza #26
New York, New York 10006

Transferees of BMO Nesbitt Burns
c/o Michael G. Zeiss
c/o The Corporation
430 Park Avenue, 15th Floor
New York, New York 10022.

Bar Cap/Equity Finan, solely in its capacity as
Custodian, Trustee, Agent, Representative or
Nominee
200 Park Avenue
New York, New York 10166

Transferees of BNP Paribas SEC Corp.
787 Seventh Avenue, The Equitable Tower
New York, New York 10019

Beneficial Holders of Accounts Held in the
Name of Bar Cap/Equity Finan
200 Park Avenue
New York, New York 10166

Transferees of Brown Brothers Harriman
140 Broadway
New York, New York 10005

BNP Paribas SEC Corp.
787 Seventh Avenue, The Equitable Tower
New York, New York 10019

Transferees of Calyon Securities (USA)
c/o Crédit Agricole CIB Building
1301 Avenue of the Americas
New York, New York 10019

Calyon Securities (USA)
c/o Crédit Agricole CIB Building
1301 Avenue of the Americas
New York, New York 10019

Transferees of CDS Clearing Deposit
85 Richmond Street West
Toronto, Ontario, M5H 2C9

Transferees of Cantor Clearing Services
Cantor Prime Services
110 East 59th Street
New York, New York 10022

Transferees of CIBC World Markets
425 Lexington Avenue
New York, New York 10017

Charles Schwab & Co. Inc. Reorganization
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Transferees of D.A. Davidson & Co.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Transferees of Comerica Bank
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Transferees of Ferris, Baker Watts
1700 Pennsylvania Avenue NW
Suite 700
Washington DC 20005

Crowell Weedon & Co.
c/o National Registered Agents, Inc.
875 Avenue of the Americas S-501
New York, New York 10001

Transferees of Fiduciary – State Street Bank
1230 Avenue of the Americas, 18th-19th Floors,
New York, New York 10020

Ferris, Baker Watts
1700 Pennsylvania Avenue NW
Suite 700
Washington DC 20005

Transferees of First Clearing, LLC
c/o Corporation Service Company
80 State Street
Albany, New York 12207

FTB/Teachers of Ohio

Transferees of Folio (FN) Investments, Inc.
8180 Greensboro Drive
8th Floor
McLean, Virginia 22102

Track Data Corporation
95 Rockwell Place
Brooklyn, New York 11217

Transferees of H&R Block Financial Advisors
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Transferees of The Fifth Third Bank
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Transferees of International Brokerage Retail
Equity

Beneficial Holders of Accounts Held in the
Name of JP Morgan Chase Bk/IA
270 Park Avenue
New York, New York 10017

Transferees of Linsco/Private Corp.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011
(Attn: LPL Financial)

Beneficial Holders of Accounts Held in the
Name of JPM/PCS Shared Svcs
270 Park Avenue
New York, New York 10017

Transferees of Mizoho Trust & Banking Co.
Mizuho Trust and Banking Co., Ltd,
1-2-1, Yaesu, Chuo-ku
Tokyo 103-8670
Japan

JP Morgan Chase Bk/IA, solely in its capacity
as Custodian, Trustee, Agent, Representative
or Nominee
270 Park Avenue
New York, New York 10017

Transferees of National City Bank
c/o PNC Bank
340 Madison Avenue
New York, New York 10017

Northern Trust Company
65 East 55th Street
New York, New York 10022

Transferees of National Financial Services
200 Liberty Street
New York, New York 10281

National Financial Services
200 Liberty Street
New York, New York 10281

Transferees of Optionsxpress, Inc.
c/o Rong Nie
228 Park Avenue S #85556
New York, New York 10003

Rickert C. Henriksen and Zheyla M.
Henriksen Community Property
3248 H Street
Sacramento, California 95816

Transferees of PNC Bank, N.A.
340 Madison Avenue
New York, New York 10017

Transferees of Regions Bank
c/o Regions Financing Corporation
1900 Fifth Avenue North
Birmingham, Alabama 35203

Transferees of RBC Dominion Securities
46579 Expedition Drive, Suite 200
Montréal, MD H3C 3A9
Canada

Scotia Capital
c/o Lawrence Jacob
One Liberty Plaza
165 Broadway
New York, New York 10006

Transferees of Robert W. Baird & Co.
c/o National Registered Agent, Inc.
875 Avenue of the Americas, Suite 501
New York, New York 10001

Transferees of Southwest Securities, Inc.
100 Broadway, 9th Floor
New York, New York 10005

Transferees of State Street Bank & Trust
1230 Avenue of the Americas, 18th-19[th] Floors,
New York, New York 10020

Southwest Securities, Inc.
100 Broadway, 9th Floor
New York, New York 10005

Transferees of State Street Bank -IBT/BGI
1230 Avenue of the Americas, 18th-19[th] Floors,
New York, New York 10020

Transferees of State Street Bank – Trust
Custody
1230 Avenue of the Americas, 18th-19[th]
Floors, New York, New York 10020

Transferees of Stephens Inc.
65 East 55th Street
New York, New York 10022

Transferees of SunTrust Bank
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Transferees of Swiss American Securities
12 East 49th Street
New York, New York 10017

Union Bank of California NA
400 California Street, 1st Floor
San Francisco, California 94104

Transferees of TD Waterhouse Canada
c/o Corporation Service Company
80 State Street
New York, New York 12207

Transferees of Trustmark National Bank
Trustmark Corporation
248 East Capitol Street
Jackson, Mississippi 39201

Transferees of Timber Hill LLC
Timber Hill LLC / IBG LLC
8 Greenwich Office Park
Greenwich, Connecticut 06831

Walter E. Hendricks
Shirley H. Cox POA
953 Sandswood Drive
Gastonia, North Carolina 28054

Transferees of Union Bank of California NA
400 California Street, 1st Floor
San Francisco, California 94104

Beneficial Holders of Accounts Held in the
Name of Wells Fargo Bank, NA
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Transferees of US Trust Company NA
767 Fifth Avenue
New York, New York 10022

TD Ameritrade Clear
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Transferres of Scottrade, Inc.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Transferees of Penson Fin Serv Inc.
546 Fifth Avenue
New York, New York 10036

Trustmark National Bank
Trustmark Corporation
248 East Capitol Street
Jackson, Mississippi 39201

Transferees of Wedbush Morgan Securities
1212 Avenue of the Americas, #1901
New York, New York 10036

US Trust Company NA
767 Fifth Avenue
New York, New York 10022

Stern Agee & Leach
2 Grand Central Tower
140 East 45th Street, 18th Floor
New York, New York 10017

Wachovia Bank N.A., solely in its capacity as
Custodian, Trustee, Agent, Rep. or Nominee
Attn: Wells Fargo
c/o Corporation Service Company
80 State Street
Albany, New York 12207

IRA FBO, Janet F. Ross VFTC as Custodian
220 Tower Lane
Penn Valley, Pennsylvania 19072

Transferees of TD Ameritrade Clear
c/o Corporation Service Company
80 State Street
Albany, New York 12207

Wells Fargo Investment LLC, solely in its
capacity as Custodian, Trustee, Agent,
Representative or Nominee
c/o Corporation Service Company
80 State Street
Albany, New York 12207

# 8274210

21

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------- X

EDWARD S. WEISFELNER, AS TRUSTEE OF THE LB            :
CREDITOR TRUST,                                        :
                                                       :
                              Plaintiff,               :
                                                       :
               -against-                               :        Index No.
                                                       :
MORGAN STANLEY & CO., INCORPORATED, SOLELY IN          :
ITS CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,             :
REPRESENTATIVE OR NOMINEE, MORGAN STANLEY /            :        **COMPLAINT**
RETAIL, SOLELY IN ITS CAPACITY AS CUSTODIAN,           :
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,             :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE             :
NAME OF MORGAN STANLEY & CO., INCORPORATED,            :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE             :
NAME OF MORGAN STANLEY / RETAIL, STATE STREET          :
BANK & TRUST, FIDUCIARY – STATE STREET BANK,           :
STATE STREET BANK – TRUST CUSTODY, STATE               :
STREET BANK - IBT/BGI, STATE STREET BANK – SPDR'S,     :
STATE STREET BANK & TRUST CO/IBT, TRANSFEREES          :
OF STATE STREET BANK & TRUST, TRANSFEREES OF           :
FIDUCIARY – STATE STREET BANK, TRANSFEREES OF          :
STATE STREET BANK – TRUST CUSTODY,                     :
TRANSFEREES OF STATE STREET BANK - IBT/BGI,            :
TRANSFEREES OF STATE STREET BANK – SPDR'S,             :
TRANSFEREES OF STATE STREET BANK & TRUST               :
CO/IBT, CREDIT SUISSE SECURITIES US, SOLELY IN ITS     :
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,                 :
REPRESENTATIVE OR NOMINEE, CREDIT SUISSE               :
SECURITIES/IA, SOLELY IN ITS CAPACITY AS               :
CUSTODIAN, TRUSTEE, AGENT, REPRESENTATIVE OR           :
NOMINEE, BENEFICIAL HOLDERS OF ACCOUNTS HELD           :
IN THE NAME OF CREDIT SUISSE SECURITIES US,            :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE             :
NAME OF CREDIT SUISSE SECURITIES/IA, BEAR STEARN       :
SECURITIES CORP, TRANSFEREES OF BEAR STEARN            :
SECURITIES CORP, DEUTSCHE BANK SECURITIES,             :
SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,          :
AGENT, REPRESENTATIVE OR NOMINEE,  BENEFICIAL          :
HOLDERS OF ACCOUNTS HELD IN THE NAME OF                :
DEUTSCHE BANK SECURITIES, INC., JPM CHASE BANK,        :

N.A., SOLELY IN ITS CAPACITY AS CUSTODIAN,                    :
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,                    :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE                    :
NAME OF JPM CHASE BANK, N.A., JP MORGAN                       :
SECURITIES, SOLELY IN ITS CAPACITY AS CUSTODIAN,              :
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,                    :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE                    :
NAME OF JP MORGAN SECURITIES, NATIONAL                        :
FINANCIAL SERVICES, TRANSFEREES OF NATIONAL                   :
FINANCIAL SERVICES, BROWN BROTHERS HARRIMAN,                  :
TRANSFEREES OF BROWN BROTHERS HARRIMAN,                       :
JPMORGAN CHASE BK/IA, SOLELY IN ITS CAPACITY AS               :
CUSTODIAN, TRUSTEE, AGENT, REPRESENTATIVE OR                  :
NOMINEE, BENEFICIAL HOLDERS OF ACCOUNTS HELD                  :
IN THE NAME OF JPMORGAN CHASE BK/IA, NORTHERN                 :
TRUST COMPANY, TRANSFEREES OF NORTHERN TRUST                  :
COMPANY, BNP PARIBAS SEC CORP, TRANSFEREES OF                 :
BNP PARIBAS SEC CORP, JPM BNK/CORR CL SVCS,                   :
SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,                 :
AGENT, REPRESENTATIVE OR NOMINEE, BENEFICIAL                  :
HOLDERS OF ACCOUNTS HELD IN THE NAME OF JPM                   :
BNK/CORR CL SVCS, PNC BANK, N.A., TRANSFEREES OF              :
PNC BANK, N.A., TD AMERITADE CLEAR, TRANSFEREES               :
OF TD AMERITRADE CLEAR, FIRST CLEARING, LLC,                  :
TRANSFEREES OF FIRST CLEARING, LLC, CALYON                    :
SECURITIES (USA), TRANSFEREES OF CALYON                       :
SECURITIES (USA), BARCLAYS CAPITAL INC., SOLELY               :
IN ITS CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,                 :
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS                 :
OF ACCOUNTS HELD IN THE NAME OF BARCLAYS                      :
CAPITAL INC., SG AMERICAS SEC LLC, SOLELY IN ITS              :
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,                        :
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS                 :
OF ACCOUNTS HELD IN THE NAME OF SG AMERICAS                   :
SEC LLC, BEAR STEARNS SECURITIES CORP. F/A/O FNY              :
SEC/HLW GROUP, CIBC WORLD MARKETS,                            :
TRANSFEREES OF CIBC WORLD MARKETS, JPM/PUBLIC                 :
EMP RET., SOLELY IN ITS CAPACITY AS CUSTODIAN,                :
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,                    :
BENEFICIAL HOLDERS OF ACCOUNTS HELD IN THE                    :
NAME OF JPM/PUBLIC EMP RET.,  WELLS FARGO BANK,               :
N.A., SOLELY IN ITS CAPACITY AS CUSTODIAN,                    :
TRUSTEE, AGENT, REPRESENTATIVE OR NOMINEE,                    :
WELLS FARGO INVESTMENT LLC, SOLELY IN ITS                     :
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,                        :
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS                 :

OF ACCOUNTS HELD IN THE NAME OF WELLS FARGO : 
BANK, N.A., BENEFICIAL HOLDERS OF ACCOUNTS : 
HELD IN THE NAME OF WELLS FARGO INVESTMENT : 
LLC, COMERICA BANK, TRANSFEREES OF COMERICA : 
BANK, SCOTTRADE, INC., TRANSFEREES OF : 
SCOTTRADE, INC., AG EDWARDS & SONS, SOLELY IN : 
ITS CAPACITY AS CUSTODIAN, TRUSTEE, AGENT, : 
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS : 
OF ACCOUNTS HELD IN THE NAME OF AG EDWARDS & : 
SONS, JP MORGAN SEC INC WF, SOLELY IN ITS : 
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT, : 
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS : 
OF ACCOUNTS HELD IN THE NAME OF JP MORGAN SEC : 
INC WF, U.S. TRUST COMPANY NA, TRANSFEREES OF : 
U.S. TRUST COMPANY NA, WACHOVIA BANK N.A., : 
SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE, : 
AGENT, REPRESENTATIVE OR NOMINEE, BENEFICIAL : 
HOLDERS OF ACCOUNTS HELD IN THE NAME OF : 
WACHOVIA BANK N.A., EDWARD D. JONES, : 
TRANSFEREES OF EDWARD D. JONES, SUMITOMO : 
TRUST &  BANKING, TRANSFEREES OF SUMITOMO : 
TRUST &  BANKING, SWISS AMERICAN SECURITIES, : 
TRANSFEREES OF SWISS AMERICAN SECURITIES, : 
ROBERT W. BAIRD & CO., TRANSFEREES OF ROBERT W. : 
BAIRD & CO., BGC INTERNATIONAL BROKER DEALER : 
CREDIT ACCOUNT, AMALGAMATED BANK, : 
AMALGAMATED BANK CRGO, TRANSFEREES OF : 
AMALGAMATED BANK, TRANSFEREES OF : 
AMALGAMATED BANK CRGO, TD WATERHOUSE : 
CANADA, TRANSFEREES OF TD WATERHOUSE : 
CANADA, H&R BLOCK FINANCIAL ADVISORS, : 
TRANSFEREES OF H&R BLOCK FINANCIAL ADVISORS, : 
DOFT & CO., INC. FIRM ACCOUNT, ELISABETH H. DOFT, : 
KDC MERGER ARBITRAGE MASTER, JMS LLC, SCOTIA : 
CAPITAL, TRANSFEREES OF SCOTIA CAPITAL, : 
LINSCO/PRIVATE CORP., TRANSFEREES OF : 
LINSCO/PRIVATE CORP., PENSON FIN SERV INC., : 
TRANSFEREES OF PENSON FIN SERV INC., MUGC MTBJ : 
PT33, NATIONAL CITY BANK, TRANSFEREES OF : 
NATIONAL CITY BANK, CANTOR CLEARING SERVICES, : 
TRANSFEREES OF CANTOR CLEARING SERVICES, : 
JPM/PCS SHARED SVCS, SOLELY IN ITS CAPACITY AS : 
CUSTODIAN, TRUSTEE, AGENT, REPRESENTATIVE OR : 
NOMINEE, BENEFICIAL HOLDERS OF ACCOUNTS HELD : 
IN THE NAME OF JPM/PCS SHARED SVCS, MJR : 
PARTNERS, TRACK DATA CORPORATION, SOUTHWEST :

SECURITIES, INC., TRANSFEREES OF SOUTHWEST           :
SECURITIES, INC., BEAR STEARNS & CO. F/A/O GABELLI   :
ASSOCIATES, MORGAN KEEGAN & CO., TRANSFEREES         :
OF MORGAN KEEGAN & CO., SUNTRUST BANK,               :
TRANSFEREES OF SUNTRUST BANK, THE FIFTH THIRD        :
BANK, TRANSFEREES OF THE FIFTH THIRD BANK, BEAR      :
STEARNS SECURITIES CORP. – FIRST NY SECURITIES /     :
BRITALLY CAPITAL, BMO NESBITT BURNS, BMO             :
NESBITT BURNS SA, TRANSFEREES OF BMO NESBITT         :
BURNS, TRANSFEREES OF BMO NESBITT BURNS SA,          :
BANK OF NOVA SCOTIA TAX, BANK OF NOVA SCOTIA         :
WMF/CDS, TRANSFEREES OF BANK OF BANK OF NOVA         :
SCOTIA TAX, TRANSFEREES OF BANK OF NOVA SCOTIA       :
WMF/CDS, BAR/CAP EQUITY FINAN, SOLELY IN ITS         :
CAPACITY AS CUSTODIAN, TRUSTEE, AGENT,               :
REPRESENTATIVE OR NOMINEE, BENEFICIAL HOLDERS        :
OF ACCOUNTS HELD IN THE NAME OF BAR                  :
CAP/EQUITY FINAN, MTBJ PT 13, JP MORGAN SEC INC      :
SL, SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,    :
AGENT, REPRESENTATIVE OR NOMINEE, BENEFICIAL         :
HOLDERS OF ACCOUNTS HELD IN THE NAME OF JP           :
MORGAN SEC INC SL, CROWELL WEEDON AND CO.            :
OMNIBUS ACCOUNT, CROWELL WEEDON & CO., STERN         :
AGEE & LEACH, TRANSFEREES OF STERN AGEE &            :
LEACH, WEDBUSH MORGAN SECURITIES,                    :
TRANSFEREES OF WEDBUSH MORGAN SECURITIES,            :
BANK OF TOKYO – MITSUBISHI, TRANSFEREES OF           :
BANK OF TOKYO – MITSUBISHI, D.A. DAVIDSON & CO.,     :
TRANSFEREES OF D.A. DAVIDSON & CO., PRIMEVEST        :
FINANCIAL SERVICES, TRANSFEREES OF PRIMEVEST         :
FINANCIAL SERVICES, CHARLES SCHWAB & CO. INC.        :
REORGANIZATION, BELLSOUTH HEALTHCARE S&P 400,        :
OPTIONSXPRESS, INC., TRANSFEREES OF                  :
OPTIONSXPRESS, INC., STIFEL NICOLAUS, AS             :
CUSTODIAN FOR JOHN J. SAUERACKER, KEYBANK            :
NATIONAL ASSOCIATION, TRANSFEREES OF KEYBANK         :
NATIONAL ASSOCIATION, STEPHENS INC.,                 :
TRANSFEREES OF STEPHENS INC., DENIS P. KELLEHER,     :
RBC DOMINION SECURITIES, TRANSFEREES OF RBC          :
DOMINION SECURITIES, CDS CLEARING DEPOSIT,           :
TRANSFEREES OF CDS CLEARING DEPOSIT, ABBEY           :
NATIONAL SECURITIES, TRANSFEREES OF ABBEY            :
NATIONAL SECURITIES, CUSTODIAL TRUST COMPANY,        :
SOLELY IN ITS CAPACITY AS CUSTODIAN, TRUSTEE,        :
AGENT, REPRESENTATIVE OR NOMINEE, BENEFICIAL         :
HOLDERS OF ACCOUNTS HELD IN THE NAME OF              :

CUSTODIAL TRUST COMPANY, ALPINE ASSOCIATES,                :
REGIONS BANK, TRANSFEREES OF REGIONS BANK,                 :
PULSE TRADING INC., AMERICAN ENTERPRISE                    :
INVESTMENT SERVICES, TRANSFEREES OF AMERICAN               :
ENTERPRISE INVESTMENT SERVICES, MIZOHO TRUST &             :
BANKING CO., TRANSFEREES OF MIZOHO TRUST &                 :
BANKING CO., UNION BANK OF CALIFORNIA NA,                  :
TRANSFEREES OF UNION BANK OF CALIFORNIA NA,                :
TRUSTMARK NATIONAL BANK, TRANSFEREES OF                    :
TRUSTMARK NATIONAL BANK, NBCN INC.,                        :
TRANSFEREES OF NBCN INC., OP&F / INTECH, DAVID R.          :
JOHNSEN AND AMALIA G. JOHNSEN (JT TEN WROS),               :
COMM. BANK OF KANSAS, TRANSFEREES OF COMM.                 :
BANK OF KANSAS, OHIO CARPENTERS MIDCAP,                    :
FTB/TEACHERS OF OHIO, SERS/SSGA PASS,                      :
SACRAMENTO EMPLOYEES RETIREMENT SYSTEM                     :
RUSSELL, TIMBER HILL LLC, TRANSFEREES OF TIMBER            :
HILL LLC, INTERNATIONAL BROKERAGE RETAIL                   :
EQUITY, TRANSFEREES OF INTERNATIONAL                       :
BROKERAGE RETAIL EQUITY, A&B DB – ANCHOR,                  :
FOLIO (FN) INVESTMENTS, INC., TRANSFEREES OF               :
FOLIO (FN) INVESTMENTS, INC., IRA FBO, JANET F.            :
ROSS VFTC AS CUSTODIAN, RICKERT C. HENRIKSEN               :
AND ZHEYLA M. HENRIKSEN COMMUNITY PROPERTY,                :
KERMIT R. MEADE, FERRIS, BAKER WATTS,                      :
TRANSFEREES OF FERRIS, BAKER WATTS, THE ANTI-              :
CRUELTY SOCIETY, ROOFER'S LOCAL 9 PENSION FUND             :
– HARRIS, WALTER E. HENDRICKS, BURL SWAFFORD               :
AND RUTH SWAFFORD JT TEN, CATO ENTERPRISES LLC  X
ARBITRAGE ACCOUNT, GULFSTREAM MARKETING
INC., VINCENT DE CICCO, AND JOHN DOES 1-500,

                              Defendants.
-------------------------------------------------------------------------

**TABLE OF CONTENTS**

COMPLAINT .......................................................................................................... 1

NATURE OF THE ACTION .................................................................................... 1

THE PARTIES, JURISDICTION AND VENUE ..................................................... 8

    I.      The Plaintiff ................................................................................... 8

    II.     The Shareholder Defendants ....................................................... 8

    III.    Jurisdiction and Venue................................................................. 48

    IV.    Non-Parties .................................................................................... 49

FACTUAL BACKGROUND ................................................................................... 52

    I.      Lyondell Shareholders Are Cashed Out in a Highly Leveraged
         Acquisition ................................................................................... 52

         A.     Lyondell – History and Background................................. 52

         B.     Blavatnik Seeks to Make a Major Petrochemicals Acquisition......... 55

         C.     Access Targets Lyondell for Acquisition ......................... 60

         D.     Blavatnik Acquires the Toe-Hold Position in Lyondell ..... 68

         E.     The Long Range Plan........................................................ 71

         F.     Smith Directs the Creation of .......................................... 74

         G.     Blavatnik Turns His Attention to Huntsman ................... 82

         H.     Blavatnik's Renewed Pursuit of Lyondell ....................... 83

    II.     The Merger Occurs Amid Signs of Deteriorating Economic and Industry
         Conditions ..................................................................................... 97

    III.    The Merger Closes ....................................................................... 118

         A.     Uses of the Proceeds of the Merger Financing ............... 120

    IV.    As A Result of the Merger, LyondellBasell Was Left with Unreasonably
         Small Capital ................................................................................ 122

         A.     Reasonableness of Projections......................................... 124

         B.     LyondellBasell's Highly Leveraged Capital Structure**Error! Bookmark not defined.**

         C.     Foreseeable Contingencies............................................... 128

    V.     LyondellBasell's Liquidity Failure Upon the Merger ................. 129

    VI.    Upon the Merger, LyondellBasell was Insolvent ....................... 136

    VII.   Upon the Merger, LyondellBasell Incurred Debts that Were Beyond its
         Ability to Repay........................................................................... 139

COUNT I – CONSTRUCTIVE FRAUDULENT TRANSFER ........................... 140

i

COUNT II – INTENTIONAL FRAUDULENT TRANSFER ............................................ 141

PRAYER FOR RELIEF ................................................................................................. 142

## COMPLAINT

Plaintiff, Edward S. Weisfelner, as Trustee for the LB Creditor Trust (the "LB Creditor Trust"), through his undersigned counsel, as and for his Complaint, alleges as follows:

## NATURE OF THE ACTION

1.     This action arises from the December 2007 acquisition, led by financier Leonard Blavatnik ("Blavatnik"), of Lyondell Chemical Company ("Lyondell"), formerly North America's third-largest independent, publicly-traded chemical company, by Blavatnik-controlled Basell AF S.C.A., a Luxembourg entity, thereafter renamed LyondellBasell Industries AF S.C.A. (prior to its acquisition of Lyondell, "Basell," and, thereafter, "LBI").  On July 16, 2007, the board of directors of Lyondell, headed by chairperson Dan F. Smith ("Smith"), authorized a cash out merger of Lyondell shareholders (the "Merger" or the "Transaction") pursuant to which Lyondell would be acquired by Basell.  In connection with the Merger, $12.5 billion was paid to Lyondell shareholders as merger consideration.  Every dollar that went to shareholders and every dollar used to pay the approximately $1 billion in transaction fees charged by affiliates, advisors, and professionals in connection with the Transaction, was funded with debt leveraged against the assets of Lyondell and its operating subsidiaries.  As a direct consequence of the Merger, LBI, Lyondell's corporate parent, LyondellBasell Finance Company ("LB Finance"), Lyondell, and many of the respective direct and indirect subsidiaries and affiliates of LBI and Lyondell, including all of Lyondell's major operating subsidiaries (collectively, "LyondellBasell") filed for bankruptcy. [1]

2.     In this action, Plaintiff, as Trustee, for and on behalf of the beneficiaries of LB Creditor Trust (the "Creditors"), seeks to have set aside and recovered as fraudulent transfers

---

[1] The bankruptcy cases were filed in the United States Bankruptcy Court for the Southern District of New York, Case No. 09-10023 (REG) on January 6, 2009 and April 24, 2009.

from the former Lyondell shareholders named hereinbelow (the "Shareholder Defendants") the approximately $5.9 billion paid to them pursuant to the Merger (the "Shareholder Transfers"), exclusive of any transfers made to the John Doe Defendants named hereinbelow.

3.      The Creditors consist of persons and entities and their respective successors and assigns who have unsatisfied claims against LyondellBasell for the payment of money (the "Creditor Claims") and who have transferred, assigned and delivered to the Trust all of their respective rights, title, and interests in and to claims, rights and causes of action arising under state law against certain persons including the Shareholder Defendants, that the Creditors had based on the receipt by such persons of consideration in connection with the Merger. The Creditor Claims are comprised of: unpaid trade claims against LyondellBasell; unpaid, unsecured funded debt claims against LyondellBasell; and unpaid, senior secured deficiency claims and unpaid, subordinated secured deficiency claims against LyondellBasell.

4.      The Shareholder Transfers may be recovered from the Shareholder Defendants for the benefit of the Creditors as fraudulent transfers because they were made with the actual intent to hinder, delay or defraud the Creditors. Additionally, the Shareholder Transfers may be recovered from the Shareholder Defendants as constructively fraudulent to the Creditors because (i) they were made without LyondellBasell receiving reasonably equivalent value or fair consideration in return (the Shareholder Defendants gave nothing in return for the Shareholder Transfers) and (ii) the $12.5 billion paid to shareholders pursuant to the Merger rendered LyondellBasell insolvent, with unreasonably small capital and was financed by the incurrence of secured debt that LyondellBasell reasonably should have believed it would be unable to pay as such debt came due.  Accordingly, pursuant to applicable law, the Shareholder Transfers may be

recovered to the extent that that Creditor Claims, remain unpaid. The amount of unpaid Creditor

Claims is no less than $12.5 billion.

5.    The $48 per share price paid to Lyondell shareholders pursuant to the Merger (the

"Merger Consideration") was a "blowout price" that resulted in a windfall to Lyondell

shareholders and management.  Prior to being put into play by Blavatnik, Lyondell's stock price

had languished for years, struggling to occasionally rise above $30 per share.  As a result of the

Merger, Smith walked away with over $100 million, most of it as a result of stock and options

issued to him pursuant to various management incentive plans.  Blavatnik, for his part, was

willing to pay this exorbitant price only because he had so little of his own money at stake.

Moreover, Blavatnik himself was a very major beneficiary of this "blowout price" since shortly

before Basell entered into an agreement to acquire Lyondell, Blavatnik had acquired, through a

Delaware entity, rights to nearly 10% of Lyondell's stock (the "Toe-Hold Position"), $1.2 billion

of the eventual $12.5 billion distribution to shareholders.  Upon the Merger, using the proceeds

of the acquisition financing with which he was saddling LyondellBasell, Blavatnik, through a

complex series of transfers netted a tax-free windfall profit in excess of $333 million.[2]

6.    Even before the Transaction, Lyondell was over-leveraged in view of the nature

of its business and its prospects.  Entirely foreseeably, it could not withstand the greater debt

burden imposed by the Transaction.  For numerous reasons, the extremely leveraged capital

structure that resulted from the Merger was both unreasonable and reckless for LyondellBasell.

First of all, both of LyondellBasell's major business segments, the manufacture of

petrochemicals and petroleum refining, are highly capital intensive.  The maintenance and

---

[2] The same Blavatnik-controlled entity used for this series of transactions, Nell Limited, organized under the laws of Gibraltar, also received a $100 million "one time" transaction advisory fee upon the Merger plus a $25 million "management" fee – all purportedly tax-free.  Thus, as a result of Basell's acquisition of Lyondell, Blavatnik was over $458 million ahead on day one.

3

operation of the enormous and enormously complex major assets of these industries, *i.e.*, the petroleum refineries and the "crackers" that break hydrocarbons into commercially useable petrochemicals, carry with them correspondingly enormous fixed costs.

7.       Complicating the capital demands imposed by high fixed costs is the extreme cyclicality of the petrochemical industry and the petroleum refining industry.  During the cycle "peaks," participants in these industries invest excess earnings in increasing capacity.  When, as inevitably occurs, industrial capacity exceeds demand, margins and profits are squeezed and the industry heads towards a "trough."  When industry overcapacity coincides with declining demand, as in a recessionary economic environment, the industry downturn will be deeper and last longer.  During a downturn, earnings and margins decline as manufacturers of what are essentially commodity products are forced to lower prices, sometimes to below break even, to maintain market share.  The combination of high fixed costs and extreme cyclicality means that companies in these industries, if they hope to survive a cycle downturn, must be adequately capitalized to enable continued operations through such a downturn.  LBI was not.  Its highly leveraged balance sheet and massive interest burdens left it unable to make it through the predicted industry cycle.

8.       LBI's highly leveraged capital structure also was reckless from the perspective of liquidity.  The working capital requirements of petrochemical producers and refining companies are subject to extreme changes due to the volatility of the market for crude oil and the other "feedstocks" that constitute the raw materials of the industry.  A single dollar upswing in the price of crude oil translates into the immediate need for millions of dollars of additional working capital.  A petrochemical producer must maintain a sufficient liquidity cushion to fund volatile cash needs and must do so even as margins are squeezed by declining demand.  Even in a

4

relatively robust environment, a petrochemicals producer whose capital structure and credit rating leave it unable to increase its short term borrowing to fund its working capital needs quickly may find itself out of money and out of luck.

9.      Finally, LBI's capital structure was particularly reckless in view of the timing of the Transaction. Long before the Merger, all leading industry analysts were forecasting that, due to worldwide overcapacity, the ongoing petrochemical cycle peak of circa 2004-2007 and the high margins contemporaneously being attained by petroleum refiners would end sometime in 2008 or 2009 and that these industries would then experience a supply driven downturn. Any divergence of opinion on the coming downturn was only with regard to exactly when the peaks in refining and petrochemicals would end, how long the downturn would last, and how deep the troughs would be. As explained herein, Lyondell and its operating subsidiaries, as well as Basell (and its subsidiaries), due to a variety of factors, were particularly disadvantaged, as compared with their competitors, to withstand the stress of a downturn. Moreover, in the months before the closing, disturbances in the credit markets and other indicators of economic instability indicated the strong possibility, if not the likelihood, of an economic recession that would exacerbate the impact of oversupply on the affected industries. Ignoring all reason, the highly leveraged capital structure created pursuant to the Merger was imposed on LBI even as all indicators showed that both of its industry segments were past the peak and were heading into the downturn.

10.     As had been entirely foreseeable at the time of the Merger and, indeed, while the Transaction was being negotiated, LBI was insufficiently capitalized to continue operations through a downturn and had insufficient liquidity to manage its volatile operating expenses. Exacerbating its already precarious condition, before the Merger, Basell, without securing additional financing, committed to the acquisition of approximately $1 billion in additional

5

refining assets, most of which had to be paid for shortly after the closing of the Merger.  Within weeks of the closing of the Merger, it was clear that LBI would be unable to meet its operating expenses and commitments from existing resources and would shortly be in a full-blown liquidity crisis.  To avoid a complete collapse, Blavatnik made emergency funding available from his entity, Access Industries Holdings LLC ("Access Industries" or "Access"), labeling it a credit facility (the "Access Revolver").  Meanwhile, LBI itself negotiated to "upsize" its third party credit facilities with reluctant lenders who took the opportunity to extract further substantial fees.  However, even these reckless and desperate measures were not enough.  By November 2008, less than a year after the Merger was consummated, LBI collapsed under the weight of the debt foisted upon it by the Merger.  Due to its overleveraged balance sheet and financial impairment, LBI was unable to fund its operations, or pay its creditors when due, and had no access to further borrowings.  Blavatnik, having made sure that amounts drawn under the Access Revolver in October 2008 had been repaid (thereby cutting his own losses), decided not to come to the aid of ailing LBI, and blocked any further funding from the Access Revolver.  Less than a year after the Transaction, LBI was planning for a bankruptcy filing and negotiating for bankruptcy financing with its existing lenders.

11.    The investment banks that initially committed to provide the approximately $22 billion used to fund the acquisition did so with the expectation that, after being paid approximately $260 million in transaction fees (in addition to other substantial fees), they could, in accordance with the then prevailing practice, quickly syndicate virtually all of the "junk" obligations being incurred and unload them off their own books.  This deal, however, turned out to be different.  Approximately two months after having signed loan commitments, the investment banks learned that Lyondell was materially missing its financial projections for 2007,

6

and it became clear that the loan syndication effort was in trouble.  By mid-September 2007, the rosy projections of Lyondell and Basell earnings that had been reverse engineered to attempt to sell the loans already looked like a pipe dream.  The financing package was drastically re-priced, restructured, and re-sized in an effort to spruce it up for the syndication market.  Notwithstanding these efforts and contrary to the plans of their internal credit committees, at the closing of the Merger, the banks who had originated the loans and undertaken to act as lead arrangers for their syndication were left holding most of the "junk."  And while the re-pricing and restructuring of the financing package did not avail the arranging banks in their syndication efforts, it substantially increased the leverage and therefore the risk associated with the Transaction.

12.    Obligors on the debt incurred to finance Lyondell's acquisition included Lyondell, its operating subsidiaries, LBI, and certain LBI affiliates.  Obligations to repay the acquisition financing were secured by, *inter alia*, first and second liens on substantially all of the assets of the obligors in favor of the lenders providing the Merger Financing (as hereinafter defined).  Although the obligor entities became liable for the repayment of the Merger Financing, to the extent that the proceeds were paid to Lyondell shareholders or used to refinance the debt of affiliates, these entities did not receive any substantive value (let alone reasonably equivalent value) in consideration for the obligations incurred.  Nor, to such extent, did these obligors receive value for the liens that they granted to secure the repayment of these obligations.

13.    The LB Creditor Trust hereby seeks relief pursuant to applicable state fraudulent transfer law from the fraudulent transfers of LyondellBasell's assets and property to the Shareholder Defendants that occurred upon the Merger which transfers were made with the intent to hinder, delay or defraud creditors and/or were made without receiving reasonably

equivalent value or fair consideration in exchange and resulted in LBI being rendered insolvent,

left with unreasonably small capital, and unable to pay its debts when they became due.

**THE PARTIES, JURISDICTION AND VENUE**

### I.    The Plaintiff

14.    Plaintiff Edward S. Weisfelner, Trustee for the LB Creditor Trust, is a resident of

New York County and has been designated to, among other things, prosecute and resolve claims

against the former Lyondell shareholders pursuant to the Plan[3] on behalf of the LB Creditor

Trust.

### II.    The Shareholder Defendants[4]

15.    Defendants Morgan Stanley & Co., Incorporated and Morgan Stanley / Retail

("Morgan Stanley") were, at the time of the Merger, registered holders of Lyondell shares.

Morgan Stanley  is a corporate entity, that has its head office and conducts business at 1585

Broadway, New York, New York 10036. Morgan Stanley is named herein solely in its capacity

as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of

Lyondell shares.   At the time of the Merger, Morgan Stanley held, in several accounts,

respectively, in such capacity, 14,169,455 shares and 1,597,064 shares of Lyondell stock and, as

a result, received, upon information and belief, $756,792,912.00 of Merger Consideration in

total.

16.    Defendants "Beneficial Holders of Accounts Held in the Name of Morgan

Stanley" are any persons or entities having a beneficial interest in the Lyondell shares through

---

[3] Third Amended Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors, confirmed on April 23, 2010.
[4] The defendants named herein do not include any person or entity who is a Financing Party Defendant Releasee or Secured Lender Releasee, but solely as those terms are defined in and only for purposes of the "Amended and Restated Settlement Agreement Relating to Committee Litigation (*Official Committee of Unsecured Creditors v. Citibank, N.A., et al.*) (Adv. Pro. No. 09-1375) (REG) (Bankr. S.D.N.Y.)," dated March 10, 2010.

8

accounts at Morgan Stanley who may have received merger consideration through Morgan Stanley and on whose behalf Morgan Stanley was acting as custodian, trustee, agent, representative, or nominee.

17.     Defendants State Street Bank & Trust, Fiduciary – State Street Bank, State Street Bank – Trust Custody, State Street Bank - IBT/BGI, State Street Bank – SPDR's, State Street Bank & Trust Co/IBT ("State Street") were, at the time of the Merger, registered holders of Lyondell shares.   State Street has an office and conducts business at 1230 Avenue of the Americas, 18th-19th Floors, New York, New York 10020.  At the time of the Merger, State Street held in several accounts, respectively, 14,912,721 shares, 89,460 shares, 183,087 shares, 7,883,158 shares, 26,269 shares and 244,159 shares of Lyondell stock and, as a result, received, upon information and belief, $1,120,264,992.00 of Merger Consideration in total.

18.     Defendants "Transferees of State Street" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at State Street who may have received merger consideration through State Street and on whose behalf State Street  was acting as trustee, agent, representative, or nominee.

19.     Defendants Credit Suisse Securities US and Credit Suisse Securities/IA ("Credit Suisse") were, at the time of the Merger, registered holders of Lyondell shares.  Credit Suisse is a corporate entity, having its head office at 11 Madison Avenue, New York, New York 10010.  Credit Suisse is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, Credit Suisse held, in several accounts, respectively, in such capacity, 8,241,487 shares and 2,585,000 shares of Lyondell stock and, as a result, received, upon information and belief, $519,671,376.00 of Merger Consideration in total.

20.     Defendants "Beneficial Holders of Accounts Held in the Name of Credit Suisse" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Credit Suisse who may have received merger consideration through Credit Suisse and on whose behalf Credit Suisse was acting as custodian, trustee, agent, representative, or nominee.

21.     Defendant Bear Stearn Securities Corp ("Bear Stearn") was, at the time of the Merger, a registered holder of Lyondell shares.  Bear Stearn has an office and conducts business at JP Morgan, 270 Park Avenue, New York, New York 10017.  Bear Stearn is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, Credit Suisse held in such capacity, 9,609,438 shares of Lyondell stock and, as a result, received, upon information and belief, $461,253,024.00 of Merger Consideration in total.

22.     Defendants "Transferees of Bear Stearn" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Bear Stearn who may have received merger consideration through Bear Stearn and on whose behalf Bear Stearn was acting as trustee, agent, representative, or nominee.

23.     Defendant Deutsche Bank Securities ("Deutsche Bank") was, at the time of the Merger, a registered holder of Lyondell shares.  Deutsche Bank  is a corporate entity, that has its head office and conducts business at 60 Wall Street, New York, New York 10005. Deutsche Bank is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, Deutsche Bank held, in such capacity, 9,321,761 Lyondell shares and, as a result, received, upon information and belief, $447,444,528.00 of Merger Consideration.

24.     Defendants "Beneficial Holders of Accounts Held in the Name of Deutsche Bank" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Deutsche Bank who may have received merger consideration through Deutsche Bank and on whose behalf Deutsche Bank was acting as custodian, trustee, agent, representative, or nominee.

25.     Defendant JPM Chase Bank, N.A. ("JPM") was, at the time of the Merger, a registered holder of Lyondell shares.  JPM is a corporate entity, that has its head office and conducts business at 270 Park Avenue, New York, New York 10017.  JPM is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, JPM held, in such capacity, 7,730,872 Lyondell shares and, as a result, received, upon information and belief, $371,081,856.00 of Merger Consideration.

26.     Defendants "Beneficial Holders of Accounts Held in the Name of JPM" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at JPM who may have received merger consideration through JPM and on whose behalf JPM was acting as custodian, trustee, agent, representative, or nominee.

27.     Defendant JP Morgan Securities ("JPMS") was, at the time of the Merger, a registered holder of Lyondell shares.  JPMS is a corporate entity, that has its head office and conducts business at 270 Park Avenue, New York, New York 10017.  JPMS is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, JPMS held, in such capacity, 7,239,938 Lyondell shares and, as a result, received, upon information and belief, $347,517,024.00 of Merger Consideration.

11

28.     Defendants "Beneficial Holders of Accounts Held in the Name of JPMS" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at JPMS who may have received merger consideration through JPMS and on whose behalf JPMS was acting as custodian, trustee, agent, representative, or nominee.

29.     Defendant National Financial Services ("NFS") was, at the time of the Merger, a registered holder of Lyondell shares.  NFS is a corporate entity, that has its head office and conducts business at 200 Liberty Street, New York, New York 10281.  At the time of the Merger, NFS held 6,663,320 Lyondell shares and, as a result, received, upon information and belief, $319,839,360.00 of Merger Consideration.

30.     Defendants "Transferees of NFS" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at NFS who may have received merger consideration through NFS and on whose behalf NFS was acting as trustee, agent, representative, or nominee.

31.     Defendant Brown Brothers Harriman ("Brown Brothers") was, at the time of the Merger, a registered holder of Lyondell shares.  Upon information and belief, Brown Brothers  is a corporate entity, that has its head office and conducts business at 140 Broadway, New York, New York 10005.  At the time of the Merger, Brown Brothers held 5,477,950 Lyondell shares and, as a result, received, upon information and belief, $262,941,600.00 of Merger Consideration.

32.     Defendants "Transferees of Brown Brothers" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Brown Brothers who may have received merger consideration through Brown Brothers and on whose behalf Brown Brothers was acting as trustee, agent, representative, or nominee.

33.     Defendant JP Morgan Chase BK/IA was, at the time of the Merger, a registered holder of Lyondell shares.  JP Morgan Chase BK/IA is a corporate entity, that has its head office and conducts business at 270 Park Avenue, New York, New York 10017.  JP Morgan Chase BK/IA is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, JP Morgan Chase BK/IA held, in such capacity, 5,279,469 Lyondell shares and, as a result, received, upon information and belief, $253,414,512.00 of Merger Consideration.

34.     Defendants "Beneficial Holders of Accounts Held in the Name of JP Morgan Chase BK/IA" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at JP Morgan Chase BK/IA who may have received merger consideration through JP Morgan Chase BK/IA and on whose behalf JP Morgan Chase BK/IA was acting as custodian, trustee, agent, representative, or nominee.

35.     Defendant Northern Trust Company ("Northern Trust") was, at the time of the Merger, a registered holder of Lyondell shares.  Northern Trust  is located at 65 East 55th Street, New York, New York 10022. At the time of the Merger, Northern Trust held 4,761,854 Lyondell shares and, as a result, received, upon information and belief, $228,568,992.00 of Merger Consideration.

36.     Defendants "Transferees of Northern Trust" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Northern Trust who may have received merger consideration through Northern Trust  and on whose behalf Northern Trust  was acting as trustee, agent, representative, or nominee.

37.     Defendant BNP Paribas Sec Corp ("BNP") was, at the time of the Merger, a registered holder of Lyondell shares.  BNP has an office and conducts business at 787 Seventh

Avenue, The Equitable Tower, New York, New York 10019. At the time of the Merger, BNP

held 2,964,491 shares of Lyondell stock and, as a result, received, upon information and belief,

$142,295,568.00 of Merger Consideration in total.

38.    Defendants "Transferees of BNP" are any persons or entities having a beneficial

interest in the Lyondell shares through accounts at BNP who may have received merger

consideration through BNP and on whose behalf BNP was acting as trustee, agent,

representative, or nominee.

39.    Defendant JPM BNK/CORR CL SVCS was, at the time of the Merger, a

registered holder of Lyondell shares. JPM BNK/CORR CL SVCS is a corporate entity, that has

its head office and conducts business at 270 Park Avenue, New York, New York 10017. JPM

BNK/CORR CL SVCS is named herein solely in its capacity as custodian, trustee, agent,

representative or nominee on behalf of beneficial holders of Lyondell shares. At the time of the

Merger, JPM BNK/CORR CL SVCS held, in such capacity, 2,352,265 Lyondell shares and, as a

result, received, upon information and belief, $112,908,720.00 of Merger Consideration.

40.    Defendants "Beneficial Holders of Accounts Held in the Name of JPM

BNK/CORR CL SVCS" are any persons or entities having a beneficial interest in the Lyondell

shares through accounts at JPM BNK/CORR CL SVCS who may have received merger

consideration through JPM BNK/CORR CL SVCS and on whose behalf JPM BNK/CORR CL

SVCS was acting as custodian, trustee, agent, representative, or nominee.

41.    Defendant PNC Bank, N.A. ("PNC") was, at the time of the Merger, a registered

holder of Lyondell shares. PNC has an office and conducts business at 340 Madison Avenue,

New York, New York 10017. At the time of the Merger, PNC held 1,880,016 Lyondell

14

shares and, as a result, received, upon information and belief, $90,240,768.00 of Merger Consideration.

42.    Defendants "Transferees of PNC" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at PNC who may have received merger consideration through PNC and on whose behalf PNC was acting as trustee, agent, representative, or nominee.

43.    Defendant TD Ameritrade Clear ("Ameritrade") was, at the time of the Merger, a registered holder of Lyondell shares.  Ameritrade is a corporate entity, having its head office at 4211 South 102nd Street, Omaha, Nebraska 68127. Ameritrade has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York 12207. Ameritrade is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.   At the time of the Merger, Ameritrade held, in such capacity, 1,286,696 Lyondell shares and, as a result, received, upon information and belief, $61,761,408.00 of Merger Consideration.

44.    Defendants "Transferees of Ameritrade" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Ameritrade who may have received merger consideration through Ameritrade and on whose behalf Ameritrade was acting as trustee, agent, representative, or nominee.

45.    Defendant First Clearing, LLC ("First Clearing") was, at the time of the Merger, a registered holder of Lyondell shares.  First Clearing  is a corporate entity, having its head office at One North Jefferson Avenue, St. Louis, Missouri 63103.  First Clearing has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York

12207. At the time of the Merger, First Clearing  held 874,390 Lyondell shares and, as a result, received, upon information and belief, $41,970,720.00 of Merger Consideration.

46.     Defendants "Transferees of First Clearing" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at First Clearing who may have received merger consideration through First Clearing and on whose behalf First Clearing was acting as trustee, agent, representative, or nominee.

47.     Defendant Calyon Securities (USA) ("Calyon") was, at the time of the Merger, a registered holder of Lyondell shares.  Calyon has an office and conducts business at c/o Crédit Agricole CIB Building, 1301 Avenue of the Americas, New York, New York 10019.  At the time of the Merger, Calyon held 558,000 Lyondell shares and, as a result, received, upon information and belief, $26,784,000.00 of Merger Consideration.

48.     Defendants "Transferees of Calyon" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Calyon who may have received merger consideration through Calyon and on whose behalf Calyon was acting as trustee, agent, representative, or nominee.

49.     Defendant Barclays Capital Inc. ("Barclays") was, at the time of the Merger, a registered holder of Lyondell shares.  Barclays has an office and conducts business at 200 Park Avenue, New York, New York 10166.  Barclays is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, Barclays held, in such capacity, 529,289 Lyondell shares and, as a result, received, upon information and belief, $25,405,872.00 of Merger Consideration.

50.     Defendants "Beneficial Holders of Accounts Held in the Name of Barclays" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at

Barclays who may have received merger consideration through Barclays and on whose behalf Barclays was acting as custodian, trustee, agent, representative, or nominee.

51.     Defendant SG Americas Sec LLC ("SG Americas") was, at the time of the Merger, a registered holder of Lyondell shares.  SG has an office and conducts business at 1221 Avenue of the Americas, 6th Floor, New York, New York 10020.  SG Americas is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, SG Americas held, in such capacity, 523,486 Lyondell shares and, as a result, received, upon information and belief, $25,127,328.00 of Merger Consideration.

52.     Defendants "Beneficial Holders of Accounts Held in the Name of SG Americas" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at SG Americas who may have received merger consideration through SG Americas and on whose behalf SG Americas was acting as custodian, trustee, agent, representative, or nominee.

53.     Defendant Bear Stearns Securities Corp. F/A/O FNY SEC/HLW Group ("Bear Stearns – HLW Group") was, at the time of the Merger, a registered holder of Lyondell shares. Bear Stearns – HLW Group conducts business at 1 Metrotech Center North, Brooklyn, New York 11201 (Attn: Prime Broker Account).  At the time of the Merger, Bear Stearns – HLW Group held 732,400 Lyondell shares and, as a result, received, upon information and belief, $35,155,200.00 of Merger Consideration.

54.     Defendant CIBC World Markets ("CIBC") was, at the time of the Merger, a registered holder of Lyondell shares.  CIBC conducts business at 425 Lexington Avenue, New York, New York 10017.  At the time of the Merger, CIBC held 598,903 Lyondell shares and, as a result, received, upon information and belief, $28,747,344.00 of Merger Consideration.

55.    Defendant "Transferees of CIBC" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at CIBC who may have received merger consideration through CIBC and on whose behalf CIBC was acting as trustee, agent, representative, or nominee.

56.    Defendant JPM/Public Emp Ret. was, at the time of the Merger, a registered holder of Lyondell shares.  JPM/Public Emp Ret. is a corporate entity, that has its head office and conducts business at 270 Park Avenue, New York, New York 10017.  JPM/Public Emp Ret. is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, JPM/Public Emp Ret. held, in such capacity, 335,923 Lyondell shares and, as a result, received, upon information and belief, $16,124,304.00 of Merger Consideration.

57.    Defendants "Beneficial Holders of Accounts Held in the Name of JPM/Public Emp Ret." are any persons or entities having a beneficial interest in the Lyondell shares through accounts at JPM/Public Emp Ret. who may have received merger consideration through JPM/Public Emp Ret. and on whose behalf JPM/Public Emp Ret. was acting as custodian, trustee, agent, representative, or nominee.

58.    Defendants Wells Fargo Bank, N.A. and Wells Fargo Investment LLC ("Wells Fargo") were, at the time of the Merger, registered holders of Lyondell shares.  Wells Fargo  is a corporate entity, having its head office at 420 Montgomery Street, San Francisco, California 94163.   Wells Fargo is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  Wells has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York 12207. At the time of the Merger, Wells Fargo held, in several accounts, respectively,

18

in such capacity, 260,005 shares and 63,776 shares of Lyondell stock and, as a result, received,

upon information and belief, $15,541,488.00 of Merger Consideration in total.

59.     Defendants "Beneficial Holders of Accounts Held in the Name of Wells Fargo"

are any persons or entities having a beneficial interest in the Lyondell shares through accounts at

Wells Fargo  who may have received merger consideration through Wells Fargo  and on whose

behalf Wells Fargo  was acting as custodian, trustee, agent, representative, or nominee.

60.     Defendant Comerica Bank ("Comerica") was, at the time of the Merger, a

registered holder of Lyondell shares.  Comerica is located at Comerica Corporate Headquarters,

Comerica Bank Tower, 1717 Main Street, Dallas, Texas 75201.  Comerica has a New York

agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New

York 10011.  At the time of the Merger, Comerica held 312,407 Lyondell shares and, as a result,

received, upon information and belief, $14,995,536.00 of Merger Consideration.

61.     Defendants "Transferees of Comerica" are any persons or entities having a

beneficial interest in the Lyondell shares through accounts at Comerica who may have received

merger consideration through Comerica and on whose behalf Comerica was acting as trustee,

agent, representative, or nominee.

62.     Defendant Scottrade, Inc. ("Scottrade") was, at the time of the Merger, a

registered holder of Lyondell shares.  Scottrade is located at 12800 Corporate Hill Drive, #250,

St. Louis, Missouri 63131.  Scottrade has a New York agent for service of process c/o CT

Corporation System, 111 Eighth Avenue, New York, New York 10011. At the time of the

Merger, Scottrade held 304,914 Lyondell shares and, as a result, received, upon information and

belief, $14,635,872.00 of Merger Consideration.

63.     Defendants "Transferees of Scottrade" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Scottrade who may have received merger consideration through Scottrade and on whose behalf Scottrade was acting as trustee, agent, representative, or nominee.

64.     Defendant AG Edwards & Sons ("AG Edwards") was, at the time of the Merger, a registered holder of Lyondell shares.  AG Edwards is located at c/o Wells Fargo & Company, 420 Montgomery Street, San Francisco, California 94163. AG Edwards has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York 12207. AG Edwards is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, AG Edwards held, in such capacity,  283,871 Lyondell shares and, as a result, received, upon information and belief, $13,625,808.00 of Merger Consideration.

65.     Defendants "Beneficial Holders of Accounts Held in the Name of AG Edwards" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at AG Edwards who may have received merger consideration through AG Edwards and on whose behalf AG Edwards was acting as custodian, trustee, agent, representative, or nominee.

66.     Defendant JP Morgan Sec Inc WF was, at the time of the Merger, a registered holder of Lyondell shares.  JP Morgan Sec Inc WF is a corporate entity, that has its head office and conducts business at 270 Park Avenue, New York, New York 10017.  JP Morgan Sec Inc WF is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, JP Morgan Sec Inc WF held, in such capacity, 254,950 Lyondell shares and, as a result, received, upon information and belief, $12,237,600.00 of Merger Consideration.

67.     Defendants "Beneficial Holders of Accounts Held in the Name of JP Morgan Sec Inc WF" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at JP Morgan Sec Inc WF who may have received merger consideration through JP Morgan Sec Inc WF and on whose behalf JP Morgan Sec Inc WF was acting as custodian, trustee, agent, representative, or nominee.

68.     Defendant U.S. Trust Company NA ("US Trust") was, at the time of the Merger, a registered holder of Lyondell shares.  US Trust has an office and conducts business at 767 Fifth Avenue, New York, New York 10022.  At the time of the Merger, US Trust held 189,760 Lyondell shares and, as a result, received, upon information and belief, $9,108,480.00 of Merger Consideration.

69.     Defendants "Transferees of U.S. Trust" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at US Trust who may have received merger consideration through US Trust  and on whose behalf US Trust was acting as trustee, agent, representative, or nominee.

70.     Defendant Wachovia Bank N.A. ("Wachovia") was, at the time of the Merger, a registered holder of Lyondell shares.  Wachovia is located at c/o Wells Fargo & Co., 420 Montgomery Street, San Francisco, California 94163.  Wachovia has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York 12207. Wachovia is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, Wachovia held, in such capacity, 148,871 Lyondell shares and, as a result, received, upon information and belief, $7,145,808.00 of Merger Consideration.

71.     Defendants "Beneficial Holders of Accounts Held in the Name of Wachovia" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Wachovia who may have received merger consideration through Wachovia and on whose behalf Wachovia was acting as custodian, trustee, agent, representative, or nominee.

72.     Defendant Edward D. Jones ("Jones") was, at the time of the Merger, a registered holder of Lyondell shares.  Jones is located at Edward Jones, 12555 Manchester Road, Saint Louis, Missouri 63131. Jones has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011. At the time of the Merger, Jones held 146,217 Lyondell shares and, as a result, received, upon information and belief, $7,018,416.00 of Merger Consideration.

73.     Defendants "Transferees of Jones" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Jones who may have received merger consideration through Jones and on whose behalf Jones was acting as trustee, agent, representative, or nominee.

74.     Defendant Sumitomo Trust &  Banking ("Sumitomo") was, at the time of the Merger, a registered holder of Lyondell shares.  Sumitomo has an office and conducts business at Sumitomo Mitsui Banking Corporation, 277 Park Avenue, New York, New York 10172.  At the time of the Merger, Sumitomo held 132,879 Lyondell shares and, as a result, received, upon information and belief, $6,378,192.00 of Merger Consideration.

75.     Defendants "Transferees of Sumitomo" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Sumitomo who may have received merger consideration through Sumitomo and on whose behalf Sumitomo was acting as trustee, agent, representative, or nominee.

76.     Defendant Swiss American Securities ("Swiss American") was, at the time of the Merger, a registered holder of Lyondell shares. Swiss American has an office and conducts business at 12 East 49th Street, New York, New York 10017. At the time of the Merger, Swiss American held 128,348 Lyondell shares and, as a result, received, upon information and belief, $6,160,704.00 of Merger Consideration.

77.     Defendants "Transferees of Swiss American" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Swiss American who may have received merger consideration through Swiss American and on whose behalf Swiss American was acting as trustee, agent, representative, or nominee.

78.     Defendant Robert W. Baird & Co. ("Baird") was, at the time of the Merger, a registered holder of Lyondell shares. Baird has an office and conducts business at 777 East Wisconsin Avenue, Milwaukee, Wisconsin 53202. Baird has a New York agent for service of process c/o National Registered Agent, Inc., 875 Avenue of the Americas, Suite 501, New York, New York 10001.At the time of the Merger, Baird held 127,715 Lyondell shares and, as a result, received, upon information and belief, $6,130,320.00 of Merger Consideration.

79.     Defendants "Transferees of Baird" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Baird who may have received merger consideration through Baird and on whose behalf Baird was acting as trustee, agent, representative, or nominee.

80.     Defendant BGC International Broker Dealer Credit Account ("BGC") was, at the time of the Merger, a registered holder of Lyondell shares. BGC is located at One America Square, London, EC3N 2LS United Kingdom. BGC has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011. At the time of

23

the Merger, BGC held 121,800 Lyondell shares and, as a result, received, upon information and belief, $5,846,400.00 of Merger Consideration.

81.     Defendants Amalgamated Bank and Amalgamated Bank CRGO ("Amalgamated Bank" were, at the time of the Merger, registered holders of Lyondell shares.  Amalgamated Bank   is a corporate entity, that has its head office and conducts business at 275 7th Avenue, New York, New York 10001.  At the time of the Merger, Amalgamated Bank held, in several accounts, respectively 116,263 shares and 2,340 shares of Lyondell stock and, as a result, received, upon information and belief, $5,692,944.00 of Merger Consideration in total.

82.     Defendants "Transferees of Amalgamated Bank" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Amalgamated Bank  who may have received merger consideration through Amalgamated Bank and on whose behalf Amalgamated Bank  was acting as trustee, agent, representative, or nominee.

83.     Defendant TD Waterhouse Canada ("TD Waterhouse") was, at the time of the Merger, a registered holder of Lyondell shares.  TD Waterhouse is located at 55 King Street West, Toronto Dominion Centre, Toronto, Ontario, M5K 1A2 Canada.  TD Waterhouse has a New York agent for service of process c/o Corporation Service Company, 80 State Street, New York, New York 12207. At the time of the Merger, TD Waterhouse held 116,827 Lyondell shares and, as a result, received, upon information and belief, $5,607,696.00 of Merger Consideration.

84.     Defendants "Transferees of TD Waterhouse" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at TD Waterhouse who may have received merger consideration through TD Waterhouse and on whose behalf TD Waterhouse was acting as trustee, agent, representative, or nominee.

85.     Defendant H&R Block Financial Advisors ("H&R Block") was, at the time of the Merger, a registered holder of Lyondell shares.  H&R Block is located at One H&R Block Way, Kansas City, Missouri 64105.  H&R Block has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011.At the time of the Merger, H&R Block held 110,189 Lyondell shares and, as a result, received, upon information and belief, $5,289,072.00 of Merger Consideration.

86.     Defendants "Transferees of H&R Block" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at H&R Block who may have received merger consideration through H&R Block and on whose behalf H&R Block was acting as trustee, agent, representative, or nominee.

87.     Defendants Doft & Co., Inc. Firm Account and Elisabeth H. Doft ("Doft") were, at the time of the Merger, registered holders of Lyondell shares.  Doft is located at Doft & Co. Inc., 55 E. 59th Street, Suite 12A, New York, New York 10022.  At the time of the Merger, Doft held in several accounts, respectively, 62,672 shares, 30,900 shares and 12,000 shares of Lyondell stock and, as a result, received, upon information and belief, $5,067,456.00 of Merger Consideration in total.

88.     Defendant KDC Merger Arbitrage Master ("KDC Merger") was, at the time of the Merger, registered holder of Lyondell shares.  KDC Merger is located at Kellner DiLeo & Company, 900 Third Avenue, Suite 1000, New York, New York 10022.  At the time of the Merger, KDC Merger held 100,000 shares of Lyondell stock and, as a result, received, upon information and belief, $4,800,000.00 of Merger Consideration in total.

89.     Defendant JMS LLC ("JMS") was, at the time of the Merger, a registered holder of Lyondell shares.  JMS has an office and conducts business at 4715 13th Avenue, Brooklyn,

New York 11219.  At the time of the Merger, JMS held 90,304 Lyondell shares and, as a result, received, upon information and belief, $4,334,592.00 of Merger Consideration.

90.     Defendant Scotia Capital ("Scotia") was, at the time of the Merger, a registered holder of Lyondell shares.  Scotia is located at 40 King Street West, Scotia Plaza, Toronto, Ontario M5W 2-X6 Canada.  Scotia has a New York agent for service of process c/o Lawrence Jacob, One Liberty Plaza, 165 Broadway, New York, New York 10006. At the time of the Merger, Scotia held 88,500 Lyondell shares and, as a result, received, upon information and belief, $4,248,000.00 of Merger Consideration.

91.     Defendants "Transferees of Scotia" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Scotia who may have received merger consideration through Scotia and on whose behalf Scotia was acting as trustee, agent, representative, or nominee.

92.     Defendant Linsco/Private Corp. ("Linsco") was, at the time of the Merger, a registered holder of Lyondell shares.  Linsco is a corporate entity, having its head office at 1833 Forest Drive, Annapolis, Maryland 21401.  Linsco has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011 (Attn: LPL Financial). At the time of the Merger, Linsco held 81,805 Lyondell shares and, as a result, received, upon information and belief, $3,926,640.00 of Merger Consideration.

93.     Defendants "Transferees of Linsco" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Linsco who may have received merger consideration through Linsco  and on whose behalf Linsco was acting as trustee, agent, representative, or nominee.

94.     Defendant Penson Fin Serv Inc. ("Penson") was, at the time of the Merger, a registered holder of Lyondell shares.  Penson has an office and conducts business at 546 Fifth Avenue, New York, New York 10036.  At the time of the Merger, Penson held 72,547 Lyondell shares and, as a result, received, upon information and belief, $3,482,256.00 of Merger Consideration.

95.     Defendants "Transferees of Penson" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Penson who may have received merger consideration through Penson and on whose behalf Penson was acting as trustee, agent, representative, or nominee.

96.     Defendant MUGC MTBJ PT33 ("MUGC") was, at the time of the Merger, a registered holder of Lyondell shares.  MUGC is an account located at Mitsubishi UFJ Global Custoday, 287-289 Route d'Arlon, L-1150, Luxembourg. The custodian bank of this account is Mitsubishi UFJ Trust and Banking Corporation (USA), 420 Fifth Avenue, 6th Floor, New York, New York 10018.  At the time of the Merger, MUGC held 69,700 Lyondell shares and, as a result, received, upon information and belief, $3,345,600.00 of Merger Consideration.

97.     Defendant National City Bank ("National City") was, at the time of the Merger, a registered holder of Lyondell shares.  National City has an office and conducts business at c/o PNC Bank, 340 Madison Avenue, New York, New York 10017.  At the time of the Merger, National City held 67,631 Lyondell shares and, as a result, received, upon information and belief, $3,246,288.00 of Merger Consideration.

98.     Defendants "Transferees of National City" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at National City who may have

received merger consideration through National City and on whose behalf National City was acting as trustee, agent, representative, or nominee.

99.    Defendant Cantor Clearing Services ("Cantor") was, at the time of the Merger, a registered holder of Lyondell shares.  Cantor is a corporate entity, that has its head office and conducts business at Cantor Prime Services, 110 East 59th Street, New York, New York 10022. At the time of the Merger, Cantor held 65,300 Lyondell shares and, as a result, received, upon information and belief, $3,134,400.00 of Merger Consideration.

100.    Defendants "Transferees of Cantor" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Cantor who may have received merger consideration through Cantor  and on whose behalf Cantor was acting as trustee, agent, representative, or nominee.

101.    Defendant JPM/PCS Shared SVCS was, at the time of the Merger, a registered holder of Lyondell shares.  JPM/PCS Shared SVCS is a corporate entity, that has its head office and conducts business at 270 Park Avenue, New York, New York 10017.  JPM/PCS Shared SVCS is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, JPM/PCS Shared SVCS held, in such capacity, 60,866 Lyondell shares and, as a result, received, upon information and belief, $2,921,568.00 of Merger Consideration.

102.    Defendants "Beneficial Holders of Accounts Held in the Name of JPM/PCS Shared SVCS" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at JPM/PCS Shared SVCS who may have received merger consideration through JPM/PCS Shared SVCS and on whose behalf JPM/PCS Shared SVCS was acting as custodian, trustee, agent, representative, or nominee.

28

103.    Defendant MJR Partners ("MJR") was, at the time of the Merger, a registered holder of Lyondell shares.  MJR conducts business at 55 East 59th Street, Room 12A, New York, New York 10022.  At the time of the Merger, MJR held 60,000 Lyondell shares and, as a result, received, upon information and belief, $2,880,000.00 of Merger Consideration.

104.    Defendant Track Data Corporation ("Track Data") was, at the time of the Merger, a registered holder of Lyondell shares.  Track Data conducts business at 95 Rockwell Place, Brooklyn, New York 11217.  At the time of the Merger, Track Data held 57,700 Lyondell shares and, as a result, received, upon information and belief, $2,769,600.00 of Merger Consideration.

105.    Defendant Southwest Securities, Inc. ("Southwest") was, at the time of the Merger, a registered holder of Lyondell shares.  Southwest has an office and conducts business at 100 Broadway, 9th Floor, New York, New York 10005. At the time of the Merger, Southwest held 51,098 Lyondell shares and, as a result, received, upon information and belief, $2,452,704.00 of Merger Consideration.

106.    Defendants "Transferees of Southwest" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Southwest who may have received merger consideration through Southwest  and on whose behalf Southwest was acting as trustee, agent, representative, or nominee.

107.    Defendant Bear Stearns & Co. F/A/O Gabelli Associates ("Bear Stearns – Gabelli") was, at the time of the Merger, a registered holder of Lyondell shares.  Bear Stearns – Gabelli conducts business at 1 Metrotech Center, Brooklyn, New York 11201 (Attn: Prime Broker Desk).   At the time of the Merger, Bear Stearns – Gabelli held 50,000 Lyondell

shares and, as a result, received, upon information and belief, $2,400,000.00 of Merger Consideration.

108.    Defendant Morgan Keegan & Co. ("Morgan Keegan") was, at the time of the Merger, a registered holder of Lyondell shares.  Morgan Keegan has an office and conducts business at 535 Madison Avenue, 10th Floor, New York, New York 10022. At the time of the Merger, Morgan Keegan held 46,303 Lyondell shares and, as a result, received, upon information and belief, $2,222,544.00 of Merger Consideration.

109.    Defendants "Transferees of Morgan Keegan" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Morgan Keegan who may have received merger consideration through Morgan Keegan  and on whose behalf Morgan Keegan was acting as trustee, agent, representative, or nominee.

110.    Defendant SunTrust Bank ("SunTrust") was, at the time of the Merger, a registered holder of Lyondell shares.  SunTrust is located at 303 Peachtree Street NE, Atlanta, Georgia 30308.  SunTrust has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York 12207. At the time of the Merger, SunTrust held 42,300 shares of Lyondell shares and, as a result, received, upon information and belief, $2,030,400.00 of Merger Consideration.

111.    Defendant "Transferees of SunTrust" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at SunTrust who may have received merger consideration through SunTrust and on whose behalf SunTrust was acting as trustee, agent, representative, or nominee.

112.    Defendant The Fifth Third Bank ("Fifth Third Bank") was, at the time of the Merger, a registered holder of Lyondell shares.  Fifth Third Bank  is a corporate entity, having its

head office at Fifth Third Center, Cincinnati, Ohio 45263. Fifth Third Bank has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York 12207. At the time of the Merger, Fifth Third Bank held 36,054 Lyondell shares and, as a result, received, upon information and belief, $1,730,592.00 of Merger Consideration.

113.    Defendants "Transferees of the Fifth Third Bank" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Fifth Third Bank who may have received merger consideration through Fifth Third Bank and on whose behalf Fifth Third Bank was acting as trustee, agent, representative, or nominee.

114.    Defendant Bear Stearns Securities Corp. – First NY Securities / Britally Capital ("Bear Stearns – Britally Capital") was, at the time of the Merger, a registered holder of Lyondell shares. Bear Stearns – Britally Capital conducts business at 1 Metrotech Center, Brooklyn, New York 11201 (Attn: Prime Broker Desk). At the time of the Merger, Bear Stearns – Britally Capital held 33,355 Lyondell shares and, as a result, received, upon information and belief, $1,601,040.00 of Merger Consideration.

115.    Defendants BMO Nesbitt Burns and BMO Nesbitt Burns SA ("BMO") were, at the time of the Merger, registered holders of Lyondell shares. BMO is located at 1 First Canadian Place, Toronto, Ontario M5X 1H3. BMO has a New York agent for service of process c/o Michael G. Zeiss, c/o The Corporation, 430 Park Avenue, 15th Floor, New York, New York 10022. At the time of the Merger, BMO held in several accounts, respectively, 14,197 shares and 17,642 shares of Lyondell stock and, as a result, received, upon information and belief, $1,528,272.00 of Merger Consideration in total.

116.    Defendants "Transferees of BMO" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at BMO who may have received merger

31

consideration through BMO and on whose behalf BMO was acting as trustee, agent, representative, or nominee.

117.    Defendants Bank of Nova Scotia TAX and Bank of Nova Scotia WMF/CDS ("Bank of Nova Scotia") were, at the time of the Merger, registered holders of Lyondell shares. Bank of Nova Scotia has an office and conducts business at 1 Liberty Plaza #26, New York, New York 10006.  At the time of the Merger, Bank of Nova Scotia held in several accounts, respectively, 3,500 shares and 24,400 shares of Lyondell stock and, as a result, received, upon information and belief, $1,339,200.00 of Merger Consideration in total.

118.    Defendants "Transferees of Bank of Nova Scotia" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Bank of Nova Scotia who may have received merger consideration through Bank of Nova Scotia and on whose behalf Bank of Nova Scotia was acting as trustee, agent, representative, or nominee.

119.    Defendant BAR CAP/Equity Finan was, at the time of the Merger, a registered holder of Lyondell shares.  BAR CAP/Equity Finan has an office and conducts business at 200 Park Avenue, New York, New York 10166.  BAR CAP/Equity Finan is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, BAR CAP/Equity Finan held, in such capacity, 24,272 Lyondell shares and, as a result, received, upon information and belief, $1,165,056.00 of Merger Consideration.

120.    Defendants "Beneficial Holders of Accounts Held in the Name of BAR CAP/Equity Finan" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Barclays who may have received merger consideration through BAR

CAP/Equity Finan and on whose behalf BAR CAP/Equity Finan was acting as custodian, trustee, agent, representative, or nominee.

121.    Defendant MTBJ PT 13 ("MTBJ") was, at the time of the Merger, a registered holder of Lyondell shares. MTBJ is an account located at The Master Trust Bank of Japan 11-3, Hamamatsu-cho, 2 chome Minato-ku Tokyo, Japan 105-8579. The custodian bank of this account is Mitsubishi UFJ Trust and Banking Corporation (USA), 420 Fifth Avenue, 6th Floor, New York, New York 10018. At the time of the Merger, MTBJ held 29,300 Lyondell shares and, as a result, received, upon information and belief, $1,406,400.00 of Merger Consideration.

122.    Defendant JP Morgan Sec Inc SL was, at the time of the Merger, a registered holder of Lyondell shares. JP Morgan Sec Inc SL is a corporate entity, that has its head office and conducts business at 270 Park Avenue, New York, New York 10017. JP Morgan Sec Inc SL is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares. At the time of the Merger, JP Morgan Sec Inc SL held, in such capacity, 27,400 Lyondell shares and, as a result, received, upon information and belief, $1,315,200.00 of Merger Consideration.

123.    Defendants "Beneficial Holders of Accounts Held in the Name of JP Morgan Sec Inc SL" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at JP Morgan Sec Inc SL who may have received merger consideration through JP Morgan Sec Inc SL and on whose behalf JP Morgan Sec Inc SL was acting as custodian, trustee, agent, representative, or nominee.

124.    Defendants Crowell Weedon and Co. Omnibus Account and Crowell Weedon & Co. ("Crowell") were, at the time of the Merger, registered holders of Lyondell stock. Crowell is

located at 1 Wilshire Boulevard, Los Angeles, California 90017.  Crowell has a New York agent

for service of process c/o National Registered Agents, Inc., 875 Avenue of the Americas S-501,

New York, New York 10001. At the time of the Merger, Crowell held in several accounts,

respectively, 12,300 shares and 11,337 shares of Lyondell stock and, as a result, received, upon

information and belief, $1,134,576.00 of Merger Consideration in total.

125.    Defendant Stern Agee & Leach ("Stern Agee") was, at the time of the Merger, a

registered holder of Lyondell shares.  Stern Agee  has an office and conducts business at 2 Grand

Central Tower, 140 East 45th Street, 18th Floor, New York, New York 10017.  At the time of the

Merger, Stern Agee  held 22,196 Lyondell shares and, as a result, received, upon information and

belief, $1,065,408.00 of Merger Consideration.

126.    Defendants "Transferees of Stern Agee" are any persons or entities having a

beneficial interest in the Lyondell shares through accounts at Stern Agee who may have received

merger consideration through Stern Agee  and on whose behalf Stern Agee was acting as trustee,

agent, representative, or nominee.

127.    Defendant Wedbush Morgan Securities ("Wedbush") was, at the time of the

Merger, a registered holder of Lyondell shares.  Wedbush has an office and conducts business at

1212 Avenue of the Americas, #1901, New York, New York 10036.  At the time of the Merger,

Wedbush held 21,141 Lyondell shares and, as a result, received, upon information and belief,

$1,014,768.00 of Merger Consideration.

128.    Defendants "Transferees of Wedbush" are any persons or entities having a

beneficial interest in the Lyondell shares through accounts at Wedbush who may have received

merger consideration through Wedbush  and on whose behalf Wedbush was acting as trustee,

agent, representative, or nominee.

129.    Defendant Bank of Tokyo - Mitsubishi ("Bank of Tokyo") was, at the time of the Merger, a registered holder of Lyondell shares.  Bank of Tokyo has an office and conducts business at 1251 Avenue of the Americas, New York, New York 10020.  At the time of the Merger, Bank of Tokyo held 20,700 Lyondell shares and, as a result, received, upon information and belief, $993,600.00 of Merger Consideration.

130.    Defendants "Transferees of Bank of Tokyo" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Bank of Tokyo who may have received merger consideration through Bank of Tokyo and on whose behalf Bank of Tokyo was acting as trustee, agent, representative, or nominee.

131.    Defendant D.A. Davidson & Co. ("D.A. Davidson") was, at the time of the Merger, a registered holder of Lyondell shares. D.A. Davidson is located at Davidson Companies, 8 Third Street North, Great Falls, Montana 59401.  D.A. Davidson has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011. At the time of the Merger, D.A. Davidson held 19,522 Lyondell shares and, as a result, received, upon information and belief, $937,056.00 of Merger Consideration.

132.    Defendants "Transferees of D.A. Davidson" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at D.A. Davidson who may have received merger consideration through D.A. Davidson and on whose behalf D.A. Davidson was acting as trustee, agent, representative, or nominee.

133.    Defendant Primevest Financial Services ("Primevest") was, at the time of the Merger, a registered holder of Lyondell shares.  Primevest is located at 400 1st Street South, Suite 300, St. Cloud, Minnesota 56301. Primevest has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011. At the time of the

Merger, Primevest held 19,175 Lyondell shares and, as a result, received, upon information and belief, $920,400.00 of Merger Consideration.

134.    Defendants "Transferees of Primevest" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Primevest who may have received merger consideration through Primevest and on whose behalf Primevest was acting as trustee, agent, representative, or nominee.

135.    Defendant Charles Schwab & Co. Inc. Reorganization ("Charles Schwab") was, at the time of the Merger, a registered holder of Lyondell shares.  Charles Schwab is located at 101 Montgomery Street, San Francisco, California 94104. Charles Schwab has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011. At the time of the Merger, Charles Schwab held 18,257 Lyondell shares and, as a result, received, upon information and belief, $876,336.00 of Merger Consideration.

136.    Defendant Bellsouth Healthcare S&P 400 ("Bellsouth") was, at the time of the Merger, a registered holder of Lyondell shares.  Bellsouth maintained an account at Bank of New York Mellon, One Wall Street, New York, New York 10286.   At the time of the Merger, Bellsouth held 16,600 Lyondell shares and, as a result, received, upon information and belief, $796,800.00 of Merger Consideration.

137.    Defendant Optionsxpress, Inc. ("Optionsxpress") was, at the time of the Merger, a registered holder of Lyondell shares.  Optionsxpress is located at 311 West Monroe Street, Suite 1000, Chicago, Illinois 60606.  Optionsxpress has a New York agent for service of process c/o Rong Nie, 228 Park Avenue S #85556, New York, New York 10003. At the time of the Merger, Optionsxpress held 16,089 Lyondell shares and, as a result, received, upon information and belief, $772,272.00 of Merger Consideration.

138.    Defendants "Transferees of Optionsxpress" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Optionsxpress who may have received merger consideration through Optionsxpress and on whose behalf Optionsxpress was acting as trustee, agent, representative, or nominee.

139.    Defendant Stifel Nicolaus, as Custodian for John J. Saueracker ("Stifel Nicolaus") was, at the time of the Merger, a registered holder of Lyondell shares.  Stifel Nicolaus is located at 3764 North Olcott Avenue, Chicago, Illinois 60634. Stifel Nicolaus has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011.  At the time of the Merger, Stifel Nicolaus held 14,800 Lyondell shares and, as a result, received, upon information and belief, $710,400.00 of Merger Consideration.

140.    Defendant Keybank National Association ("Keybank") was, at the time of the Merger, a registered holder of Lyondell shares. Keybank has an office and conducts business at 575 Fifth Avenue, New York, New York 10017.  At the time of the Merger, Keybank held 14,675 Lyondell shares and, as a result, received, upon information and belief, $704,400.00 of Merger Consideration.

141.    Defendants "Transferees of Keybank" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Keybank who may have received merger consideration through Keybank and on whose behalf Keybank was acting as trustee, agent, representative, or nominee.

142.    Defendant Stephens Inc. ("Stephens") was, at the time of the Merger, a registered holder of Lyondell shares.  Stephens has an office and conducts business at 65 East 55th Street, New York, New York 10022.  At the time of the Merger, Stephens held 13,340 Lyondell

shares and, as a result, received, upon information and belief, $640,320.00 of Merger Consideration.

143.    Defendants "Transferees of Stephens" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Stephens who may have received merger consideration through Stephens and on whose behalf Stephens was acting as trustee, agent, representative, or nominee.

144.    Defendant Denis P. Kelleher ("Kelleher") was, at the time of the Merger, a registered holder of Lyondell shares.  Kelleher's mailing address is c/o Wall Street Investment Services, 17 Battery Place, 11th Floor, New York, New York 10004.  At the time of the Merger, Kelleher held 10,000 Lyondell shares and, as a result, received, upon information and belief, $480,000.00 of Merger Consideration.

145.    Defendant RBC Dominion Securities ("RBC") was, at the time of the Merger, a registered holder of Lyondell shares.  RBC is located at 46579 Expedition Drive, Suite 200, Montréal, MD H3C 3A9 Canada.  At the time of the Merger, RBC held in several accounts, respectively, 1,209,168 shares and 1,226,348 shares of Lyondell stock and, as a result, received, upon information and belief, $116,904,768.00 of Merger Consideration in total.

146.    Defendants "Transferees of RBC" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at RBC who may have received merger consideration through RBC and on whose behalf RBC was acting as trustee, agent, representative, or nominee.

147.    Defendant CDS Clearing Deposit ("CDS") was, at the time of the Merger, a registered holder of Lyondell shares.  CDS is located at 85 Richmond Street West, Toronto,

Ontario, M5H 2C9.  At the time of the Merger, CDS held 1,338,168 Lyondell shares and, as a result, received, upon information and belief, $64,232,064.00 of Merger Consideration.

148.    Defendants "Transferees of CDS" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at CDS who may have received merger consideration through CDS and on whose behalf CDS was acting as trustee, agent, representative, or nominee.

149.    Defendant Abbey National Securities ("Abbey") was, at the time of the Merger, a registered holder of Lyondell shares.  Abbey is located at 400 Atlantic Street, Stamford, Connecticut 06901.  At the time of the Merger, Abbey held 1,290,600 Lyondell shares and, as a result, received, upon information and belief, $61,948,800.00 of Merger Consideration.

150.    Defendants "Transferees of Abbey" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Abbey who may have received merger consideration through Abbey and on whose behalf Abbey was acting as trustee, agent, representative, or nominee.

151.    Defendant Custodial Trust Company ("Custodial Trust") was, at the time of the Merger, a registered holder of Lyondell shares.  Custodial Trust is a corporate entity, having its head office at 101 Carnegie Center, Princeton, New Jersey 08540.  Custodial Trust is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Lyondell shares.  At the time of the Merger, Custodial Trust held, in such capacity, 480,613 Lyondell shares and, as a result, received, upon information and belief, $23,069,424.00 of Merger Consideration.

152.    Defendants "Beneficial Holders of Accounts Held in the Name of Custodial Trust" are any persons or entities having a beneficial interest in the Lyondell shares through

accounts at Custodial Trust who may have received merger consideration through Custodial Trust and on whose behalf Custodial Trust was acting as custodian, trustee, agent, representative, or nominee.

153.    Defendant Alpine Associates ("Alpine") was, at the time of the Merger, a registered holder of Lyondell shares. Alpine conducts business at 100 Union Avenue, Suite 7, Cresskill, New Jersey 07626. At the time of the Merger, Alpine held 475,000 Lyondell shares and, as a result, received, upon information and belief, $22,800,000.00 of Merger Consideration.

154.    Defendant Regions Bank ("Regions") was, at the time of the Merger, a registered holder of Lyondell shares. Regions is located at c/o Regions Financial Corporation, 1900 Fifth Avenue North, Birmingham, Alabama 35203. At the time of the Merger, Regions held 177,155 Lyondell shares and, as a result, received, upon information and belief, $8,503,440.00 of Merger Consideration.

155.    Defendants "Transferees of Regions" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Regions who may have received merger consideration through Regions and on whose behalf Regions was acting as trustee, agent, representative, or nominee.

156.    Defendant Pulse Trading Inc. ("Pulse") was, at the time of the Merger, a registered holder of Lyondell shares. Pulse is located at 2 Liberty Square, 2nd Floor, Boston, Massachusetts 02109. At the time of the Merger, Pulse held 169,294 Lyondell shares and, as a result, received, upon information and belief, $8,126,112.00 of Merger Consideration.

157.    Defendant American Enterprise Investment Services ("American Enterprise") was, at the time of the Merger, a registered holder of Lyondell shares. American Enterprise is

located at 70400 AXP Financial Center, Minneapolis, Minnesota 55474.  At the time of the

Merger, American Enterprise held 93,422 Lyondell shares and, as a result, received, upon

information and belief, $4,484,256.00 of Merger Consideration.

158.    Defendants "Transferees of American Enterprise" are any persons or entities

having a beneficial interest in the Lyondell shares through accounts at American Enterprise who

may have received merger consideration through American Enterprise and on whose behalf

American Enterprise was acting as trustee, agent, representative, or nominee.

159.    Defendant Mizoho Trust & Banking Co. ("Mizoho") was, at the time of the

Merger, a registered holder of Lyondell shares.  Mizoho is located at Mizuho Trust and Banking

Co., Ltd, 1-2-1, Yaesu, Chuo-ku, Tokyo 103-8670, Japan.  At the time of the Merger, Mizoho

held 73,459 Lyondell shares and, as a result, received, upon information and belief,

$3,526,032.00 of Merger Consideration.

160.    Defendants "Transferees of Mizoho" are any persons or entities having a

beneficial interest in the Lyondell shares through accounts at Mizoho who may have received

merger consideration through Mizoho and on whose behalf Mizoho was acting as trustee, agent,

representative, or nominee.

161.    Defendant Union Bank of California NA ("Union Bank") was, at the time of the

Merger, a registered holder of Lyondell shares.  Union Bank is located at 400 California Street,

1st Floor, San Francisco, California 94104.  At the time of the Merger, Union Bank held 56,633

Lyondell shares and, as a result, received, upon information and belief, $2,718,384.00 of Merger

Consideration.

162.    Defendants "Transferees of Union Bank" are any persons or entities having a

beneficial interest in the Lyondell shares through accounts at Union Bank who may have

received merger consideration through Union Bank and on whose behalf Union Bank was acting as trustee, agent, representative, or nominee.

163.    Defendant Trustmark National Bank ("Trustmark") was, at the time of the Merger, a registered holder of Lyondell shares.  Trustmark is located at Trustmark Corporation, 248 East Capitol Street, Jackson, Mississippi 39201.  At the time of the Merger, Trustmark held 52,793 Lyondell shares and, as a result, received, upon information and belief, $2,534,064.00 of Merger Consideration.

164.    Defendants "Transferees of Trustmark" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Trustmark who may have received merger consideration through Trustmark and on whose behalf Trustmark was acting as trustee, agent, representative, or nominee.

165.    Defendant NBCN Inc. ("NBCN") was, at the time of the Merger, a registered holder of Lyondell shares.  NBCN is located at 250 Yonge Street, Suite 1900, Toronto, Ontario M5B 2L7 Canada.  At the time of the Merger, NBCN held 52,541 Lyondell shares and, as a result, received, upon information and belief, $2,521,968.00 of Merger Consideration.

166.    Defendants "Transferees of NBCN" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at NBCN who may have received merger consideration through NBCN and on whose behalf NBCN was acting as trustee, agent, representative, or nominee.

167.    Defendant OP&F / Intech ("OP&F") was, at the time of the Merger, a registered holder of Lyondell shares.  The address of OP&F is presently unknown.  At the time of the Merger, OP&F held 51,900 Lyondell shares and, as a result, received, upon information and belief, $2,491,200.00 of Merger Consideration.

168.    Defendants David R. Johnsen and Amalia G. Johnsen (JT TEN WROS) (the "Johnsens") were, at the time of the Merger, registered holders of Lyondell shares.  The Johnsens reside at 1011 13th Street, Wilmette, Illinois 60091. At the time of the Merger, the Johnsens held 41,696 Lyondell shares and, as a result, received, upon information and belief, $2,001,408.00 of Merger Consideration.

169.    Defendant Comm. Bank of Kansas ("Comm. Bank") was, at the time of the Merger, a registered holder of Lyondell shares.   The address of Comm. Bank is presently unknown.  At the time of the Merger, Comm. Bank held 30,586 Lyondell shares and, as a result, received, upon information and belief, $1,468,128.00 of Merger Consideration.

170.    Defendants "Transferees of Comm. Bank" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Comm. Bank who may have received merger consideration through Comm. Bank and on whose behalf Comm. Bank was acting as trustee, agent, representative, or nominee.

171.    Defendant Ohio Carpenters Midcap ("Ohio Carpenters") was, at the time of the Merger, a registered holder of Lyondell shares.  Ohio Carpenters maintained an account at State Street Bank, State Street Financial Center, One Lincoln Street, Boston, Massachusetts 02111.  At the time of the Merger, Ohio Carpenters held 24,400 Lyondell shares and, as a result, received, upon information and belief, $1,171,200.00 of Merger Consideration.

172.    Defendant FTB/Teachers of Ohio ("FTB") was, at the time of the Merger, a registered holder of Lyondell shares.  The address of FTB is presently unknown.  At the time of the Merger, FTB held 23,500 Lyondell shares and, as a result, received, upon information and belief, $1,128,000.00 of Merger Consideration.

43

173.    Defendant SERS/SSGA PASS ("SERS") was, at the time of the Merger, a registered holder of Lyondell shares.  SERS is located at c/o State Street Global Advisors, One Lincoln Street, State Street Financial Center, Boston, Massachusetts 02111.  At the time of the Merger, SERS held 21,776 Lyondell shares and, as a result, received, upon information and belief, $1,045,248.00 of Merger Consideration.

174.    Defendant Sacramento Employees Retirement System Russell ("Sacramento Retirement System") was, at the time of the Merger, a registered holder of Lyondell shares. Sacramento Retirement System is located at 980 9th Street, Suite 1800, Sacramento, California 95814.  At the time of the Merger, Sacramento Retirement System held 18,840 Lyondell shares and, as a result, received, upon information and belief, $904,320.00 of Merger Consideration.

175.    Defendant Timber Hill LLC ("Timber Hill") was, at the time of the Merger, a registered holder of Lyondell shares.  Timber Hill is located at Timber Hill LLC / IBG LLC, 8 Greenwich Office Park, Greenwich, Connecticut 06831.  At the time of the Merger, Timber Hill held 17,631 Lyondell shares and, as a result, received, upon information and belief, $846,288.00 of Merger Consideration.

176.    Defendants "Transferees of Timber Hill" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Timber Hill who may have received merger consideration through Timber Hill and on whose behalf Timber Hill was acting as trustee, agent, representative, or nominee.

177.    Defendant International Brokerage Retail Equity ("IBRE") was, at the time of the Merger, a registered holder of Lyondell shares. The address of IBRE is presently unknown.  At

the time of the Merger, IBRE held 15,680 Lyondell shares and, as a result, received, upon

information and belief, $752,640.00 of Merger Consideration.

178.    Defendants "Transferees of IBRE" are any persons or entities having a beneficial

interest in the Lyondell shares through accounts at IBRE who may have received merger

consideration through IBRE and on whose behalf IBRE was acting as trustee, agent,

representative, or nominee.

179.    Defendant A&B DB - Anchor ("A&B") was, at the time of the Merger, a

registered holder of Lyondell shares.  The address of A&B is presently unknown.  At the time of

the Merger, A&B held 15,000 Lyondell shares and, as a result, received, upon information and

belief, $720,000.00 of Merger Consideration.

180.    Defendant Folio (FN) Investments, Inc. ("Folio") was, at the time of the Merger, a

registered holder of Lyondell shares.  Folio is located at 8180 Greensboro Drive, 8th Floor,

McLean, Virginia 22102.  At the time of the Merger, Folio held 14,188 Lyondell shares and, as a

result, received, upon information and belief, $681,024.00 of Merger Consideration.

181.    Defendants "Transferees of Folio" are any persons or entities having a beneficial

interest in the Lyondell shares through accounts at Folio who may have received merger

consideration through Folio and on whose behalf Folio was acting as trustee, agent,

representative, or nominee.

182.    Defendant IRA FBO, Janet F. Ross VFTC as Custodian ("IRA FBO") was, at the

time of the Merger, a registered holder of Lyondell shares.  IRA FBO's mailing address is 220

Tower Lane, Penn Valley, Pennsylvania 19072.  At the time of the Merger, IRA FBO held

14,000  Lyondell shares and, as a result, received, upon information and belief, $672,000.00 of

Merger Consideration.

183.    Defendant Rickert C. Henriksen and Zheyla M. Henriksen Community Property ("Henriksen Property") was, at the time of the Merger, a registered holder of Lyondell shares. Henriksen Property is located at 3248 H Street, Sacramento, California 95816.  At the time of the Merger, Henriksen Property held 12,700 Lyondell shares and, as a result, received, upon information and belief, $609,600.00 of Merger Consideration.

184.    Defendant Kermit R. Meade ("Meade") was, at the time of the Merger, a registered holder of Lyondell shares.  Meade resides at 6 Pellington Court, Pine Brook, New Jersey 07058.  At the time of the Merger, Meade held 12,200 Lyondell shares and, as a result, received, upon information and belief, $585,600.00 of Merger Consideration.

185.    Defendant Ferris, Baker Watts ("Ferris") was, at the time of the Merger, a registered holder of Lyondell shares.  Ferris is located at 1700 Pennsylvania Avenue NW, Suite 700, Washington DC 20005.  At the time of the Merger, Ferris held 11,775 Lyondell shares and, as a result, received, upon information and belief, $565,200.00 of Merger Consideration.

186.    Defendants "Transferees of Ferris" are any persons or entities having a beneficial interest in the Lyondell shares through accounts at Ferris who may have received merger consideration through Ferris and on whose behalf Ferris was acting as trustee, agent, representative, or nominee.

187.    Defendant the Anti-Cruelty Society was, at the time of the Merger, a registered holder of Lyondell shares.  The Anti-Cruelty Society is located at 157 West Grand Avenue, Chicago, Illinois 60610 (Attn: Dan Overstreet).  At the time of the Merger, Anti-Cruelty Society held 10,900 Lyondell shares and, as a result, received, upon information and belief, $523,200.00 of Merger Consideration.

188.    Defendant Roofer's Local 9 Pension Fund - Harris ("Roofer's Local 9 Pension") was, at the time of the Merger, a registered holder of Lyondell shares.  Roofer's Local 9 Pension is located at 66 Connecticut Boulevard, East Hartford, Connecticut 06108 (Attn: Annemarie Brescia). At the time of the Merger, Roofer's Local 9 Pension held 10,860 Lyondell shares and, as a result, received, upon information and belief, $521,280.00 of Merger Consideration.

189.    Defendant Walter E. Hendricks ("Hendricks") was, at the time of the Merger, a registered holder of Lyondell shares.  Hendricks' mailing address is Shirley H. Cox POA, 953 Sandswood Drive, Gastonia, North Carolina 28054.  At the time of the Merger, Hendricks held 10,750 Lyondell shares and, as a result, received, upon information and belief, $516,000.00 of Merger Consideration.

190.    Defendants Burl Swafford and Ruth Swafford JT Ten (the "Swaffords") was, at the time of the Merger, a registered holder of Lyondell shares.  The Swaffords reside at 7110 Eudora Street, Dallas, Texas 75230.  At the time of the Merger, the Swaffords held 10,544 Lyondell shares and, as a result, received, upon information and belief, $506,112.00 of Merger Consideration.

191.    Defendant Cato Enterprises LLC Arbitrage Account ("Cato Enterprises") was, at the time of the Merger, a registered holder of Lyondell shares.  Cato Enterprises is located at #2 Woodland Drive, Cranbury, New Jersey 08512.  At the time of the Merger, Cato Enterprises held 10,000 Lyondell shares and, as a result, received, upon information and belief, $480,000.00 of Merger Consideration.

192.    Defendant Gulfstream Marketing Inc. ("Gulfstream") was, at the time of the Merger, a registered holder of Lyondell shares.  Gulfstream is located at 26 Bartow Point, Savannah, Georgia 34104. At the time of the Merger, Gulfstream held 10,000 Lyondell

shares and, as a result, received, upon information and belief, $480,000.00 of Merger Consideration.

193.    Defendant Vincent De Cicco ("De Cicco") was, at the time of the Merger, a registered holder of Lyondell shares.  De Cicco resides at 2821 NE 40th Street, Lighthouse Point, Florida 33064.  At the time of the Merger, De Cicco held 10,000 Lyondell shares and, as a result, received, upon information and belief, $480,000.00 of Merger Consideration.

194.    Defendants "John Does 1-500" are any other persons or entities having a beneficial interest in the Lyondell shares who held, at the time of the Merger, at least 10,000 Lyondell shares, and, as a result, received $480,000 or more of Merger Consideration.[5]

### III.    Jurisdiction and Venue

195.    This Court has personal jurisdiction over the Shareholder Defendants, *inter alia*, (i) pursuant to CPLR § 301 because they are business organizations that conduct business within New York or are individuals that are domiciled or reside in New York State, or (ii) pursuant to CPLR § 302(a)(1), *inter alia*, they transact business in New York State.

196.    Jurisdiction is appropriate in the Commercial Division pursuant to sections 202.70(a) & (b)(1) of the Commercial Division Rules because the Plaintiff seeks to recover more than $150,000.00.  Plaintiff seeks to recover approximately $5.9 billion in this action, exclusive of damages sought from the John Doe Defendants.

197.    Venue is proper in this Court pursuant to CPLR § 503(b) because Plaintiff, Edward S. Weisfelner, Trustee of the LB Creditor Trust resides in New York County.

---

[5] The Plaintiff reserves the right to amend the complaint to add additional defendants who received less than $480,000 in Merger Consideration.

## IV.    Non-Parties[6]

198.    Citibank, N.A. ("Citibank"), is referenced in its capacity as (i) predecessor administrative agent under the Senior Credit Facility (as hereinafter defined), and individually as lender thereunder; (ii) collateral agent under the Bridge Loan Facility (as hereinafter defined); and (iii) in such other capacities as it has acted under the Senior Credit Facility or the Bridge Loan Facility.

199.    Citibank International plc is referenced in its capacity as predecessor European administrative agent under the Senior Credit Facility and individually as lender thereunder.

200.    Citigroup Global Markets Inc. is referenced in its capacity as a joint lead arranger under the Senior Credit Facility and individually as lender thereunder.

201.    Goldman Sachs Credit Partners, L.P. ("Goldman"), is referenced in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

202.    Goldman Sachs International is referenced in its capacity as a joint lead arranger under the Senior Credit Facility and individually as lender thereunder.

203.    Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill" or "Merrill Lynch") is referenced in its capacity as (i) investment banking advisor, through its Global Markets and Investment Banking Group, to Access and Blavatnik for the Lyondell acquisition, (ii) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

---

[6] All in their former capacity, prior to the Effective Date of the Plan.

204.    Merrill Capital Corporation is referenced in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) administrative agent under the Bridge Loan Facility.

205.    ABN AMRO Inc. ("ABN AMRO") is referenced in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

206.    ABN AMRO Bank N.V. is referenced in its capacity as a joint lead arranger under the Senior Credit Facility and individually as lender thereunder.

207.    UBS Securities, LLC ("UBS"), is referenced in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

208.    Access Industries, Inc. upon information and belief, is an entity organized under the laws of Delaware under the control of Blavatnik.

209.    Nell Limited is an entity organized under the laws of Gibraltar under the control of Blavatnik. As of the date of the Merger, Blavatnik had a 97.3% ownership interest in NAG Investments LLC, which in turn had at least a 96.5% interest in Nell Limited.  Other members of Nell Limited included Access Industries.

210.    Leonard Blavatnik, at all relevant times, was Chairman and President of Access Industries and a member of the Supervisory Board of LBI.  Blavatnik controlled Basell and later LBI through his ownership and control over Access and the related entities.

211.    Dan F. Smith served as the Chief Executive Officer and a Director of Lyondell prior to the Merger, and was the only inside director of Lyondell.

212.    Lincoln Benet, at all relevant times, was Chief Executive Officer of Access
Industries, a manager of AI Chemical Investments LLC ("AI Chemical") and  a member of the
Supervisory Board of LBI effective December 20, 2007.

213.    T. Kevin DeNicola, at all relevant times, was Chief Financial Officer of Lyondell.

214.    Edward J. Dineen, at all relevant times, was Senior Vice President of the
Chemicals and Polymers segment of Lyondell, and a board member of Lyondell Chemical
Company, as of March 28, 2008.

215.    W. Norman Phillips, at all relevant times, was former Senior Vice President of the
Fuels and Pipelines segment of Lyondell.

216.    Stephen I. Chazen, at all relevant times, was member of the board of directors of
Lyondell and Senior Executive Vice President and Chief Financial Officer of Occidental
Petroleum Corporation.

217.    Alan Bigman was Chief Financial Officer of Basell, at all times relevant prior to
December 20, 2007, including the period prior to the execution of the Merger Agreement on or
about July 15, 2007 through the closing of the Merger on December 20, 2007, a representative of
LyondellBasell Industries AF GP S.à.r.l. (the "GP"), the general partner of LBI (prior to the
Merger, known as "Basell AF GP S.à.r.l.") and  was a board member of Lyondell Chemical
Company as of March 28, 2008.

218.    Philip Kassin was Head of Mergers and Acquisitions and Financing of Access
Industries at all times relevant prior to December 20, 2007, including the period prior to the
execution of the Merger Agreement on or about July 15, 2007 through the closing of the Merger
on December 20, 2007, a representative of the GP, and upon information and belief, effective
December 20, 2007, was a member of the Supervisory Board of LBI.

219.    Volker Trautz, at all relevant times, was Chief Executive Officer of Basell and later LBI.

220.    Ajay Patel, at all relevant times, was a Vice President of Mergers and Acquisitions at Access.

## FACTUAL BACKGROUND

### I.    Lyondell Shareholders Are Cashed Out in a Highly Leveraged Acquisition

#### A.    Lyondell – History and Background

221.    Incorporated in 1985 as a subsidiary of the Atlantic Richfield Company ("ARCO"), Lyondell initially consisted of an aggregation of assets that no longer fit within ARCO's business plan and for which it had been unsuccessful in finding a buyer.  Hoping to create a viable company, Lyondell managers deployed a strategy of opportunistic acquisitions, picking up assets being cast off by the major petrochemical companies who were exiting intermediate petrochemical manufacturing.

222.    After going public in 1989, the strategy continued, and during the ten year period from 1996 through 2006, Lyondell management grew revenues from $5.1 billion to $22.2 billion.  Growth was principally realized through acquisitions. These acquisitions included, without limitation, the acquisition of ARCO Chemical (for approximately $8 billion in 1998), the creation of the Equistar Joint Venture in 1997, and the subsequent consolidation of those joint venture assets through buyouts of Lyondell's partner's interests in 2002 and 2004; and the acquisition of Millennium Chemicals in 2004.  In 1993, Lyondell diversified into petroleum refining through the creation of the joint venture with CITGO Petroleum Corporation ("CITGO"). In 2006, it greatly increased its investment in petroleum refining by buying out CITGO's interest in the joint venture and becoming the sole owner of a refinery on the Gulf Coast (the "Houston Refinery") formerly owned jointly with CITGO.

52

223.    By 2006, Lyondell was the third largest independent chemical company in the

United States with facilities in several states, and a minor presence in Japan and France,

although, as discussed below, its high cost structure, older facilities, and strategically poorly

located operations put it at a competitive disadvantage to its global competitors.

224.    Characteristic of a company whose principal business was the manufacture of

commodity petrochemicals, Lyondell's profits and earnings had tracked the peaks and troughs of

the industry as a whole and had historically been very volatile.   Lyondell's EBITDA (*i.e.*,

earnings before interest, taxes, depreciation, and amortization) for 2003, a "trough" year for the

petrochemicals industry, was only approximately 24% of what it had been in 1995, a "peak"

year.   Lyondell's historical stock prices reflected the company's earnings volatility and other

investor concerns, such as its high leverage, which was the result of its acquisition activity.

Offered to the public at $30 per share in 1989, Lyondell stock was an aftermarket disaster.   It

peaked at approximately $36 per share in 1998 only to fall back to much lower levels and

thereafter languished for years until it was again buoyed by a peak in the petrochemical and

refining industry cycles.   The chart below details Lyondell stock prices (high and low points) for

the years from 1999 through 2006, the year of Blavatnik's initial bid:

### Lyondell Stock Price (USD)

| YEAR | HIGH | LOW |
|:---:|:---:|:---:|
| 1999 | 22.50 | 11.25 |
| 2000 | 19.50 | 8.43 |
| 2001 | 17.95 | 9.45 |
| 2002 | 17.59 | 10.33 |
| 2003 | 17.10 | 10.96 |
| 2004 | 29.59 | 14.58 |
| 2005 | 35.65 | 22.30 |
| 2006 | 27.60 | 18.86 |

225.    Since 2000, Lyondell management had included de-levering as a keystone of their business strategy to enhance shareholder value.  Consistent with this objective, Lyondell used cash flow from operations to repay more than $2.5 billion of debt from September 2004 to December 2006.  Following the increase in the debt related to the acquisition of CITGO's interest in Houston Refinery in August 2006, Lyondell increased its debt-repayment target from $3 billion to $5 billion.  Nonetheless, Lyondell continued to be highly levered for a commodities petrochemical producer.

226.    In 2006, and consistently continuing through 2007, petrochemicals industry analysts predicted that, largely due to slowing demand growth and massive, low cost capacity coming on line, the high margins then being experienced would begin to decline through 2007-2008 as the industry headed into a supply driven downturn, bottoming out to a "trough" during 2010-2011.  Refining industry analysts likewise foresaw that the historically high margins of that industry would contract in the coming years.  Lyondell was by no means ideally positioned to withstand a squeeze on its earnings; its balance sheet for the year ending December 31, 2006 included approximately $8 billion of long-term debt, and Lyondell's debt to EBITDA ratio, a key credit metric, was at 3.4x for the year-end, one of the highest among comparable companies. Understandably, Lyondell's publicly stated financial goal for 2007 was "to enhance its financial flexibility by improving its balance sheet through debt reduction and by maintaining a strong liquidity position, with an ultimate goal of achieving an investment-grade credit rating." An investment-grade credit rating would further enhance Lyondell's flexibility and liquidity, critical to maintaining a sound financial condition through a downturn.

227.    Lyondell management's objectives of "improving its balance sheet," "maintaining a strong liquidity position," and "achieving an investment grade credit rating" were not to be

realized.   Instead, Lyondell's management, presented with an opportunity to "cash out" while earnings were still high and before the company would skid into the next downturn, seized on that opportunity. By the end of 2008, following the Transaction, LBI became the most highly leveraged petrochemical chemical producer, by far and bar none, with a total debt to EBITDA ratio of 7x.   In contrast, the median 2008 debt to EBITDA ratio for major petrochemical producers was 2.3x.

### B.   Blavatnik Seeks to Make a Major Petrochemicals Acquisition

228.   In 1986, Leonard Blavatnik founded Access Industries, an international industrial group based in New York, of which he remains Chairman and President.

229.   Blavatnik, a self-described "strategic investor," became a public figure in connection with his role in the Soviet privatization auctions of the 1990s.   The privatization process resulted in the transfer of much of the vast industrial wealth of the former Soviet Union to an oligarchy of new multi-billionaire industrialists.   Blavatnik, whose net worth reportedly exceeds $7.5 billion, is frequently identified on lists of the world's wealthiest individuals.   The full extent of his holdings, much of which is held by or through private companies, is not a matter of public record.

230.   Through Access and its affiliates and in conjunction with joint venturers, Blavatnik accumulated a portfolio of investments in a broad range of basic and advanced industries.   After acquiring substantial assets in Russia, Blavatnik expanded his business interests to Europe and the United States.   His investment portfolio, much of which has been acquired through highly-leveraged transactions, includes stakes in oil, coal, aluminum, petrochemicals and plastics, telecommunications, media, and real estate.

231.   By 2004-2005, low interest rates, loosening lending standards, and the post-Enron/WorldCom regulatory tightening on publicly held companies had given rise to the largest

private equity boom the world had ever seen.  Equity sponsors, funds, and "strategic" investors

alike were on the lookout for acquisition targets that could be bought with borrowed money,

would generate cash flows to pay for themselves, and could then be drained of their cash and/or

sold at a profit.

232.     Whereas the conventional wisdom had been that only certain industries and only

selected targets with low debt loads and stable cash flows were suitable candidates for highly-

leveraged acquisitions, by 2005, these suitability criteria had been cast aside and almost any

company with EBITDA could become the subject of a leveraged acquisition strategy.

Investment bankers eager to generate their "deal" fees and confident that the non-investment

grade or "junk" markets would buy whatever they were selling, competed in an overheated

private equity market to sell "financing packages" for leveraged acquisitions.  The rewards for

the investment bankers and the institutions that originated these loans were great.  Once securing

a leveraged financing transaction and earning multi-million dollar fees for investment banking

services, the financing parties earned additional fees through the syndication of the loans and in

their roles as administrative and collateral agents for the banks, institutions, and funds that held

the loans.  Generally, the financing parties who originated the loans would then sell most of the

loans through syndication, keeping for themselves only the highest quality (most secure, best

priced) piece of the loan and freeing up their own balance sheets to do the next deal, earn the

next round of fees, and on and on.

233.     Blavatnik was an active and eager participant in this investment market.  On May

5, 2005, Access, through its affiliate Nell Acquisition S.à.r.l. (yet another Blavatnik-controlled

entity) acquired Netherlands-based Basell from Royal Dutch Shell plc and the BASF Group in a

highly-leveraged transaction.  Access made this acquisition after several months of detailed due

diligence after entering into a confidentiality agreement with Basell.  Basell, a Luxembourg limited partnership, was an international chemicals company, then self-described as the world's largest manufacturer and marketer of polypropylene and advanced polyolefins, and a major European manufacturer and marketer of polyethylene.  Eighty percent of the financing for the €4.5 billion price paid by Access for Basell was debt.  Access's only contribution to Basell's equity was approximately €860 million in cash.

234.    Once having acquired Basell, Blavatnik and his team at Access, including Philip Kassin, Senior Vice President and head of Mergers and Acquisitions and Financing, were on the lookout to leverage the investment in Basell by using it as an equity stake for much larger leveraged transactions.  Blavatnik's strategy was to capitalize on the cheap money available in the non-investment grade credit markets to acquire, using maximum leverage and minimum equity, one or more major petrochemicals producers, thereby amassing a global petrochemical conglomerate.  Counting on the spread between cheap long term money and return on assets acquired, Blavatnik's strategy was to rely on earnings to service debt and reduce the debt load, freeing up cash to be distributed to him in the form of shareholder distributions or management fees.  During the period from its acquisition by Blavatnik until December 20, 2007, when Basell was used as the platform for the acquisition of Lyondell, Blavatnik-controlled Access affiliates took out approximately €340.5 million (or $463 million) of cash from Basell in the form of dividends and management fees.

235.    While the overall strategy was simple, the pronounced cyclicality of the petrochemical industry and the refinery industry heightened the risk involved in a highly leveraged acquisition.  Rather than enjoying stable cash flows that can be counted upon to cover fixed costs and charges (such as the costs of plant operation and maintenance as well as interest

payments on mountains of acquisition financing), petrochemicals and refining had long been defined by their peaks and troughs in earnings.

236.    At the peak of a petrochemical cycle, limits on the capacity of existing plants to convert petrochemical "feedstocks" (most importantly crude oil and naphtha, a natural gas) into ethylene, propylene, and other products used in a wide range of industrial applications permit manufacturers to obtain high margins on their products.  These high margins, in turn, result in increased investment in production as excess profits are reinvested in new capacity.  When, eventually, this new capacity exceeds demand, overcapacity drives margins down and the industry heads into the next trough.  Additional earnings volatility results from macroeconomic forces and changes in the prices of feedstocks.  During 1993, the deepest trough in recent petrochemicals history, cash margins on ethylene, a major primary petrochemical commodity, dropped to approximately 13% of margins seen three years before, a reduction of 87%.  In the subsequent peak in the ethylene cycle, margins shot up almost 1100% from 1993 levels (from 1.4 cents per pound to 16.8 cents per pound) only to drop again to 2.9 cents a pound in 2002. And during the more recent petrochemical industry trough of 2002, the drop in certain industry commodity spreads was even worse than in 1993.

237.    The petroleum refining industry is also subject to pronounced business cycles, experienced by industry participants in the form of extreme changes in the "crack spread" – the price differential between refined petroleum products (such as gasoline) and the crude oil from which they are derived.  The refinery industry is also subject to disruptions in the market due to geopolitical developments and natural disasters.  For example, in August and September 2005, back to back hurricanes rocked the energy infrastructure of Louisiana and Texas, disrupting as much as 30% of U.S. refining capacity.  More recently, the oil spill in the Gulf of Mexico, which

may now be the single largest oil spill in United States history, could ultimately affect the petrochemical and refining industries located in that region and beyond, as some analysts are already forecasting the price of oil to increase to $100/barrel.

238.    A company that has both petrochemical assets and refinery assets is subject to both cycles.    Historically, petrochemical cycles occur over a five- to seven-year period; petroleum refining cycles have been longer.    If both industries are in a downturn at the same time, the financial performance of a company relying on both petrochemical and refining assets will be doubly devastated.

239.    Notwithstanding that cash flows from a petrochemicals company could not reasonably be expected to be stable or necessarily predictable, Blavatnik was intent on acquiring major petrochemical assets in one or more highly leveraged transactions.    Given that the petrochemicals industry was poised for a downturn, Blavatnik's strategy was essentially a gamble on the timing and severity of the next downcycle.    If, after being acquired, the earnings of the acquired company would remain strong enough for long enough, sufficient debt could be paid off before the trough to enable the company to continue to fund its operations.    If successful in maintaining ownership of assets through the turn of the petrochemical cycle, Blavatnik's upside would be great.    Blavatnik could emerge on the other side of a trough with substantial equity in a major global petrochemical company poised to generate robust earnings as the industry heads toward the next peak.    If, as it turned out, he overleveraged and could not finance his business through a downturn, because of his minimal equity investment, the pain would largely be felt by others, namely the creditors of Lyondell and Basell.

## C.    **Access Targets Lyondell for Acquisition**

240.    By the spring of 2006, Access had identified Lyondell among several other

possible acquisition targets, including Huntsman International, LLC ("Huntsman"), a major

petrochemical company.

241.    Lyondell was much larger than Basell, with revenues for fiscal year 2005 of

approximately $18.6 billion, compared to Basell's approximately €8.6 billion in revenues

(approximately $10.2 billion).

242.    Although Blavatnik may have targeted Lyondell even earlier, the origins of the

acquisition of Lyondell by Basell can be traced to April 2006 when Lyondell was exploring the

alternatives of either selling its 58.7% interest in the Houston Refinery, or buying out its joint

venture partner, CITGO, an indirect subsidiary of the national oil company of Venezuela.

Blavatnik saw the auction process for the Houston Refinery as a means to learn more about

Lyondell and place Access in a better position to potentially acquire the whole company.

243.    On April 10, 2006, Blavatnik and Kassin arranged an introductory meeting in

New York with Dan F. Smith, Lyondell's President and Chief Executive Officer.  Signaling

Access's interests in acquiring Lyondell, Kassin also informed Smith that he had plans to meet

with Stephen I. Chazen, Senior Executive Vice President and Chief Financial Officer of

Occidental Petroleum Corporation ("Occidental Petroleum") and a Director of Lyondell.

Occidental Petroleum held, at the time, a significant percentage of Lyondell's outstanding stock.

244.    After the meeting, Blavatnik e-mailed Kassin asking him to prepare leveraged

buyout models for Lyondell "with non-stupid prices (*i.e.* not 30 [per share])."

245.    Kassin called Smith on April 19, 2006 to follow up on the initial meeting and to

request a further meeting in Houston to discuss the interest of Access in exploring a potential

acquisition of Lyondell by Basell. Smith, who had headed Lyondell while it pursued its strategy of growth through acquisitions, indicated that Lyondell was not for sale.

246. Undeterred, on April 24, 2006, Kassin, acting on Blavatnik's instructions, contacted Smith to make an offer to purchase Lyondell for $24 to $27 per share. Smith brought Blavatnik's offer to the attention of the Lyondell board at a regular meeting held on May 4, 2006. At the same meeting, Chazen informed the board that representatives of Access had approached him in his capacity as Chief Financial Officer of Occidental Petroleum regarding an interest in Lyondell. The board discussed the indication of interest and determined that the proposed price range, which was approximately 10% above the range at which shares of Lyondell had recently been trading, was insufficient.

247. Weeks later, in early June 2006, Kassin was advised by Smith that Access's offer was deemed by the board to have been too low to warrant a formal response. According to Smith, if Access wanted to negotiate, it would have to offer at least a 20% premium over the most recent closing price of its stock. As of that time, the price of Lyondell stock had actually fallen a bit – back to approximately $24 per share. Taking its cue from Smith's suggestion regarding a 20% premium, Access decided to analyze a possible acquisition of Lyondell for $28 per share. Access provided Merrill Lynch ("Merrill"), Blavatnik's investment banking advisor for the Transaction, with substantive analyses for various acquisition scenarios, which Merrill used to model various alternative structures for acquiring Lyondell at $28 per share.

248. Shortly thereafter, Merrill prepared "discussion materials" for the acquisition of Lyondell, including financial models of three variations of a leveraged acquisition of Lyondell at $28 per share: an all cash acquisition of Lyondell assuming Lyondell had sold the Houston Refinery; an all cash acquisition assuming Lyondell's full ownership of the Houston Refinery;

and, finally, a part stock, part cash acquisition.   Projections for Lyondell earnings used in this modeling were derived from data from industry analyst Chemical Market Associates, Inc. ("CMAI") and from what were characterized by Merrill as "Wall Street" analysts.   Merrill's projections for Lyondell, excluding the Houston Refinery segment, were as follows:

**EBITDA (in millions of $)**

| YEAR | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| CMAI Case | 3,316 | 3,140 | 2,744 | 2,511 | 2,165 |
| Analyst Consensus | 3,308 | 3,339 | 3,017 | 2,729 | 2,327 |

249.   As reflected in this presentation, earnings from Lyondell's chemicals operations were expected to peak in 2006-2007 and to decline materially thereafter.

250.   In a summary to the materials headed "Why This Transaction Makes Sense," Merrill, which stood to be paid millions of dollars of fees from this transaction, claimed the "timing was right" given the stage in the industry cycle and the "strength in the leveraged finance market."

251.   On August 10, 2006, Access made its first formal bid to purchase Lyondell, proposing in a written offer to acquire all of the outstanding shares of Lyondell for a cash price of $26.50 to $28.50 per share.   The letter attached the "highly confident letter" that Access requested Merrill to provide on July 23, 2006 in which Merrill expressed its opinion that it could procure adequate financing to finance the Merger and indicated that Access itself would provide up to $1 billion of cash as part of the financing of the proposed transaction.   Access's offer letter, which was signed by Volker Trautz, CEO of Basell (on behalf of Basell), and Blavatnik (on behalf of Access), indicated that Access and Basell would need 30-45 days of due diligence

"[w]ith the cooperation of Lyondell's management team" before signing a definite merger agreement.

252.   On August 14, 2006, a special meeting of the Lyondell board of directors was held to discuss the Access offer.   After discussion, the board instructed Smith to advise Access and Basell that the proposal was not in the best interests of Lyondell's shareholders and that it did not wish to explore the proposal further.   The rejection was communicated in writing to Access.

253.   Following its rejection of Access's offer, Lyondell announced that it would not be selling the Houston Refinery but would instead be acquiring CITGO's joint venture interest at a price of $2.1 billion.   Lyondell management, anticipating a possible economic/industry downturn and tightening of the credit markets, planned to use Lyondell's increased share of the earnings from the Houston Refinery (which it would now own 100%) to continue its long-term de-levering strategy to pay down "as quickly as possible" another $2 billion of debt.   However, at least one director, Chazen, expressed a belief to Smith that the refining industry was heading for a downturn.   Meanwhile, the stock price for Lyondell began to edge upwards slightly. Responding to these developments, Access, while continuing to monitor Lyondell, turned its acquisition efforts elsewhere for the next several months.

254.   In February 2007, the price of Lyondell shares climbed past $30 per share and began trading in ranges not seen since mid-2005.   Rather than discouraging Blavatnik's interest in Lyondell, its rising stock price apparently resulted in a concern that an opportunity was being lost.   Abandoning his previous position that a $30 per share offering price for Lyondell would be "stupid," on February 28, 2007, Blavatnik emailed Kassin and Ajay Patel, a Vice President of

Mergers & Acquisitions at Access, asking them to prepare models based on an acquisition of Lyondell at $35 to $38 per share.

255.    Merrill was requested to assist Access by updating its June 2006 financial models for the proposed acquisition, which had assumed a price per share for Lyondell of $28, with revised models based on a price per share of $38. Presentation materials, dated March 27, 2007, were prepared by Merrill Global Markets. The March 27, 2007 presentation materials included "Base Case" projections and valuations for the combined Lyondell/Basell enterprise. Merrill's March 27, 2007 "Base Case" EBITDA projections for Lyondell on a standalone basis (the "March 2007 Projections") were as follows:

**EBITDA (in millions of $)**

| YEAR | 2007 | 2008 | 2009 | 2010 | 2011 |
|------|------|------|------|------|------|
| Chemicals | 1,877 | 1,533 | 1,031 | 809 | 848 |
| Refining | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 |
| Total | 3,064 | 2,752 | 2,325 | 2,067 | 1,980 |

256.    The March 2007 projections for Lyondell's petrochemical operations were identified by Merrill as having been developed from market sources and industry analyst CMAI. Consistent with Merrill's mid-2006 presentation, Lyondell's earnings from its chemicals operations were projected to decline materially after 2007. Refining projections were derived from data available from the "data room" used at the time of the CITGO auction. These showed that earnings from refining were anticipated to be essentially flat during the five year projection period of 2007-2011 although declining significantly after 2009. With respect to Basell's

earnings projections, Merrill relied on Basell management forecasts which were flat even past 2009.

257.    The materials included a "Downside Case," which, without explanation, was calculated by decreasing "Base Case" assumptions by 15% with respect to Basell – a downside case much less severe than previous historical troughs.   Merrill stated a "Base Case" valuation of Basell and Lyondell combined at between $23.2 billion and $27.2 billion compared to the "Base Case" valuation that it had included in its June 2006 presentation of between $21.3 billion and $27.7 billion.  Embodied in this combined enterprise valuation was a "mark to market" value of Basell equity of between $3.9 and $4.6 billion, purportedly based upon the public trading multiples of its peer group.  Access and Blavatnik knew that the valuation of Basell's equity was without credible basis.

258.    In its "Executive Summary," Merrill laid out the various claimed rationales for the deal.   One deal driver was cheap, easy money available through "covenant lite" credit arrangements.  Quite simply, according to the Executive Summary, the main deal driver was the fact that the debt could be sold to the credit markets: "given…[t]he historically high aggressiveness in the financing markets at the current time, we believe an acquisition of [Lyondell] could be accomplished with no incremental cash equity from [Access] at prices in the upper $30s."

259.    The other deal driver was simple greed.   According to Merrill, without any "incremental cash equity" from Access other than its investment in Basell, five years out from an acquisition of Lyondell Access's incremental equity "would be in the range of $4 billion to $8 billion."  Thus, according to Merrill, while the transaction would result in "a meaningfully higher equity risk," the upside potential was enormous.

260.    From March 27, 2007 through July 10, 2007, Merrill prepared successive presentations for Access that included EBITDA projections for Lyondell for the five year projection period.  During this period, Merrill's projections of Lyondell's future earnings remained substantially unchanged from the March 2007 Projections.

261.    Notwithstanding that the time horizon for the forecasted industry/economic downturn was closer (and that there was, therefore, less remaining time to benefit from earnings at peak levels) and that Lyondell at $38 per share would cost approximately $2.5 billion, or 36%, more than Lyondell at $28 per share nine months prior, the analysis set forth in the March 27 presentation materials was strongly bullish.  According to the Merrill presentation materials, Lyondell, a company which had yet to attract other potential suitors, purportedly was "the single most attractive transformation acquisition opportunity for [Basell]."  The increase in Lyondell's stock price was "explained" by Lyondell's acquisition of CITGO's interest in the Houston Refinery, the recent sale of Lyondell's titanium dioxide (Ti02) assets for $1.2 billion, analysts' projections, and increases in the stock prices of Lyondell's publicly traded peers. Echoing the sentiments (discussed below) of Lincoln Benet, CEO of Access, the Merrill materials presented an acquisition of Lyondell as a gamble that offered a big pay out if Lyondell could survive a "downside scenario." According to Merrill, in terms that Merrill knew would resonate with Access and Blavatnik, the transaction could be financed "with 100% debt."

262.    A related Merrill "Executive Summary," dated April 10, 2007, touted the deal, purporting to answer the questions "Why Hugo?"[7] and "Why Now?" Succinctly stated, the answer was, "Because you can."  In this document, the proposed transaction was characterized as a way to capitalize on "[h]igh levels of leverage at historically low spreads," "covenant lite structures" and "acceptance of aggressive rollover of equity." Access, using privately held Basell

---

[7] "Hugo" was a code name used to describe the Lyondell acquisition.

as equity (which, based on unrealistic earnings projections that failed to reflect the forecasted downturn, was given a preposterously high and artificial valuation), had the ability to exploit the current credit market conditions to acquire equity in Lyondell purportedly worth billions of dollars for itself without risking any substantial capital of its own.   Merrill and other lead arrangers could then off-load the junk into the market and earn huge fees.

263.   After receiving the March 27 presentation materials, Access asked Merrill to provide an analysis of whether, if the forecasted industry downturn turned out to be more severe than analysts were then projecting, the combined companies would be able to cover their debt expenses and meet their other financial obligations.   In response to this request, Merrill supplemented the presentation materials with a "Credit Stress Test" that illustrated, according to Merrill, "the resilience of the proposed capital structure."

264.   Merrill's Credit Stress Test was based on a purchase price for Lyondell common stock of $38 per share and total funded acquisition debt in the amount of $19.6 billion, a significant feature of which was "Pay in Kind" or "PIK" notes, which would allow the company to meet its obligation to pay interest through the issuance of additional notes in lieu of cash.   As an analytical tool for purposes of testing the credit, the Credit Stress Test modified forecasts for years 2007 through 2013 to replicate historical trough conditions seen in 1993, described erroneously as the deepest trough in recent history.

265.   The Credit Stress Test analysis showed that, on the assumption of a $38 purchase price and the use of PIK notes, the combined enterprise could satisfy its interest payments under the assumed capital structure.   However, the actual terms of the Transaction in December 2007 did not conform to the assumptions used for the Credit Stress Test.   Had a "Credit Stress Test" been applied to actual terms of the Transaction – *i.e.*, with a $48 per share purchase price, the

capital structure that was actually put into place upon the Merger (which did not include PIK notes), and incorporating the capital expenditures and capital requirements projected or anticipated as of the closing date of the Merger – LBI would have failed the Credit Stress Test.

266.    As set forth more fully below, the deal terms materially changed after March 27, 2007, with the purchase price escalating from $38 per share to $48 per share, after Blavatnik lost out to an entity controlled by Apollo Management, L.P. ("Apollo") in bidding for Huntsman. With Blavatnik determined to do the deal at any price provided only that he was not required to invest any "incremental equity," Merrill did not re-do the previous "Credit Stress Test" to reflect these changes to its assumptions.

### D.    Blavatnik Acquires the Toe-Hold Position in Lyondell

267.    Merrill's March 27 materials and their supplements also included tactical advice on the acquisition, including the suggestion that Access proceed with the acquisition of Lyondell by first establishing a toe-hold of up to 14.9% in Lyondell.  In this connection, Merrill brought to Access's attention the fact that Occidental Petroleum, whose Senior Executive Vice President and CFO, Chazen, sat on Lyondell's board, had acquired a block of Lyondell shares in connection with a sale of assets, and was in the process of disposing of its Lyondell holdings, which consisted of 20,997,020 shares.

268.    In an e-mail dated April 5, 2007, Lincoln Benet suggested that Access should acquire a block of Lyondell stock that was "big enough to matter," and should focus on acquiring an existing stake of Lyondell stock as a precursor to a Lyondell bid.  Merrill advised the Access representatives that Access stood to make a profit on such a block of shares either upon an Access buyout of Lyondell or a buyout by a third party.

269.    For the sole purpose of acquiring the Toe-Hold Position, Blavatnik formed AI Chemical, with Benet, Access's Chief Executive Officer as one of its Managers.  On May 4, 2007, Occidental Petroleum, through its affiliate Occidental Chemical Holding Corporation ("OCHC"), entered into agreements with Merrill Lynch by which Occidental Petroleum would divest itself of 20,990,070 shares of Lyondell common stock.  On the same day, AI Chemical entered into a postpaid share forward transaction with Merrill Lynch (the "Merrill Lynch Agreement"), with an effective date of May 9, 2007.  The Merrill Lynch Agreement gave AI Chemical until May 9, 2008 to elect to either physically settle the contract for a price of $32.11 per share or to settle the transaction  (*i.e.*, to receive or pay the change in the value of the underlying shares).  At the time AI Chemical entered into the Merrill Lynch Agreement, Blavatnik was the sole member of AI Chemical, and the option on the Toe-Hold Shares was apparently AI Chemical's sole asset.

270.    On May 11, 2007, Blavatnik and AI Chemical filed a Schedule 13D reporting having entered into the Merrill Lynch Agreement. The Schedule 13D disclosed that Blavatnik and AI Chemical might seek to engage in discussions with Lyondell concerning the possible acquisition of all the shares of Lyondell and a possible merger between Lyondell and affiliates of AI Chemical, including Access or Basell.  On May 11, 2007, Lyondell received a letter sent on behalf of AI Chemical and Blavatnik, stating that Blavatnik, through AI Chemical, might acquire over 50% of the outstanding stock of Lyondell.

271.    The day Blavatnik and AI Chemical filed the Schedule 13D, Lyondell's stock closed at $36.75 per share, up 11% from the day before.

272.    At around the same time that Blavatnik signaled his interest in acquiring Lyondell, Smith rejected an overture from Apollo to consider a "going private" transaction.

69

Although Smith claimed that he rejected the Apollo proposal for a management-led LBO as inconsistent with management's fiduciary duties, in reality he had no interest in a management buyout.  This is  because Smith knew that the company could not sustain the level of debt such a transaction would require and that, if he participated in a management-led LBO, he would be left with substantial holdings of Lyondell stock.  He determined that it would be far better to be bought out in a leveraged transaction than to be left, in a management-led LBO, with a company crippled by acquisition debt.

273.    Indeed, Smith acknowledged as much in 2007 when he testified that he would not lead a management led buyout because, "if you do a leveraged buyout stand-alone and you try to finance this with the valuation you've got in earnings, there will come a year in the very near future that you won't be able to pay the interest bill.  There's just too much variation in the numbers…."

274.    When Blavatnik's acquisition of the Toe-Hold Position was made public, Smith, speaking at a conference in Las Vegas, spoke about the implications of a leveraged buyout of Lyondell by an equity sponsor, such as Access, as the markets had anticipated in light of the Schedule 13D filing.  Smith admitted that such a transaction could "enrich the shareholders" but observed the very different impact on Lyondell creditors.  Smith continued: "If you're a bondholder, I am not sure you get enriched in that situation.  If you think you are going to have a down cycle in the chemical markets, I don't think you want to add $8 billion, $10 billion debt to this and live through that."

275.    In response to the news that Blavatnik had acquired the Toe-Hold Position and disclosure that Lyondell was a potential acquisition target, Smith saw his opportunity to cash out. To maximize shareholder (and management) profits from a buyout, Smith knew it would be

necessary to hype Lyondell's earnings capacity.   In recent years however, Lyondell had not

attempted to develop accurate earnings projections (essential to any valuation), and, indeed,

Smith had grown deeply skeptical of the ability to accurately project Lyondell earnings.

Annually, however, since at least 2003, Lyondell had engaged in an annual planning process,

known internally as the Long Range Plan (the "LRP"), which included the preparation of

projections for use in the context of strategic and capital expenditure planning.   Shortly after the

announcement of the acquisition of the Toe-Hold Position, Smith decided that it was necessary

to "refresh" the earnings projections included in the then current LRP.   Such "refreshed"

numbers were later to be used by Smith to support a valuation for Lyondell that he hoped would

justify the exorbitant  price he demanded.

**E**.    **The Long Range Plan**

276.    The LRP process commonly began during the summer months and was completed

by the end of each calendar year.   The primary purposes of the LRP process were business

planning and to focus on strategy and resource allocation.   The LRP process culminated with

approval by the board of an annual budget for capital expenditures.   As a component of the LRP

process, EBITDA projections were developed for each of the major business divisions.   Notably,

the earnings projections included in the LRP were not intended for use in valuing the company,

for obtaining financing, or for an M&A transaction.

277.    There was broad internal participation in the LRP process. Participants included

Norman Phillips and Edward Dineen, the heads of  business units (refining and chemicals) and

Karen Twitchell, the company's treasurer.   Twitchell reviewed projected cash flows, the sources

and uses of cash, and provided input on the reasonableness of certain assumptions used in the

LRP.   An ongoing operational group referred to as the Business Performance Analysis and

Reporting group ("BPAR"), also participated. In addition, back office departments, such as human resources, also provided information that went into the LRP.

278.    To initiate the process, the officer group, working under Smith's direction, obtained input from outside consultants to provide views on macroeconomic indicators, such as global GDP growth, regional GDP growth, crude oil forecasts, natural gas forecasts, and interest rates. The officer group and Smith would then formulate a view on the various macroeconomic indicators discussed with the consultants. In order to develop these projections, among other things, the business units utilized outside consultants to formulate views on where the particular business was heading in the near term. The business units would either have meetings with the consultants, or they would reference materials published by the consultants. The heads of each business segment were to utilize the agreed upon assumptions in order to develop plans for their respective business units.

279.    According to management, the LRP process was a full bottoms-up analysis of Lyondell's businesses and operations. Heads of each business unit would apply the assumptions developed by management to their particular unit. EBITDA projections would be developed starting at the plant level and then be aggregated to develop a unit projection. Each business unit would develop projections on volumes, margins, prices, operating rates, and capital spending that it felt was necessary or believed would be helpful to the overall business.

280.    The process involved multiple meetings within each business unit, with Dineen and Phillips reviewing the initial numbers and providing questions and comments on those initial projections, and each business unit going through the same process. Manufacturing, which is responsible for the day to day operation of Lyondell's plants, provided estimates for turnarounds, safety, environmental improvements, plant process, and cost improvements.

281.    After each business unit finalized its analysis, the numbers were provided to corporate development, which would create the actual LRP.  Creation of the LRP was followed by numerous presentations by the heads of each unit to senior management, and, much like the process within the business units, there was back and forth between senior management and the business heads about various aspects of the LRP.  Ultimately, the LRP was presented to the Lyondell Board of Directors and the first year of the LRP was incorporated as the capital budget for the following year.

282.    The Lyondell Capital Budget and Operating Plan for years 2007 through 2011, dated December 6, 2006 (the "2007 Long Range Plan"), the last LRP prior to the Transaction, contained the following projections for EBITDA:

### EBITDA (in millions of $)

| YEAR | 2007 | 2008 | 2009 | 2010 | 2011 |
|------|------|------|------|------|------|
| EC&D[8] Segment | 1,465 | 1,295 | 599 | 564 | 518 |
| PO&RP[9] Segment | 712 | 657 | 664 | 701 | 676 |
| Refining Segment | 1,333 | 1,324 | 1,375 | 1,110 | 932 |
| Total | 3,510 | 3,276 | 2,638 | 2,375 | 2,126 |

283.    Upon information and belief, in the Spring of 2007, on or after April 24, 2007, Lyondell made its annual presentation to ratings agencies and provided a five-year EBITDA projection for each of its business segments (the "Spring 2007 Ratings Agency Presentation").

---

[8] Ethylene, Co-Products & Derivatives
[9] Propylene Oxide and Related Products

284.    The EBITDA projections in the Spring 2007 Ratings Agency Presentation had been adjusted downward from the 2007 Long Range Plan to reflect that the company had been failing to meet its projections for earnings from both refining and petrochemcials for the current year.    The LRP projections for 2007 and those used in the Spring 2007 Ratings Agency Presentation are contrasted below:

### EBITDA (in millions of $)

|  | **LRP** | **Spring 2007 Ratings Agency Presentation** |
|---|---|---|
| EC&D Segment | 1,465 | 1,330 |
| PORP Segment | 712 | 650 |
| Refining Segment | 1,333 | 1,270 |
| Total EBITDA | 3,510 | 3,250 |

### F.    Smith Directs the Creation of "Refreshed" EBITDA Projections

285.    Although the projections for year 2007 were lowered in the Spring 2007 Ratings Agency Presentation from those found for those segments in the 2007 Long Range Plan, earnings projected for 2008-2011 remained the same since, according to Smith, "management's perspective for 2008-2011 had not changed."    According to Smith, other than the Spring 2007 Rating Agency Projections, Lyondell did not provide any financial projections outside the Company during the first half of 2007.

286.    Despite having been of the view that nothing had changed to alter the outlook for 2008-2011 since the development of the 2007 LRP, in response to Blavatnik's acquisition of the Toe-Hold Position, Smith determined that he needed to "refresh" the projections that had been

included in the LRP, since they were too low to justify the high price at which he wanted to sell

Lyondell to Blavatnik.

287.    The perfunctory process by which Lyondell "refreshed" its projections was

improvised in response to the perceived opportunity presented by Blavatnik's interest in

Lyondell and bore no resemblance to the LRP process.  Rather than broadly involving all levels

of management, the preparation of refreshed projections involved a small inner circle, selected

by Smith, and was completed in a "very compressed time period," and it is unclear if Smith's

small inner circle did anything other than adopt the results desired by Smith to generate

improved, manipulated LRP projections.  No bottoms-up, plant-by-plant analysis of earnings was

undertaken.  Unlike the LRP process, which was designed to be used to for planning purposes,

refreshing the LRP projections had no purpose other than to justify a high price for Lyondell.

288.    On June 18, 2007, less than two weeks after a meeting in London between Trautz

and Smith during which the two had discussed a potential transaction and Smith told Trautz that

he needed an offer of $48 per share, Robert Salvin of Lyondell, who had been enlisted by Smith

to assist in coming up with new projections, provided Kevin DeNicola, then Chief Financial

Officer of Lyondell, with two new sets of projections called "Today's View" and "Alternate

View" as follows: [10]

### EBITDA (in millions of $)

| Refining | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| 2007 Long Range Plan | 1,333 | 1,324 | 1,376 | 1,110 | 933 | 6,078 |
| Case 1 - "Today's View" | 1,700 | 1,700 | 1,600 | 1,500 | 1,300 | 7,800 |
| Case 2 - "Alternate View" | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 8,000 |

---

[10] In its required public disclosures regarding the background of the Transaction, including its October 2007 proxy statement soliciting shareholder approval of the Merger, Lyondell failed to disclose the communications between Smith and Trautz that actually occurred at a June 7, 2007 London dinner meeting, and falsely stated that the $48 per share price was first raised on July 9, 2007.

| EC&D | | | | | | |
|---|---|---|---|---|---|---|
| 2007 Long Range Plan | 1,465 | 1,295 | 599 | 564 | 518 | 4,441 |
| Case 1 - "Today's View" | 1,150 | 1,150 | 800 | 700 | 600 | 4,400 |
| Case 2 - "Alternate View" | 1,150 | 1,150 | 800 | 700 | 600 | 4,400 |

| PO&RP | | | | | | |
|---|---|---|---|---|---|---|
| 2007 Long Range Plan | 712 | 657 | 664 | 701 | 676 | 3,410 |
| Case 1 - "Today's View" | 712 | 657 | 664 | 701 | 676 | 3,410 |
| Case 2 - Alternate View | 712 | 657 | 664 | 701 | 676 | 3,410 |

| Total Company EBITDA | | | | | | |
|---|---|---|---|---|---|---|
| 2007 Long Range Plan | 3,510 | 3,276 | 2,639 | 2,375 | 2,125 | 13,925 |
| Case 1 - "Today's View" | 3,562 | 3,507 | 3,064 | 2,901 | 2,576 | 15,610 |
| Case 2 - "Alternate View" | 3,462 | 3,407 | 3,064 | 3,001 | 2,876 | 15,810 |

289.   As shown in the chart above, the "refreshed" projections for "Today's View" included $1.685 billion of additional EBITDA as compared to the EBITDA projections contained in the 2007 Long Range Plan.   Management projections for Lyondell refining EBITDA show a significant increase in projected EBITDA for 2008 over 2007 ($1.7 billion compared to $1.279 billion, as reflected in the Spring 2007 Rating Agency Presentation), reflecting the apparent view that refining margins for 2008 would not merely remain at the high 2007 levels seen in the first half of 2007, but would actually increase significantly in 2008 (by about 14%) and remain above 2007 levels through 2009.   Such projections were "developed" (actually, concocted) without any reliance on any third-party consultants or industry experts.   In fact, the industry outlook implied by these projections was inconsistent with industry analysts' forecasts at the time, something known to Smith and his inner circle of Lyondell management confederates.   Notably, and reflecting that, rather than being *bona fide* estimates developed using actual data, these projections had been pulled from a hat; the "refreshed" refining projections were round numbers, crudely reflecting the arbitrary nature of the "refreshed" projections.

290.    In reality, the new projections were based on little more than the purported and unfounded views of Smith himself, who was seen as the "driving force" behind the decision to acquire 100% ownership from CITGO of the Houston Refinery in the first instance.   Having been responsible for the acquisition of the Houston Refinery, Smith purportedly believed that the high price paid by Lyondell for the refinery was justified by the prospects for continued high refining margins.   By the time that Blavatnik acquired his Toe-Hold Position, however, Smith was aware that his views were contradicted by existing industry outlook and lacked any objective basis.  Smith's unfounded industry outlook for refining was denominated as "Dan's spread," and represented Smith's purported view on the crack spread for heavy crude.   In reality, "Dan's spread," which was referred to in a spreadsheet containing the new Lyondell EBITDA projections, was a combination of self-promotion and brazen fabrication.

291.    By way of background, the Maya 2-1-1 crack spread is a commonly used indicator of refining margins from "heavy sour" crude oil.   The Maya 2-1-1 crack spread measures the difference between the cost of two barrels of Maya crude oil and the price of one gallon of gasoline and one gallon of home heating oil on the spot market.

292.    The Houston Refinery is a complex refinery, which means that it is able to refine a range of heavier high sulfur crude oils from which greater quantities of contaminants, such as sulfur, metals and organic acids must be removed.   The earnings potential of a complex refinery depends upon its ability to process lower cost heavy sour crude oil feedstock at costs that allow refined products to compete with products refined from lighter crudes.   The relative profitability of a simple versus complex refinery will depend on current market conditions, in particular the price differential between light and heavy crude oil, the incremental cost to refine that heavy

crude oil and maintain the complex refining facility, and the value received for the lower valued byproducts such as petroleum coke and sulfur.

293.    However, according to information available in various contemporaneous industry publications, industry experts were forecasting declines in refining margins of anywhere between 3%-25%, based on, among other things, new additions to refining capacity, declining heavy crude oil output and the U.S. and Europe renewable fuels initiatives.  Both Purvin & Gertz ("P&G") and Turner Mason & Co. ("TMC"), the only industry consultants that are known to have developed forecasts specifically of the Maya 2-1-1 crack spread in 2007, projected that beginning in 2008 and continuing though the five year projection period, the Maya 2-1-1 crack spread would decline from levels seen in 2007.

294.    In preparing presentations for Access regarding the proposed acquisition of Lyondell by Basell between August 2006 and July 10, 2007, Merrill had incorporated EBITDA projections for the Houston Refinery derived from the data furnished to prospective bidders for the refinery in 2006.  Such projections were recognized by Merrill to be "in line with consensus estimates and projected peer performance."

295.    Merrill's "Wall Street Consensus" or Merrill's projections for the Houston Refinery (on a standalone basis), prior to July 15, 2007 are as set forth below:

### Houston Refinery EBITDA (in millions of $)

| Merrill Presentation | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| April 1, 2007 (100% Mark-to Market) | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 | 6,090 |
| April 10, 2007 (credit stress test) | 1,069 | 975 | 906 | 755 | 566 | 4,271 |
| June 17, 2007 (CML 13K Base | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 | 6,090 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Case) | | | | | | |
| June 17, 2007 (ML 13K Downside Case) | 1,009 | 1,036 | 1,100 | 1,069 | 962 | 5,176 |
| July 9, 2007 | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 | 6,090 |
| July 10, 2007 | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 | 6,090 |

296.    The views of other analysts were similar.  On July 5, 2007, just two weeks after Lyondell's projections were "refreshed," Paul Smith, a Managing Director at Citibank, sent Robert Salvin and Mario Portela of Lyondell, a Citibank presentation entitled "Project Launcelot," in which Citibank set forth the Wall Street outlook for Lyondell's EBITDA. Citibank projected Houston Refinery EBITDA for 2007-2008 to be $640 million less than Smith's "Today's View."

297.    As is clear from the Merrill analysis, the broad consensus was that Lyondell would experience much lower EBITDA results from its refining operations than those concocted by Smith and his inner circle.

298.    The impact of speculative and unsupported projections for increased profitability from the Houston Refinery, as Smith knew at the time in manipulating Lyondell's EBITDA projections, was to add approximately $2.0 billion of additional projected EBITDA to the already highly optimistic projections contained in the 2007 Long Range Plan.  The five year projection period EBITDA from refining operations set forth in the management presentation eventually presented to support the Merger included, overall, approximately $3 billion in speculative EBITDA.

299.    The "refreshed" projections also included speculative and unsupported forecasts for Lyondell EBITDA from petrochemical operations. Consistent with widely held industry outlook of the petrochemicals industry cycle, in each year since 2003 (2003 through 2006),

Lyondell management had prepared a long range plan (five-year) showing that management anticipated that EBITDA from petrochemical operations would decrease significantly from 2007 to 2008 and would continue to decline thereafter.

300.    Thus, management's 2004 LRP showed a decrease in Lyondell EBITDA (excluding refining) for 2008 versus 2007 of approximately 29%; management's 2005 LRP showed a decrease in Lyondell EBITDA (excluding refining) for 2008 versus 2007 of approximately 32%; management's 2006 LRP showed a decrease in Lyondell EBITDA (excluding refining) for 2008 versus 2007 of 15%; and finally, the 2007 Long Range Plan showed a decrease in Lyondell EBITDA (excluding refining) for 2008 versus 2007 of 8.8%. At odds with management's previous outlook (and with the prevailing industry outlook), the management projections for Lyondell EBITDA (excluding refining) in the refreshed projections include almost no decrease in projected Lyondell  EBITDA (excluding refining) from 2007 to 2008.  In fact, the management projections for 2008 Lyondell EBITDA (excluding refining) ($1.806 billion) represented a 24% increase over actual 2007 Lyondell EBITDA (excluding refining).

301.    In addition to including an unsupported forecast of improved margins for 2008 over 2007, the "refreshed" petrochemical projection included unsupported improvements (relative to the 2007 Long Range Plan) for the later years in the projection period.  These improvements amounted to hundreds of millions of dollars of speculative earnings for which there was no support.

302.    The impact of the speculative and unsupported assumptions concerning the profitability of the Lyondell petrochemical operations was to add approximately an additional

$1.6 billion of EBITDA to the already highly optimistic projections contained in the 2007 Long

Range Plan.

303.    Overall, "Today's View" included an aggregate of $3.4 billion of EBITDA over

the five-year period over and above the Merrill projections first presented to Access in March

2007 (and substantially unchanged thereafter until July 14, 2007), which Merrill had based on

CMAI's updated 2007 industry outlook as well as other industry sources and the 2006 data room

appraisals of the Houston Refinery.  "Today's View" and the Merrill view are compared below:

**EBITDA (in millions of $)**

| YEAR | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|------|------|------|------|------|------|-------|
| "Today's View" | 3,562 | 3,507 | 3,064 | 2,901 | 2,576 | 15,610 |
| Merrill's Pre-July 2007 View | 3,064 | 2,752 | 2,325 | 2,067 | 1,980 | 12,188 |
| Difference | 498 | 755 | 739 | 834 | 596 | 3,422 |

G.      **Blavatnik Turns His Attention to Huntsman**

304.    While Smith was "refreshing" Lyondell's projections in preparation for

negotiations with Blavatnik, Blavatnik was exploring other acquisition opportunities. Blavatnik

was internally known at Access as the "King of Optionality." Blavatnik had, as among potential

acquisition targets, for some time also been actively pursuing Huntsman. After acquiring the

Toe-Hold Position, Blavatnik kept his "options" regarding Lyondell on hold over the next

several weeks while his Access deal team moved forward on another front with a potential

acquisition of Huntsman. On June 26, 2007, after extensive negotiations and due diligence by

Basell, Basell and Huntsman entered into a definitive agreement pursuant to which Basell

committed to acquire Huntsman in a transaction valued at approximately $9.6 billion.

305.    Upon learning of the Huntsman deal, Smith became concerned as he believed that

it was unlikely that Blavatnik would acquire both Huntsman and Lyondell. In fact, just after

learning that Blavatnik entered into a definitive agreement with Huntsman, Smith remarked in an

email to DeNicola, "[n]ow we will have to contend with Len and Peter [Huntsman]!" Despite

the disappointment, the implications of the Huntsman deal for Lyondell was not lost on Smith.

He commented that the premium that Blavatnik was paying for Huntsman "is equal to about 48

for us," the same number he floated to Trautz at their meeting on June 7, 2007, in London.

306.    In the hope that Lyondell was not completely off Blavatnik's radar, Smith wanted

to know how the proposed financing structure of the Huntsman deal would be affected "if we

were added to mix?"

307.    On July 4, 2007, Huntsman advised Access and Basell that Hexion Specialty

Chemicals, Inc. ("Hexion"), an Apollo-controlled entity, had made a superior bid. Thereafter, on

July 12, 2007, Huntsman backed out of its agreement with Basell, incurring a $200 million

contractual break-up fee (payable to Basell) in order to enable it to accept the higher offer from Hexion.

308.    Huntsman was not the only petrochemicals target to elude Blavatnik.  He also had failed in his efforts earlier in 2007 to acquire General Electric's plastics division, which Basell's competitor, Saudi Arabian Basic Industries (or "SABIC"), snatched up.  By early July 2007, there were already indications that the credit markets could be tightening.  The "King of Optionality," sensing his options were slipping away, resolved that he would close the deal to acquire Lyondell, whatever it took.

### H.    Blavatnik's Renewed Pursuit of Lyondell

309.    Approximately a month prior to the break up of the Huntsman deal, Volker Trautz, the CEO of Basell, had flown to London at the request of Blavatnik and met with Smith (who was in London for a conference) on June 7, 2007.  During a private dinner meeting, Smith told Trautz that if Blavatnik "really want[s] to consolidate then [Blavatnik] can use Lyondell as a platform."  According to Trautz, Smith then began negotiating and "suggest[ed] a price of $48/share [for Lyondell] would be justified."  Trautz understood Smith to be communicating that if Blavatnik wanted to acquire Lyondell, he had to offer $48 per share.  On July 4, 2007, the very day that Access learned it was out-bid on the Huntsman deal by Apollo, Blavatnik contacted Smith directly to request a meeting about the Lyondell acquisition.

310.    On July 9, 2007, Smith and Blavatnik met privately in New York at Access's offices in Manhattan right before Smith flew to The Netherlands for a regularly scheduled Lyondell board meeting.  According to Lyondell's proxy statement soliciting shareholder consent to the Merger, on this occasion, Blavatnik initially suggested a price of $40 per share for Lyondell, which was then trading at $39.21 per share.  Smith suggested that if Blavatnik was

serious, he needed to make his best offer.  Smith had on a previous occasion indicated that the

Lyondell board would be looking for a 20% premium over market price, and had already

privately told Trautz in London on June 9, 2007 that $48 per share was an appropriate price to

purchase Lyondell.  Blavatnik requested that Smith contact him later that same day to further

discuss the matter.

311.    During the July 9 meeting, Blavatnik told Smith that if a deal was consummated,

Blavatnik intended to appoint Trautz as CEO of the combined companies.  Thus, Smith knew

before a deal was struck that he would no longer be chief executive of Lyondell.  Although

Blavatnik asked Smith to remain on as Chairman, Smith understood that such a position would

not allow him to "have much influence."  In reality, Smith was not concerned about his potential

role with the new company, or with the consequences of the inflated projections he had

engineered, or with the consequences of LBI being unable to service its crushing debt.  Although

he did not formally decline the offer to remain as Chairman of the combined companies until

October 2007, for Smith the transaction meant an opportunity to exit from his role as Lyondell's

chief executive, and cash out with an enormous personal fortune.

312.    Later, on July 9, Smith called Blavatnik from the airport.  After some discussion,

Blavatnik indicated to Smith that Basell could pay $48 per share if Lyondell could sign an

agreement by Monday, July 16, 2007 and agree to a $400 million break up fee.  Blavatnik said

the transaction would have fully committed financing and that consummation of the transaction

would not be conditioned on obtaining financing.  He gave Smith until July 11, 2007 to respond.

Smith responded that he would report that information to the Lyondell Board.  The Lyondell

Board had a meeting scheduled for July 10, at The Hague, The Netherlands.

313.    When word of Blavatnik's offer to acquire Lyondell at $48 per share reached his

top executives, they were both incredulous and frightened.  On July 9, 2007, Kassin informed

Patel by email that Blavatnik intended to sign an agreement with Lyondell by July 16.  Patel

asked if Kassin was joking.  Kassin responded by email: "No I aint [sic] – last hour most bizarre

in my carrer [sic]."

314.    In an email dated July 10, 2007, Kassin commented on the transaction to Bigman,

Chief Financial Officer of Basell, "Not my idea.  I can't sleep thinking of this at $48." Bigman

replied:  "Me  neither,  woke  up  at  4:30."  Bigman  emailed  his  concerns  to  Blavatnik,  even

knowing  it  would  be  no  use:  "I  know  you've  already  made  up  your  mind,  but  I  am

uncomfortable with the valuation—it's almost $5 billion more than we were offering a year ago

and over $2 billion more than we were discussing just a few weeks ago."

315.    Merrill  had  been  requested  to  update  its  June  12,  2007  analysis  (which  had

assumed a per share price of between $38 and $42) to reflect an acquisition at between $45 and

$50  per  share.   Modeling  the  deal  at  these  price  ranges,  based  on  its  prior  projections  for

earnings, showed the combined enterprise with ratios of debt to EBITDA in excess of 5x as it

headed into the trough years.

316.    Because of concerns related to the amount of leverage in the proposed deal, on

July 10, 2007, Merrill raised the idea of including a "market flex" provision into the financing

commitment that would permit Merrill to require that Access provide an incremental equity

contribution to the merged entities of $1 to $2 billion if such a feature was necessary to syndicate

the loan.  Merrill also proposed issuance of PIK financing at the holding company level in order

to  lower  the  debt  levels  at  the  operating  company  level.   Although  Access  had  proposed

including up to $1 billion of cash as part of its unsuccessful August 2006 offer for Lyondell,

Patel promptly informed Merrill that such proposed financial structures were unnecessary and "wholly unacceptable." Access and Blavatnik no longer had any intention of putting their own cash or capital at risk in the deal.

317.     Writing to Blavatnik, Bigman acknowledged that Merrill having raised the need for a market flex provision was "another indication that we're on the edge here." In fact, the "all debt" financing of an acquisition of Lyondell was not "on the edge," but well over it. The extreme leverage being proposed would, upon the Merger, result in LBI being severely undercapitalized for the purposes of its combined businesses.

318.     Like Lyondell, Basell had an annual plan process which in November 2006 had resulted in the issuance of a 2007-2011 Basell Business Plan including EBITDA projections for the five year projection period. By July 2007, these projections had already been adjusted upward at least once since the issuance of the 2007 Basell Business Plan. Rather than reconsider, in view of projected high leverage, whether the combined entities would be adequately capitalized, on or prior to July 10, 2007 Access supplied Merrill with another upward adjustment of the Basell forecast including significantly higher earnings by Basell for all years during the period projected. These newly forecast earnings significantly reduced the earnings trough that Basell had earlier projected for 2009 and 2010. These "updated" Basell EBITDA projections were updated yet again on or prior to July 14-15, 2007. These upward adjustments to the projections found in the then current Basell business plan resulted in an aggregate increase in the projected EBITDA of Basell of 19% for the period. These "updates" to the Basell EBITDA projections are shown in the table below:

**EBITDA (in millions of $)**

| Basell Management Projections | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| 2006 Plan | 1,375 | 1,396 | 1,287 | 1,113 | 1,296 | 6,467 |
| July 9-10, 2007 Update | 1,675 | 1,483 | 1,353 | 1,158 | 1,358 | 7,027 |
| July 14-15, 2007 Update | 1,905 | 1,755 | 1,359 | 1,311 | 1,365 | 7,695 |
| Aggregate change  ($) | 530 | 359 | 72 | 198 | 69 | 1,228 |
| Aggregate change (%) | 38.5 | 25.7 | 5.6 | 17.8 | 5.3 | 19 |

319.    The smaller, older and less efficient petrochemical plants operated in Europe by Basell would foreseeably be hit hard in the coming downturn. The Basell projections, however, had been prepared with a view to their use in connection with leveraging Basell to acquire additional assets.  As such, these projections largely ignored the forecasted downturn and failed to reflect the sharp decrease in earnings that many of Basell's facilities would foreseeably experience.  Notwithstanding the facially apparent failure to reflect the reality of the business cycle, the presentation materials prepared by Merrill for Access during the period when it was promoting the Transaction consistently reflect that Merrill (as was known or should have been known by Access) failed to subject Basell projections provided to it by Access to independent analysis by reference to industry analysts' forecasts of supply and demand for the petrochemical products manufactured by Basell.

320.    On July 10, 2007, Merrill, using the new, higher Basell projections, issued a revised presentation containing both "Base Case" and "Downside Case" financial models for the Transaction.

321.    On July 11, 2007, Benet emailed Blavatnik, Trautz, Bigman, Kassin, and Patel with his analysis of the proposed capital structure.  According to Benet, if Lyondell, considered

on a standalone basis, performed as forecasted by the "Base Case" projections that had been
developed by Merrill using CMAI and other data, the combined enterprise would likely meet its
debt service but its equity owners would essentially be "working for the banks." As Benet
crunched the numbers, only if Lyondell materially outperformed the projections would the
transaction make any sense.  He showed this by adjusting the Base Case to increase EBITDA by
15%, calling this the "Sensitivity Case."  Under this Sensitivity Case, Lyondell EBITDA would
be $3.5 billion in 2007, as opposed to a "Base Case" EBITDA projection of approximately $3.1
billion.  As explained by Benet, the acquisition was a bet on the chance that Lyondell would
materially overshoot Merrill's projections, even though Access had no evidence that would occur
and knew that the petrochemical industry was poised to enter its next trough.  He explained:
"[T]he rationale at this price [$48 per share] would be that we actually are buying the option on
(a) the upside case equal to or greater than the Sensitivity, and (2) owning an enormous asset
base into the next upswing."

322.    In reviewing Benet's analysis, Trautz asked Benet if he was correct "that we
basicly [sic] at 48 per share can only justify the deal via synergies and the belief in the upside
over the base case?" Benet confirmed that this was indeed his view:

> Correct.  For the next three years, the Base Case assumed average
> EBITDA of $2.3bn.  That's not enough for $48/share.
>
> We need to be expecting > $2.7bn to start paying down debt in the
> 'good times'.  And if we get $3bn it makes a real dent, which also
> provides cushion against a sharper downfall in the 'bad times'.
>
> If they were to make $3.5bn [for 2007], is > $2.7bn average for the
> next 3 years realistic or a pipedream?

323.    On July 10, 2007, the Lyondell Board met in The Hague, and Smith reported on
his discussions with Blavatnik, and it was decided that the Board would convene a special
meeting the following day to further discuss the matter.  At that meeting, the Lyondell Board

also reviewed the "refreshed" projections, the 2007 Long Range Plan, and historical analyses of Lyondell's performance. The "refreshed" projections had changed so dramatically from the 2007 Long Range Plan, that the Lyondell Board knew or should have known that that the "refreshed" numbers were inflated, unreasonable, and unachievable.

324.    The next day, a special meeting of the Lyondell Board was convened, again in The Hague, and Smith reported on discussions with Blavatnik since July 10th. The Lyondell Board was advised that Lyondell management wanted to schedule a special Board meeting "on the afternoon of Monday, July 16th," *i.e.*, the deadline set by Blavatnik for entering a definitive agreement. The Lyondell Board also discussed engagement of an investment banking firm to serve as financial advisor to Lyondell and authorized management to continue the discussions with Blavatnik regarding a possible transaction.

325.    On July 12, 2007, in anticipation of Lyondell's board accepting the $48 per share price, Access quickly lined up the lead bankers – in addition to Merrill, that would include Citibank and Goldman.

326.    Also on July 12, 2007, the Lyondell Board met again in The Hague, at which time it reconfirmed that it would have a special meeting on July 16, 2007. Given that Lyondell's Board was still in The Netherlands on July 12, along with Lyondell senior management, it was necessary for them to return to the United States to advance discussions.

327.    On or about July 12, 2007, Lyondell commenced providing materials to Basell and Access in response to the preliminary due diligence request of Basell and Access. Meetings between representatives of Lyondell and representatives of Basell and Access took place on July 13, 2007 through July 15, 2007 in New York and Houston to enable Basell and Access to review certain business, financial and legal matters.

89

328.    By this time, Kassin, who remained opposed to the deal, was resigned to the inevitability of the transaction going forward.  He commented in an email dated July 12, 2007:

> My job is to sign this up…I will make it happen if I have to kill myself…the real problem is – I hate the deal at $48 and am scared to death that the banks will ALL want new cash equity…I am trying to separate my two roles – one deal weasel who will get this signed up in record time…vs. Board member with fiduciary role for the shareholder…this one will be tough.

329.    However, Kassin and others within Access and Basell expressed their concerns regarding the accelerated pace of the deal.  Kassin remarked to Patel, in an email dated July 12, 2007, that: "There is no realism in the schedule whatsoever" and that "we should have bought Huntsman at 26/27 – not Hugo at 48."  At the same time, Kassin remarked to Bigman, Trautz and Patel in a separate email that the meetings between Lyondell and Basell needed to start as soon as possible the morning of July 13th, because "starting at 1 pm has us really losing half a day in a schedule that has no fat."  The next day, despite Access's efforts to expedite the process, a meeting that was scheduled to take place on Friday, July 13, 2007 was delayed, because, according to an email from Kassin, "the Hugo CFO just called me and they are still scrambling and have been really caught flatfooted."

330.    The sole due diligence meeting between Lyondell's management and the banks (*i.e.*, Merrill, Citibank, and Goldman) occurred at the offices of Skadden Arps in New York on Saturday, July 14, 2007.  During this meeting, Lyondell's management team gave a PowerPoint presentation (the "Lyondell Management Presentation") to representatives of Basell, Access, Citibank, Merrill and Goldman.  The EBITDA projections for years 2008 through 2011 contained in the Lyondell Management Presentation were identical to the "Today's View" contained in the June 18 spreadsheet from Robert Salvin of Lyondell, other than a downward

adjustment of $100 million for EC&D in 2010.  The EBITDA projections set forth in the

Lyondell Management Presentation were as follows:

### EBITDA (in millions of $)

| YEAR | 2007 (E) | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Refining | 1,568[11] | 1,700 | 1,600 | 1,500 | 1,300 |
| EC&D | 950 | 1,150 | 800 | 600 | 600 |
| PO& RP | 730[12] | 657 | 664 | 701 | 676 |
| Total | 3,248 | 3,507 | 3,064 | 2,801 | 2,576 |

331.   Unlike the EBITDA forecasts for 2008-2011 in the 2007 Long Range Plan and

Merrill Lynch's July 10, 2007 Base Case for Lyondell, each of which fell considerably short of

the average annual EBITDA of ">$2.7 bn," Access's Benet thought necessary to support the

$48/share acquisition price and "start paying down debt in 'good times'," the inflated EBITDA

in the Lyondell Management Presentation met this mark.

332.   The Lyondell Management Presentation also included quarterly EBITDA

estimates for each quarter of 2007.  These showed that management now projected total

EBITDA of $3.248 billion for the year ending 2007.  This 2007 projection included $818 million

of EBITDA for the third quarter of 2007 and $916 million of EBITDA for the fourth quarter of

2007.

333.   Trautz, who attended the Lyondell Management Presentation at Skadden Arps,

and was the most experienced and expert senior Basell representative present, did not find the

internal Lyondell management projections at all credible.  He understood that Lyondell

management, which would enrich itself if the deal went forward, was highly motivated to pitch

---

[11] Including "turn around adjustment."
[12] Including "adjustments."

Lyondell as worth the $48 per share price. For his part, Blavatnik did not attend these meetings, but received reports from members of his team who attended, including Trautz.

334.    From July 12, 2007 through July 15, 2007, the parties and their external and internal legal counsel prepared and negotiated the form of a definitive agreement for the transaction and related documentation.

335.    On July 14, 2007, Lyondell entered into an agreement with Deutsche Bank Securities, Inc. ("DBSI") to provide an opinion as to the financial fairness to Lyondell shareholders of the price to be paid for Lyondell common stock.

336.    On or about July 14, 2007, Access provided Merrill with the latest, newly updated projections for Basell EBITDA, increasing the EBITDA projected to be achieved by Basell for the five year period 2007 through 2011 by approximately $650 million (almost 10% over the most recent cumulative EBITDA provided to Merrill). By Sunday, July 15, 2007, Merrill had generated a revised model of the Transaction, this time incorporating Lyondell management projections and "updated" Basell projections. Merrill's new "Base Case" EBITDA projections (the "July 15 Base Case"), set forth in the table below side by side with Merrill's "Base Case" EBITDA projections of only a few days before (the "July 10 Base Case"), were materially higher.

| Fiscal Year | July 10 Base Case | July 15 Base Case | Percentage Change from July 10 to July 15 |
|---|---|---|---|
| 2007 | $4,839 | $5,375 | +11.1% |
| 2008 | $4,435 | $5,222 | +17.7% |
| 2009 | $3,878 | $4,281 | +10.4% |
| 2010 | $3,435 | $4,005 | +16.6% |
| 2011 | $3,538 | $3,906 | +10.4% |
| 2012 | $3,878 | $3,928 | +1.3% |
| 2013 | $4,144 | $4,090 | -1.3% |

337.    All too conveniently, the July 15 Base Case, unlike the old July 10, 2007 projections (dated only three business days earlier), showed the enterprise's combined EBITDA/debt ratios would stay comfortably below the "too risky" 5x levels, which had prompted Merrill to raise the issue of requiring additional equity from Access.

338.    Since Blavatnik had insisted that the Merger agreement had to be signed by Monday, July 16, 2007, there was no time for Access to engage in further due diligence or reasoned analysis.    Instead, Access recklessly accepted Lyondell's internal "management projections" and used them to pump up the purported valuation of Lyondell.    Greased in this way, the transactional wheels continued to move forward.    The idea of obtaining a commitment from Access to support the merged entities with additional equity was apparently abandoned by Merrill.

339.    Due diligence done here by Access was perfunctory at best, and in material respects, nonexistent.[13]    Blavatnik had made up his mind—he wanted the deal.    And Lyondell management, having been offered a "blowout" price at $48 per share, was not only willing to oblige, but also did everything in its power to make a deal happen at any cost.

340.    On July 16, 2007, Access and Basell made a formal written proposal to Lyondell to acquire all of the common stock of Lyondell for a cash purchase price of $48 per share and outlined the other terms of Basell's offer, as reflected in the proposed form of merger agreement and the Commitment Letter (as defined below).    The proposal explained that the $48 per share price was a "compelling price" for Lyondell's shareholders because it represented:

- ▪ a 45% premium to the closing stock price of $33.07 on May 10th (the day prior to public disclosure of Access's agreement to acquire a 8% position in Lyondell)

- ▪ a 40% premium to the 52-week "unaffected" high closing price through May 10th of $34.18 (closing price on May 3, 2007)

---

[13] By contrast, in August 2006, Access/Basell advised Lyondell that it would require 30-45 days of diligence.

- a 128% premium to the 52-week unaffected low closing price through May 10th of $21.05 (closing price on June 13, 2006)

341.    Upon the Merger, each outstanding share of Lyondell common stock would be converted into the right to receive $48 in cash.  Later in the day on July 16, 2007, at a special meeting of the Lyondell Board, the proposed transaction was unanimously approved by the Lyondell Directors.  Notably, many of the Lyondell Directors, including Smith, stood to earn huge sums of money on the deal, and all the Lyondell Directors stood to make significant sums of money.  In addition to benefiting from the Merger to the extent of existing stockholdings, they would receive additional payments triggered by the Merger.  The chart below lists the amount of Lyondell stock, stock options, and derivatives that Dan Smith and the other Directors would be cashed out for upon the closing of the Merger:

| Directors | Common Stock | Stock Options | Phantom Stock | Deferred Stock Units | Total value (at $48/share) |
|---|---|---|---|---|---|
| **Dan Smith** | 370,996 ($17,807,808) | 1,180,400 ($36,973,979) | 54,864 ($2,633,472) | - | $57,415,259.00 |
| **Eight Other Directors** | 142,100 ($6,820,800) | 30,000 ($1,010,375) | 60,790 ($2,917,920) | 34,724 ($1,638,973) | $12,388,068 |

342.    Just two days after being retained by Lyondell, DBSI delivered its fairness opinion at the Lyondell board meeting on July 16, 2007.  In rendering its opinion, DBSI assumed that the financial forecasts and projections provided to it by Lyondell were reasonable, and thus expressed no view as to the reasonableness of such forecasts and projections, or the assumptions upon which they were based.[14]  In fact, DBSI did not assume responsibility for independently verifying *any* information that it relied upon, whether publicly available or furnished to it.  In

---

[14]  After July 17, 2007, DBSI raised concerns about inconsistencies between the EBITDA projections contained in the Lyondell Management Presentation and in the one page spreadsheet summarizing Lyondell's EBITDA projections through 2011 that was part of Salvin's email of June 18, 2007.

return for providing the Fairness Opinion, DBSI received a Transaction Fee of $35 million.  A large portion of this fee ($25 million) was dependent upon consummation of the Merger.

343.   Approximately $21 billion was necessary to complete the proposed acquisition including approximately (i) $12.5 billion of Merger Consideration to be paid in respect of the outstanding shares of Lyondell's common stock, (ii) $7.1 billion plus an additional approximately $500 million in related prepayment fees to refinance certain existing indebtedness of both legacy companies, (iii) approximately $574.6 million[15] to pay fees and expenses in connection with the Transaction and the financing agreements, and (iv) $337.3 million to pay amounts pursuant to various Lyondell benefit and incentive plans, stock option plans, and other equity based incentive programs, including certain change in control arrangements.

344.   On the same day as the three banks agreed to provide $21 billion of financing to enable Blavatnik to amass his global petrochemical company, Blavatnik caused Basell to issue a shareholder dividend in the amount of €75 million, draining Basell of the capital that it shortly would desperately need.  This was the second Basell cash dividend of 2007, the prior being a dividend on or about May 29, 2007, for €140 million.

345.   On or about July 16, 2007, the Supervisory Board of Basell (the equivalent to a board of directors) voted to approve the proposed acquisition.  At a deposition conducted in a Lyondell shareholder litigation following the signing of the Merger, Kassin, who served on Basell's Supervisory Board, claimed he voted against the transaction, later explaining that he found the $48 per share price "ludicrous," and could not, consistent with his fiduciary responsibility as a member of Basell's Supervisory Board, vote in favor of it.  According to Kassin, Trautz was also opposed to acquiring Lyondell at $48 per share.

---

[15] Including M&A advisory and financing Arranger fees, other professional fees, and costs and expenses.  Assumes $1.40/€.

346.    On or as of July 16, 2007, the parties executed and delivered the Agreement and

Plan of Merger, dated as of July 16, 2007 among Basell, BIL Acquisition Holdings Limited, a

wholly owned Delaware subsidiary of Basell, and Lyondell (the "Merger Agreement").

347.    As negotiated between Basell and Lyondell, the Merger Agreement had no

"financing out" – Basell's obligation to close the Transaction was not conditioned on its ability

to find the money to pay for it.  On the same day as it entered into the Merger Agreement, Basell

obtained a commitment letter from Merrill, Citibank, and Goldman.  Pursuant to the commitment

letter, the three co-lead banks committed to fund up to $14 billion of first lien secured credit

facilities, including a $13 billion Term Loan, and up to $7 billion of second lien loans pursuant

to a bridge facility.  Basell, at its option and in lieu of the bridge facility could issue up to $7

billion in principal amount of second lien notes and/or senior unsecured notes (at the option of

the banks) in a private debt offering.  Merrill, Citibank, and Goldman were appointed as joint

lead arrangers, bookrunners, and global coordinators for the first lien credit facilities.  ABN

AMRO joined as a fourth lead arranger in early August.

348.    On July 17, 2007, prior to the opening of trading on the New York Stock

Exchange, Lyondell and Basell issued a joint press release announcing the proposed transaction.

349.    On or about August 25, 2007, Basell made an irrevocable offer to purchase the

Berre L'Etang Refinery ("Berre") from Royal Dutch Shell plc for a purchase price of

approximately $947 million.  Basell made the commitment, which like the Merger, had no

financing contingency, without funding in place to pay for this billion dollar asset and without a

plan on how to finance the purchase. of course, Basell intended to fund the purchase of Berre

with further borrowings.  The financing of the Berre acquisition remained an open issue

throughout the fall of 2007, and Patel wrote to Twitchell on September 13, 2007 that "[n]o bank

or bondholder will just fund into this deal [without] a definitive answer on how the refinery will be financed."

350.    In October, when UBS agreed to join Merrill, Citibank, Goldman, and ABN AMRO (collectively, the "Lead Arrangers"), these parties agreed to increase the size of the commitment from $21 billion to $22 billion in exchange for various pricing concessions.  As the Lead Arrangers duly noted at the time, the additional $1 billion of funding, earmarked to pay for Berre and other assets Basell hoped to snap up, further increased the leverage at which the company would be forced to operate.

## II.    <u>The Merger Occurs Amid Signs of Deteriorating Economic and Industry Conditions</u>

351.    In mid-July 2007, when Basell entered into the Merger Agreement and contractually bound itself to buy Lyondell for $48 per share, all of the parties to the Merger Agreement knew the Merger was a gamble as to whether the combined companies would be able to generate sufficient earnings through a downturn in the industry cycle to fund operations and service the mountain of debt to be incurred.  The members of the Board of Directors of Lyondell knew that the entire transaction would be financed with debt:  Lyondell's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 (the "June 30, 2007 10-Q") contained the following disclosure regarding the impact of the planned Merger on Lyondell's financial condition and, inferentially, on its future access to the credit markets:

> Basell intends to finance the merger consideration with borrowings and, as a result, Lyondell would have become more levered, which would exacerbate the risks relating to Lyondell's level of debt.  In July 2007, Standard and Poor's Rating Services placed its credit rating for Lyondell, Equistar and Millenium debt on Credit Watch with negative implications and Moody's Investor Service placed the rating of Lyondell, Equistar and Millenium under review for possible down grade, *each as a result of the anticipated post-merger capital structure.*

(Emphasis added).

352.     The Lyondell Board also knew that the highly-leveraged company would face

significant barriers in obtaining additional financing in the highly foreseeable event that the

liquidity available through the financing put in place upon the Merger was insufficient.

Lyondell's June 30, 2007 10-Q presented the leveraging of Lyondell pursuant to the Merger as a

risk factor: "Lyondell's consolidated balance sheet is highly levered and, if the merger is

completed, Lyondell may become more levered which would exacerbate the risks described

herein."

353.     These risks were more specifically described to include the following:

> *Lyondell may not be able to obtain financing in the future for*
> *working capital, capital expenditures, acquisitions, debt service*
> *requirements or other purposes;* less levered competitors could
> have a competitive advantage because they have lower debt service
> requirements; and in the event of poor business conditions,
> Lyondell may be less able to take advantage of significant business
> opportunities and to react to changes in market or industry
> conditions than its competitors.

(Emphasis added).

354.     Thus it was clear, at the time of the signing of the Merger Agreement, that the

economic enterprise created by combining Basell and Lyondell was severely disadvantaged by

its proposed capital structure.

355.     Almost immediately following the signing of the Merger Agreement and long

before the Merger closed, emerging operating results for Lyondell and other information

demonstrated that the "Today's View" EBITDA projections which had been incorporated into

the July 15 Base Case were, at a minimum, unreasonably and speculatively optimistic.  Data

available to the capital markets and to the managements of Lyondell, Access, and Basell,

demonstrated that petrochemical manufacturers, unable to pass on increased feedstock costs,

were experiencing a strong compression of margins.  In short, the window to do a leveraged finance deal in petrochemicals had closed.

356.    The sobering reality for Lyondell was repeatedly confirmed and reconfirmed in the weeks and months leading to the December 20, 2007 closing.  Lyondell's final numbers for the second quarter were somewhat below its projections.  Lyondell's performance for the third quarter of 2007, however, departed sharply from the "refreshed" projections presented in the Lyondell Management Presentation.    Instead, these results looked remarkably like the "Downside Case" that analysts at Merrill and Citibank had included in their reports to their credit committees.  As the year moved into the fourth quarter, even the "Downside Case" was looking unduly optimistic.  Clouding the prospects for strong earnings, crude oil prices, which had been rising steadily all year, were continuing to rise and there were growing concerns that increasing energy costs, among other factors, would trigger a recession.  For his part, Trautz was not surprised in the least that oil prices would continue to rise, and suspected, even before the Merger Agreement was signed, that the trend of increasing oil prices alone was likely to ensure that Lyondell would not meet its rosy projections for the second, third, and fourth fiscal quarters of 2007.  If this spike in oil prices occurred, and price increases could not be passed on to customers, margin squeeze could result in earnings in line with the Credit Stress Test scenario that had been run by Merrill in April 2007, which showed Lyondell's EBITDA for 2008 dropping to approximately $2.1 billion.

357.    With so much at stake in the continuation of robust earnings through 2007, once the Merger Agreement had been inked, Lyondell's operating results, including its final, adjusted EBITDA balances for the second quarter of 2007, emerging results of the third quarter and its revised earnings projections for the balance of the year, were eagerly awaited by Access and the

Lead Arrangers.  This data would be a centerpiece of the presentations to prospective lenders being prepared by the Lead Arrangers to syndicate the $21 billion in debt that they had committed themselves to fund.

358.    In actuality, as early as July 19th, just *three days* after signing the Merger Agreement, Lyondell management already knew that it would not meet its third quarter EBITDA projections for 2007.  Thereafter, the speculative nature of "Today's View" was exposed when it was estimated that Lyondell would miss its third quarter EBITDA projections for 2007 by $85 million or approximately 10%.   Ultimately, the third quarter miss, at $134 million, or approximately 16%, was even larger than estimated.

359.    Despite knowing by no later than mid-August that Lyondell would widely miss its third quarter projections, Smith did not disclose this information to anyone at Access until September 11, 2007.  On that date, Smith sent an email to Blavatnik with emerging results of the third quarter.  In that same email, Smith also informed Blavatnik that Lyondell was likely to miss its fourth quarter EBITDA projections by approximately $200 million, or approximately 22%.  Smith provided no explanation for these significant misses.  Overall, actual EBITDA for 2007 would miss Lyondell management's EBITDA projections for 2007 by $376 million, and actual EBITDA for the second half of 2007 was 27% below the projections contained in the Lyondell Management Presentation.

360.    The reaction inside Access was alarm – Lyondell was materially missing projections that had been provided by Lyondell's management on July 14, 2007, merely two months earlier, and just prior to execution of the Merger Agreement.  The assumption underlying the Lyondell management projections that had been used by Merrill for its July 15 Base Case, that the strong performance of the first quarter of the year would be sustained through the year,

had been exposed as completely wrong. Blavatnik, noting the drop, responded to Smith's September 11 email stating, "Quite a change from your team's projections." At the same time, Blavatnik forwarded the results to Alan Bigman (Basell) and Philip Kassin (Access) asking, "Much below projected??" Kassin responded in two separate emails. In the first, he responded, "3rd qtr original projection was $818 mm." In the second email he wrote, "fyi – HERE WAS THE FORECAST THEY GAVE US WHEN WE SIGNED MERGER AGREEMENT."

361. Patel, emailing Alan Bigman and others, raised the possibility that Basell consult with its attorneys to consider its "options." To Kassin, Patel ticked off a list of recent leveraged transactions ("Great, Harman, SLM, Genesco, Reddi Ice") that had been renegotiated or from which one party had sought to back away based on purported changes in circumstances.

362. As the management teams for Lyondell, Basell, and Access prepared in late September 2007 to present updated pro forma financials to the banks financing the Merger, Bigman was gravely concerned. Emailing Kassin and Patel on September 24, Bigman stated that "Lyondell's shortfall is the number one problem we face—by a big margin." Patel responded, "the banks will be very, very troubled by the updated projections when they hear them on Wed." Lyondell management struggled to explain and minimize the significance of the earnings shortfall. Adjustments were made to the EBITDA balances to add back over $237 million to the EBITDA for the first two quarters, supposedly for "non-recurring costs." Watching the process of Lyondell scurrying to get ready to explain the status of the deal to the banks, commented Patel, was "like witnessing a slow motion train wreck." Kassin anticipated that banks who were planning to participate in the syndication would be "screaming bloody murder" and "requesting backup on Q3 and Q4 data for their credit comms." Kassin also warned Blavatnik to "expect more fireworks" from the banks after they receive the business plan and projections.

363.    Lyondell's poor performance provoked strong concerns about the banks' ability to syndicate the deal.  Although the banks' obligations to fund were not technically conditional on a successful syndication, a failed syndication would have repercussions on all parties. Access had a material interest in the successful syndication of the loans because, if syndication was unsuccessful, the banks had a variety of options, including the prerogative to increase interest rates on certain tranches of the Merger debt, to increase the commitment fees on undrawn portions of certain facilities, and otherwise re-tranche debt on terms more favorable to the banks.  To support the syndication, and notwithstanding the fact that the July 15 Base Case had been exposed as unrealistic, Basell and Access now had a common burden to present projections showing that earnings would be sufficient for LBI to finance its businesses though the expected earnings downturn.  Writing to Blavatnik on September 14, 2008, Kassin made clear that he understood that the objective for the upcoming presentation to be made to the Lead Arrangers was "to sell 20b in debt."

364.    Kassin also set out his roadmap of how to goose the projections to get to the necessary magic numbers.  First of all, Trautz and Bigman could not afford to be conservative so as to assure that projections would be met.   Second, Basell management needed to layer optimistic projections with purported "synergies" that would boost the projections.  "Synergies" – reduced costs of operations (either through the elimination of redundancy, greater efficiency, or other means) anticipated in connection with a business combination – are notoriously "soft" numbers, and here, for a number of reasons, Lyondell and Basell were ill suited to realize cost reductions due to claimed "synergies," had not done adequate due diligence on potential synergies, and were left to exaggerate or invent various potential synergies to attempt to compensate for the loss in EBITDA.

365.    Even if synergies are potentially available, it is always uncertain that management will be able to implement the necessary strategies to achieve them.  As pointed out by Trautz, "As an old M+A fox you know as well as I do the statistics.  Out of 100 mergers about 90 deliver the promised synergiies [*sic*] and even so about 50 fail." - Why? "wrong financing, [wrong] people," and the inability "to generate promised [*sic*] EBITDA" and to "master the cultural" shock.  Kassin acknowledged that this was all true but explained that in order "to achieve good execution on the financing and give the NewCo a better financial footing we need to 'sell' a realistic synergy scenario to the market . . . applying leverage to this number will be very helpful . . . erring on the side of being not too conservative helps here greatly."

366.    The financial projections of the combined companies developed for a September 26, 2007 presentation to lenders were a feat of reverse engineering.  Rather than meeting the July 15 Base Case of $3.4 billion of EBITDA for 2007, Lyondell's 2007 EBITDA would come in at no more than $2.7 billion.  The problem to overcome: sustaining the believability of the July 15 Base Case in the face of the emerging reality of Lyondell's poor performance for 2007. Reflecting the consensus industry outlook, all of the prior projections of Lyondell's performance submitted by Merrill showed earnings peaking in 2007 and then plateauing or declining in 2008 and thereafter beginning a steeper descent into the anticipated trough in 2011.  However, if actual 2007 EBITDA for Lyondell were used as the starting point for this downward descent, projected earnings for each subsequent year would be materially and adversely impacted.  Such revised projections would clearly demonstrate that the combined companies were severely undercapitalized and would be unable to cover debt charges through the downturn.  Moreover, the reduced earnings projections would also impact the discounted cash flow analysis of LBI and show a company that was either insolvent or, at best, verging on insolvency.

367.    The solution to declining earnings?  First, ignore all available economic, industry and company indicators pointing to a continued decline in earnings and project a huge earnings spike for 2008.  Second, make up lost 2007 earnings in later years by adding "synergies," thus reducing the slope of the downward descent.  This intentional manipulation of projections is exactly what the interested parties to the transaction did.

368.    Below are (i) the EBITDA projections developed by Merrill dated July 10, 2007; (ii) Merrill projections dated July 15, 2007, incorporating Lyondell management projections supplied by Lyondell management on July 14, 2007 immediately prior to the signing of the Merger Agreement (which by September 11, 2007 were known to be materially inaccurate); and (iii) the "reverse engineered" projections developed in early September 2007 for a presentation to lenders on September 26, 2007 (the "September Projections").

369.    Strikingly apparent is the pronounced spike in earnings (not featured in the prior projections) that now was being projected to occur during 2008.  Lyondell thus projected a 23% increase in 2008 EBITDA versus 2007.  Notable also is (i) the impact of the projected 2008 spike on earnings projections for each successive year, and (ii) the slower descent of the slope. Whereas the July 15 Base Case had shown EBITDA declining 31% from 2007, a "peak" year, to 2011, a "trough" year, the September Projections now showed a peak to trough decline of less than 10%.



370.   The 2008 earnings spike seen in the September Projections was unsupported by any reasoned analysis and inconsistent with industry forecasts.  The September Projections baselessly ignored industry forecasts that the decline from the 2005 peak in the margins (the "crack spread") for refined petroleum products generally, and particularly for the type of crude processed at the Houston Refinery, *i.e.*, "heavy sour," would continue during 2008 and thereafter.  This pressure on margins reflected by Lyondell's third and fourth quarter results was no fluke but was driven by factors that would foreseeably continue to depress margins over time.  First, gasoline demand was down due to high prices and the beginning of a weakening in the economy.   Second, and longer term, substantial new capacity to convert "heavy sour" was scheduled to come on line in 2009 and beyond.  Third, due to local conditions in Mexico and Venezuela, the production of "heavy sour" had declined, driving up its price and reducing the relative discount seen between heavy sour (which is more expensive to refine) and the higher

priced "light sweet" crudes.   Unaccountably and baselessly, the assumption underlying the
September Projections was that the crack spread for heavy sour would increase materially (by
15%) in 2008 and remain, in subsequent years, at much higher levels than were being forecasted
by industry analysts.  Thus, whereas third quarter projection for the Maya crack spread by Purvin
& Gertz, a leading refinery forecasting firm, was $24.23 a barrel, projected EBITDA for LBI
was based on a margin of $30.41 a barrel for this type of crude.   Reflecting the market's
understanding that, due to declining demand and increased capacity, the refining cycle was
heading toward a downturn, by the end of August 2007, the stock prices for publicly traded oil
refining companies had declined by 20% to 25%, with both stock prices and margins projected to
slide even further in the fourth quarter.

371.   Another unfounded assumption of the September Projections was that 2008
EBITDA for Lyondell's commodities chemicals business (EC&D) would increase by almost
50% over 2007 EBITDA from such business sector. No such increase was being forecast by
analysts.   Moreover, the September Projections for this industry segment unreasonably
overlooked Lyondell's disadvantages, relative to its competitors, including, without limitation,
its dependence on liquid feedstocks (the prices of which were increasing) as opposed to natural
gas feedstocks (which had remained relatively stable).   Rather than forecasting a surge in
profitability for 2008, analysts, including CMAI had, during the course of 2007, grown
increasingly bearish on basic petrochemicals, repeatedly adjusting downward projections on
margins for leading petrochemical products such as ethylene and polyethylene.   Broader
indications of industry prospects also pointed to 2007 being the end of the peak.  In July 2007,
Standard & Poor's announced that the entire industry's average credit rating was deteriorating

and cut the credit ratings of two-thirds of the chemicals companies it covered to speculative status.

372.   For anyone to have projected future performance based on Lyondell materially outperforming its industry peers in 2008, as is implied by the projected 23% spike in refining EBITDA and the projected expansion of petrochemicals margins, was manifestly unreasonable, if not fraudulent.   In fact, in addition to the reasons stated above, for the additional reasons summarized below, all of which were known to Lyondell and Basell management, following the Merger, both historical Lyondell and the combined Lyondell and Basell companies were far more likely to underperform relative to their peers and be less able to compete in a downturn:

a.   <u>Lyondell's Houston Refinery</u>.   Lyondell's Houston Refinery, one of Lyondell's most important assets, had a significantly higher cost of production than its competitors and its profitability was dependent on, among other factors, the discount at which "heavy sour" crude could be purchased relative to lighter, sweeter grades.   As explained above, by 2007 it was known that any competitive advantage derived from the Houston Refinery's ability to refine "heavy sour" crude was diminishing due to the narrowing of this differential, a trend that was expected to continue.[16]

b.   <u>Olefins (Ethylene, Propylene Butadiene, and Isobutylene)</u>.   Both Lyondell and Basell's olefin businesses were heavily exposed to the slower growing markets in North America and Western Europe, where their facilities were primarily based, and both lacked a significant low-cost business presence in the Middle East, exposing the combined company to substantial

---

[16] As noted above, Basell, prior to the Merger, had entered into a contract to purchase Berre. Although Berre used a lighter grade of crude than the Houston Refinery, it suffered from some of the same disadvantages as the Houston Refinery and its margins were also being compressed by declining demand and other factors. The closing of the acquisition of Berre occurred in April 2008, but the risks associated with such acquisition were known before the Merger. Moreover, as discussed below, Goldman told Access, before the closing of Berre, that it was "morally wrong" for Basell to acquire Berre and that Basell should "break" the deal. Basell spurned Goldman's request and acquired the refinery, further exacerbating Basell's liquidity problems.

additional risk in the olefin business during the next industry down-cycle.  Lyondell's and

Basell's olefin assets were also older (relative to their competitors) and smaller (relative to their

competitors).  They also were particularly economically vulnerable to shutdowns (*e.g.*, Basell's

steam crackers).  Unlike its domestic competitors, moreover, Lyondell's olefin facilities, which

are based in the United States, significantly rely on "heavy liquid feed" (*i.e.*, distillates from the

Houston Refinery), which puts Lyondell's olefin business at a competitive disadvantage in the

United States.

      c.    <u>Polyethylene (High and Low Density)</u>.  Both Lyondell and Basell, due to their

primary presence in North America and Western Europe, were heavily exposed to slower

growing markets in these regions and additional pressures due to environmental regulation and

were not positioned to participate in developing higher margin products with their existing

facilities.  Due to their relatively uncompetitive cost structure and their geographical footprint

focused on North America and Europe, Lyondell and Basell were exposed to be harder hit by the

next high density polyethylene industry downturn.  Lyondell's low density polyethylene business

focused on lower margin products, which would be particularly vulnerable in the next downturn.

Both Lyondell and Basell had older, smaller scale facilities than their competitors.  In Lyondell's

case, its facilities carried higher overhead relative to its competitors due to inefficiently operated

facilities with high maintenance costs.  Basell suffered from the same infirmities (*i.e.*, its

Frankfurt, Germany facility was old, small, and had a higher cost of production relative to its

competitors).

      d.    <u>Propylene Oxide and Derivatives, Acetyls, and Aromatics</u>.  Lyondell's presence

in each business sector had a competitive disadvantage.  For example, in Propylene Oxide,

Lyondell was heavily dependent on co-product technology, which was facing pressure both from

significant competition and legislation at the time (*i.e.*, MTBE, which was being phased out as an oxygen aid for gasoline and is now banned in the United States, and co-product styrene, which was a poor industry performer).  In Acetyls, Lyondell had only a single production site compared to a global and growing presence for its key competitors (BP and Celanese Corporation).  And in Aromatics, Lyondell's business carried high unit costs due to its lack of scale compared to its competitors.

 e. <u>Technology</u>.  Basell's technology revenue, which relied heavily on capital, was likely to slow considerably due to the impending petrochemical industry trough, reducing investment in the technologies it licensed.

 373. The September Projections for the combined Lyondell and Basell entities were even more fanciful than the standalone projections for Lyondell.  In addition to the baseless spike in earnings for both its petrochemicals and refinery operations that Lyondell would supposedly enjoy in 2008, the September Projections for the combined companies (graphed below together with the July 10 Base Case and the July 15 Base Case) likewise ignored currently available information indicating the onset of a downturn and were inflated by incorporation of billions of dollars of projected earnings over the five-year projection period based on purported "synergies."  Combined projected earnings for 2008 included $75 million of "synergies."  Projected earnings for 2009 included $280 million in "synergies."  Each subsequent year included $420 million in "synergies."



**Consolidated EBITDA Projections**

374.    Remarkably, the new projections actually showed combined EBITDA for 2008 to be 13.2% higher than for 2007, even though, as reflected by all prior projections, Wall Street and industry analysts were all projecting that earnings for petrochemicals and refining would trend downwards or remain flat during this period.  Even the highly optimistic Lyondell management projections incorporated into the July 15 Base Case showed a 3% decrease during this same period.

375.    The projected spike in Lyondell earnings for 2008 and inflated earnings for years 2009 through 2011 were entirely unreasonable, if not fraudulent, and were unsupported by factors intrinsic to Lyondell or Basell, conditions with respect to the industries in which they operated, or the overall economic outlook as forecasted at the time.  The synergies were pure speculation, added to bring earnings to where they needed to be rather than based on any expected cost-savings from the Merger.  According to Francesco Zerega of Basell, even $250 million (as opposed to $400 million) was a stretch.  In an email sent to Trautz and Bigman, Zerega wrote: "given the very limited market/product overlap between Basell and Hugo, a 400 m

USD longer term target is in my view very unlikely. A number closer to the 250 m USD ballpark would be in my view a more logical, challenging and stretching (but not unrealistic) target for the transition team . . . if we talk about higher long term targets, we should also talk about higher implementation costs."

376. Lyondell's official third quarter results confirmed a material downward earnings trend, which Smith had first disclosed to Access on September 11, 2007. As disclosed to the public in its report of third quarter earnings on Form 8-K dated October 25, 2007 (the "October 25, 2007 Form 8-K"), EBITDA was $684 million. In order to have remained on target to meet the July 15 Base Case projections for 2007 of $3.4 billion, EBITDA for the third quarter of 2007 should have been at least as high as for the preceding quarter. Instead, the third quarter's $684 million EBITDA was a 23% drop from second quarter EBITDA. In Lyondell's third quarter earnings press release, Smith expressed concern for Lyondell's financial performance:

> Entering the quarter, we and many others in the industry expected that crude oil and ethane costs would plateau at then-current levels; however, they continued to escalate. As a result, significant price increases were required just to offset the cost increases, and margins did not expand to levels that we believe reflect the supply/demand balance. Refining results, while solid, reflected the fact that industry spreads declined from very strong early-summer levels earlier than usual. This occurred despite record low gasoline and distillate inventories as measured by days of inventory. Unfortunately, crude oil and ethane prices have increased steadily throughout the year, and a certain amount of time is needed to pass increases of this magnitude through the chemical and polymer markets. As a consequence, year-to-date results have not fully reflected existing industry operating rates.

377. The outlook for the fourth quarter of 2007 was equally grim. Lyondell's October 25, 2007 Form 8-K warned:

> Thus far in the fourth quarter, both crude oil and ethane price increases have accelerated, setting new highs. Quarter to date, our refining spreads are slightly less than the third-quarter average as our heavy crude advantage has partially offset declines in base

111

refining margins. In the ethylene, co-products and derivatives segment, record high raw material costs are offsetting the benefit of recent price increases, necessitating further pricing initiatives. In our propylene oxide and related products segment, oxygenated fuel (MTBE/ETBE) margins have declined following typical seasonal patterns.

378.    At the presentation to lenders that took place on or around September 26, 2007, mid-year operating results for Lyondell and Lyondell management's projections for the second half of the year were disclosed to the Lead Arrangers. According to Kassin, when Citibank and Merrill learned of Lyondell's mid-year results, they were shocked over how much Lyondell "missed [its] numbers."

379.    During October 2007, the Lead Arrangers began to formally solicit banks and other institutions to participate in senior secured facilities that would be used to finance the Merger. For this purpose, a Confidential Information Memorandum dated October 2007 (the "October CIM") and other materials were furnished to prospective lenders. Four tranches of loans were offered pursuant to the October CIM: $2.150 billion in asset-based loan facilities, a $1 billion revolving credit facility, a $2 billion Senior Secured Term Loan A, and a $9.450 billion Senior Secured Term Loan B. The remaining financing of the Merger – the $8 billion Bridge Loan Facility (as hereinafter defined) – was not included in this syndication effort. The October CIM was supplemented during November 2007 with a Confidential Information Memorandum (the "November CIM") prepared for purposes of soliciting participation in the $2.15 billion asset-based lending facilities.

380.    Not surprisingly, despite the parties' efforts to market the loan syndication, the banks that had been counted upon to participate in the first phase of the syndication were backing away. In an email from Patel to Bigman and others, Patel recalls that several banks whom they had counted on to significantly participate in the loan syndication, including HSBC, JP Morgan,

Credit Suisse, and Morgan Stanley, "ran for the hills." Unfortunately for Access, its efforts to secure participation by threatening to retaliate against banks who were not willing to participate materially in the loan syndication (*i.e.*, by either not allowing them into future Access deals or otherwise terminating business relationships) were not successful.

381.   Responding to the failed syndication effort, the Lead Arrangers presented Access with proposed modifications to the terms of the financing as it had been outlined in the Commitment Letter. Whereas the original $13 billion Commitment had consisted entirely of term loans and revolving loans, the Lead Arrangers now proposed to substitute $2.15 billion of receivables and inventory asset-based financing for $2.15 billion of the term loan/revolver financing. Such asset-based financing is a less flexible source of liquidity for the borrower than a committed term loan or revolver since borrowings thereunder are tied to a borrowing base of inventory and receivables. Due to the volatility of the commodities markets, dependency on an inventory based facility is particularly problematic for a petrochemical manufacturer such as Lyondell. If orders slow or the value of inventory declines, the borrower is unable to draw upon the facility because there will be insufficient current receivables and inventory to provide the borrowing base to support borrowings. When prices rise sharply, the size of the facility may quickly become inadequate to finance working capital needs. Then, if prices decline, receipt of cash from product sales may lag behind cash necessary to make required repayments as the borrowing base declines.

382.   In September 2007, the management of Lyondell, Access, and Basell knew that the $2.15 billion asset-based facilities being implemented were not the functional equivalent of a conventional senior term loan facility in the same nominal amount such as contemplated by the initial Commitment Letter. Moreover, crude oil prices, which had been approximately $50 a

barrel in January 2007, had risen steadily all during 2007, reaching $75 a barrel in September 2007. From and after September 2007 through the December 20, 2007 closing of the Merger, crude oil prices rose at an accelerated rate. From the perspective of this pre-Merger period, and more so as the year approached its end, it was unreasonable not to have available sufficient liquidity in the event prices continued to rise and, instead, to rely on a short-term abatement of price escalation to maintain the company in operation. The critical need for LBI to have more liquidity to address these rising prices could not have been clearer. The increased liquidity needs of LBI were ignored when the asset-based facilities were substituted for the term loan financing, a substitution motivated not by the projected liquidity needs of LBI but by the fact that such asset-based financing limited lender exposure and would be easier for the Lead Arrangers to syndicate. In the months to come, much of the incremental liquidity supposedly available under these asset-based facilities would prove illusory and would vanish precisely when needed, leaving the company with a liquidity shortfall in the range of $2 to $3 billion. This liquidity shortfall was entirely foreseeable to Blavatnik, Access, Lyondell and Basell management.

383.    In addition to structural changes made to the financing package, pricing modifications were also made to enhance the potential salability of the loans.

384.    On November 20, 2007, the merger between Lyondell and Basell was approved at a meeting of Lyondell shareholders.

385.    On November 28, 2007, S&P and Moody's simultaneously downgraded the debt of both Basell and Lyondell, citing the substantial post-LBO increase in debt "at a mature state in the petrochemical cycle."

386.    By the end of November 2007, of the $21.6 billion of financing committed to fund the LBO, the Lead Arrangers had succeeded in securing participation only in the $2.15

billion asset-based loans. According to Citibank's closing memorandum, "[t]he deal was mostly funded by underwriters at close with a handful of banks (5) coming in with small commitments."

387.    In the midst of the Lead Arrangers' failed efforts to syndicate their loans, on December 7, 2007, Blavatnik caused Basell to issue its third shareholder distribution of 2007, for €100 million, bringing the total amount of cash taken out of Basell in 2007 in the form of shareholder distributions to €315 (or approximately $430 million).

388.    On December 10, 2007, an article was published titled "Basell to Delay $21 Billion Lyondell Financing Plan." In this article, Trautz is quoted as saying "We thought we would be going to the markets in October or November, now we think we will go in first or second quarter." Trautz's comments caused more consternation among the Lead Arrangers, as observed by Kassin in an email dated December 10, 2007:

> "Uday [Merrill Lynch] just called to say that the banks are very unhappy with [Trautz's] comments…"
>
> "It gets worse . . . just released on Bloomberg . . . our phones are ringing off the hook."

389.    On December 11, 2007, Fitch followed S&P and Moody's with its own downgrade of the debt of Basell and Lyondell, citing substantial re-leveraging to facilitate the Transaction.

390.    Margins continued to tighten during the fourth quarter. Rather than making up for prior lost earnings, Lyondell operated at a loss during the last quarter of 2007 and had unadjusted EBITDA for that period of approximately $613 million, off by approximately 33% from the Lyondell Management Presentation. Actual EBITDA for Lyondell for all of 2007 was $2.7 billion, off 20% from the July 15 Base Case.

391.    Against the background of Lyondell's deteriorating third and fourth quarter performance and industry forecasts of a more severe downturn, it became more and more obvious as the scheduled date for the Merger approached that the earnings projections provided by Lyondell Management in connection with the Merger Agreement were, at a minimum, unreasonable and, in fact, inflated.

392.    The unreasonableness of management's projections for 2008 alone is strikingly apparent from the comparison, graphed below, of actual Lyondell adjusted EBITDA versus management projections for the three quarters preceding the Merger.   Ignoring a pattern of repeated, widening "misses" for each of three successive quarters in 2007, management's quarterly projections for 2008, prepared on or around November 2007 for "legacy" Lyondell following the Merger, were completely unreasonable.[17]



Lyondell Quarterly Adjusted EBITDA Projection Versus Actual

---

[17] Actual results presented below for 2008 adjusted EBITDA are based on publicly available data reported for Lyondell Chemical Company.   Estimated 2008 EBITDA represents estimated EBITDA generated from assets of certain former non-U.S. subsidiaries of Lyondell Chemical Company that were transferred following the Merger to non-U.S. subsidiaries of LBI. Actual EBITDA from these transferred entities is not available at the present time.

393.    During 2007, prior to the closing of the Merger, including during the period after the Merger Agreement was signed until the closing of the Merger, the petrochemical industry forecasts weakened progressively, due, *inter alia*, to the slowing economy, rising energy costs (which led to compressing of margins), weakening demand for chemicals, and announcements of increased capacity within the industry (by competitors of Lyondell and Basell).  Deteriorating industry and related business developments suggested that the next trough in the petrochemical industry would be longer and considerably deeper than anticipated at the beginning of 2007. Moreover, given the disadvantaged position of Lyondell and Basell compared to their competitors and their particular vulnerability to the next petrochemical industry trough, representatives of Lyondell, Basell, and Access, including Blavatnik, knew or should have known that the next petrochemical industry trough would much more severely and negatively impact the income and profitability of Lyondell and Basell than their more advantaged competitors.

394.    Indeed, in the midst of the liquidity crisis that occurred soon after the Merger, it was widely acknowledged within Access that Lyondell's "refreshed" projections had been prepared for selling purposes and could not be relied upon for purposes of estimating cash flows. As Javier Martinez, an associate at Access, stated in a March 11, 2008 email in which he advocated for updated projections to address the liquidity crisis:

> The one major outstanding issue is the projection update (surprise, surprise!). . . . This is important because currently liquidity position and models are being compared and contrasted to the July 2007 Base Case (which was mainly prepared by Lyondell for selling purposes anyway!) so it is difficult for them to understand what the situation is past the next month or so.

395.    In commenting on LBI's liquidity issues immediately after the Merger, Patel noted that "[b]asically, 80% of the liquidity 'issue' is stuff that should have been incorporated into forecast because it was [known] quite a while ago."

## III.          The Merger Closes

396.    On December 20, 2007 (the "Merger Closing"), pursuant to the Merger Agreement, an indirect merger subsidiary of Basell was merged into Lyondell, and all of Lyondell's 253,535,778 outstanding shares of common stock, including restricted stock, were converted into the right to receive $48 in cash and Basell, which thereupon changed its name to LyondellBasell Industries A.F. S.C.A., became, through an intermediate holding company, the corporate parent of Lyondell.

397.    Also on December 20, 2007, Lyondell and certain affiliates entered into debt facilities (the "Facilities") pursuant to which they incurred obligations in the approximate amount of $20.7 billion (the "Obligations"). The Obligations were incurred under (i) a senior credit facility (the "Senior Credit Facility")[18] providing term and revolving loans in the aggregate amount of approximately $12.4 billion; (ii) a bridge loan facility (the "Bridge Loan Facility") [19]

---

[18] Entered into pursuant to a credit agreement (the "Senior Credit Agreement"), dated as of December 20, 2007, as amended and restated on April 30, 2008, among Citibank, N.A., as administrative agent, Citibank International plc, as European administrative agent, the lenders party thereto from time to time (the "Senior Lenders"), and Citigroup Global Markets Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch, Pierce, Fenner & Smith  Inc., ABN AMRO Inc., and UBS Securities LLC as joint lead arrangers (such parties to the Senior Credit Facility including Deutsche Bank Trust Company Americas as successor to Citibank, N.A., as administrative agent, and Citibank International plc, as European administrative agent, (the "Senior Credit Facility Lender Parties")), Lyondell, Basell Holdings B.V. ("Basell Holdings"), Basell Finance Company B.V. ("Basell Finance"), and Basell Germany Holdings GmbH ("Basell Germany") as borrowers (the "Senior Credit Facility Borrowers"), and certain direct and indirect subsidiaries of the Senior Credit Facility Borrowers as guarantors (the  "Senior Credit Facility Subsidiary Guarantors" or the "Subsidiary Guarantors"; and together with the Senior Credit Facility Borrowers, collectively, the "Senior Credit Facility Obligors"). The Senior Credit Facility included, inter alia, a €1.3 billion, 7-year Senior Secured German Term Loan B with Basell Germany as Borrower (the "German Term Loan B") and a $500 million, 6-year Senior Secured Dutch Term Loan A with Basell Holdings as Borrower (the "Dutch Term Loan A").

[19] Entered into pursuant to a bridge loan agreement (the "Bridge Loan Agreement"), dated as of December 20, 2007, as amended and restated on April 30, 2008, and as further amended and restated on October 17, 2008, among Merrill Lynch Capital Corporation, as administrative agent; Citibank, N.A., as collateral agent; the lenders party thereto from time to time (the "Bridge Lenders"); and Merrill Lynch, Pierce, Fenner & Smith Inc.; Goldman Sachs Credit Partners, L.P.; Citigroup Global Markets Inc.; ABN AMRO Inc.; and UBS Securities LLC as joint lead arrangers

providing for second lien bridge term loans (the "Bridge Loans") in the aggregate amount of $8 billion; (iii) an inventory-based revolving credit facility (the "ABL Inventory Facility")[20] providing for a $1 billion inventory-based revolving facility; and (iv) $1.15 billion receivables securitization facility (the "ABL Receivables Facility" and, together with the ABL Inventory Facility, the "ABL Facilities", and the ABL Facilities together with the Senior Credit Facilities and the Bridge Loan Facility, the "Merger Financing").

398.     To secure repayment of the Obligations incurred under the Senior Credit Facility (the "Senior Credit Facility Obligations"), the Senior Credit Facility Obligors (excluding Millennium US Op Co LLC, Millennium Petrochemicals, Inc. and Milennium Specialty Chemicals, Inc. which granted no security interests in their assets) granted security interests to Citibank, N.A., as collateral agent, in certain of their real and personal property.  The Senior Credit Facility Obligors that are U.S. entities granted security interests in certain of the real and personal property, including: (a) all stock owned by each such Senior Credit Facility Obligor in any wholly owned subsidiary of LBI; (b) all debt securities held by each such Senior Credit Facility Obligor; (c) all payments, rights, privileges and proceeds of (a) and (b); and (d) substantially all of each such Senior Credit Facility Obligor's personal property, including equipment but not including accounts receivable, inventory and interests in any joint ventures. LBI, Basell Holdings, Basell Finance, Basell Germany and certain affiliates (the "European Obligors"), granted security interests to Citibank, N.A., as Senior Collateral Agent, in certain

---

(such parties, the "Bridge Loan Lender Parties"), LyondellBasell Finance Company, as borrower (the "Bridge Borrower"); and the Subsidiary Guarantors that guaranteed the Senior Credit Facility Obligations, as guarantors thereunder (the "Bridge Guarantors;" and together with the Bridge Borrower, the "Bridge Loan Obligors").

[20] Entered into pursuant to a credit agreement, dated as of December 20, 2007, among Citibank, N.A., as administrative agent and co-collateral agent, General Electric Capital Corporation, as co-collateral agent (along with Citibank, N.A., the "ABL Collateral Agents"), the lenders party thereto from time to time, Citigroup Global Markets Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation, ABN AMRO Inc., and UBS Securities LLC, as joint lead arrangers; and Lyondell, Houston Refining, Equistar, and Basell USA Inc., as borrowers thereunder, providing for a $1 billion, 5-year Asset Based Inventory Revolving Credit Facility, $175 million of which was funded at closing.

equity and debt securities owned by the European Obligors and all rights related thereto, and in certain other personal property. Finally, pursuant to various pledge, charge, security and assignment agreements between themselves and Citibank, N.A., as Senior Collateral Agent, other subsidiaries of Basell granted to the Senior Collateral Agent a first priority security interest over various equity securities, as well as other real, personal and intellectual property (all of the foregoing described security interests and liens, the "Senior Liens").

399.    To secure the repayment of all obligations incurred under the Bridge Loan Facility, including the guarantee obligations thereunder (the "Bridge Loan Obligations"), LyondellBasell Finance Company and each of the Bridge Guarantors, including the European Obligors, granted to Citibank, N.A., as collateral agent (in such capacity, the "Bridge Collateral Agent"), a second priority (or third priority) security interest in substantially the same real and personal property that secured the Senior Credit Facility Obligations (the "Bridge Loan Liens").

400.    To secure obligations under the ABL, the ABL Obligors granted to the ABL Collateral Agents for the benefit of the ABL Lenders, (i) a first priority pledge of all equity interests owned by each ABL Obligor in, and all indebtedness owed to each ABL Obligor by LB Receivables I and Basell Capital Corporation and (ii) a first priority security interest in certain deposit accounts, all receivables and inventory, and related assets owned by each ABL Obligor (together, the "ABL Lien Transfers"). Further, the ABL was guaranteed on an unsecured basis by each U.S. subsidiary (the "ABL Guarantors") of each ABL Obligor (the "ABL Obligations").

A.    **Uses of the Proceeds of the Merger Financing**

401.    The proceeds of the Merger Financing were applied to fund the transactions contemplated in connection with the Merger as follows:

>    (i)    <u>Shareholder Payments.</u>    Approximately $12.5 billion to former shareholders of Lyondell as payment of the cash due to them upon

conversion of their shares into the right to receive cash including (x) $523,803,305 to Nell Limited, an entity incorporated in Gibraltar in respect of shares of Lyondell, (y) $674,328,055 to LyondellBasell Finance for further transfer to Merrill Lynch Equity Derivatives, in satisfaction of a debt owed by Nell Limited, also in respect of Lyondell shares and (z) $100 million in Merger Consideration to Lyondell Officers and Directors, as set forth below.

(ii)   <u>Refinancing of Pre-Existing Debt</u>.   Approximately $7.1 billion (net of $489 million of premiums and other breakage costs associated with the tender offers of Lyondell and Equistar public debt) was used to refinance pre-existing debt of Lyondell, Basell, and certain of their respective consolidated subsidiaries as follows:

(a)   $3.062 billion to repay the Lyondell 10½% Senior Unsecured Notes Due 2013 ("2013 Notes"), the Lyondell 8% Senior Unsecured Notes Due 2014 ("2014 Notes"), the Lyondell 8¼% Senior Unsecured Notes Due 2016 ("2016 Notes"), and the Lyondell 6⅞% Senior Unsecured Notes Due 2017 ("2017 Notes");

(b)   $1.753 billion to the repay the Lyondell Term Loan Due 2013 ("2013 Term Loan");

(c)   Approximately $858,811 to repay the Lyondell 10½% Senior Secured Notes Due 2013 ("2013 Secured Notes");

(d)   Approximately $1.475 billion to repay the Equistar 10.125% Senior Unsecured Notes Due 2008 ("2008 Notes"), the Equistar 8.75% Senior Unsecured Notes Due 2009 ("2009 Notes"), and the Equistar 10.625% Senior Unsecured Notes Due 2011 ("2011 Notes");

(e)   Approximately $301 million to repay the Equistar inventory-based credit facility;

(f)   Approximately $576 million to repay the Equistar accounts receivable securitization facility; and

(g)   Approximately €310.6 million to repay the Basell Multicurrency Revolving Senior Facility (the "Basell Senior Facility").

(iii)   <u>Payments to Lyondell Officers and Employees</u>.   The proceeds of the Facilities were also used to fund approximately $337.3 million of payments under various Lyondell benefit and incentive plans, stock option plans, and other equity based incentive programs triggered or accelerated by the change of control of Lyondell (the "Change of Control Payments").

121

Payments received by Lyondell Officers and Directors, set forth below included (i) Change of Control Payments and (ii) payments of Merger Consideration in respect of Lyondell common stock and vested stock options owned by them.

| Executives | Change of Control Payments[21] | Payments of Merger Consideration[22] |
|---|---|---|
| Dan F. Smith | $57,216,503 | $54,781,787 |
| T. Kevin DeNicola | $15,476,541 | $10,366,012 |
| Edward J. Dineen | $11,110,970 | $1,855,947 |
| W. Norman Phillips Jr. | $4,366,503 | $1,352,351 |
| | | |
| Eight Other Executives[23] | $70,681,499 | $25,639,888 |
| | | |
| **Total** | **$158,852,016** | **$93,995,985** |

| Non-employee Directors | Change of Control Payments | Payments of Merger Consideration |
|---|---|---|
| Ten Non-employee Directors | $13,537,523 | $5,607,686 |

    (iv)   <u>Transaction Fees and Expenses</u>.  Approximately $574.6 million to fund additional fees and expenses, including the following:

        (a)   $127,608,860 to Nell Limited by Basell AF S.C.A. as payment for (a) a purported one time transaction advisory fee ($100 million), (b) an annual management fee of $25 million, and (c) reimbursement of claimed expenses of $2.6 million.

## IV.   <u>As a Result of the Merger, LyondellBasell Was Left with Unreasonably Small Capital</u>

    402.   Given the cyclicality of Lyondell's business, Lyondell's fixed costs and working capital requirements, the business could not be reliably funded from earnings.  Lyondell needed a

---

[21] For both the executives and non-employee directors, these amounts include payments made as a result of, or accelerated by, the Merger in connection with the following, where applicable: unvested stock options, restricted stock, cash payments made in connection with the award of restricted stock, performance units, a deferral plan, a supplemental executive retirement plan, a severance pay plan, and so-called welfare benefits.

[22] For both the executives and non-employee directors, these amounts include Lyondell common stock and vested stock options that the individuals held independent of the Merger, and that were cashed out in connection with the Merger.

[23] Actual amounts for these eight other executives are likely higher because the LB Creditor Trust has limited information for two of the executives.

capital structure that would provide the necessary flexibility, including access to the credit markets, to keep the company afloat during a downturn.   In addition, according to Smith, Lyondell needed between $2 and $2.5 billion of "room" just to meet its working capital needs. Testifying at a deposition held on October 25, 2007, a little less than two months before the Merger would be consummated on December 20, 2007, Smith explained Lyondell's need for over $2 billion in available liquidity as a simple lesson learned from the commodities markets over the prior two years:

> That's about how much room you need with the crazy market that we deal in with crude oil and natural gas, et cetera, that we literally have seen cost of inputs rise more than $2 billion in each of the last two years.  So our working capital has gone way higher.  You've got to be able to finance the business.  And then suddenly, if the earnings fall off, you're just stuck.

403.    "You've got to be able to finance the business." In failing to adequately capitalize LBI while incurring $22 billion of indebtedness to fund the Merger, $12.5 billion of which would flow out to Lyondell stockholders (including $1.2 billion to Blavatnik and over $100 million to Smith), the parties to the Merger recklessly or willfully overlooked this simple truth. Taking into appropriate account actual performance of Lyondell and Basell for 2007 and all available data which was known or should have been known by Lyondell, Basell, and Access management, Lyondell was insufficiently capitalized to provide it with the necessary liquidity to fund its operations through a downturn.  When the cost of hydrocarbon inputs continued to rise after the Merger, as they had for the prior two years, LBI had to exhaust all available sources of liquidity to finance its working capital needs.   And, when as had been widely forecasted, earnings did indeed fall off, LBI, unable to fund its operations or meet its obligations as they became due, was forced into bankruptcy.

A. **Reasonableness of Projections**

404.    The adequacy of the capitalization of the combined companies following the Transaction was premised on the EBITDA forecasted by the managements of the two companies as stated in the July 15 Base Case, as subsequently modified (the "Management Projections").[24] The Management Projections included $18.38 billion of cumulative EBITDA projected by the managements of the two companies from the combined operations during the period 2008 through 2011 (the "Projection Period").

405.    EBITDA forecast in the Management Projections for each year of the Projection Period are as follows:

### EBITDA (in millions of $)

| YEAR | 2008 | 2009 | 2010 | 2011 | Cumulative |
|------|------|------|------|------|------------|
| Basell | 1,681 | 1,343 | 1,109 | 1,135 | 5,268 |
| Lyondell | 3,515 | 3,072 | 2,818 | 2,593 | 11,998 |
| Other | (18) | (18) | (18) | (18) | (72) |
| Net Synergies | 45 | 300 | 420 | 420 | 1,185 |
| | 5,223 | 4,697 | 4,329 | 4,130 | 18,379 |

---

[24] Limited modifications to EBITDA forecasts contained in the July 15 Base Case were made in the October CIM and the November CIM. The principal difference between the July 15 Base Case and the identical forecasts contained in the October and November CIMs are the EBITDA numbers given for 2007 and 2008. While the July 15 Base Case forecast $5.253 billion of EBITDA for 2007, the October CIM and the November CIM reflect a recognition that actual results for 2007 would fall short of the July 15 Base Case and show a revised EBITDA forecast for 2007 of $4.613 billion.  The October CIM and November CIM EBITDA forecasts for 2008 are also reduced relative to the July 15 Base Case by $155 million in the amount of synergies forecast for 2008 and Basell 2008 EBITDA was adjusted modestly downward by approximately $70 million. Apart from the limited adjustment in Basell's EBITDA forecast for 2008, the July 15 Base Case projections were virtually identical to the projections included the Management Projections in forecasting EBITDA for 2008-2011.

406.    However, only cash flows that are reasonably anticipated should be considered in assessing capital adequacy.  As described in detail, *supra*, the Management Projections were, at a minimum, speculative, unsupported by objective data, and were at odds with the economic and supply/demand forecasts of leading petrochemicals and refining industry analysts.  Ultimately, based on information known at the time of the Transaction, the $18.38 billion of cumulative EBITDA included in the Management Projections exceeded, by between $5 and $6 billion (one third of the projected EBITDA), what could reasonably and prudently be relied upon as a source of the cash necessary to operate the businesses of LBI during the Projection Period.

407.    Three dozen EBITDA projections were prepared by Lyondell and Basell and their financial advisors or the Lead Arrangers during 2007 prior to the Transaction. of these, the Management Projections (which incorporate the July 15 Base Case with minimal changes) contain the most aggressive EBITDA forecasts for the Projection Period.  The Management Projections were recklessly used by management of Lyondell, Access, and Basell to support a premium price for the Merger, which was to be 100% financed with debt, and to support the syndication of the excessive Merger Financing, all to the detriment of LBI's other creditors.

408.    Various downside projections prepared by the Lead Arrangers, although not true downside cases in that they did not reflect the full range of foreseeable downside scenarios from the perspective of late 2007, more adequately demonstrated the reasonably foreseeable cash flows of LBI upon the close of the Transaction.  The downside cases included the April 10, 2007 Merrill Lynch "Credit Stress Test Case," the "July 10, 2007 Merrill Lynch Downside Case" and the July 15, 2007 "Citibank Downside Case."  In each of these cases, net cash flows on a cumulative basis were negative, indicating that LBI would be unable to meet its debt service obligations and/or fund capital expenditures over the five year period.  The annual net cash flows

in the "Credit Stress Test Case" and "Citibank Downside Case" turn negative in 2009, with the net cash flows in the "Merrill Lynch Downside Case" turning negative in 2010. All three cases continue to generate negative cash flow throughout the remainder of the projection period, except for the "Citibank Downside Case" which anticipates net cash flow turning positive in 2012, after reaching a $1 billion cumulative deficit over the preceding period. The cumulative debt service obligations alone with respect to the Merger Financing account for 77% to 93% of the cumulative EBITDA projected in the three downside cases.

409. None of the three cases provide any meaningful level of cash flows to support or contribute to LBI's other liquidity needs, including the need to provide for reasonably foreseeable stresses and contingencies. The resulting debt to EBITDA leverage ratios indicate that LBI had far exceeded reasonable measures of debt capacity and would not be able to reasonably refinance its maturing long-term debt obligations on an arms' length basis over the course of the projection period, and that LBI would be anticipated to fail the debt service covenant requirements of the Merger Financing in the third quarter of 2008, the fourth quarter of 2008 and in each year from 2009-2012.

### B.   LyondellBasell's Highly Leveraged Capital Structure

410. Following and as a result of the Transaction, and as assessed, *inter alia*, by reference to the historical liquidity of the two legacy companies and by liquidity levels maintained by comparable petrochemical and refining companies operating under the same conditions of volatility and cyclicality to which LBI was subject, LBI's leverage was too high to allow it to survive potential downturns in operating cash flows or to meet a wide range of reasonably foreseeable stresses and contingencies. Due to its high leverage, LBI was unable to obtain an acceptable credit rating to maintain necessary trade credit and, as a consequence of the

liens and restrictions imposed under the terms of the Merger Financing, had inadequate borrowing capacity to cover foreseeable stresses and contingencies.

411.   The debt burden of LBI was so much higher than the combined debt burden of Basell and Lyondell before the Transaction that it moved the combined company to the highest end of the range for virtually every leverage measure, as compared to the following comparable companies in the chemicals and refining industries: BASF, Celanese, Dow, Eastman, Huntsman, Nova, and Westlake (chemicals);  Alon USA, Frontier Oil, Holly, Sunoco, Tesoro, Valero and Western (refining).  Following the Merger and as a result thereof, LBI was the lowest ranking company among its peers, as measured by Liquidity to Current Liabilities, Liquidity to Tangible Assets, Liquidity to Total Assets and  Liquidity to Current Assets.

412.   LBI's opening liquidity at the close of the Transaction was also considerably less than the total combined historical liquidity of the legacy companies.   Between December 31, 2006 and September 30, 2007, the combined reported liquidity of Lyondell and Basell fell between $3.3 and $3.9 billion, in comparison to the $1.323 billion in liquidity immediately after the consummation of the Transaction (of which liquidity only $926 million was truly available for use in funding operations).  Despite the increased size and debt burden of the combined businesses, LBI's opening liquidity as of December 20, 2007 was far less than what legacy Lyondell maintained by itself in the year prior to the Transaction and instead approximates the level of liquidity that the smaller Basell maintained by itself over the same period.  Between December 31, 2006 and September 30, 2007, the combined reported liquidity of Lyondell and Basell was between 27.1% and 37.0% of outstanding debt.  In contrast, LBI's liquidity was 5.5% of its outstanding debt after the consummation of the Transaction.

## C.    **Foreseeable Contingencies**

413.    The information available at the time of the Transaction confirmed that LBI's liquidity was inadequate to address reasonably foreseeable contingencies.  Pricing of crude oil options in late 2007 indicated significant expected volatility (even exceeding the expected volatility of the S&P 500 stock market index).  The risk of a recession was anticipated and estimated by Basell as 50% in March 2007.  Further, weather-related interruptions in service were foreseeable, as LBI had fourteen plants along the Gulf Coast, a region vulnerable to the dangers of hurricane activity.

414.    Evidencing the predictability of these contingencies, and their effect on liquidity needs, in December 2006 Lyondell estimated contingent liquidity needs as follows:

| | |
|---|---|
| Unplanned Downtime (one plant) | $150-$350MM |
| Large Turnarounds | $75-175MM |
| Weather | $150-500MM |
| Margin Calls | $150-250MM |
| Working Capital | $200-400MM |
| | $725-$1675MM |

415.    In its Proxy Statement filed with the SEC prior to the Transaction, Lyondell likewise recognized the risks associated with the projections it created, including:

- The availability, cost and price volatility of raw materials and utilities;

- Uncertainties associated with the U.S. and worldwide economies, including those due to political tensions in the Middle East and elsewhere;

- The cyclical nature of the chemical and refining industries; and

- Operating interruptions (including leaks, explosions, fires, weather-related incidents, mechanical failure, unscheduled downtime, and supplier disruptions).

416.    LBI's liquidity was insufficient to provide for these known risks.  Moreover, LBI had a centralized cash management system, meaning that the unreasonably small capital of the LBI corporate group resulted in unreasonably small capital for LBI and each of its direct and indirect subsidiaries.

## V.   LyondellBasell's Liquidity Failure Upon the Merger

417.    As was reasonably foreseeable at the time, LBI's collapse started early.  Very predictably, the spike in 2008 EBITDA, forecasted in response to Lyondell's disappointing results for 2007, did not materialize.  Instead, predictably, the same factors that had adversely impacted Lyondell's earnings in each of the last three quarters of 2007, continued to squeeze the margins of LBI's chemicals business.  Similarly, LBI's forecasts (unsupported by industry analysts) of improved refining margins proved to be unfounded: margins on refining, a key profit driver for LBI, remained at the rates seen in 2007.  Earnings through the first four months of 2008, including income from joint ventures, fell behind the projections by $326 million.  By April 2008, LBI was forced to materially revise its pre-Merger forecasts downward to reflect its actual business performance.  Under these revised forecasts, the new "Base Case" was for $4.6 billion of EBITDA for 2008 versus $5.4 billion[25] of EBITDA for the September Projections used for syndication purposes.  Looking forward to future revisions to the business plan, management formulated an April 2008 "downside" case for the year projecting 2008 EBITDA at $4.3 billion – almost a full billion dollars below the July 15 Base Case.

418.    Moreover, from the effective time of the Merger until filing for Chapter 11, LBI was in an ongoing liquidity crisis from which it was unable to emerge.  As of the Merger closing, LBI's available liquidity (cash balances and unfunded portions of its facilities), less incremental constraints imposed by its credit facilities, and deductions for uncertainty of timing of cash

---

[25] Including Solvay Engineered Polymers, Inc., which LBI purchased in February 2008, and Berre.

receipts and distributions, was only $926 million.  And while a billion dollars may seem like a lot of money, for an operation of the size, complexity and volatility of LBI, a company materially larger even than Lyondell, $1 billion of liquidity was completely inadequate.  In a single day, cash outflows could reach $500 million, a reality that Karen Twitchell, LBI's treasurer, had to deal with on a day by day basis.  Twitchell's concerns regarding LBI's liquidity, however, fell on deaf ears.  This reality was known to Access, Basell, and Lyondell management well prior to the Merger. Within approximately 60 days after the closing of the Merger, liquidity actually available on a day-to-day basis, net of unfunded commitments, was *negative* $213 million.

419.    Within weeks after the Merger, LBI management was forced to seek to "upsize" its borrowing capacity by $600 million by finding funding for the "accordion" feature included in the ABL.  Also near the end of March 2008, the company sought to upsize its European accounts receivable asset-backed facility by $170 million.  With LBI's daily liquidity in the negative at the end of February 2008, it was fighting for its life, according to Kassin.

420.    Conditions worsened in March 2008; by March 13, 2008, there were concerns at LBI that by the end of March 2008, LBI's projected liquidity would be $153 million, well below the minimum liquidity needed to fund LBI's daily operations.  While waiting for additional funds to become available through the upsizing of the revolvers, Access, battling with LBI's lenders, was forced to make available what the parties characterized as a credit line (the Access Revolver) in order to meet LBI's immediate needs for liquidity.  So desperate was LBI for an additional $600 million in ABL financing that it agreed to a "LIBOR floor" on the term loan facility with an estimated incremental cost of $309 million.

421.    The liquidity crisis was largely the result of a failure to adequately account for contingencies – as Patel stated in a March 12, 2008 email, "as far as I can tell, only about $200 million of [the liquidity] crunch is due to rising oil, the rest is bad planning and pretending that all is well. . . . Basically, 80% of the liquidity 'issue' is stuff that should have been incorporated into forecast because it was [known] quite a while ago."

422.    The Lead Arrangers also expressed concern.  As Kassin noted in a March 16, 2008, email, referencing Citibank's view, "[p]eople at very high levels are flipped out and nervous regarding the LBI liquidity crunch."  In late March 2008, Goldman pressed Access to "put in $500-$1,000 million of equity" into Basell, and advised Patel that the "level of angst in their shop is rising to high levels."  Patel reported to Blavatnik and others in a March 19, 2008 email that Goldman was consumed with Lyondell's liquidity crisis, stating that Goldman believed that "It's 'morally wrong for LBI to buy [the] Berre [refinery] and they [*i.e.*, Basell] should just break' the deal [to purchase Berre]."  Access worried that if the seller "sniff[ed]" the liquidity problems, they would "panic" and "you can kiss LBI . . . goodbye."  However, instead of breaking the Berre deal, Access and Basell rejected Goldman's request and closed that transaction the following month, using approximately $600 million in borrowed funds from the banks that further depleted LBI's liquidity.

423.    On March 27, 2008, LBI, Basell Finance, and Lyondell agreed to the terms of the Access Revolver with Access Industries, which provided the Company with $750 million in revolving credit.  Even as it was being put into place, the intention was to use the Access Revolver only as a last resort.  Blavatnik had no interest in being a lender to LBI and from the perspective of the Lead Arrangers, who were still hoping to syndicate in a delayed launch, LBI's need to obtain emergency funding from an affiliate looked bad.  The plan, however, was to delay

a draw on the Access Revolver until the Lead Arrangers had succeeded in syndicating their loans.

424.    In an April 10, 2008 email to Kassin, Twitchell wrote: "No one is truly listening. This company needs more liquidity.  The company's daily/monthly/quarterly cash flows are VERY volatile…bottom line is that this company needs more liquidity."

425.    LBI's persistent problems forced it to revise its planned debt reduction for 2008 from a $1.3 billion reduction to only a $300 million reduction.  With an industry-wide trough already underway, LBI's inability to pay down debt caused both S&P and Moody's to downgrade their outlooks on all ratings of LBI from stable to negative.

426.    At the same time, trade credit became restricted.  As Bigman stated in a September 2, 2008 email, between the closing of the Merger and September 2, 2008, LBI lost an estimated $420 million of trade credit - $180 million of which was lost since the S&P downgrade.

427.    LBI's available cash plummeted $1 billion in just two months from June to August 2008, and fell another $500 million by the middle of October.  Without the Access Revolver or the upsizing of the ABL Facility, by mid-October 2008, LBI's available cash was near $0.

428.    In the second half of 2008, EBITDA in LBI's chemicals businesses continued to decline, and its fuels business plunged over the precipice, off $780 million by October 2008, and off $1.4 billion by December 2008.

429.    By October 2008, the blame game between the Access team (Kassin and Patel) and the LBI team (Trautz and Bigman) was in full swing.  Patel and Kassin, worried about their

reputations, exchanged frantic emails as they watched LBI management fail to avoid the impending collapse.

430.    In the last quarter of 2008, the punishingly high prices of raw materials began to drop.  And, because the ABL Inventory Facility generally permitted LBI to borrow only up to 75% of the inventory's value, eroding inventory values resulted in a severely diminished borrowing base and triggered LBI's obligation to repay the ABL Lenders.  The timing of this contraction in the borrowing base coincided with a steep decline in earnings during the second half of 2008.  As receivables dried up, so too did the borrowing base under the ABL Receivables Facility.

431.    On October 15, 2008, Lyondell, unable to otherwise satisfy obligations then becoming due and unable to obtain financing from any other source, drew $300 million from the last resort Access Revolver.  Although Lyondell was clearly insolvent at the time, and had insufficient capital to continue operating, on October 16, 17, and 20, it repaid the $300 million in three payments of $100 million each.  Even as the cash starved company commenced its death dive, the priority remained to assure that risk to Blavatnik be minimized or non-existent.

432.    By the end of November 2008, LBI's earnings were significantly off in every division except Technology, which accounted for only an immaterial amount of earnings.  LBI's EBITDA was only approximately $2 billion, off 53% versus projected November year-to-date EBITDA in the LBI business plan.

433.    LBI began negotiating forbearance agreements with its lenders, eventually obtaining a forbearance of $281 million in principal, interest, and fees.

434.    On December 12, 2008, Twitchell e-mailed Richard Storey, Finance Director of Access, informing him that Lyondell would require funding under the Access Revolver in the

133

amount of $100 million on December 29, and in the amount of $300 to $350 million on December 30 or 31 early in the morning. She stated that Lyondell would be unable to repay the $300 million draw for several months. Storey forwarded the e-mail to Benet and wrote, "This is a problem."

435.    On December 17, 2008, Access assigned the Access Revolver to AI International, a Luxembourg entity, so that it could fund any draws on the Access Revolver with offshore funds. By this point in time, however, Blavatnik had already consulted with restructuring advisors and been told a far greater infusion of funds than was potentially available under the Access Revolver was necessary to fund LBI's operations and allow it to meet its obligations into 2010.

436.    On December 17, 2008, a Managing Director at Lazard Ltd., who had been seeking to be retained for the restructuring of LBI, gave Blavatnik some personal advice. The Managing Director told Blavatnik not to "put any more money into LBI until you know that you (possibly with a partner) are able to invest more than what is required. In this case, we calculate that you need more than $3 billion." The Managing Director advised Blavatnik that if he only invested $1 billion in LBI, "based on the numbers we see, you won't save the existing equity and you probably won't get much of your $1 billion back."

437.    By mid-December 2008, LBI management was involved in emergency discussions with its lenders to prepare for a Chapter 11 filing and arrange financing to support LBI through bankruptcy proceedings, in which Blavatnik, through Access or another Blavatnik-controlled entity, would contribute part of such financing in an amount equal to the Access Revolver to obtain a more favorable secured position than if Access permitted a draw down under the Access Revolver.

438.    By December 20, 2008, Access was considering the tax benefits of waiting to abandon LBI in 2009 versus 2008.

439.    On December 29, 2008, Kassin informed Blavatnik that LBI was unraveling at a very rapid pace and would likely not last until January 5, 2009.

440.    On December 30, 2008, even though Lyondell managers knew that AI International would reject the request, they went through the charade of requesting a draw down of the entire $750 million balance of the Access Revolver.  AI International promptly denied the request, and LyondellBasell thereafter filed a Chapter 11 proceeding.

441.    None of the difficulties that LBI faced in its first year should have been unanticipated.  Each should and could have been dealt with had LBI been adequately capitalized with a capital structure that reasonably provided for LBI's foreseeable needs to finance its businesses through a downturn.  Economists and industry analysts had been handicapping the possibility of an economic recession that foreseeably would depress demand and exacerbate the forecasted chemicals industry downturn.  As put by Alan Bigman in an affidavit submitted along with Lyondell's bankruptcy filings, "[t]he petrochemical industry historically *has been defined* by its cyclical nature." Before Lyondell became an acquisition target, Lyondell's strategy was to leverage down in anticipation of the downturn.  Instead, indifferent to anything but taking the gamble on surviving a trough to benefit on the upside, Access chose to leverage up, imposing a staggering debt burden just as the peaks in both industries had past.  It was clear, moreover, by the fall of 2007, that the fact that LBI was operating in two major industries, petrochemicals and refining, would not operate as a hedge on risk.  Both industries would head into the downturn at the same time.  By the time the Merger closed, and indeed well before, it was known that LBI was on a high-wire without a net.

135

442.    The consequences to LBI of insufficient liquidity were also a known risk long before the Merger closed.  After two years of steady increases in the commodities markets and a marked increase in volatility, no petrochemicals manager should even be seriously heard to claim surprise at the trend continuing.  Crude oil prices had already reached $90 a barrel by the time the Merger closed in late December, up almost $40 a barrel from where they had been less than twelve months before.  As characterized by Smith, the commodities market for oil and gas was a "crazy market" and an additional $40 rise may have seemed unlikely to some but was far from outside the realm of possibility.

443.    In short, LBI did not fail because of a unique or unforeseeable convergence of bad luck.  Levered within an inch of its life, it was absolutely barred from accessing financing needed to survive even a short term drop off in earnings.  As the capital markets that recoiled from holding its debt understood even before the Merger closed, LBI's capital structure made its failure during the downturn inevitable.  Once the Merger closed, the only question remaining was the precise point along the path to the trough at which complete and irretrievable failure would occur.  LBI failed because it was inadequately capitalized and grossly overleveraged and, accordingly, unable to deal with the stresses inherent in the industries in which it was operating.

## VI.    Upon the Merger, LyondellBasell Was Insolvent

444.    Because the Merger rendered the LBI enterprise insolvent, it rendered Lyondell flagrantly insolvent because Lyondell, only a part of the new enterprise, was nonetheless obligated on all of the Merger debt.  Upon the closing of the Merger, LBI, considered on a consolidated basis with its subsidiaries (the "LBI Group"), had liabilities in the amount of approximately $26 billion of such amount, approximately $22 billion represented obligations under the Facilities and the balance was other debt.  On and as of the date of the Merger, December 20, 2007, the fair value of the assets of LBI Group ranged from no more than $21.1

billion to at most $24.29 billion and may have been materially less than this range of fair value. Accordingly, from and after the closing of the Merger, the LBI Group was insolvent. This insolvency deepened over the course of 2008.

445. Further, each of the LyondellBasell entities was likewise insolvent when considered on an individual basis, as a result of each taking on approximately $20.7 billion of joint and several liability which, when combined with other liabilities of the individual LyondellBasell entities, was considerably more than the fair value of their assets. The amount of debt incurred by each individual Debtor was not diminished by the operation of contribution rights, as such rights were unavailable to those LyondellBasell entities that were primary borrowers under the Obligations (such as Lyondell Chemical Company for approximately $10 billion of the Obligations) and, moreover, were subordinate to the repayment in full of the obligors under the new Facilities. The contribution rights were, in any event, worthless against other entities that were themselves rendered insolvent by the Transaction.

446. The insolvency of the LBI Group (and each of its individual members) as of the date of the Merger can be strongly demonstrated by, among other means, the very same methodology repeatedly used by Merrill in its role as advisor to Blavatnik and Access for the Lyondell acquisition. As investment advisor to Access, to value the pro forma combined Lyondell-Basell companies, Merrill customarily performed what it referred to as a "Mid-Cycle EBITDA-based valuation." To perform such a valuation of the pro forma company, Merrill would first compute "Mid-Cycle EBITDA," which was the average of five years of projected pro forma combined EBITDA. Merrill would then multiply the resulting Mid-Cycle EBITDA by a range of "Exit Multiples," (5.75x, 6.50x, 7.25x) selected by it as appropriate, thereby arriving at a range of "enterprise values" for LBI Group.

447.    Using this methodology, over the course of its involvement, Merrill prepared for Access several different valuations based on a variety of different earnings projections. With respect to projected earnings of Basell, Merrill consistently used forecasts provided to Merrill by Access/Basell. With respect to projected earnings for Lyondell, until July 15, 2007, all projections used by Merrill for valuing the combined enterprise were developed using industry sources including industry data from industry consultants and analysts such as CMAI and other publicly available company specific and industry sources. For example, on or about July 10, 2007, before having received non-public projections from Lyondell management, Merrill, relying on Access projections for Basell and projections developed using industry sources for Lyondell, provided Access with a valuation based on its "Downside Case Projections" for the combined entity. Using its "Downside Case" projections, Merrill calculated a Mid-Cycle EBITDA of $3.8 billion. Then, applying its selected Exit Multiples to Mid-Cycle EBITDA, it provided a range of values from between $22 billion (using the 5.75x multiple) to $27.7 billion (using the 7.25x multiple), with $24.8 billion as its mid-point valuation (using the 6.50x multiple) for the combined companies.

448.    A few days after providing Access with this "Downside Case," Merrill applied this same Mid-Cycle EBITDA-based valuation methodology using the earnings projections provided to Access and Basell by Lyondell management. Based on Lyondell management earnings projections as of July 15, 2007, Merrill calculated a Mid-Cycle EBITDA of $4.8 billion. Then, applying its selected Exit Multiples to this amount, it generated a range of posited values, with the mid-point value, based on the mid-point 6.50 exit multiple, being $31.5 billion.

449.    The EBITDA projections upon which Merrill based its valuations, however, included billions of dollars of earnings that were, at a minimum, entirely speculative,

unsupported by the historical performance of the two companies, and unreasonable in view of macroeconomic, industry, and company specific factors known at the time of the Merger. Neither the Lyondell projections nor the Basell projections reasonably reflected the foreseeable impact on the earnings of these companies of the supply driven downturn widely forecasted for the petrochemical industry in the years immediately succeeding the Merger. Moreover, as demonstrated above, Lyondell's projections were pumped up with hundreds of millions of dollars of annual projected earnings from refining operations based on an entirely unsupported forecast of crack margins reflecting Smith's directions, at odds with objective industry data.

450. Using the same Mid-Cycle EBITDA-based valuation methodology used by Merrill to value the companies on a combined pro forma basis, but using the projections that more reasonably reflected the earnings that could be reasonably anticipated in view of factors known at the time of the Merger, the liabilities of the combined LBI Group exceeded the fair value of its assets on and as of the date of the Merger.

## VII. Upon the Merger, LyondellBasell Incurred Debts that Were Beyond its Ability to Repay

451. Upon the Merger, LBI incurred obligations which, combined with its pre-existing obligations, constrained its further access to the capital markets. As financed pursuant to the Merger, LBI was left with insufficient funds available to meet short and medium term needs, including: (i) funding the post-Merger payment of the purchase price for Berre that it had committed to purchase prior to the Merger, as well as other planned acquisitions and capital expenditures; (ii) the payment of millions of dollars of interest and fees due to the Lead Arrangers, including approximately $250 million of incremental fees due as a result of the exercise by the Lead Arrangers of the "flex provisions" included in the Merger Financing; and (iii) other costs, expenses and obligations that foreseeably would become due and payable within

the weeks and months following the Merger.  As a means to extricate itself from the resulting liquidity crisis that arose shortly after the closing of the Merger, LBI "upsized" its existing working capital facilities, effectively exhausting all remaining available sources of liquidity.

452.    Thereafter, when, as had been fully foreseeable, under the stress of a forecasted industry downturn that reduced its earnings and margins, the borrowing bases of LBI's asset based facilities contracted, and LBI was required to pay down these facilities, it was left with insufficient funds to operate, fell into financial distress and was unable to pay other obligations as they became due, including payment of principal and interest due on the Facilities.

453.    Upon the Merger, LBI had incurred, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

**COUNT I**
**CONSTRUCTIVE FRAUDULENT TRANSFER**
**(Applicable State Fraudulent Transfer Law)**

**(Against Former Lyondell Shareholders)**

454.    The LB Creditor Trust restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

455.    On or about December 20, 2007, LyondellBasell transferred to the Shareholder Defendants approximately $5.9 billion of the proceeds of the Facilities, exclusive of any amounts that were transferred to the John Doe Defendants..

456.    LyondellBasell did not receive reasonably equivalent value or fair consideration in exchange for the obligations it incurred or the payments made to enable the Shareholder Transfers paid to the Shareholder Defendants.

457.    At the time of the Shareholder Transfers to the Shareholder Defendants, LyondellBasell was insolvent or became insolvent as a result of the obligations incurred or the

payments made. Consequently, the Shareholder Transfers were fraudulent as to then present creditors.

458.    At the time of the Shareholder Transfers to the Shareholder Defendants, (i) LyondellBasell was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with LyondellBasell was an unreasonably small capital; and/or (ii) LyondellBasell intended to incur, or believed or reasonably should have believed that LyondellBasell would incur, debts that would be beyond its ability to pay as such debts matured. Consequently, the Shareholder Transfers were fraudulent as to then present and future creditors.

459.    The Shareholder Transfers paid to the Shareholder Defendants should be set aside pursuant to applicable state fraudulent transfer law and the Shareholder Defendants should be required to return the Shareholder Transfers to the LB Creditor Trust.

## COUNT II
## INTENTIONAL FRAUDULENT TRANSFER
### (Applicable State Fraudulent Transfer Law)

### (Against Former Lyondell Shareholders)

460.    The LB Creditor Trust restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

461.    The LyondellBasell approved the Merger and entered into and executed the transactions in connection therewith, including the making of the Shareholder Transfers to the Shareholder Defendants with knowledge of the effect such payments would have on the creditors of LyondellBasell, and with the intent to hinder, delay or defraud the creditors of LyondellBasell. Therefore, the Shareholder Transfers were fraudulent as to then present and future creditors.

462.    The Shareholder Transfers paid to the Shareholder Defendants should be set aside

pursuant to applicable state fraudulent transfer law, and the Shareholder Defendants should be

required to return the Shareholder Transfers to the LB Creditor Trust.


## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff requests that judgment be entered

in its favor against the Shareholder Defendants as follows:

(1)    On Count I:

      a.    finding that the Shareholder Transfers were fraudulent as to the Creditors
          pursuant to applicable state fraudulent transfer law;

      b.    avoiding, disregarding and nullifying the Shareholder Transfers to the
          extent necessary to satisfy the Creditor Claims;

      c.    entering judgment against the Shareholder Defendants in the amount of
          the Shareholder Transfers and allowing Plaintiff to levy execution against
          them in satisfaction of the Creditor Claims; and

      d.    providing for such other relief as justice and equity may require.

(2)    On Count II:

      a.    finding that the Shareholder Transfers were fraudulent as to the Creditors
          pursuant to applicable state fraudulent transfer law;

      b.    avoiding, disregarding and nullifying the Shareholder Transfers to the
          extent necessary to satisfy the Creditor Trust Claims;

      c.    entering judgment against the Shareholder Defendants in the amount of
          the Shareholder Transfers and allowing Plaintiff to levy execution against
          them in satisfaction of the Creditor Claims; and

      d.    providing for such other relief as justice and equity may require.

Dated: October 22, 2010
        New York, New York

Respectfully submitted,

EDWARD S. WEISFELNER, AS TRUSTEE OF
THE LB CREDITOR TRUST


By: _/s/ Sigmund S. Wissner-Gross_____
    Sigmund S. Wissner-Gross
    May Orenstein
    BROWN RUDNICK LLP
    Seven Times Square
    New York, NY 10036
    (212) 209-4800

    Steven D. Pohl
    BROWN RUDNICK LLP
    One Financial Center
    Boston, MA 02111
    (617) 856-8200


    *Counsel for Edward S. Weisfelner, as
    Trustee of the LB Creditor Trust*

# 8268296

143