UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————

|                                              |     |                          |
|----------------------------------------------|-----|--------------------------|
| In re:                                       | )   | Chapter 11               |
|                                              | )   |                          |
| LYONDELL CHEMICAL COMPANY, *et al.*,         | )   | Case No. 09-10023        |
|                                              | )   | Jointly Administered     |
|                          Debtors.            | )   |                          |
|                                              | )   |                          |
| EDWARD S. WEISFELNER, AS                     | )   |                          |
| LITIGATION TRUSTEE OF THE                    | )   |                          |
| LB CREDITOR TRUST,                           | )   |                          |
|                          Plaintiff,          | )   | Adversary Proceeding     |
| v.                                           | )   | Case No. 10-4609 (REG)   |
|                                              | )   |                          |
| FUND 1., *et al.*,                           | )   |                          |
|                          Defendants.         | )   |                          |

————————————————————————————

### ERRATA ORDER RE DECISION AND ORDER ON
### MOTIONS TO DISMISS

This matter having come up on the Court's own motion, it is ORDERED:

1. The Court's Decision and Order on Motion to Dismiss, dated January 14, 2014, is

corrected in the respects noted below:

> Section I.B.2 (under the heading "2. 'Field' Preemption"),
> fourth paragraph, last sentence:  change "had" to "have",
> and "when" to "since".[1]

2.    Future references to this decision shall be to the decision as corrected, a copy of

which is attached as exhibit A.

Dated: New York, New York          ***s/Robert E. Gerber***_____
       January **_16_**, 2014              United States Bankruptcy Judge

---

[1] The sentence should now read:  "State and federal fraudulent transfer recovery schemes have coexisted, with the federal statute availing trustees of state remedies, for 75 years, since 1938 amendments to the former Bankruptcy Act enacted a new § 70e to the Act, providing trustees with state law rights supplementing the relatively narrow federal rights then existing under Bankruptcy Act § 67."

# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LYONDELL CHEMICAL COMPANY, *et al.*, | ) | Case No. 09-10023 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| EDWARD S. WEISFELNER, AS | ) | |
| LITIGATION TRUSTEE OF THE | ) | |
| LB CREDITOR TRUST, | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| v. | ) | Case No. 10-4609 (REG) |
| | ) | |
| FUND 1., *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

_____

## DECISION AND ORDER ON MOTIONS TO DISMISS

APPEARANCES:

BROWN RUDNICK LLP
*Counsel for the Plaintiff*
7 Times Square
46th Floor
New York, New York 10036
By:     Sigmund S. Wissner-Gross, Esq. (argued)
        Steven D. Pohl, Esq.
        May Orenstein, Esq.
        Aaron Lauchheimer, Esq.

WILMER CUTLER PICKERING HALE AND DORR LLP
*Counsel for Movant Defendants*
7 World Trade Center
New York, New York 10007
By:     Philip D. Anker, Esq. (argued)
        Ross E. Firsenbaum, Esq.
        Peter J. McDonald, Esq.
        Pamela Karten Bookman, Esq.
1875 Pennsylvania Avenue, NW
Washington, D.C. 20037
By:     Craig Goldblatt, Esq.
        Joel Millar, Esq.

## TABLE OF CONTENTS

Facts ............................................................................................................................. 4

Discussion .................................................................................................................... 7

I. Effect of Section 546(e) ........................................................................................ 9

    A.   Section 546(e)'s Applicability to Individual Creditors' State Law Claims .......... 10

    B.   Preemption ....................................................................................................... 12

        1.   "Express" Preemption .................................................................................. 14

        2.   "Field" Preemption ...................................................................................... 15

        3.   "Conflict" Preemption ................................................................................. 18

            (a)   Conflict Preemption:  the Impossibility Branch ...................................... 18

            (b)   Conflict Preemption:  the Obstacle Branch ............................................ 19

               (i)    Conflict Preemption General Principles ............................................. 19

               (ii)   The Totality of Congressional Intent ................................................. 20

               (iii)  Section 546(e) Intent............................................................................ 29

               (iv)  The Barclays Decision ........................................................................ 35

II.  Funds to Stockholders Not Property of the Debtor? .................................... 43

III.  Conduits, Nominees, Non-beneficial Holders ........................................... 48

IV.  Ratification by LBO Lender Creditors? ................................................... 50

V.  Intentional Fraudulent Transfer Claims .................................................... 54

    A.   Failure to Allege Fraudulent Intent  on Part of Board of Directors ................... 54

    B.   Failure to Allege Which Debtor Made the Transfer ........................................... 60

    C.   Facts Supporting Intent to Hinder, Delay or Defraud........................................ 61

    D.   Plausibility ....................................................................................................... 63

Conclusion ................................................................................................................. 64

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In late December 2007, Basell AF S.C.A. ("**Basell**"), a Luxembourg entity

controlled by Leonard Blavatnik ("**Blavatnik**"), acquired Lyondell Chemical Company

("**Lyondell**"), a Delaware corporation headquartered in Houston—forming a new

company after a merger (the "**Merger**"), LyondellBasell Industries AF S.C.A. (as used

by the parties, "**LBI**," or here, the "**Resulting Company**"),[1] Lyondell's parent—by

means of a leveraged buyout ("**LBO**"). The LBO was 100% financed by debt, which, as

is typical in LBOs, was secured not by the acquiring company's assets, but rather by the

assets of the company to be acquired. Lyondell took on approximately $21 billion of

secured indebtedness in the LBO, of which $12.5 billion was paid out to Lyondell

stockholders.

In the first week of January 2009, less than 13 months later, a financially strapped

Lyondell filed a petition for chapter 11 relief in this Court.[2] Lyondell's unsecured

creditors then found themselves behind that $21 billion in secured debt, with Lyondell's

assets effectively having been depleted by payments of $12.5 billion in loan proceeds to

stockholders, who, under the most basic principles of U.S. insolvency law, are junior to

creditors in right of payment.[3]

---

[1] Acronyms make understanding difficult for readers who have not been living with a case. The Court tries to minimize their use. For readability, except where acronyms appear in quotations or have acquired obvious meaning, the Court expands the acronyms out, or substitutes terms that are more descriptive of the entity's role in the transaction.

[2] Lyondell then filed along with 78 affiliates. About three months later, on April 24, 2009, the Resulting Company and another Lyondell affiliate joined them as debtors in this Court.

[3] Payments incident to the LBO and the Merger allegedly also cost Lyondell approximately $575 million in transaction fees and expenses, and another $337 million in payments to Lyondell officers and employees in change of control payments and other management benefits. But this action does not address them, except insofar as they are alleged to have provided a motive for the alleged intentional fraudulent transfer claims discussed in Section V below.

-1-

This adversary proceeding is one of three[4] now in the federal courts that were brought by trusts created for the benefit of Lyondell unsecured creditors to assert any legal claims that might have merit as a consequence of the LBO, the Merger and related transactions or incidents.  In this adversary proceeding, which was removed by the defendants from state court, the LB Creditor Trust (the "**Creditor Trust**") asserts state law constructive fraudulent transfer claims with respect to the LBO as the assignee of such claims from Lyondell creditors.  The Creditor Trust seeks to recover, from the Lyondell former stockholders who received the largest payments,[5] approximately $6.3 billion in payments that were made to them as transferees incident to the LBO.  The fraudulent transfer claims here are asserted only under state law, and not under any provision of the Bankruptcy Code.

Since the early days that LBOs came into common use, it has been recognized that LBOs are subject to fraudulent transfer laws, and that when an LBO renders a debtor

---

[4]     In the first of the others, *Weisfelner v. Blavatnik*, No. 09-1375 ( "*Blavatnik*"), another trust, the LB Litigation Trust (the "**Litigation Trust**") asserts 21 claims for damage to Lyondell under state law, the laws of Luxembourg, and the Bankruptcy Code—principally against officers and directors (and the foreign equivalents of such) of Lyondell and Basell, Blavatnik, and Blavatnik entities and personnel—most significantly for breaches of fiduciary duty and aiding and abetting those breaches.

In the second of the others, *Weisfelner v. Alfred R. Hoffman Charles Schwab & Co. Cust. IRA Contributory* ("*Hoffman*"), No. 10-5525, the Litigation Trust asserts *federal* fraudulent transfer claims, under section 548 of the Bankruptcy Code, against shareholders who secured LBO consideration.  To the extent that any section 548 claims might otherwise lie under constructive fraudulent transfer doctrine, they may not be asserted in the Second Circuit, under the Circuit's decisions in *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.)*, 651 F.3d 329 (2d Cir. 2011) ("*Enron*"), and *Official Comm. of Unsecured Creditors v. American United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 719 F.3d 94 (2d Cir. 2013) ("*Quebecor*").  After *Enron* came down, the Litigation Trust withdrew the constructive fraudulent transfer claims that previously had been asserted in *Hoffman*, without prejudice to any rights the Litigation Trust might have if the controlling law were thereafter to change.  The *Hoffman* intentional fraudulent transfer claims remain.

[5]     The Creditor Trust has brought claims in this adversary proceeding only against those who are alleged to have received more than $100,000.  Of these, about 90 are alleged to have received more than $10 million, and 10 are alleged to have received more than $100 million.  *See* Second Am. Compl. ¶ 15, Dec. 19, 2011, ECF No. 253 ("**Complaint**").

insolvent or inadequately capitalized, a court can, subject to applicable defenses, grant

injured creditors relief.[6]  Here, whether the evidence will establish that Lyondell was

rendered insolvent or inadequately capitalized as a consequence of the LBO is a matter

yet to be decided, and likely to be subject to debate, since Lyondell's misfortune took

place at the time of the worst financial meltdown since the Great Depression.  But a large

number of principally institutional stockholder defendants here (collectively, the

"**Movants**") seek dismissal of this case before reaching the insolvency issues.  They

move for dismissal of the claims on five grounds—contending, in the most far reaching

of their arguments, that after a company files for bankruptcy, stockholder recipients of

proceeds of leveraged buyouts are immunized from constructive fraudulent transfer

---

[6]     *See, e.g.*, *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1296–97 (3d Cir. 1986)
(mortgages executed in favor of lender in connection with LBO were fraudulent transfers); *HBE
Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) ("**HBE Leasing**") (noting that it is well
established that multilateral transactions may under appropriate circumstances be "collapsed" and
treated as phases of a single transaction for analysis under the Uniform Fraudulent Conveyance
Act, and that "[t]his approach finds its most frequent application to lenders who have financed
leveraged buyouts of companies that subsequently become insolvent"); *Wieboldt Stores, Inc. v.
Schottenstein*, 94 B.R. 488, 503 (N.D. Ill. 1988) (Holderman, J.) ("**Wieboldt I**") (denying motions
to dismiss fraudulent transfer claims that had been asserted in connection with LBO), and 131
B.R. 655, 664–65 (N.D. Ill. 1991) (Holderman, J.) ("**Wieboldt II**") (denying later motions for
summary judgment).

As explained by the Third Circuit in its later decision in *Plassein International*:

> [L]everaged buyouts, in certain circumstances, can prejudice
> unsecured creditors of the acquired company by exchanging
> the equity in the acquired company for secured debt held by
> other creditors with priority over the claims of the unsecured
> creditors.  Accordingly, the use of a debtor's assets for
> security for a loan can impair the ability of unsecured creditors
> to recover their debts from the debtor.  Therefore a reasonable
> argument can be made that, if possible, fraudulent transfer
> laws should not be applied to protect leveraged buyouts from
> being avoided as fraudulent transfers.

*Brandt v. B.A. Capital Co. LP (In re Plassein Intern. Corp.)*, 590 F.3d 252, 256 (3d Cir. 2009)
("**Plassein International**") (citations omitted).  Thus most of the LBO fraudulent transfer
jurisprudence has recognized the potential viability of fraudulent transfer claims against
stockholders paid off in LBOs, and has focused instead on whether the LBO actually rendered the
debtor insolvent or left it with inadequate working capital, or whether the stockholders were
nevertheless immunized from liability by reason of the section 546(e) safe harbor.  *See, e.g., id.*

claims by the Bankruptcy Code's section 546(e) safe harbor, even when the constructive

fraudulent transfer claims are not brought by a trustee under the Bankruptcy Code, and

instead are brought on behalf of individual creditors under state law.

While the Movants recognize that the Bankruptcy Code says nothing about

cutting off rights asserted solely under state law, or preempting them, they argue that the

Code's section 546(e) nevertheless applies, and also that state law rights are preempted

by implication.

The Court cannot agree. Rather, it agrees with the recent holdings in the *Tribune

Company Fraudulent Conveyance Litigation*[7] and the *Irving Tanning Company* chapter

11 case[8] that section 546(e) does not apply to suits under state fraudulent transfer laws.

And it agrees with the holding in *Tribune* that state fraudulent transfer laws are not

preempted. Dismissal premised on the asserted applicability of section 546(e) to state

law claims, and on implied preemption by section 546(e), is denied. The remainder of

the motions are granted in part and denied in part, as set forth more specifically below.

## Facts

It is unnecessary, for the purposes of this decision, to discuss the underlying

allegations in the depth that would be required in the related *Blavatnik* action. The

Creditor Trust here seeks to recover (but only from those receiving payments in excess of

$100,000)[9] approximately $6.3 billion of the $12.5 billion that Lyondell former

---

[7]   *In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310 (S.D.N.Y. 2013) (Sullivan, J.) ("*Tribune*").

[8]   Transcript of Decision of Feb. 17, 2013, *Development Specialists, Inc. v. Kaplan (In re Irving Tanning Co.)*, No. 12-01024 (Bankr. D. Me. Feb. 17, 2013), ECF No. 43 (Kornreich, J.) ("*Irving Tanning*").

[9]   There is no need to name them, and upon the agreement of the parties, the caption was changed to refer to the first named defendant as "Fund 1," and to other defendants by similar generic names. Most appear to be investment banking houses, brokerage firms, or other financial institutions.

-4-

stockholders received incident to the LBO and Merger.  The Creditor Trust is the

assignee of claims assigned to it as a consequence of Lyondell's reorganization plan by

creditors holding unsecured trade claims, funded debt claims, and senior and

subordinated secured deficiency claims.[10]

The Creditor Trust alleges that $12.5 billion in payments to former Lyondell

Shareholders was made without reasonable value in return—in fact, that "the Shareholder

Defendants gave nothing in return."[11]  The Creditor Trust then alleges that the

$12.5 billion paid to stockholders pursuant to the Merger rendered Lyondell insolvent

and with unreasonably small capital, having been financed by the incurrence of secured

debt that Lyondell reasonably should have believed it would be unable to pay as such

debt became due.[12]

As noted above, the claims here are asserted solely under state law.[13]  As relevant

here, the Creditor Trust's claims are not asserted in any way under the Bankruptcy Code,

under its sections 548 (by which the trustee can assert, for the benefit of the estate, a

federal cause of action to avoid fraudulent transfers); 544 (by which the trustee has a

federal right to assert, for the benefit of the estate, state law causes of action to avoid

---

[10]    Complaint ¶ 3.

[11]    *Id.* ¶ 4.

[12]    *Id.*

[13]    The particular state law is not relevant to these motions, if it ever will be.  State fraudulent transfer
law is largely, but not entirely, the same throughout the United States; the Uniform Fraudulent
Transfer Act  ("**UFTA**") has been enacted in 43 of the states, though two (including New York)
still use the older Uniform Fraudulent Conveyance Act ("**UFCA**"), and five others have
idiosyncratic statutes or rely on common law.  *See* Kenneth C. Kettering, *Codifying a Choice of
Law Rule for Fraudulent Transfer:  A Memorandum to the Uniform Law Commission*, 19 AM.
BANKR. INST. L. REV. 319 (2011).  All states grant creditors relief when transfers from a debtor
render the debtor insolvent or with unreasonably small capital, and none have safe harbors like
Bankruptcy Code section 546(e).

fraudulent transfers); 550 (which provides a right of recovery for transfers avoided under, *inter alia*, sections 548 or 544) or otherwise.

Before this action was commenced, the Court confirmed Lyondell's plan of reorganization (the "**Plan**").  Among other things, the Plan provided for the creation of a trust to initiate or continue litigation at one time belonging to the bankruptcy estate.  The Plan also provided for certain claims that the Lyondell estate could assert on behalf of its creditors to be abandoned to another trust for the benefit of Lyondell creditors.

The Plan defined "Abandoned Claims" as "the claims and causes of action brought on behalf of the Debtors' estates pursuant to section 544 of the Bankruptcy Code against former shareholders of Lyondell Chemical."[14]  The Plan further provided:

> On the Effective Date, the Abandoned Claims shall be discontinued by the Debtors without prejudice and the Debtors shall be deemed to have abandoned, pursuant to section 554 of the Bankruptcy Code, any and all right to further pursue Abandoned Claims.  Upon the effectiveness of the aforesaid discontinuance and abandonment, each holder of Allowed 2015 Notes Claims, General Unsecured Claims, and holders of the Deficiency Claims . . . shall contribute to the Creditor Trust any and all State Law Avoidance Claims.  The Creditor Trust shall be authorized to prosecute the State Law Avoidance Claims that are contributed to the Creditor Trust . . . .[15]

The Creditor Trust then brought the state law avoidance claims in New York Supreme Court.  One month later, a group of defendants (principally investment banking houses, brokerage firms and other financial institutions) represented by Wilmer Cutler Pickering Hale and Dorr LLP ("**WilmerHale**"), which has taken the lead in the defense

---

[14]    Third Am. and Restated Joint Ch. 11 Plan of Reorganization for the LyondellBasell Debtors, at 2, Mar. 12, 2010, ECF No. 4418-1 ("**Plan**").

[15]    Plan at 60.

of this adversary proceeding, filed a notice of removal to the district court, thereby

removing this action from state court to federal court. No motion for remand was filed.

The case was then referred to this Court under the district court's standing order of

reference.

## Discussion

The Movants seek dismissal[16] on five asserted grounds—that:

> (1) (a) the state law fraudulent transfer claims may not be brought
>
> by reason of section 546(e) of the Bankruptcy Code, and (b) such claims
>
> are preempted by the federal Bankruptcy Code;
>
> (2) the Creditor Trust cannot recover because the transferred funds
>
> were not property of the Debtors;
>
> (3) many of the Shareholder Defendants were merely nominees,
>
> non-beneficial holders, or conduits;
>
> (4) the Creditor Trust lacks standing to sue on behalf of the
>
> lenders, who must be found to have ratified the transfers in question; and

---

[16]    The principles applicable to motions to dismiss under Rule 12(b)(6) need not be addressed at length here. Fed. R. Civ. P. 8(a)(2) requires only "'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("***Twombly***") (alteration in original). A complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, though this particular complaint is replete with them. Factual allegations are presumed true and construed in favor of the plaintiff, but the Court "[is] not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("***Iqbal***") (internal quotation marks omitted).

*Twombly* and *Iqbal* also direct courts to consider, on 12(b)(6) motions to dismiss, whether claims are plausible. The Supreme Court has expressly told the lower courts that in "[d]etermining whether a complaint states a plausible claim . . . the reviewing court [is required] *to draw on its experience* and common sense." *Iqbal*, 556 U.S. at 679 (emphasis added). If writing on a clean slate, the Court would not have come to such a view, as it could lead to different conclusions on 12(b)(6) motions, which are matters of law, depending on individual judges' experience with the matters in question. But of course the Court decides these motions in accordance with the Supreme Court's directions in that regard.

(5) the Creditor Trust has failed to satisfactorily plead its claims
for intentional fraudulent transfer.

For reasons set forth below:

(1) The Court rejects the Movants' contentions (a) that section
546(e) applies to fraudulent transfer claims brought by or on behalf of
creditors under state law, and (b) that state law fraudulent transfer claims
are preempted by section 546(e) or otherwise under federal law.

(2) The Court rejects the Movants' contention that the Creditor
Trust cannot recover by reason of the assertion that the transferred funds
were not property of the Debtors.  The Creditor Trust has satisfactorily
alleged facts plausibly supporting a conclusion that the LBO (under which
Lyondell incurred debt, and Lyondell assets were pledged, with the intent
that loan proceeds go to Lyondell stockholders) was a unitary transaction
that should be collapsed, for analytical purposes, to correspond to its
economic substance and to the intent of those who allegedly structured the
LBO in that fashion.

(3) The Court agrees that nominees, non-beneficial holders of
Lyondell stock, and conduits through which consideration passed cannot
be held liable.  To the extent any defendant here was merely a conduit
through which LBO proceeds passed to another, or otherwise was not an
ultimate beneficial recipient of the LBO proceeds, the claims against it
must be dismissed.

-8-

(4) The Court agrees with the Movants' contention that the LBO secured lenders (whose rights to avoid fraudulent transfers were also assigned to the Creditor Trust) must be deemed to have ratified the transfers here. To the extent that relief is sought here on behalf of entities that were LBO lenders themselves, the Movants' motion is granted.

(5) Though it disagrees with several of the Movants' points with respect to the allegations of intentional fraudulent transfer, the Court agrees that the allegations were deficient. But as it is possible that the deficiencies may be addressed, the Court is dismissing the intentional fraudulent transfer claims with leave to replead.

## I.

### Effect of Section 546(e)

In the first of their five arguments, the Movants argue that the Creditor Trust's state law claims must be dismissed because similar constructive fraudulent transfer claims brought under the Bankruptcy Code would have to be dismissed, by reason of the safe harbor applicable to federal constructive fraudulent transfer claims under Bankruptcy Code section 546(e). That argument is asserted at two levels. The Movants first argue that section 546(e) provides a substantive defense to the individual creditors' purely state law claims that have been asserted here, as it would to federal claims brought under sections 544 or 548 of the Bankruptcy Code. The Movants then argue that by reason of the states' failure to include a similar safe harbor in their own legislation, the states' similar but not congruent constructive fraudulent transfer avoidance statutes are preempted and hence invalid. In each respect, the Court cannot agree.

A.    *Section 546(e)'s Applicability to Individual
      Creditors' State Law Claims*

The first contention requires only brief discussion.  The *Tribune* court found

section 546(e) inapplicable to state law claims brought on behalf of individual creditors,

and this Court does too.  As the *Tribune* court observed, any analysis of the extent to

which section 546(e) would also proscribe state law constructive fraudulent transfer

claims starts with what Congress said.[17]  Section 546(e) provides that "the *trustee* may

not avoid a transfer"[18]  Congress did not make section 546(e) applicable to claims by or

on behalf of individual creditors.  And as the *Tribune* court likewise observed, quoting

*Hartford Underwriters*,[19] if Congress intended section 546(e) to be more broadly

applicable, "it could simply have said so."[20]

The *Irving Tanning* court held likewise.  There, as here, a litigation trust asserted

fraudulent transfer claims after a failed LBO.  The trust did so in two capacities:  (1) as

here, as the assignee of individual creditors,[21] and (2) (and unlike here), as the assignee

---

[17]    *See* 499 B.R. at 315–16 ("To determine whether Section 546(e) also applies to the Individual
        Creditors, the Court 'must begin with the language employed by Congress and the assumption that
        the ordinary meaning of that language accurately expresses the legislative purpose.'" (quoting
        *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008), which in turn had quoted *United States
        v. Albertini*, 472 U.S. 675, 680 (1985))).

[18]    11 U.S.C. § 546(e) (2006) (emphasis added); *see also Tribune*, 499 B.R. at 316 ("Section 546(e)
        addresses its prohibition on avoiding settlement payments only to the bankruptcy trustee . . . .").

[19]    *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("**Hartford
        Underwriters**") ("Congress 'says in a statute what it means and means in a statute what it says
        there.'").

[20]    *Tribune*, 499 B.R. at 316.

[21]    *See* Complaint at ¶ 5, *Irving Tanning*, No. 12-01024 (Bankr. D. Me. Nov. 25, 2012) ECF No. 1
        ("**Irving Tanning Complaint**") ("In addition, the Complaint asserts state law fraudulent transfer
        claims owned by creditors of Prime Maine, in such capacity, and which were assigned to the Trust
        under the Plan and the Confirmation Order.").

-10-

of the estate.[22]  The defendants moved to dismiss the complaint, arguing, among other

things, that section 546(e) barred even the claims that were asserted solely on behalf of

individual creditors under state law.  The *Irving Tanning* court denied their motion.  In its

dictated opinion, it held:

> It is alleged that the Plaintiff is the Trustee under
> the Debtor's Plan of Reorganization, with two hats.
> One, assignee of creditors by agreement of the
> creditors and court approval of the Plan and, two,
> that the trustee, the liquidating trustee, is the
> successor in interest to the debtor in possession or
> the statutory trustee.
>
> The Defendants would have it that these are
> mutually exclusive roles.  I hold otherwise.  I
> believe that the liquidating trustee, as assignee of
> creditors, may assert these actions, and that being
> so, that 546(e) does not apply.[23]

While the Movants spend 10 pages in their brief arguing the matter as if sections

544 and 548—and hence section 546(e)—apply to this case, this is not a case about

sections 544 and 548.  The Creditor Trust's claims are not asserted under those

provisions.  The claims here are not being asserted on behalf of the estate; they are

asserted on behalf of individual creditors.  Here there is no statutory text making section

546(e) applicable to claims brought on behalf of individual creditors, or displacing their

state law rights, by plain meaning analysis or otherwise.  Like the *Tribune* and *Irving

Tanning* courts, this Court cannot conclude that section 546(e) covers individual

creditors' fraudulent transfer claims.

---

[22]    *See* Irving Tanning Complaint ¶ 5 ("This Complaint . . . asserts federal law claims, to which the
Trust succeeds [the Debtors], to recover fraudulent transfers under section 544(b) and applicable
state law.").

[23]    Transcript of Decision of Feb. 17, 2013 at 6:23–7:7, *Irving Tanning*, No. 12-01024 (Bankr. D. Me.
Feb. 17, 2013), ECF No. 43.

B.      *Preemption*

The Court then turns to the Movants' contention that section 546(e) preempts

state constructive fraudulent transfer laws.  Consistent with the thoughtful decision in

*Tribune*,[24] this Court likewise concludes that the state law constructive fraudulent transfer

laws here are not preempted.

"As every schoolchild learns, our Constitution establishes a system of dual

sovereignty between the States and the Federal Government."[25]  "Federalism, central to

the constitutional design, adopts the principle that both the National and State

Governments have elements of sovereignty the other is bound to respect."[26]

From the existence of two sovereigns—the federal government and the states—

follows the possibility that state and federal laws can be in conflict or at cross-purposes.[27]

The Supremacy Clause provides a clear rule that federal law "shall be the supreme Law

of the Land; and the Judges in every State shall be bound thereby, any Thing in the

Constitution or Laws of any State to the Contrary notwithstanding."[28]  "Under this

principle, Congress has the power to preempt state law";[29] state laws that conflict with

federal laws are "without effect."[30]

---

[24]     *Tribune*, 499 B.R. at 320.

[25]     *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) ("***Gregory***").

[26]     *Arizona v. United States*, --- U.S. ---, 132 S.Ct. 2492, 2500 (2012) ("***Arizona***"); *accord Gregory*, 501 U.S. at 457.

[27]     *Arizona*, 132 S.Ct. at 2500.

[28]     U.S. Const. art. VI, cl. 2.

[29]     *Arizona*, 132 S.Ct. at 2500.

[30]     *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) ("***Altria Group***") (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)); *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94–95 (2d Cir. 2012) ("***Niagara Mohawk***") (quoting *Altria Group*).

But whether Congress has actually preempted state law is not infrequently debatable.  The Supremacy Clause and the Nation's federal system "contemplate . . . a vital underlying system of state law, notwithstanding the periodic superposition of federal statutory law."[31]  Despite the "sweeping language" of the Supremacy Clause, "courts do not readily assume preemption.  To the contrary, 'in the absence of compelling congressional direction,' courts will not infer that 'Congress ha[s] deprived the States of the power to act.'"[32]

Preemption determinations are guided by two "cornerstones" of the Supreme Court's preemption jurisprudence.[33]  First, "the purpose of Congress is the ultimate touchstone in every pre-emption case."[34]  Second, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"[35]  Federal courts rely on the presumption against preemption because respect for the states as "independent sovereigns in our federal

---

[31]   *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) ("***MTBE***").

[32]   *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 238 (2d Cir. 2006) (alteration in original) (quoting *N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 540 (1979)).

[33]   *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("***Wyeth***").

[34]   *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("***Lohr***")); *accord Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992); *see also Niagara Mohawk*, 673 F.3d at 95 ("The key to the preemption inquiry is the intent of Congress . . . ." (quoting *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010))).

[35]   *Wyeth*, 555 U.S. at 565 (alteration in original) (quoting *Lohr*, 518 U.S. at 485).

-13-

system" leads those courts to assume that "Congress does not cavalierly pre-empt state-law causes of action."[36]

For these reasons, the party asserting that federal law preempts state law bears the burden of establishing preemption.[37]

"Congress may manifest its intent to preempt state or local law explicitly, through the express language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law."[38] Thus, preemption may be express or implied. Implied preemption, in turn, may be of two types, "field preemption" and "conflict preemption," each as explained below.

The Court considers each of those three possibilities[39] in turn.

### 1.    "Express" Preemption

Congress may, if it chooses, identify state laws that it considers to be inconsistent with federal goals. And if it does so by statutory enactment, any such state laws must

---

[36]    *Wyeth*, 555 U.S. at 565 n.3 (quoting *Lohr*, 518 U.S. at 485); *accord Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 449 (2005) ("**Dow Agrosciences**") ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995))).

[37]    *MTBE*, 725 F.3d at 96; *see also U.S. Smokeless Tobacco Mfg. Co. LLC v. City of N.Y.*, 708 F.3d 428, 432 (2d Cir. 2013) ("**Smokeless Tobacco**") ("Preemption analysis is guided by the presumption that a federal statute does not displace the local law 'unless Congress has made such an intention clear and manifest.'" (quoting *Dow Agrosciences*, 544 U.S. at 449)).

[38]    *Niagara Mohawk*, 673 F.3d at 95.

[39]    The Movants' opening brief was vague as to the kind of preemption upon which they rely. They later stated, in their reply brief, that "[a]lthough conflict preemption is the most clearly applicable doctrine here given the direct conflict between the [Creditor Trust]'s state-law claims and federal law, field preemption also applies." (Reply Mem. in Further Support of Defs.' Mot. to Dismiss 13 n.4, Apr. 15, 2011, ECF No. 168 ("**Movants' Reply Br.**")). They thus do not appear to contend that express preemption is applicable here, and the Court accordingly addresses express preemption only briefly.

-14-

fall.  "There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision."[40]

But there is no contention in this case that Congress expressly preempted state fraudulent transfer laws in any respect that applies here.[41]  There is no contention that Congress enacted legislation declaring what the Movants here effectively ask the Court to determine—that Congress preempted state fraudulent transfer statutes to the extent that they were not drafted in the same terms the federal statutes were.

The Court cannot find that Congress expressly preempted any state law causes of action for fraudulent transfers, or, especially, those in instances where the states' laws were simply not congruent with federal ones.

### 2.    "Field" Preemption

Field preemption occurs when Congress has manifested an intent to "occupy the field" in a certain area, as evidenced by "a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."[42]

Here the Court cannot make such a finding.  Congress has not evidenced any intention to wholly occupy the fields of avoidance or recovery of fraudulent transfers.[43]

---

[40]    *Arizona,* 132 S.Ct. at 2500–2501.

[41]    Congress did so in a different respect, and its decision to do so in that respect alone is significant here.  *See* pages 22 to 23 and n.71 below.

[42]    *Niagara Mohawk*, 673 F.3d at 95 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)).

[43]    The Court does not believe that the "field" can properly be regarded as broadly as insolvency generally, at least where creditors have agreed to limit or transfer their own rights.  Of course a state is without power to make or enforce any law governing bankruptcies that impairs the obligation of contracts, grants discharges, extends to persons or property outside its jurisdiction, or

To the contrary, the states and federal government have long had a shared interest in

protecting the legitimate desire of creditors to be repaid, and in avoiding transactions

parting with debtor property for inadequate consideration when such comes at creditors'

expense.

States have had fraudulent conveyance avoidance and recovery statutes since the

time of the Revolutionary War (when states enacted their own versions of the English

Statute of 13 Elizabeth), and especially since 1918, with the proposal of the Uniform

Fraudulent Conveyance Act, which was thereafter adopted in 26 states, and whose

provisions were later incorporated into the Federal Bankruptcy Act.[44] Rights under the

state statutes could, and often would, be brought by creditors under state law, without the

need for the commencement of proceedings in bankruptcy.

Federal bankruptcy laws have existed, though with periods during which no

federal bankruptcy statute was in place, since 1800.[45] During the years during which

---

conflicts with the national bankruptcy laws. *See International Shoe Co. v. Pinkus*, 278 U.S. 261,
263–264 (1929). But debtors and creditors can and frequently do agree to bankruptcy alternatives
governed or enforced by state law, such as assignments for the benefit of creditors (authorized
under the law of many states) and consensual out-of-court workouts.

Nor does the Court believe that the "field" can be regarded as broadly as "proceedings" within
bankruptcy, as the Movants assert in passing in a footnote of their reply brief. *See* Movants'
Reply Br. 13 n.4. For that broad proposition, they quote the decision of a district judge in *Official
Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Grp. (In re
Hechinger Inv. Co. of Del.)*, 274 B.R. 71 (D. Del. 2002) ("*Hechinger*"). But the conclusion there
is right or wrong as a matter of *conflict* preemption, not field preemption (though the court there
articulated its conclusions in terms of both doctrines), and the *Hechinger* discussion of
"proceedings" in the field preemption context appears to be based on a misunderstanding of what
"proceedings" means in bankruptcy usage. As used within the bankruptcy community,
"proceedings" include applications, motions, contested matters and adversary proceedings, *see,
e.g., Buena Vista Television v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.)*, 307
B.R. 404, 413 n.22 (Bankr. S.D.N.Y. 2004), a very large number of which arise under state law.

[44]     *See Fraudulent Transfer Act Summary*, NAT'L CONFERENCE OF COMM'RS ON UNIF. STATE LAWS,
http://www.uniformlaws.org/ActSummary.aspx?title=Fraudulent% 20Transfer%20Act (last
visited Jan 7, 2014).

[45]     *See* DAVID A. SKEEL, JR., DEBT'S DOMINION: A HISTORY OF BANKRUPTCY LAW IN AMERICA, at
3–4 (2001) ("*Debt's Dominion*").

federal bankruptcy statutes were in place, they coexisted with the fraudulent transfer

statutes of the states.  Section 544 of the Code, which provides trustees with avoidance

remedies available to creditors under state law (derived from a similar provision under

§ 70e of the now-superseded Bankruptcy Act),[46] evidences quite the opposite of a federal

intention to wholly occupy the avoidance action field.  Rather, it allows state rights of

action to continue, and provides bankruptcy trustees (and those, like debtors in

possession, with the rights of trustees) with state law remedies *in addition to those* (such

as under section 548 of the Code) arising under federal law.[47]  State and federal

fraudulent transfer recovery schemes have coexisted, with the federal statute availing

trustees of state remedies, for 75 years, since 1938 amendments to the former Bankruptcy

Act enacted a new § 70e to the Act, providing trustees with state law rights

supplementing the relatively narrow federal rights then existing under Bankruptcy Act

§ 67.[48]

---

[46]     *See* 5 *Collier on Bankruptcy* (16th ed. 2013) ("***Collier***") ¶ 544.LH[2] ("Subsection (b)(1) is
derived from Section 70e.  It gives the trustee the rights of actual unsecured creditors under
applicable law to void transfers.").

[47]     Of course, it is contrary to the important bankruptcy policy of equality of distribution if individual
creditors suing to advance personal interests assert claims which, if otherwise actionable, may
(and should) be asserted by the estate for the benefit of all.  This principle was noted as recently as
yesterday by the Second Circuit in a non-preemption case, *Marshall v. Picard (In re Bernard L.
Madoff Inv. Sec. LLC)*, No. 12-1645-bk(L), --- F.3d ---, 2014 U.S. App. LEXIS 600, at *25, 2014
WL 103988, at *7 (2d Cir. Jan. 13, 2014) ("It is normally the debtor's creditors, and not the debtor
itself, that have the right to assert a fraudulent transfer claim outside of bankruptcy, but in
bankruptcy such a claim is usually brought by the trustee, for the benefit of all creditors.  This is
because the claim is really seeking to recovery property of the estate." (quoting *Highland Capital
Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 n.9
(5th Cir. 2008))).  Thus, when the trustee or estate representative can act, individual creditors
cannot.  But when the trustee no longer can act, or chooses not to, individual creditors can,
especially in cases where a reorganization plan, by express terms, conveys the estate's rights back
to individual creditors.

[48]     *See* 4A *Collier on Bankruptcy* (14th Ed. 1978) ("***Collier 14th***") ¶ 70.03[1] (showing, with italics,
1938 additions to the Bankruptcy Act as it then existed).  *Collier 14th* is the earlier edition of
*Collier on Bankruptcy*, which discussed the law under the former Act.  It should be contrasted
with the present version, in which the present Bankruptcy Code section 544 is discussed.  *See
Collier* ¶ 544.06[2] & n.18.

-17-

As is apparent from the above, the states have regulated fraudulent transfers for far longer than the federal government has, and Congress left that regulation in place when it enacted the Chandler Act amendments to the former Bankruptcy Act in 1938.  It cannot be said that there was or is any Congressional intent to occupy the fraudulent transfers remedies field—or "to preclude enforcement of state laws on the same subject."[49]

### 3.    "Conflict" Preemption

Conflict preemption, by contrast, occurs when "state law 'actually conflicts with federal law,' including where 'it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[50]  The Court must consider the Movants' contentions in each respect.

### (a)    Conflict Preemption:  the Impossibility Branch[51]

While the Supreme Court once endorsed a narrow view of the "impossibility" branch of conflict preemption, in recent years it has applied a more expansive analysis, and "found 'impossibility' when 'state law penalizes what federal law requires,' or when state law claims 'directly conflict' with federal law."[52]  But "[e]ven understood expansively, '[i]mpossibility preemption is a demanding defense,'" and the Second

---

[49]    *See* n.42 above.

[50]    *Niagara Mohawk*, 673 F.3d at 95.

[51]    The Court structures its discussion, and its caption headings, as the Second Circuit did in its recent decision in *MTBE*.

[52]    *MTBE*, 725 F.3d at 97 (citation omitted).

Circuit will not easily find a conflict that overcomes the presumption against preemption.[53]

In *MTBE*, the Second Circuit could not find a conflict overcoming the presumption against preemption, and here this Court cannot find such a conflict either. Federal law does not require stockholders to sell their stock, in LBOs or otherwise. State fraudulent transfer laws do not forbid a stockholder from receiving payment in exchange for its stock, even when payment comes pursuant to an LBO; they merely provide that if that stockholder effectively was unjustly enriched at the expense of creditors because the debtor was insolvent, the money must be paid back.

Importantly, the state transfer laws said to be preempted do not regulate conduct; they do not require anyone to do anything. In the LBO context, state fraudulent transfer laws do no more than attach consequences to past conduct, and grants rights of action to those—unpaid creditors—who have been injured thereby.

The Court cannot find a basis for conflict preemption under the impossibility branch here.

    (b)    *Conflict Preemption:  the Obstacle Branch*

        (i)    *Conflict Preemption General Principles*

As explained by the Supreme Court in *Arizona* and by the Second Circuit in *MTBE*, the second branch of conflict preemption—the obstacle analysis—comes into play "when state law is asserted to 'stand[] as an obstacle to the accomplishment and

---

[53]    *Id.*

-19-

execution of the full purposes and objectives of Congress.'"[54] "It precludes state law that

poses an 'actual conflict' with the overriding federal purpose and objective."[55]

Importantly for the purposes of this analysis:

> The burden of establishing obstacle preemption,
> like that of impossibility preemption, is heavy:
> "[t]he mere fact of 'tension' between federal and
> state law is generally not enough to establish an
> obstacle supporting preemption, particularly when
> the state law involves the exercise of traditional
> police power." . . . [F]ederal law does not preempt
> state law under obstacle preemption analysis unless
> "the repugnance or conflict is so direct and positive
> that the two acts cannot be reconciled or
> consistently stand together."[56]

Thus "the conflict between state law and federal policy must be a sharp one."[57]

In the Movants' reply brief (the first in which the exact basis for their preemption

contentions is fleshed out), they clarify that it is the obstacle branch on which they rely.[58]

But like the *Tribune* court,[59] this Court cannot find a basis for conflict preemption under

the obstacle branch either.

### (ii)    The Totality of Congressional Intent

Consistent with the principle that the key to preemption is the intent of

Congress,[60] this Court, like the *Tribune* court, looks to that intent[61]—mindful, as the

---

[54]    *MTBE*, 725 F.3d at 101 (alteration in original) (quoting *Arizona*, 132 S. Ct. at 2505).

[55]    *Id.* (quoting *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 162 (2d Cir. 2013)).

[56]    *MTBE*, 725 F.3d at 101–02 (first alteration in original).

[57]    *MTBE*, 725 F.3d at 101 (quoting *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007)).

[58]    *See* Movants' Reply Br. 6 ("The state-law claims here most assuredly 'stand as an obstacle to the
        accomplishment and execution' of Section 546(e), and would 'frustrate the purposes' of that
        federal legislation.").

[59]    *See* 499 B.R. 316–320.

[60]    *See* page 13 & n.34 above.

Supreme Court and the Second Circuit have held, that one must look to the "*full* purposes and objectives of Congress."[62]  In doing so, a court must look not only at Congress' intent with respect to section 546(e), but also to the remainder of Congress' intent with respect to bankruptcy policy.  The Congressional intent underlying section 546(e) is part, but much less than all, of the necessary inquiry.

     The fact (quite obvious to those in the bankruptcy community) that there are *many* competing concerns addressed in bankruptcy policy was recognized in *Tribune*.  Even while noting legislative history and caselaw referring to it stating that Congress enacted Section 546(e) to "protect the nation's financial markets from the instability caused by the reversal of settled securities transactions,"[63] the *Tribune* court continued:

> However, Congress pursues a host of other aims through the Bankruptcy Code, not least making whole the creditors of a bankruptcy estate.  It is not at all clear that Section 546(e)'s purpose with respect to securities transactions trumps all of bankruptcy's other purposes.[64]

The *Tribune* court continued:

> To the contrary, Congress has repeatedly indicated that it did not enact Section 546(e) to protect market stability to the exclusion of all other policies.[65]

Exemplifying this, the *Tribune* court pointed out that even after having been asked to do so, Congress failed to expressly preempt state law constructive fraudulent transfer

---

[61]    *See MTBE*, 725 F.3d at 102 ("To determine whether a state law (or tort judgment) poses an obstacle to accomplishing a Congressional objective, we must first ascertain those objectives as they relate to the federal law at issue.").

[62]    *Arizona*, 132 S.Ct. at 2501; *MTBE*, 725 F.3d at 97 (quoting *Arizona*) (emphasis added in each case) (internal quotation mark omitted).

[63]    *Tribune*, 499 B.R. at 317 (internal quotation marks omitted) (quoting *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 848 (10th Cir. 1990) ("***Kaiser Steel***")).

[64]    *Id.* (citation omitted).

[65]    *Id.* at 318.

claims.[66]  The *Tribune* court further observed that "tellingly, Congress chose not to

extend Section 546(e) to [state law constructive fraudulent transfer] claims filed *before*

bankruptcy or to intentional fraudulent conveyance claims brought *after* a bankruptcy

filing, even though these types of claims pose the very same threat to the stability of

securities markets."[67]  And it understandably observed that:

> Obviously, Congress has struck some balance
> between various policy priorities, which means that
> it has determined that fraudulent conveyance
> actions *are not necessarily and in all cases*
> "repugnant" to the interest of market stability.[68]

It concluded that it was "not authorized to upend Congress' balance between the

operation of state and federal law, even if doing so would clearly benefit investors and

markets."[69]

Additionally, the *Tribune* court made still one more powerful point.  It saw that

Congress had demonstrated elsewhere in the Bankruptcy Code that it knew how to—and

was willing to—expressly preempt an individual creditor's state law claims.[70]  In the

1990s, Congress concluded that its desire to facilitate charitable contributions trumped its

desire to maximize the extent to which creditors were repaid.  To that end (along with

amending sections 544 and 548 of the Code to prevent a trustee from recovering

---

[66]    *Id.*  ("For example, the Commodities Futures Trading Commission and Commodity Exchange, Inc. petitioned Congress to amend Section 546(e) to expressly preempt SLCFC [state law constructive fraudulent conveyance] claims.  Nevertheless, Congress declined to do so when it enacted Section 546(e) in 1977.  Moreover, on each of the eight occasions when it has amended Section 546(e), Congress has never added an express preemption provision, even after the Bankruptcy Court for the District of Delaware held that Section 546(e) *permits* creditors to assert SLCFC claims under the right circumstances.") (citations and footnotes omitted).

[67]    *Id.*

[68]    *Id.* (emphasis added) (citing *MTBE*, 725 F.3d at 101–02).

[69]    *Id.*

[70]    *Id.*

charitable gratuitous transfers), Congress then *expressly preempted* state fraudulent

transfer laws that would permit individual creditors to recover with respect to such

contributions so long as the contributions did not exceed the Congressionally prescribed

amount.[71]  But Congress enacted no similar provision to preempt state fraudulent transfer

laws in other respects, before then or thereafter.

The Supreme Court has noted, as the *Tribune* court recognized, that "[t]he case

for federal pre-emption is particularly weak where Congress has indicated its awareness

of the operation of state law in a field of federal interest, and has nonetheless decided to

stand by both concepts."[72]  The *Tribune* court recognized that, and then focused on

Congress' express preemption of state fraudulent transfer law with respect to charitable

contributions and Congress' failure to provide for express preemption of state fraudulent

transfer law in any other respect.  From that, the *Tribune* court properly concluded:

> This is powerful evidence that Congress did not
> intend for Section 546(e) to preempt state law. . . .
> Congress's explicit preemption of all creditors'
> state-law claims in one section of the Code
> undermines the suggestion that Congress intended
> to *implicitly* preempt state-law claims only two
> sections later.[73]

---

[71]  *See* 11 U.S.C. § 544(b)(2) (added by Bankruptcy—Religious Liberty and Charitable Donation Protection Act of 1998, Pub. L. No. 105–183, June 19, 1998, 112 Stat. 517) ("Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal *or State* law in a Federal or State court *shall be preempted* by the commencement of the case.") (emphasis added).

[72]  *Wyeth*, 555 U.S. at 575 (internal quotation mark omitted); *see also MTBE*, 725 F.3d at 101–02; *Tribune*, 499 B.R. at 318 (in each case citing *Wyeth*, and in *Tribune*'s case citing both).

[73]  499 B.R. at 318–319 (citations omitted); *see also Integrated Solutions, Inc. v. Svc. Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir.1997), *quoted in Tribune*, 499 B.R. at 319 ("The clear lack of Congressional intent to preempt state law . . . is even more telling given the explicit language the Congress uses when it intends to displace state nonbankruptcy law in other provisions of the Code." (citing 11 U.S.C. §§ 541(c)(1), 1123(a))).

This Court agrees with the *Tribune* preemption analysis for those reasons, and others as well.  In one of its leading bankruptcy opinions, the Supreme Court has reminded those considering bankruptcy issues that statutory construction is a "holistic endeavor,"[74] and the Second Circuit has held likewise.[75]  That is "especially true of the Bankruptcy Code."[76]  As the Second Circuit, speaking through Judge Feinberg, observed in another of its bankruptcy cases:

> It is clear that the "starting point in every case involving construction of a statute is the language itself.  But the text is only the starting point," especially when the language is ambiguous.  The Supreme Court has thus explained in interpreting other sections of the Bankruptcy Code that "we must not be guided by a single sentence or [part] of a sentence, but *look to the provisions of the whole law, and to its object and policy.*"[77]

The Second Circuit's instructions in that regard necessarily must apply not just to *construction* of the Bankruptcy Code, but also to any consideration of Congressional intent.  In any implied preemption analysis, one cannot properly look at the purposes of section 546(e) alone; one must also consider the remainder of the Code's "object and policy."

Congressional intent underlying the bulk of bankruptcy policy precedes the enactment of section 546(e) by nearly 200 years, going back to the first federal bankruptcy statute in 1800.  Importantly, Congress evidenced the intent to utilize avoidance actions to protect the creditors of estates from dissipation of assets without

---

[74]    *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

[75]    *See, e.g.*, *In re WorldCom, Inc.*, 723 F.3d 346, 360 (2d Cir. 2013).

[76]    *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) (en banc).

[77]    *Capital Commc'ns Fed. Credit Union v. Boodrow* (*In re Boodrow*), 126 F.3d 43, 49 (2d Cir. 1997) (citation omitted) (alteration in original) (emphasis added).

appropriate consideration in the Chandler Act amendments to the then-existing

Bankruptcy Act of 1898.[78]  Congress continued them when it enacted the modern

Bankruptcy Code in 1978.[79]

As noted in the very first chapter of *Collier*, speaking to an overview of the

Bankruptcy Code, chapter 5—in which avoidance actions and the section 546(e) safe

harbor are both addressed—avoidance actions have an important purpose in bankruptcy:

> In order to vindicate the Bankruptcy Code's policies
> of ratable and equitable distribution of a debtor's
> assets to and among similarly situated creditors, the
> Code permits the estate representative to avoid
> various types of transactions.  Principal among
> these avoiding powers, found in chapter 5 of the
> Code, are the strong arm power of section 544, the
> preference provision of section 547, the fraudulent
> transfer provision of section 548 and setoff
> provision of section 553.[80]

As the *Tribune* court recognized, federal law seeks to achieve a *host* of federal

objectives and policy priorities, as does the Bankruptcy Code itself.  Federal objectives

and policy priorities embodied within the Bankruptcy Code include (in addition to

"making whole the creditors of a bankruptcy estate," as noted by the *Tribune* court,[81] and

protecting markets from systemic risk), the protection of creditors from transfers from

insolvent estates, and respect for contractual, capital structure and statutory priorities in

distributions from debtors' assets.

---

[78]     *See* 5 *Collier* ¶ 548.01[2].

[79]     *See* 5 *Collier* ¶¶ 548.01[2], 548.12.

[80]     1 *Collier* ¶ 1.05[5].

[81]     *Tribune*, 499 B.R. at 317.

Those federal policies also include principles noted in *Jewel Recovery, L.P. v. Gordon*,[82] in the Northern District of Texas, and in one of the most important of the *Adler Coleman* cases, here in the Southern District of New York[83]—with each recalling the Supreme Court's 1945 holding in *Young v. Higbee Co.*[84] The *Jewel Recovery* court observed that:

> In Chapter 5 of the Bankruptcy Code, Congress determined that certain categories of transfers, otherwise permitted under non-bankruptcy law, could be avoided, and the property or its monetary value recovered by a bankruptcy trustee for the benefit of all creditors. Congress determined that a few individuals should not be allowed to benefit from transfers by an insolvent entity at the expense of the many.[85]

Similarly, citing *Jewel Recovery* and *Young v. Higbee*, the *Adler Coleman* court observed

> [T]he underlying philosophy of the Bankruptcy Code and SIPA [the Security Investor Protection Act] establishes certain equitable principles and priorities designed to maximize assets available for ratable distribution to all creditors similarly situated. To this end, the rules seek to prevent unjust enrichment and to avoid placing some claims unfairly ahead of others by distinguishing transactions truly entered in good faith and for value from those somehow induced and tainted by preference, illegality or fraud.[86]

---

[82]    196 B.R. 348, 352 (N.D. Tex. 1996) (Kendall, J.) ("*Jewel Recovery*").

[83]    *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 477 (S.D.N.Y. 2001) (Marrero, J.) ("*Adler Coleman*").

[84]    324 U.S. 204, 210 & 210 n.8 (1945) ("[H]istorically one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another. And the corporate reorganization statutes look to a ratable distribution of assets among classes of stockholders as well as creditors.").

[85]    196 B.R. at 352.

[86]    263 B.R. at 463 (citation omitted).

Thus federal policies also include—in addition to protecting markets from systemic risk—the avoidance of insolvent entities' transfers, for the benefit of all creditors, when they come at the expense of the creditor community.  As the National Bankruptcy Conference ("**NBC**")[87] observed in Congressional testimony, when Congress was considering the Pub. L. 105–183 amendments to the Code, discussed above, under which state fraudulent transfer laws were expressly preempted with respect to charitable contributions, there is a:

> [L]ongstanding bankruptcy policy—inherited by this nation at its founding and dating back to England's Statute of Elizabeth, enacted in 1571— that insolvent debtors should not be able to evade their financial commitments by making gifts.[88]

Important federal policies also include that of the traditional priority of creditors of insolvent companies over those companies' stockholders, as implemented by the absolute priority rule, which has been an element of U.S. insolvency law for over a hundred years[89]—and which has provided, at least since the Supreme Court's 1913

---

[87]    "The [NBC] was formed from a nucleus of the nation's leading bankruptcy scholars and practitioners, who gathered informally in the 1930's at the request of Congress to assist in the drafting of major Depression-era bankruptcy law amendments, ultimately resulting in the Chandler Act of 1938.  [It] was formalized in the 1940's and has been a resource to Congress on every significant piece of bankruptcy legislation since that time."  *See Our Mission*, http://www.nationalbankruptcyconference.org/mission.cfm (last visited Jan. 8, 2014).

[88]    *Bankruptcy Issues in Review:  The Bankruptcy Code's Effect on Religious Freedom and a Review of the Need for Additional Bankruptcy Judgeships Before the Subcomm. on Admin. Oversight and the Courts and the Comm. on the Judiciary*, 105th Cong. 1 (1997) (prepared statement of NBC).  The NBC was ultimately unsuccessful in dissuading Congress from expressly preempting state fraudulent transfer laws that could avoid charitable gifts.  But Congress did not then preempt state fraudulent transfer laws in any other respects.  The point, of course, is not whether Congress was right or wrong when it considered charitable gifts to be sufficiently important to trump longstanding bankruptcy policy; it is that "trumping" decisions present balancing issues for *Congress* to decide, which Congress can do when it chooses to expressly preempt state law.

[89]    *See Northern Pac. R. Co. v. Boyd*, 228 U.S. 482 (1913) ("***Boyd***").  As the Supreme Court then put it:

> [I]f purposely or unintentionally a single creditor was not paid, or provided for in the reorganization, he could assert his superior rights against the subordinate interests of the old

decision in *Boyd* (if not also the Supreme Court's 1899 decision in *Louisville Trust*), that any plan of reorganization in which "stockholders [a]re preferred before the creditor, [is] invalid."[90]  The Second Circuit recognized this principle, and applied it, in its well-known *Iridium* decision,[91] citing, among other authorities, *Boyd*.[92]  As *Iridium* holds, the absolute priority rule has importance even outside of decisions as to whether to confirm reorganization plans.  It is the "most important factor" that must be considered in any settlement where absolute priority rule considerations appear.[93]

Presumably Congress could, if it wanted, determine that its interest in protecting markets (or market participants, which is not the same thing), should trump the historical priority of creditors over stockholders, and all of the other historic concerns noted above. Congress then could provide for express preemption of state law constructive fraudulent transfer claims, just as it did with respect to charitable gifts.  But Congress did not do so,

---

stockholders in the property transferred to the new company. They were in the position of insolvent debtors who could not reserve an interest as against creditors.  Their original contribution to the capital stock was subject to the payment of debts.  The property was a trust fund charged primarily with the payment of corporate liabilities.  *Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditor, was invalid.*

*Id.* at 504 (emphasis added); *see also Louisville Trust Co. v. Louisville, N. A. & C. R. Co.* 174 U.S. 674, 683–684 (1899)("***Louisville Trust***")  (in context of foreclosure proceedings affecting a railroad, "no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation. . . . This is based upon the familiar rule that the stockholder's interest in the property is subordinate to the rights of creditors.").

[90]  *Boyd*, 228 U.S. at 504.

[91]  *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007) ("***Iridium***").

[92]  *See id.* at 462–63.

[93]  *Id.* at 455, 463, 464.

even though its enactment of section 544(b)(2) makes clear that it was well aware of that option.

### (iii)   Section 546(e) Intent

Moreover, even if the policies underlying section 546(e) were the *only* federal policies to be implemented, they would not require a finding that state constructive fraudulent transfer laws are repugnant to federal law, at least in a situation like this one.

Understanding the Congressional purpose underlying the present section 546(e) requires an understanding of the concerns that led to it.  No provisions protecting margin payments or settlement payments from avoidance existed under the former Bankruptcy Act.[94]  And in the *Ira Haupt* case[95] (a Chapter XI case under the former Act), a bankruptcy trustee of commodity broker Ira Haupt brought suit against a *commodities exchange* and *commodities clearing association* to recover for alleged fraudulent conveyances of margin payments on cottonseed oil futures.  The *Ira Haupt* court denied the defendant clearing association's motion for summary judgment,[96] making the clearing association—a market middleman[97]—potentially liable for massive liability.

"[I]n response" to *Ira Haupt* and similar caselaw,[98] Congress included a section 764(c) as part of the Bankruptcy Reform Act of 1978, which became the modern Bankruptcy Code.[99]  Section 764(c), which was applicable only in commodity broker

---

[94]   *See* 5 *Collier* ¶ 546.LH[5].

[95]   *Seligson v. New York Produce Exch.*, 394 F. Supp. 125 (S.D.N.Y. 1975) ("***Ira Haupt***").

[96]   *Id.* at 136.  The *Ira Haupt* court did, however, ultimately dismiss claims against the exchange, finding that the exchange could not be held accountable for the clearing association's actions.  *Id.* at 138.

[97]   *See id.* at 136.

[98]   5 *Collier* ¶ 546.LH[5] & nn.36–37.

[99]   5 *Collier* ¶ 546.LH[5].

liquidation cases under subchapter IV of chapter 7, prohibited a trustee from avoiding a

transfer that was a margin payment or a deposit with *a commodity broker* or *forward*

*contract merchant*, or that was a settlement payment by *a clearing organization*.  Its

purpose was to facilitate prepetition transfers, promote customer confidence in

commodity markets, and ensure the stability of the commodities markets.[100]

In 1982, section 764(c) was repealed and a section 546(d) was enacted, which

became section 546(e) after further amendments in 1984.[101]  Congress did so to expand

the concepts underlying former section 764 to make them applicable to the securities

markets as well as to the commodities markets.[102]

But the purposes of each—protections of the markets, and brokers and clearing

organizations—were the same, as can be seen by comparing the legislative history from

1978 and 1982.[103]  In the 1978 Legislative Interchange*, reported in the Congressional

Record, Senator Mathias sought and obtained Senator DeConcini's confirmation that the

intent of section 764 was "to provide that margin payments and settlement payments

previously made by a bankrupt to a commodity broker, forward contract merchant and by

---

[100]    5 *Collier* ¶ 546.LH[5] & n.40.

[101]    5 *Collier* ¶ 546.LH[5] & n.42.

[102]    *See* 5 *Collier* ¶ 546.LH[5] & n.43.  *Collier* there points out legislative history in 1982 that "[t]he new section 546(d) reiterates and clarifies the provision of current section 764(c), [and] also encompasses both stockbrokers and securities clearing agencies.  Thus, it has been placed among the general provisions in chapter 5 of title 11, rather than among the commodity broker provisions in subchapter IV of chapter 7." (Internal quotation marks and citation omitted).  *Collier* further points out that section 546(d) was enacted "to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market." *Id.*  (Internal quotation marks omitted).

[103]    Compare legislative history with respect to the original (commodities focused) 1978 enactment, 124 CONG. REC. S17403–34, at S17433 (daily ed. Oct. 6, 1978), reprinted in *Collier* App. Pt. 4(f)(iii) (the "**1978 Legislative Interchange**"), and the 1982 amendment, which expanded the earlier commodities focused safe harbor to cover the securities markets, H.R. REP. No. 97-420 (1982), reprinted in 1982 U.S.C.C.A.N. 583 and *Collier* App. Pt 41(d)(i)(A) (the "**1982 House Report**").

or to a clearing organization [were] nonvoidable transfers by the bankrupts [*sic*]

trustee[.]"[104]  Senator Mathias observed that the new sections 764(d) and 548(d)(2) would

"substantially reduce[] the likelihood that the bankruptcy of one customer or broker will

lead to the bankruptcy of another broker or clearinghouse."[105]  He considered this

provision (along with related provisions that would impose limits on stays on the

transfers or liquidations of commodity contracts by exchanges or clearing organizations)

to be an "important protection[] to these dynamic markets which are vital to our Nation's

economy."[106]

The purpose of the 1982 amendment adding protections for the securities

markets—beyond the commodities markets—was the same.  As stated in the 1982 House

Report:

> The commodities and securities markets operate
> through a complex system of accounts and
> guarantees.  Because of the structure of the clearing
> systems in these industries and the sometimes
> volatile nature the markets [*sic*], *certain protections
> are necessary to prevent the insolvency of one
> commodity or security firm from spreading to other
> firms and possibly threatening the collapse of the
> affected market.*
>
> The Bankruptcy Code now expressly provides
> certain protections to the commodities market *to
> protect against such a "ripple effect."*  One of the
> market protections presently contained in the
> Bankruptcy Code, for example, prevents a trustee in
> bankruptcy from avoiding or setting aside, as a
> preferential transfer, margin payments made to a
> commodity broker (see 11 U.S.C. Sec. 764(c)).

---

[104]      124 CONG. REC. at S17433.

[105]      *Id.*

[106]      *Id.*

> The thrust of several of the amendments contained
> in H.R. 4935 is to clarify and, in some instances,
> broaden the commodities market protections and
> *expressly extend similar protections to the securities
> market.*[107]

Section 546(e)'s purpose in protecting markets was recognized by the Second

Circuit in its well known decision in *Enron*,[108] a case involving the statutory construction

of section 546(e) but which did not consider preemption.[109]  As the *Enron* court put it,

Congress enacted section 546(e)'s safe harbor in 1982 as a means of "minimiz[ing] the

displacement caused in the commodities and securities markets in the event of a major

bankruptcy affecting those industries."[110]  The *Enron* court continued that if a firm were

required to repay amounts received in settled securities transactions, it could have

insufficient capital or liquidity to meet its current securities trading obligations, placing

other market participants and the securities markets themselves at risk.[111]  Similarly, the

*Adler Coleman* court explained 546(e)'s purposes in terms of protecting the markets from

systemic risk:  "[m]ore specifically, Congress sought to prevent the 'ripple effect' created

by 'the insolvency of one commodity or security firm from spreading to other firms and

---

[107]   1982 House Report at 1–2 (emphasis added).  It later stated that the new section 546(d) would "reiterate[] the provisions of [then] current section 764(c)," and would "encompass[] both stockbrokers and securities clearing agencies."  *Id.* at 3.

[108]   *See* n.4 above.

[109]   The *Enron* court expressed its understanding of section 546(e)'s purpose in the context of a dispute as to the *interpretation* of section 546(e), and section 546(e)'s cross-reference to section 741(8)'s "rather circular[]" definition of "settlement payment," 651 F.3d at 334—more specifically, whether "settlement payment" should be construed sufficiently broadly to cover the redemption of commercial paper before maturity.  *See id.* at 330.  The *Enron* court was not called upon to decide, and did not decide, any issues with respect to preemption.  Likewise, the Second Circuit's other leading 546(e) case, *Quebecor*, *see* n.4 above, did not address preemption either.

[110]   *Enron*, 651 F.3d at 334 (alteration in original) (internal quotation marks omitted) (quoting *Kaiser Steel*, 913 F.2d at 849, in turn quoting the 1982 House Report); *see also Adler Coleman*, 263 B.R. at 477 (also quoting *Kaiser Steel* and the 1982 House Report).

[111]   651 F.3d at 334.

possibly threatening the collapse of the affected industry.'"[112]  All of these concerns, of

course, involve potential injury to the *markets*, rather than to particular individuals or

entities who chose to invest in them.

Constructive fraudulent transfer cases can fall in different places along the

spectrum of federal concerns.  At one end of the spectrum, where safe harbors are at least

arguably essential, are actions against exchanges or clearing institutions, as in *Ira

Haupt*,[113] where the denial of summary judgment in favor of the New York Produce

Exchange's clearing association inspired Congress to enact the first safe harbor to

legislatively overrule *Ira Haupt*.[114]  At that same end of the spectrum are actions against

depositories for investors or those in the middle of a transaction chain where claims

against one could lead to problems of falling dominos.  Protecting against such situations

could result in Congressional concerns of such magnitude that Congress might conclude

that they should trump all other bankruptcy policies, even deeply rooted ones.

At the other extreme, where safe harbors are at least arguably absurd, are LBOs

and other transactions involving privately held companies where the stock is not even

traded in the financial markets.[115]  Granting relief to injured creditors in cases of that

---

[112]    263 B.R. at 477 (quoting the 1982 House Report).

[113]    *See* n.95 above.

[114]    *See* pages 29–30 & nn.98–100 above.

[115]    *See, e.g., Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414, 419, 423 (Bankr. S.D.N.Y. 2011) (Drain, J.) (denying summary judgment sought by the three defendant stockholders who had sold their stock in a bar and grill, citing decisions noting that granting a safe harbor to a constructively fraudulent private stock sale "has little if anything to do with Congress' stated purpose in enacting section 546(e)," and that exempting transactions like the sale of privately held stock from avoidance was "so far removed from achieving Congress' professed intent to protect the financial markets that it would be absurd to apply" the section 546(e) safe harbor to a transaction of that character); *Official Comm. of Unsecured Creditors v. Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 76 (Bankr. E.D.N.Y. 2007) (Craig, C.J.) (declining to dismiss fraudulent transfer action brought against stockholders where the action "[did] not involve publicly traded securities or otherwise implicate the public securities markets").

-33-

character could not seriously be argued to create systemic risk. But there is nevertheless a caselaw split—driven by different views as to whether section 546(e) is indeed unambiguous,[116] and whether application of its literal text would lead to absurd results[117]—as to whether they nevertheless fall within section 546(e)'s scope. Transactions whose reversal would not create systemic risk arguably also include LBO payments to stockholders at the very end of the asset transfer chain, where the stockholders are the ultimate beneficiaries of the constructively fraudulent transfers, and can give the money back to injured creditors with no damage to anyone but themselves.

Deciding where to draw the line in balancing the needs of the markets, on the one hand, and creditors, on the other, is the job of Congress.

Protecting the financial markets is not necessarily the same thing as protecting investors in the public markets, even if they happen to be stockholders who are major investment banks. Focusing on that distinction, the NBC has advocated Congressional legislation amending the safe harbors so as to keep the safe harbors in place where necessary to protect the *markets* (*i.e.*, to protect the nation's financial system from ripple effects or other systemic risk) but not go beyond that to also protect those who claim protection here—beneficial holders of securities at the end of the asset dissipation chain.[118]

---

[116]    *See* 5 *Collier* ¶ 546.LH[5] ("While some courts rely on the plain meaning of section 546(e) and hold that section 546(e) does apply to private transactions, other courts have held that the statute is ambiguous and give accord to the congressional intent to only protect transactions which implicate systemic risks, as described in the legislative history of the statute.").

[117]    *See* n.115 above.

[118]    In its testimony to the ABI on chapter 11 reform, the NBC explained:

> After studying the various types of payments protected by the
> safe harbor in the years since it was first enacted, the [NBC's]
> Capital Markets Committee found that payments received by
> beneficial holders of securities, in other words, payments

Nothing in the legislative history of the existing law evidences a desire to protect individual investors who are beneficial recipients of insolvents' assets. The repeatedly expressed concern, by contrast, has been that of protecting *market intermediaries* and protecting the *markets*—in each case to avoid problems of "ripple effects,"[119] *i.e.*, falling dominos. Thus, at least in the context of an action against cashed out beneficial holders of stock, at the end of the asset dissipation chain, state law fraudulent transfer laws do not "stand as an obstacle" to "purposes and objectives of Congress"—even if one were to ignore the remainder of bankruptcy policy and focus solely on the protection against the "ripple effects" that caused section 546(e) to come into being.

###### (iv)    The Barclays Decision

Finally, the Movants call this Court's attention to another district court decision in this district, *Whyte v. Barclays Bank.*[120] There, in a plenary action brought in this district, a litigation trust formed under a reorganization plan in the *SemGroup* chapter 11 case[121] asserted constructive fraudulent transfer claims against two Barclays entities with respect

---

going beyond those made to market system participants, were being sheltered under section 546(e). The Committee concluded that avoidance recoveries from the ultimate recipients of certain transfers on securities, the beneficial owners, would not create the systemic risk the safe harbor was intended to avoid. As an unwarranted limitation on the trustee's power to recover assets for all creditors, the Committee recommended that actions against beneficial holders for recovery of redemption payments, principal payments, dividend payments, interest payments or other distributions on or in respect of securities be taken out of the safe harbor provision of section 546(e).

NBC, *Statement Before American Bankruptcy Institute Commission to Study the Reform of Chapter 11*, 3–4 (May 15, 2013), http://commission.abi.org/sites/default/files/statements/15may2013/Statement_for_ABI_commission_May_15_2013_Vris.docx.

[119]    *See* 1982 House Report at 1–2.

[120]    *Whyte v. Barclays Bank PLC*, 494 B.R. 196 (S.D.N.Y. 2013) (Rakoff, J.) ("***Barclays***").

[121]    *In re SemCrude L.P., et al.*, No. 08-11525 (Bankr. D. Del.) (Shannon, J.) ("***SemGroup***").

to the prepetition novation of a New York Mercantile Exchange swap portfolio by SemGroup entities.[122]  In a brief order in November 2012, the *Barclays* court granted the defendants' motions to dismiss,[123] followed by a June 2013 written decision setting forth the reasons for the earlier order.[124]

In the subsequent written decision, the *Barclays* court explained the reasons for the earlier order:

> In sum, the Court, confirming its "bottom-line" Order, holds that where, as here, creditors' claims are assigned along with Chapter 5 federal avoidance claims to a litigation trust organized pursuant to a Chapter 11 plan, the section 546(g)[[125]] "safe harbor" impliedly preempts state-law fraudulent conveyance actions seeking to avoid "swap transactions" as defined by the Code.[126]

The Movants ask this Court to regard *Barclays* as persuasive authority[127] with respect to the Movants' 546(e) defense to the claims asserted here.  For a number of reasons, the Court cannot do so.

---

[122]  As alleged in the amended complaint, SemGroup was a large energy transport and storage company that filed for bankruptcy in July 2008.  Amended Complaint at ¶ 1, *Barclays*, No. 12 Civ. 5318 (S.D.N.Y. Sept. 28, 2012), ECF No. 25.  Prepetition, Barclays and SemGroup entered into an agreement (called a "novation") by which, in return for approximately $143 million, Barclays acquired SemGroup's portfolio of commodities derivatives traded on the New York Mercantile Exchange.  *See* 494 B.R. at 198.  It was apparently undisputed that the novation qualified as a "swap" transaction that would be immunized from section 544 and 548 liability under section 546(g).  *See* 494 B.R. at 199.

[123]  Order, *Barclays*, No. 12 Civ. 5318 (S.D.N.Y. Nov. 7, 2012), ECF No. 32 ("The defendants' motion to dismiss is hereby granted.  However, final judgment will not be entered until the Court issues its written opinion giving the reasons for this decision.").

[124]  *See* n.120 above.

[125]  Section 546(g) provides, in substance, that notwithstanding sections 544 and 548, trustees and estate representatives cannot avoid prepetition transfers in connection with swap agreements.  Like section 546(e), it is subject to an exception for transfers with actual intent to hinder, delay or defraud.

[126]  *Barclays*, 494 B.R. at 201.

[127]  The Court relies on the district court decisions in *Tribune* and *Barclays* to the extent each is persuasive; neither is binding on this Court, since as this Court has noted in earlier decisions, district court decisions are not binding on bankruptcy courts except with respect to any district

Preliminarily, the *Tribune* court found *Barclays* "readily distinguishable"[128] when *Barclays* was brought to the *Tribune* court's attention, and the *Tribune* court was right in doing so. As the *Tribune* court observed, the *SemGroup* reorganization plan had provided for a *single trust* to serve in the capacity of both the bankruptcy trustee and the representative of outside creditors.[129] The *Tribune* court considered that significant. It read the *Barclays* court as having "reasoned that, because Section 546(g) barred *SemGroup-as-trustee* from avoiding these transactions, to allow *SemGroup-as-creditor—* itself a 'creature of a Chapter 11 plan'—to avoid the transaction 'by way of a state fraudulent conveyance action would stand as a major obstacle to the purpose and objectives of' the prohibition in Section 546(g)."[130] The *Tribune* court paraphrased the *Barclays* court—fairly, in this Court's view—as having reasoned that:

> In essence, SemGroup could not simply *take off its trustee hat*, put on its creditor hat, and file an avoidance claim that Section 546(g) *prohibited the trustee* from filing.[131]

The *Tribune* court contrasted its own situation:

> By contrast, the Individual Creditors here, unlike SemGroup, are not creatures of a Chapter 11 plan, and they *are in no way identical with the*

---

court mandate pursuant to an appeal. *See In re Motors Liquidation Co.*, 486 B.R. 596, 642 n.189 (Bankr. S.D.N.Y. 2013) (Gerber, J.); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430 n.10 (1996) ("If there is a federal district court standard, it must come from the Court of Appeals, not from the over 40 district court judges in the Southern District of New York, each of whom sits alone and renders decisions not binding on the others."); *Tuttle v. Buckner (In re Buckner)*, 218 B.R. 137, 146 n.12 (10th Cir. BAP 1998) (decision of a district judge, while binding in the case from which an appeal was taken, was merely persuasive, and not binding, in another case) (citing 1B JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE ¶ 0.402[1] (2d ed. 1996) (opinion of single judge in a multi-judge district is not binding precedent in future cases, but merely persuasive)).

[128]    499 B.R. at 319.

[129]    *Id.*

[130]    *Id.* (emphasis added).

[131]    *Id.* (emphasis added).

> *bankruptcy trustee*; as a result, there is no reason
> why Section 546(e) should apply to them in the
> same way that Section 546(g) applied to
> SemGroup.[132]

Here too, *Barclays* is distinguishable for the reasons set forth in the italicized language.[133]   In this case, estate claims and creditor claims are not being asserted by the same trust, and the Creditor Trust is not also asserting claims on behalf of the Lyondell estate.   Rather, the plaintiff Creditor Trust here holds only *creditor* claims—with respect to which the estate abandoned section 544 rights the estate had to assert on behalf of creditors generally—and the creditors who owned the underlying avoidance claims

---

[132]   *Id.* (emphasis added).  Similarly, the *Tribune* court noted three other cases in which federal courts blocked state causes of action because of section 546(e).  *See* 499 B.R. at 319 n.10 (citing *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009); *U.S. Bank N.A. v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 812, 815 (N.D. Tex. 2012); *Hechinger*, 274 B.R. at 95–96).  But it observed that each of the cases likewise involved a successor to the bankruptcy trustee— which was expressly bound by section 546(e), and that "none of them addresse[d] whether section 546(e) should apply to individuals or entities other than the trustee."  *Id.*

[133]   In one of the other respects with which the Court differs with the *Barclays* court (and where it appears that the *Tribune* court assumed, without deciding, that the *Barclays* court did not err in that respect), the Court does not find significance in the fact that a plaintiff litigation trust did or did not acquire its rights under a chapter 11 plan, or was a "creature" of a chapter 11 plan.  *See Barclays*, 494 B.R. at 200.

The *Barclays* court cited no bankruptcy law or other authority as to why the distinction matters, and this Court can think of no reason why it would.  Individuals and entities can convey choses in action by contract, and though, when they do so, the assignees are subject to defenses applicable to their assignors, *see, e.g.*, *In re KB Toys Inc.*, 736 F.3d 247, 250 (3d Cir. 2013), the assignees also acquire the rights of their assignors.  A reorganization plan is a species of court approved contract, *see, e.g.*, *Charter Asset Corp. v. Victory Markets, Inc. (In re Victory Markets, Inc.)*, 221 B.R. 298, 303 (2d Cir. BAP 1998) ("a confirmed plan holds the status of a binding contract as between the debtor and its creditors"), and so long as the assignment of the rights has been duly implemented, it does not matter whether that is accomplished by a standalone contract or pursuant to a plan.

Section 1123 of the Code, which addresses what a plan of reorganization may contain, provides that in addition to the various enumerated matters, *see* section 1123(b)(2) through (b)(5), a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title."  Section 1123(b)(6).  At least as a general matter, choses in action can be assigned.  *See, e.g.*, *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir. 1997) ("**Advanced Magnetics**") ("In general, claims or choses in action may be freely transferred or assigned to others."); *Cordes Fin. Serv. v. A.G. Edwards & Sons*, 502 F.3d 91, 103 (2d Cir. 2007) (same, quoting *Advanced Magnetics*).  The assignments of claims by creditors under the plan in *SemGroup* and in this case were garden variety examples of this.

contributed them to the Creditor Trust.  The matter here is analytically the same as the

situation in *Tribune*, where individual creditors asserted their claims personally.

But more fundamentally, the Court must say that it has reservations as to the

correctness of the "bottom-line" judgment in *Barclays*, and especially the *Barclays*

reasoning.  Respectfully, the Court considers the *Barclays* analysis to be less thorough

than that of *Tribune*, and considers a number of the elements of the *Barclays* analysis to

be flawed.

Preliminarily, the *Barclays* court declined to apply the usual presumption against

implied preemption[134] as directed by the Supreme Court in *Lohr* and *Wyeth*,[135] and the

Second Circuit in *Smokeless Tobacco* and *MTBE*.[136]  The *Barclays* court did so, it

explained, "because there is a history of significant federal presence in this area of

regulation."[137]  But respectfully, the Court believes that premise to be flawed.  Section

546(g) was enacted only in 1990, and the earliest safe harbors, sections 546(e) and

764(c), were enacted only in 1982 and 1978, respectively.  By contrast, state laws

protecting creditors from fraudulent transfers appeared in the earliest days of the

Republic (having had their origins in the Statute of Elizabeth of 1571); constructive

fraudulent transfer doctrine appeared in the Uniform Fraudulent Conveyance Act of 1918

(and again in the now-repealed Bankruptcy Act with the Chandler Act Amendments of

---

[134]     *See Barclays*, 494 B.R. at 200 n.6 ("Because there is a history of significant federal presence in
          this area of regulation, the Court does not apply a presumption against preemption." (citing *United
          States v. Locke*, 529 U.S. 89, 108 (2000))).  The *Barclays* court went on to say that even if it were
          to apply such a presumption, doing so would not alter its conclusion.

[135]     *See* page 13 & n.35 above.

[136]     *See* pages 13–14 & n.37 above.  Of course, neither *MTBE* nor *Smokeless Tobacco* had yet been
          issued as of the time that the November 2012 "bottom-line order" had been entered, and *MTBE*
          had not been issued when the written *Barclays* opinion was published.  A lesser body of authority
          (though still emanating from the Supreme Court) had dictated consideration of the presumption at
          that time.  *See, e.g.*, *Lohr*, 518 U.S. at 485.

[137]     494 B.R. at 200 n.6.

1938);[138] and the earlier state fraudulent transfer laws were adopted (rather than

preempted) as part of the Chandler Act Amendments of 1938.  In fact, the portion of

*Collier* just quoted in footnote 138 continues:

> Given the elemental nature of fraudulent transfer
> law, however, there was no preemption intended,
> and states (as well as the federal government)
> continued to adapt parts of fraudulent transfer law
> for their own purposes.  Fraudulent transfer law is,
> for example, the ancestor of many related common
> law and statutory doctrines we now take as
> blackletter law.  It is, for example, one of the reason
> [*sic*] there are statutes restricting when a
> corporation may declare dividends on its stock, and
> is at the root of tort concepts of successor liability.
> It is the direct ancestor of bulk transfer laws  as well
> as the absolute priority rule in bankruptcy
> reorganizations.[139]

Countervailing considerations of bankruptcy policy (discussed in *Tribune* and above, but

not addressed by the *Barclays* court) have likewise been elements of federal policy for

far, far longer.[140]

---

[138]    As *Collier* explains:

> Fraudulent transfer law was first fully absorbed into federal
> bankruptcy law in 1938 through the various provisions of the
> Chandler Act.  Before the Chandler Act, federal bankruptcy
> law only directly addressed actual intent fraudulent transfers,
> and then only to the extent made within four months of
> bankruptcy.  The 1938 amendments brought the full panoply
> of fraudulent transfer law into federal law, including the
> ability to avoid constructively fraudulent transfers.  At that
> time, noting the growing adopting of the 1918 UFCA,
> Congress adopted its language as federal law.  In the words of
> one of the documents used to frame the bill that became the
> Chandler Act, "[w]e have condensed the provisions of the
> Uniform Fraudulent Conveyance Act, retaining its substance,
> and, as far as possible, its language."

5 *Collier* ¶ 548.01[2] (footnotes omitted).

[139]    *Id.*

[140]    In support of its view, the *Barclays* court cited *United States v. Locke*, 529 U.S. 89 (2000)
("***Locke***"), though without quoting or paraphrasing it.  But the *Locke* court stated, at the place
cited by the *Barclays* court, that in the case then before it, "Congress has legislated in the field

Then, the *Barclays* analysis failed to acknowledge or comply with the Supreme Court's directive that courts considering matters of implied preemption under the "obstacle branch" consider the "*full purposes and objectives of Congress*,"[141] which, as the *Tribune* court noted, include "a host of other aims through the Bankruptcy Code."[142] The *Barclays* court appears to have given no consideration to any Congressional objectives other than protection of the financial markets—including, as noted above, longstanding and fundamental principles that insolvent debtors cannot give away their assets to the prejudice of their creditors. The *Barclays* court drew conclusions based on a view of the "obvious purpose" of section 546(g) without likewise considering the "obvious purpose" of other key elements of bankruptcy policy. It is difficult to see how the *Barclays* court could appropriately analyze these issues without attention to the other historic concerns.[143]

---

from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme." *Id.* at 108; *see also id.* at 98 ("The State of Washington has enacted legislation in an area where the federal interest has been manifest since the beginning of our Republic and is now well established. The authority of Congress to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations, was cited in the Federalist Papers as one of the reasons for adopting the Constitution.") (citations to *Federalist Papers* omitted). That rationale would not seem to apply to safe harbor legislation first enacted by the Congress in 1990, and whose first cousins went back no earlier than 1978—especially when it is the *state law* that goes back to the earliest days of the Republic.

[141]    *Arizona*, 132 S.Ct. at 2505 (emphasis added) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (internal quotation mark omitted). The Second Circuit reiterated that in *MTBE*, *see* 725 F.3d at 101, though after *Barclays* was issued. Importantly, neither the Supreme Court, in *Arizona*, nor the Second Circuit, in *MTBE*, articulated the proper standard as turning on a conflict with "any" of the purposes and objectives of Congress. Rather, each spoke of the "full" purposes, which can be read only as requiring consideration of them in their totality.

[142]    499 B.R. at 317.

[143]    The *Barclays* court also failed to address the point noted in *Tribune* that Congress elected to expressly preempt state law with respect to charitable contribution fraudulent transfers, but failed to expressly preempt state law in any other respects, though Congress was on notice of judicial decisions that had allowed state law constructive fraudulent transfer claims on the part of creditors to proceed. *Tribune*, 499 B.R. at 318 ("Congress has never added an express preemption provision, even after the Bankruptcy Court for the District of Delaware held that Section 546(e) *permits* creditors to assert [state-law constructive fraudulent conveyance] claims under the right circumstances." (citing *PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 607 (D. Del. 2003))).

Then, the *Barclays* court appears to have accepted, without further analysis, the

defendants' contention in that case that voiding the payments would "inevitably create"

disruption to the markets[144]—a matter that is of particular concern when the Movants

here ask this Court to apply the *Barclays* analysis to also avoid transfers to stockholders

at the end of the asset dissipation chain, which at least seemingly would not involve

systemic risk concerns.  Protecting *market participants* is not the same as protecting

*markets*; if protecting the former were deemed to be desirable, Congress could elect to do

so, but that would be a matter for express preemption, and not an implied preemption that

is only judicially inferred.  There is of course a possibility that evidence in *Barclays*

ultimately might prove out the *Barclays* court's concerns (at least in the context of swap

transactions),[145] but it is difficult to see how such a determination could be made under

Rule 12(b)(6).  And if that premise were true, consideration of any such adverse effects

would then have to be considered in the context of the other bankruptcy policies in play,

to determine whether, as the Circuit has held, "the repugnance or conflict is so direct and

positive that the two acts cannot be reconciled or consistently stand together."[146]

Looking at *Barclays* as a whole, it appears to be driven largely by the

*consequences* of a legislative terrain in which there are similar, but not congruent, federal

and state fraudulent transfer statutes, and the *Barclays* court's recognition that state law

might permit a recovery on behalf of creditors when federal law would not.  Recognition

---

[144]    *See* 494 B.R. at 200 ("The obvious purpose of section 546(g), fully confirmed by the legislative history, is to protect securities markets from the disruptive effects that unwinding such transactions would inevitably create.").

[145]    Needless to say, this Court expresses no view on whether the *Barclays* "bottom line" might still be correct in the context of the swap transactions presented there, notwithstanding the matters discussed above and below.

[146]    *MTBE*, 725 F.3d at 101–02 (internal quotation marks omitted).

of the consequences of a ruling is hardly inappropriate, but in this Court's view,

considerations of potentially different results cannot trump application of the standards

articulated in *Arizona*, *MTBE*, *Smokeless Tobacco* and similar cases.[147]

* * *

Thus, like the court in *Tribune*, the Court rules that state law constructive

fraudulent transfer claims brought on behalf of individual creditors are not impliedly

preempted, by section 546(e) or otherwise.[148]

II.

Funds to Stockholders Not Property of the Debtor?

In their second principal point, the Movants then argue that the Creditor Trust's

claims fail as a matter of law because the Creditor Trust seeks to avoid transfers of funds

---

[147]    Litigants on each side of a controversy live with statutes as they find them.  Defendants in avoidance action litigation have successfully relied on section 546(e) to immunize themselves from trustees' avoidance claims even in cases not involving systemic risk; *Enron* and *Quebecor* absolve transferees from liability in such instances because the statutory language Congress employed was held to require such a result.  But just as plaintiffs in avoidance actions must live with the Code as Congress drafted it when the defendants in those actions invoke the text of the Bankruptcy Code as it was written, defendants in avoidance actions must do so too.  That is particularly so when the defendants in those actions wish to expand the application of the Code beyond situations involving systemic risk.

[148]    Though the *Tribune* court held that the constructive fraudulent transfer claims before it were not impliedly preempted, it noted that the Committee there (effectively, an estate representative) was still pursuing its own avoidance action against the LBO beneficiaries, a matter that could raise section 362 concerns "for as long as the trustee [was] exercising its avoidance powers."  499 B.R. at 322–23.  Here the facts are similar in many respects but somewhat different in others, because acts rather similar to those that troubled the *Tribune* court are underway not in this action, but in a separate one, *Blavatnik*, brought by a different trust (though with the same person as the trustee) yet with overlapping ultimate beneficiaries, and targeting the same transactions that the Creditor Trust here is currently targeting.  *See id.* at 324.  But the claims brought by that separate trust in that other action may not survive, as they may suffer from the same deficiencies the Court discusses in Section V below.  The Court believes that, like the *Tribune* court, *see id.* at 324–25, it should give the parties an opportunity to be heard further with respect to the section 362 concerns, and does not otherwise address them now.

that "merely passed through the Debtors to the beneficial holders of the Lyondell stock and never became property of any Debtor."[149]  The Court disagrees.

The premise of the Movants' argument seemingly is that the transfers of cash came from the LBO lenders through their paying agent to Lyondell stockholders; did not involve the Debtors' own, pre-existing assets; and thus "did not cause any injury to the Debtors' creditors."[150]  The Court finds these contentions, and particularly the last of them, puzzling, to say the least.  As plausibly alleged by the Creditor Trust—if not also conceded—Lyondell's pre-existing assets were pledged as collateral for the LBO Lenders' loans.  And loan proceeds, whose payment was secured by Lyondell's assets, by liens that would place the LBO Lenders ahead of preexisting unsecured creditors, then went to the stockholders.

The Creditor Trust asks this Court to initially focus on two separate "value transferring" transactions[151]—the transfer of the value of Lyondell's assets to the Lenders in the form of liens securing the financing, and the transfer to stockholders of the proceeds of the loans secured by Lyondell's assets.[152]  The Creditor trust then asks the Court to focus on its allegation—that is plausible, in this Court's view—that the two transactions were envisioned and must be considered together, as a means of withdrawing the equity that previously existed in Lyondell's property, transferring it to Lyondell's stockholders, and replacing the underlying equity that supported unsecured debt with more senior secured debt.

---

[149]    Mem. of Law in Support of Defs.' Mot. to Dismiss the Compl. 35, Jan. 11, 2011, ECF No. 72 ("**Movants' Br.**").

[150]    Movants' Br. 41.

[151]    Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Compl. 48, Mar. 26, 2011, ECF No. 142 ("**Creditor Trust's Br.**").

[152]    *See* Creditor Trust's Br. 49.

This allegation—which must be proven, of course, but which at least seemingly is supported by the underlying transaction documents themselves—is indeed, as the Creditor Trust asserts, a garden variety application of fraudulent transfer doctrine to LBO transactions.[153]  Courts analyzing the effect of LBOs have routinely analyzed them by reference to their economic substance, "collapsing" them, in many cases, to consider the overall effect of multi-step transactions.  The shorthand for that is "Collapsing Doctrine," an expression familiar to most in the commercial bankruptcy community.

Collapsing is routinely used in the analysis of LBOs as fraudulent transfers.  As the Second Circuit has observed:

> It is well established that multilateral transactions may under appropriate circumstances be "collapsed" and treated as phases of a single transaction for analysis under the UFCA [Uniform Fraudulent Conveyance Act].  This approach finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent.  The paradigmatic scheme is similar to that alleged here:  one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee.  The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing.[154]

---

[153]    *See, e.g.*, *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 645–46 (3d Cir. 1991) ("The effect of an LBO is that a corporation's shareholders are replaced by secured creditors.  Put simply, stockholders' equity is supplanted by corporate debt.").

[154]    *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) ("*HBE Leasing*") (citations omitted).  Here the Movants assert that the Lyondell situation involves a variant of that, under which the loan proceeds were not routed through Lyondell (as a species of conduit) but instead were disbursed directly to stockholders.  Assuming—as the Creditor Trust will have to prove, but now plausibly alleges—that there was the intent to engage in a unitary transaction, that distinction, to the extent there is a distinction, does not warrant different analysis.  The economic effect is exactly the same.  *HBE Leasing* stands for the proposition that in analyzing LBO transactions under fraudulent transfer law, the Second Circuit authorizes, if it does not also compel, analyzing LBO transactions in accordance with their economic substance.

-45-

The Second Circuit had noted the same principles two years earlier, in another

fraudulent transfer case, *Orr v. Kinderhill Corp.*[155]  There, quoting the Supreme Court's

well known observation in *Pepper v. Litton*[156] that "[i]n equity, 'substance will not give

way to form, [and] technical considerations will not prevent substantial justice from

being done,'"[157] the Second Circuit held that "[w]here a transfer is only a step in a general

plan, the plan must be viewed as a whole with all its composite implications."[158]

Likewise, in the recent decision in this District in *Tronox*,[159] the court held once

again (there in the context of a statute of limitations determination), that fraudulent

conveyances had to be "examined for their substance, not their form."[160]  The *Tronox*

court, quoting the Second Circuit's decisions in *Orr* and *HBE Leasing*, and the

bankruptcy court decision in this district in *Sunbeam*,[161] applied collapsing doctrine and

ultimately concluded the various transfers constituted a "single integrated scheme."[162]

---

[155]    991 F.2d 31 (2d Cir. 1993) ("***Orr***").

[156]    308 U.S. 295, 305 (1939).

[157]    *Orr*, 991 F.2d at 35 (alteration in original).

[158]    *Id.* (alteration in original).

[159]    *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, No. 09-10156 (ALG), --- B.R. ---, 2013
         Bankr. LEXIS 5232, 2013 WL 6596696 (Bankr. S.D.N.Y. Dec. 12, 2013) (Gropper, J.)
         ("***Tronox***").

[160]    *Tronox*, 2013 Bankr. LEXIS 5232, at *65, 2013 WL 659696, at *16.

[161]    *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re
         Sunbeam Corp.)*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) (Gonzalez, C.J.) ("***Sunbeam***")
         ("Although the concept of 'collapsing' a series of transactions and treating them as a single
         integrated transaction has been applied primarily when analyzing a transfer alleged to be
         fraudulent in the context of a failed leveraged buy-out ("LBO"), it has also been utilized in other
         contexts.  Courts have 'collapsed' a series of transactions into one transaction when it appears that
         despite the formal structure erected and the labels attached, the segments, in reality, comprise a
         single integrated scheme when evaluated focusing on the knowledge and intent of the parties
         involved in the transaction." (citations omitted)).

[162]    *Tronox*, 2013 Bankr. LEXIS 5232, at *67, 2013 WL 659696, at *17.

-46-

Similarly, as a consequence of the pledge of Lyondell's assets, the Creditor Trust has at least plausibly alleged that Lyondell was truly prejudiced by a transaction that was assertedly a transfer between third parties.[163]

The Court is also unpersuaded by the Movants' contention that an "application of funds" provision—requiring LBO loan proceeds to be used solely for the purpose of the LBO—denied Lyondell control over the use of proceeds, precluding a finding of Debtor control over the borrowed funds. Lyondell had the control over its collateral before it pledged it to the LBO Lenders. And in any event, limits on the application of funds would be an element of the *form* of the transaction, which at most might be argued to a trier of fact in an effort to show that the substance was something different than that alleged by the Creditor Trust. That, of course, is a matter inappropriate for consideration under a Rule 12(b)(6) motion. In fact, the Movants' contentions as to the use of the funds (along with the Movants' related contention that "the Debtors would not have received the funds in the first place")[164] address evidentiary facts that, if proven, might *support* the Creditor Trust's assertion that there was an intent to effect a unitary transaction.

All of this is not to say, of course, that the LBO here necessarily must be collapsed. It is to say merely that the Creditor Trust has plausibly alleged facts under

---

[163]   *Compare* Creditor Trust's Br. 60–61 *with* Movants' Br. 36–37. For that reason, among others, the Movants' reliance on *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177 (11th Cir. 1987) ("***Chase & Sanborn***") is misplaced. *Chase & Sanborn* did not involve an LBO, nor did it involve a pledge of the debtor's assets. In substance, the money there went into the debtor and out again, *see id.* at 1179–80, and in fact the Eleventh Circuit found, after noting the necessity to "look beyond the particular transfers in question to the entire circumstances of the transactions," *id.* at 1181–82, that "the actual connection between the funds and the debtor was quite tangential: a two-day layover in a special account then only recently opened and soon thereafter closed." *Id.* at 1182. Here, by contrast, if the Creditor Trust's allegations are ultimately proven, the effect on Lyondell and its unsecured creditors will hardly be tangential; Lyondell's unsecured creditors, who after the LBO found themselves behind $21 billion in secured debt, were very much injured.

[164]   Movants' Br. 42.

which it might be.  The Movants' motion to dismiss insofar as its rests on the notion that

Lyondell failed to part with value as part of the LBO is denied.

III.

Conduits, Nominees, Non-beneficial Holders

In their third principal point, the Movants seek to dismiss claims asserted against

Defendants that were sued as conduits or as mere "holders," and not beneficial owners, of

Lyondell stock—with the latter including, most obviously, depositories or nominees.  In

this respect the Movants are quite right, and the claims against any such entities must be

dismissed.

In fraudulent transfer actions asserted under federal law, where recovery of

transferred property or its value is sought under section 550 of the Code, recovery may be

obtained from an entity that is an "initial transferee," or an entity for whose benefit such

transfer was made.  A similar rule applies when that recovery is sought under state law.[165]

But while "initial transferee"[166] is not defined in the Bankruptcy Code or any state

analogs, it does not include those who are not beneficial owners.  Under federal and state

law alike, an allegedly fraudulent transfer may not be recovered from a defendant who

was a mere conduit in the transfer.[167]  As the Second Circuit observed in *Finley Kumble*,

"[e]very Court of Appeals to consider this issue has squarely rejected a test that equates

---

[165]     See, for example, the Texas fraudulent transfer law.  TEX. BUS. & COM. CODE ANN. § 24.009
(West 2013) (judgment may be entered against "the first transferee of the asset or the person for
whose benefit the transfer was made.").

[166]     *See Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988).

[167]     *See, e.g.*, *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine,
Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 58–59 (2d Cir. 1997) ("***Finley Kumble***");
*Geltzer v. D'Antona (In re Cassandra Group)*, 312 B.R. 491, 496–97 (Bankr. S.D.N.Y. 2004)
(Lifland, C.J.); *Tese-Milner v. Moon (In re Moon)*, 385 B.R. 541, 552 (Bankr. S.D.N.Y. 2008)
(Gerber, J.).

-48-

mere receipt with liability, declining to find 'mere conduits' to be initial transferees."[168]
The Second Circuit went on to hold that "[w]e join these other circuits in adopting the
'mere conduit' test for determining who is an initial transferee under § 550(a)(1)."[169]

     While the Court assumes that the Creditor Trust did the best it could in carving

out from its list of defendants those who were not beneficial holders, it appears that the

Creditor Trust was not fully successful in this regard.  This Court's experience[170] has

taught it that publicly traded securities are frequently held by depositories, in "street

name" or otherwise by those who are not the underlying beneficial holders,[171] and that

payments could well have been sent to institutions who then transmitted those payments

further on.  Presumably the Creditor Trust's efforts did not fully succeed; otherwise, a

motion would not have been brought on these grounds.

     In instances in which recipients of LBO payments were either conduits who

passed those payments on to others, or who were "holders" of the stock (e.g., as

nominees or depositories) but not the beneficial owners, they cannot be held liable as

---

[168]    *Finley Kumble*, 130 F.3d at 57.

[169]    *Id.* at 58.  It went on to observe that numerous bankruptcy courts, including those in the Second
Circuit, had also used a mere conduit test to assess initial transferee status.  *Id.* at 58 n.3.

[170]    Under *Iqbal*, the Court is not only permitted to draw upon its experience; it is required to do so.
*See* n.16 above.

[171]    For instance, this created major problems in another case on this Court's watch, *Global Crossing
Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing, Ltd.)*, 385 B.R. 52
(Bankr. S.D.N.Y. 2008) (Gerber, J.) ("**Global Crossing**").  In *Global Crossing*, an estate
representative sued recipients of a $20 million dividend that had been issued when Global
Crossing was insolvent, just a few weeks before Global Crossing's chapter 11 filing.  But the
estate representative had initially sued only the paying agent for the dividend—a conduit—and
that entity, in turn, had received the payment on behalf of many other institutions, many of whom
were likewise nominees, depositories or other conduits.  When the actual beneficial holders were
ultimately identified, the estate representative voluntarily dismissed the conduits—and properly
so, as the above cases make clear.  When the earlier complaint was amended to name the actual
beneficial owners only after the statute of limitations passed, the Court then had to consider
whether the complaint related back.

recipients of fraudulent transfers.  Claims against conduits and any holders who were not

beneficial holders are dismissed.

## IV.

### Ratification by LBO Lender Creditors?

The Movants' fourth principal contention is that the Creditor Trust lacks standing

to sue on behalf of the LBO Lenders, whose rights to recover on fraudulent transfer

claims were likewise assigned to the Creditor Trust along with those of trade creditors

and bondholders.  The Movants argue principally that the LBO Lenders must be deemed

to have ratified the transfers incident to the LBO as a matter of law,[172] and that the

Creditor Trust accordingly lacks standing to assert claims on their behalf.  While the

Court does not see the deficiency as one of standing,[173] it agrees with the underlying

point, and holds that to the extent the Creditor Trust asserts fraudulent transfer claims as

the assignee of LBO lenders, such claims must be dismissed.

As the Movants properly point out,[174] courts in this Circuit—including the Second

Circuit—have held that creditors who are participants in an alleged fraudulent transfer, or

---

[172]    The Movants also seem to argue, though not at length, that the Creditor Trust lacks standing to assert claims on behalf of LBO lenders because no benefit would accrue to them.  *See* Movants' Br. 44.  The Court cannot agree with this contention.  While, unlike trade creditors and bondholders, the LBO Lenders were secured, and thus received greater distributions on their claims than other creditors, the LBO Lenders still are undersecured, and hold deficiency claims. While they suffered lesser injury as a consequence of the LBO than wholly unsecured creditors did, the LBO Lenders still have unpaid deficiency claims, and would be aggrieved when Lyondell funds went to more junior stockholders.

[173]    The Court sees the Creditor Trust's standing as turning on whether there was a due assignment of assignors' rights to the Creditor Trust (*i.e.*, on whether the Creditor Trust "owns" the causes of action it is asserting), and on whether the assignors suffered an injury in fact.  Looking at that, the Creditor Trust has the requisite standing.  The real problem, as the Court sees it, is that with respect to the LBO Lenders subset of the assignors from whom the Creditor Trust took assignments of the creditors' avoidance rights, there is an additional defense.

[174]    *See* Movants' Br. 45–47; Movants' Reply Br. 31–32.

who have ratified it, cannot then seek to have that transfer avoided.[175]  The rubrics under

which that conclusion has been reached have varied slightly—"ratification," "consent,"

"estoppel," or "material participa[tion] in the transaction"—but the underlying point is

the same.  Creditors who authorized or sanctioned the transaction, or, indeed, participated

in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims

of it.[176]

   The Creditor Trust understandably does not dispute that defenses to claims

against an assignor are also valid against an assignee.  It also does not appear to dispute

---

[175]   *See In re Best Products Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) (Brozman, C.J.) ("*Best Products*") ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance." (citing 1 G. Glenn, *Fraudulent Conveyances and Preferences,* §§ 111 at 221 and 113 at 223 (1940) ("*Glenn*"))); *Adelphia Recovery Trust v. HSBC Bank USA*, 634 F.3d 678, 691 (2d Cir. 2011) ("*Adelphia*")  (same, quoting *Best Products* and citing *Glenn*); *Harris v. Huff (In re Huff)*, 160 B.R. 256, 261 (Bankr. M.D. Ga. 1993) (Hershner, C.J.) ( a trustee who had succeeded to a secured creditor's rights under section 544 could not prosecute a fraudulent conveyance action, because the creditor had agreed not to contest the debtor's conveyance to his mother, and hence was estopped from challenging the conveyance); *see also* Report and Recommendation of the Special Master, *In re Refco, Inc., Sec. Litigation*, 2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) (Capra, Special Master) ("*Refco*"), *report adopted*, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010) (Rakoff, J.) (where payments were made to stockholders as part of a tender offer, and the funds used by the debtor to fund the tender offer had come from a lender that had extended the loan to the debtor for that purpose, a trustee could not seek to recover the payments to the stockholders for the benefit of that lender).

[176]   *See, e.g., Refco*, where the Special Master, in a report and recommendation that was thereafter adopted by the district judge, stated:

> Any realistic assessment of the inferences raised by [certain paragraphs in the complaint] leads to the conclusion that Refco was heavily involved in structuring the transaction for the purchase of PlusFunds shares. . . . Refco's intimate involvement in the transaction for assertedly worthless shares is more than enough to disqualify Refco as a legitimate creditor of the Suffolk estate. . . .
>
>    . . . The Credit Agreement provides that the funds from Refco could be used only for the purchase of PlusFunds shares, and could only be disbursed with the permission of Refco.  Refco was thus intimately involved with and voluntarily participated in what the Plaintiff readily asserts was a fraudulent transaction.
>
>    . . . Therefore, Refco cannot be the triggering creditor, because it was a material participant in the alleged fraudulent transaction.

2009 WL 7242548, at *11 (footnote omitted).

the underlying legal proposition argued by the Movants—that a creditor that ratifies a
fraudulent transfer cannot then argue that the fraudulent transfer should be avoided.  The
Creditor Trust argues, instead, that the matter of ratification is an affirmative defense[177]
and that it raises issues of fact—and that for each of these reasons, the defense cannot be
considered on a motion under 12(b)(6).  The Court is unable to agree with either
contention.

First, the fact that ratification is an affirmative defense does not mean that it can
never be considered on a motion to dismiss.  The Second Circuit has repeatedly noted
that a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6)
motion raising an affirmative defense "if the defense appears on the face of the
complaint."[178]  And the Creditor Trust itself recognizes that an affirmative defense can be
decided on a motion to dismiss if the defense is obvious from the pleadings and papers
before the court.[179]  In fact, this Court has noted that principle in unrelated proceedings in
the *Lyondell* chapter 11 case.[180]

Then, while factual issues might exist if any LBO Lender's participation in the
financing were not apparent from the LBO documents, the Court may review and rely on
the LBO documents in ruling on the sufficiency of the Complaint, since they were relied

---

[177]    *See* Creditor Trust's Br. 63.

[178]    *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("***Pani***") ("An
affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without
resort to summary judgment procedure, if the defense appears on the face of the complaint.");
*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d
147, 158 (2d Cir. 2003) (same, quoting *Pani*); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d
406, 425 (2d Cir. 2008) (same).

[179]    *See* Creditor Trust's Br. 63 (citing *Landau v. American Int'l Grp.*, No. 97 Civ. 3465, 1997 U.S.
Dist. LEXIS 14325, at *9, 1997 WL 590854, at *3 (S.D.N.Y. Sept. 23, 1997) (McKenna, J.)).

[180]    *See Highland Capital Mgt., L.P. v. UBS Sec. LLC (In re Lyondell Chemical Co.)*, 491 B.R. 41, 50
n.42 (Bankr. S.D.N.Y. 2013) ("***Lyondell-Highland***").

on by the Creditor Trust in drafting it.[181]  The Court has difficulty seeing how the

Creditor Trust could plausibly be alleging that any LBO Lender was ignorant of the fact

that it was lending for the purpose of financing an LBO, and that LBO proceeds would

then go to stockholders—especially since, as the Movants have pointed out in a different

context (discussed in Section II above) the loan documents required loan proceeds to be

used for that purpose.

    That is more than sufficient to establish the requisite participation and ratification,

which in the context here, requires no more than that knowledge.  While more nuanced

knowledge might be necessary to establish ratification in other contexts, it is more than

sufficient here for the LBO lenders to have known—as the documents themselves

establish—that they were lending for the purposes of an LBO, and that the proceeds of

their loans were going to stockholders.

    While most claims on behalf of creditors other than LBO Lenders survive under

this Court's rulings, claims on behalf of LBO Lenders cannot.[182]

---

[181]    *See id.* at 50 nn.43–47 ("a complaint is 'deemed to include any written instrument attached to it as
an exhibit or any statements or documents incorporated in it by reference.'  And the Court may
also consider, on a motion to dismiss (and without converting the motion to one for summary
judgment) 'documents attached to the complaint as an exhibit or incorporated in it by reference . . .
matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or
of which plaintiffs had knowledge and relied on in bringing suit'—though with respect to a
document in a plaintiff's possession or as to which it has knowledge, only so long as the plaintiff
relied on any such document in drafting the complaint, or knowingly chose to characterize the
document, without attaching it, in a manner to its liking.") (alterations in original) (footnote
references to citations omitted).

[182]    The Creditor Trust is on stronger ground when it argues in its response that the Movants "leave
unsaid what they would have this Court do at this juncture in the proceedings."  Creditor Trust's
Br. 64.  The Court is inclined to view the Creditor Trust's claims as being an amalgam of the
claims of many individual creditors—some of which (*e.g.*, trade creditors and bondholders) that
still would have claims, and others (LBO Lenders) that would not.  If numbers put forward by the
litigants in their briefs are accurate, this ruling might have substantial practical importance—as the
LBO Lenders' aggregate claims (including those against smaller stockholder recipients of LBO
payments who are not defendants in this action) are said to constitute in excess of $10 billion, and
the remaining creditors' claims are said to total "less than a quarter of that amount."  Movants'
Reply Br. 32.  The Court has ruled that only non-LBO Lender creditors may have claims, and that
the Creditor Trust can sue only on their behalf.  But it is also at least arguable that any stockholder

V.

Intentional Fraudulent Transfer Claims

In their fifth and final point, the Movants ask this Court to dismiss the Creditor

Trust's intentional fraudulent transfer claims.  Though the Movants' contentions are not

formally broken down, they effectively assert four alleged deficiencies:  (1) failure to

allege fraudulent intent on the part of Lyondell's *board of directors*, as contrasted to its

senior *management*; (2) failure to allege which debtor made the transfer; (3) failure to

allege facts supporting intent to hinder, delay or defraud creditors; and (4) that the claims

are implausible.

For reasons discussed below, the Court does not agree with all of the Movants'

contentions in this regard.  But the deficiencies are sufficiently material to require that the

intentional fraudulent transfer claims now be dismissed.  As it is possible that the

deficiencies may be addressed, the Court is dismissing the intentional fraudulent transfer

claims with leave to replead.

A.    *Failure to Allege Fraudulent Intent*
      *on Part of Board of Directors*

Relying on the principal of law that corporations can merge only with the

approval of their boards of directors,[183] and the Creditor Trust's many allegations relating

to Board consideration and ultimate approval of the LBO,[184] the Movants argue in

---

that is a defendant here would have to return the entire LBO payment it received until the claims
of qualifying creditors were fully satisfied.  Because the Court well understands the importance of
this ruling, it will give the two sides a full opportunity to brief and argue its consequences—
including, among other things, an opportunity to argue that there are ways to look at the
implications of this in ways different from the Court's initial view.

[183]    *See* Movants' Reply Br. 39 ("Under applicable law, the Merger could not have been consummated
without the board's approval.  Thus it is the board's—and not merely Smith's or anyone else's—
intent that matters." (footnote omitted)).

[184]    *See, e.g.*, Complaint ¶¶ 144, 145, 162, 172, 173.

-54-

substance that because the Creditor Trust's allegations of fraudulent intent rest on the
intent of Lyondell CEO Dan Smith and other *officers*—and assertedly allege no facts
establishing scienter on behalf of *board members other than Smith*—the intentional
fraudulent transfer allegations are legally insufficient.[185]   In opposition, the Creditor Trust
contends that the intent of Smith and other officers must be imputed to Lyondell (without
inquiry into the mindset of Lyondell directors other than Smith)[186] and that this is
enough.   Each contention, in the Court's view, fails to appropriately address the
underlying legal principles.

It is fundamental, of course, that under the law of Delaware (under which
Lyondell was organized), corporate decisions to merge or to engage in LBOs require
consideration and approval by the corporation's board of directors.[187]   But while the
Court recognizes the role the Board should have exercised in connection with the LBO
(and allegations in the Complaint that Lyondell's board considered the proposed merger
at several meetings before approving it), the Court finds the Movants' argument still to be
too simplistic.   The Movants' argument effectively disregards any influence on the Board
that Smith and others may have exercised.   It also disregards the appropriate legal test,
discussed below.

---

[185]    *See* Movants' Br. 56 ("There are no allegations that Lyondell's board of 11 directors, which
included 10 directors in addition to Smith, acted with intent to defraud Lyondell's creditors in
approving the Merger."); *see also* Movants' Reply Br. 40 ("The Trustee has not alleged that any of
the other directors acted with intent to defraud Lyondell's creditors.").   The Movants' argument
does not further drill down on what the rule of law should be if some, but less than all, of the
directors have the required intent, and in light of the Court's rulings in this area, the Court does
not now have to address that question.

[186]    Smith, it should be remembered, was a director too.

[187]    *See* DEL. CODE ANN. tit. 8, § 251(b) (2013) ("The board of directors of each corporation which
desires to merge or consolidate shall adopt a resolution approving an agreement of merger or
consolidation and declaring its advisability.").

By the same token, the Court finds the Creditor Trust's position—that under "ordinary agency principles,"[188] the conduct of CEO Smith and others helping him can be automatically imputed, without consideration of their influence on the Board's decision—to be too simplistic here as well.  As a very general matter it is true, as the Creditor Trust states in a brief in *Blavatnik*,[189] incorporated by reference in this case, that "the transferor [in a fraudulent transfer case] is deemed to have the knowledge and intention of its directors, officers and other agents."  And the two cases the Creditor Trust cited, *James River Coal* and *Anchorage Marina*, did indeed say, respectively, that "the fraudulent intent of an officer or director may be imputed to the [d]ebtors for purposes of recovering an intentional fraudulent transfer,"[190] and that "[i]n cases . . . in which the [d]ebtor is a corporation[,] the intent of the controlling officers and directors is presumed to be the [d]ebtor's intent."[191]

But neither of the quoted passages from *James River Coal* and *Anchorage Marina* addresses any necessary distinctions between officers and directors in instances where the distinctions matter.  And the statements in *James River Coal* and *Anchorage Marina* must be read in context.  In each of those cases, the issues here were not presented, and those courts did not need to focus on any applicable distinctions between officers, on the one hand, and directors, on the other.  In *James River Coal*, the court understandably observed that "[a] corporation, being an entity created by law, is incapable of formulating

---

[188]    Creditor Trust's Br. 70 n.59.

[189]    Brief of Creditor Trust at 19, *Blavatnik*, No. 09-1375 (Bankr. S.D.N.Y. Nov. 24, 2010), ECF  No. 458 ("**Creditor Trust Blavatnik Br.**") (citing, with a "*see, e.g.*," *Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 161 (Bankr. E.D. Va. 2007 ) (Huennekens, J.) ("***James River Coal***"), and *Armstrong v. Ketterling (In re Anchorage Marina, Inc.),* 93 B.R. 686, 691 (Bankr. D.N.D. 1988) (Hill, J.) ("**Anchorage Marina**")).

[190]    *James River Coal,* 360 B.R. at 161.

[191]    *Anchorage Marina,* 93 B.R. at 691.

or acting with intent."[192]   And it was in that context that the *James River Coal* court went

on to say that "*[t]hus*, for the purpose of recovering impermissibly transferred corporate

assets and thereby facilitating creditor recovery, the intent of the officers and directors

may be imputed to the corporation."[193]   Immediately thereafter, the *James River Coal*

court noted allegations in the complaint before it that "the '*Directors* caused the

Debtors'" to make the challenged transfers—and went on to say that "the fraudulent

intent of the *Directors* may be imputed to the Debtors," and that the fraudulent intent of

certain insiders there, "*as Directors*," could also be imputed to the debtors for the

purposes of the intentional fraudulent transfer claim.[194]   Thus, while *James River Coal* is

plainly correct, it does not address the issue presented here.

Similarly, in the other decision cited by the Creditor Trust, *Anchorage Marina*,

the court started, as did the *James River Coal* court, by noting once again that "in cases

such as this one in which the Debtor is a corporation[,] the intent of the controlling

officers and directors is presumed to be the Debtor's intent."[195]   And the *Anchorage*

*Marina* court then went on to find, after trial—where each of the two defendants, who

had authorized payments to themselves, were the stockholders and *also directors*[196]—that

the alleged intentional fraudulent transfers had been proven.   It was shown that the

defendants "together control[led] the majority of the voting rights of Anchorage.   Thus,

---

[192]      360 B.R. at 161.

[193]      *Id.* (emphasis added).

[194]      *Id.* (emphasis added in each instance).

[195]      93 B.R. at 691.

[196]      *See id.* at 687 ("Defendants Robert B. Hart and Arnold Ketterling were Anchorage shareholders
          and directors"); *accord id.* at 688 ("All three shareholders became directors of the corporation.").

their intent was Anchorage's intent."[197]  *Anchorage Marina* too is plainly correct, but

does not address the issue presented here.

Other cases in which a natural person's intent was imputed to a corporate

transferor, considered by the *James River Coal* court but not by either of the two sides

here, likewise addressed situations in which the natural person was either a director of the

corporate transferor, had the ability in fact to influence the transfer, or both.[198]

The appropriate standard is, as the First Circuit articulated it in *Roco Corp.*,

whether the individual whose intent is to be imputed "was in a position to control the

disposition of [the transferor's] property."[199]  Though the *Roco Corp.* court did not

discuss at substantial length why it considered that standard to be the right one, that

---

[197]    *Id.* at 691.

[198]    *See Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 980, 984 (1st Cir. 1983) ("**Roco Corp.**")
("We may impute any fraudulent intent of Consove to the transferor Roco because, as the
company's president, director, and sole shareholder, he was in a position to control the disposition
of its property."); *Forman v. Jeffrey Matthews Fin. Grp., LLC (In re Halpert & Co.)*, 254 B.R.
104, 110, 121 (Bankr. D.N.J. 1999) (Gambardella, J.) (president of a small brokerage firm
transferred all of the assets of his company to another brokerage firm and to his wife, having
obtained the written consent of the debtor's board of directors, though by means not fleshed out in
the opinion, and where the president's influence appears to have been undisputed); *Wilson v. RHS
& Assocs. (In re Blazo Corp.)*, 1994 Bankr. LEXIS 322, at *10, 1994 WL 92405, at *4 (Bankr.
N.D. Ohio Feb 25, 1994) (Williams, J.) ("**Blazo Corp.**") (An individual who was chairman of the
board of directors, president and chief executive officer of debtor, a lower power television
network that also produced and aired television commercials and programs, ran an alleged Ponzi
scheme.  The *Blazo Corp.* court denied summary judgment sought by a transferee defendant,
concluding that as there was no evidence that the Board attempted to oust him, he was acting
within the scope of his authority, and his intent should be imputed to the debtor corporation);
*Freehling v. Nielson (In re F & C Servs., Inc.)*, 44 B.R. 863, 871 & 871 n.7 (S.D. Fla. 1984)
(Weaver, J.) (Chairman of the board of directors of the debtor, an insurance agency, caused the
transfer of substantially all of the debtor's assets to a new corporation he formed.  While minutes
of a board meeting purportedly authorizing the transaction existed, another board member—and
perhaps the only other board member—testified that he never attended the board meetings
reflected in the corporate minutes, and no directors meetings would have occurred without his
knowledge).

[199]    701 F.2d at 984.

standard nevertheless makes sense; imputation of an officer's intent is appropriate if, but only if, that intent has a material effect on causing the transfer.[200]

Here, however, the Creditor Trust relies on a species of automatic imputation, without the additional showing that is required under *Roco Corp.* and common sense. As pleaded, the claims are now insufficient. If the Creditor Trust cannot plead facts supporting intent to hinder, delay or defraud on the part of a critical mass of the *directors* who made the decisions in question, the Creditor Trust must then allege facts plausibly suggesting that Smith (who was only one member of a multi-member Board) or others could nevertheless "control the disposition of [Lyondell's] property"—by influence on the remaining Board members[201] or otherwise. As the Complaint now lacks sufficient allegations of that character, the intentional fraudulent transfer claim must be dismissed.

---

[200]    The Court is also unpersuaded by arguments presented in one form or another by each of the two sides here that principles underlying the *Wagoner* Rule line of cases, *see Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir.1991), imputing insiders' wrongful conduct to deny standing to estate representatives suing third parties, and in cases imputing knowledge or wrongful conduct under the doctrine of *in pari delicto*, *see Kirschner v. KPMG LLP*, 938 N.E.2d 941, 951–52 (2010), should be applied in this case. While all have their underpinnings in agency law (some of which have been aptly described as employing "fictions," *see Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co.)*, 311 B.R. 350, 369, 370 (S.D.N.Y. 2004) (Wood, C.J.)), matters involving actions with a legally required level of intent are not necessarily the same as those involving notice or knowledge. If intent is to be meaningful, it must have some causal effect on the underlying offense. It is better, in the Court's view, to employ the standard articulated by the First Circuit in *Roco Corp.*, which effectively does not utilize fictions, and instead requires a nexus between the alleged wrongful intent and the resulting injury.

[201]    The Creditor Trust additionally argues, in footnotes, that "there are in any case allegations in the Complaint concerning the knowledge of the outside members of the Board of Directors, for example that they *should have known* that the earnings projections upon which the Merger financial case was being based were unsupportable in light of prior projections that they had reviewed . . . ." Creditor Trust's Br. 70 n.59; *accord* Creditor Trust Blavatnik Br. 19 n.8 ("the Lyondell board of directors knew *or should have known* that the refreshed numbers were inflated, unreasonable, and unachievable.") (emphasis added in each case). Whatever the relevance that such allegations may have to duty of care claims asserted against other board members, allegations of that character—"should have known," which effectively impose a negligence standard—are unhelpful with respect to intentional fraudulent transfer claims, which require an *actual* intent to hinder, delay or defraud. *See, e.g.*, *United States v. Finkelstein*, 229 F.3d 90, 95 ("the should-have-known alternative connotes a concept more akin to negligence than to knowledge."); *United States v. Bader*, 956 F.2d 708, 710 ("What the defendant should have known is not knowledge.").

-59-

As it is possible that this deficiency may be cured, the Court grants leave to replead.

B.    *Failure to Allege Which Debtor Made the Transfer*

The Movants also argue that the Complaint fails to identify the Debtor or Debtors that made the transfers—referring instead to "an amorphous 'LyondellBasell' . . . a vaguely defined term" [202] that was "defined broadly to include 'LyondellBasell Industries AF S.C.A. ("LBI"), LyondellBasell Finance Company, Lyondell Chemical Company,' and 'many of the respective direct and indirect subsidiaries of LBI and Lyondell, including all of Lyondell's major operating subsidiaries.'"[203]

This contention appears to have been addressed by the Creditor Trust, to the extent it was addressed at all, merely by speaking of the various Lyondell affiliates in the aggregate.[204]

The Court believes, as discussed in Section II above, that collapsing doctrine could enable the Court to disregard corporate distinctions, and to look at the LBO as a whole. But the Creditor Trust must at the least identify in its Complaint the particular Debtors that are to be included as part of the collapsing analysis, and whose assets are alleged to have been transferred or subjected to liens. The Court agrees with the Movants that the intentional fraudulent transfer claim is presently deficient in these respects as well.

---

[202]    Movants' Br. 55.

[203]    Movants' Reply Br. 35.

[204]    *See* Complaint ¶ 1.

The intentional fraudulent transfer claim is dismissed for this additional reason. Once again, however, since it is possible that the deficiencies can be cured, leave is granted to replead.

C.      *Facts Supporting Intent to Hinder, Delay or Defraud*

The Movants properly observe that under the law of either of the states whose law the parties address, claims for intentional fraudulent transfer require the pleading of facts showing an "actual intent" to "hinder, delay or defraud creditors." The Movants are also correct in noting that conclusory allegations are insufficient. But the Creditor Trust does not dispute those underlying principles. It contends instead that it has indeed alleged the necessary facts.

In some respects the Creditor Trust has, and in other respects it has not. The Creditor Trust has pleaded facts that, if proven, would suggest that Lyondell CEO Smith and senior management intended to secure a variety of benefits to themselves, as management and stockholders, which would result from Blavatnik's acquisition of Lyondell, the merger of Basell and Lyondell, and the LBO from which those ends would be achieved.[205] But the pleading of facts evidencing an intention to injure creditors or to recklessly disregard creditor interests—as contrasted to an intent to enrich oneself—is considerably thinner.

---

[205]    The Complaint alleges, *e.g.*, that for Smith the LBO represented an opportunity to "cash out with an enormous personal fortune," Complaint ¶ 132, and that he ultimately "walked away with over $100 million." *Id.* ¶ 5.

The intent element of an intentional fraudulent transfer claim "may be alleged generally so long as the plaintiff alleges 'facts that give rise to a strong inference of fraudulent intent.'"[206]  Additionally,

> "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the Court must take into account plausible opposing inferences," such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[207]

Generally, in intentional fraudulent transfer cases as well as securities fraud cases, a "strong inference of fraudulent intent 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"[208]

The Movants are right in contending that the Complaint is nearly entirely constructive fraudulent transfer focused, and speaks of the *effect* of the LBO, as contrasted to its *intent*.  The Movants are also right in contending that the Complaint is devoid of any allegations of facts supporting an intention to actually injure creditors (and in particular, to hinder delay and defraud them), as contrasted to allegations evidencing an intention on the part of Lyondell corporate officers to enrich themselves, whatever the

---

[206]    *Pereira v. Grecogas Ltd. (In re Saba Enters.)*, 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009) (Gonzalez, J.) (citations omitted).

[207]    *In re Bear Stearns Cos., Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 499 (S.D.N.Y. 2011) (Sweet, J.).

[208]    *The Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 774 (Bankr. S.D.N.Y. 2008) (Bernstein, C.J.); *see also Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292, 308 (S.D.N.Y. 2009) (McKenna, J.).  As recognized by Judge Lifland and the cases cited here, "[t]his two-prong test is commonly applied to analyze scienter in securities fraud actions, but the 'same standard has been applied in [the Second] Circuit to non-securities fraud claims.'"  *In re Bernard L. Madoff Inv. Sec. LLC*, 445 B.R. 206, 222 n.14 (Bankr. S.D.N.Y. 2011) (Lifland, J.) (second alteration in original).

consequences.  The Complaint charges, in substance, a reckless disregard of the consequences that such enrichment would have on creditors.

With respect to this additional asserted basis for dismissal, the facts pleaded to show *motive* are enough.  The Complaint satisfactorily alleges a *motive* to commit fraud (on the part of Smith and any directors who were also stockholders), and alleges an opportunity for Smith and officers assisting him to advance the LBO process—part, but less than all, of the required showing.  But the complaint would satisfactorily allege the ultimate *opportunity* to do the allegedly resulting damage only if influence on the Board could be shown.  If (but only if) the Creditor Trust can show the requisite influence on the Board's decision-making, discussed above, the Complaint need not be dismissed for failure to allege the requisite intent.

### D.    Plausibility

Finally, the Movants contend that "participation of the Lenders—major, sophisticated financial institutions, such as Citibank, Goldman Sachs, and Merrill Lynch—renders implausible any claim that the Merger was undertaken with knowledge that it would inevitably lead to Lyondell's or Basell's failure."[209]  This is the least persuasive of the Movants' points.  In light of the fees and other benefits associated with financing the LBO, and the obvious fact that, in the absence of avoidance, secured creditors would be paid before unsecured creditors would realize anything, the Creditor Trust's allegations are not implausible.  Additionally, though the Court, for reasons discussed above,[210] would be reluctant to draw on its personal experience with LBOs and fraudulent transfer suits if the Supreme Court had not invited lower courts to do so, the

---

[209]    Movants' Br. 57.

[210]    *See* n.16 above.

Court's experience tells it that LBOs much more than occasionally fail, and that their risks are well known.[211]  The participation of major financial institutions does not, without more, render allegations of intentional fraud or recklessness implausible.

The Court declines to dismiss the intentional fraudulent transfer claims based on asserted implausibility.

<u>Conclusion</u>

For the reasons set forth above:

    (1)  The Movants' motion to dismiss insofar as premised on the contentions that the Creditor Trust's constructive fraudulent transfer claims

        (a)  are proscribed by Bankruptcy Code section 546(e), or

        (b) are preempted by section 546(e) or otherwise by federal law,

is denied.

---

[211]    The Court's experience is not merely its own.  As stated in *Debt's Dominion*:

> Corporate takeovers frequently take the form of a leveraged buyout . . . . The buyout is referred to as "leveraged" because the bidder causes the target firm to incur enormous amounts of new debt (the "leverage") to help pay for the acquisition. . . . If all goes well, the bidder then uses revenues generated by the target corporation to repay the debt incurred to finance the takeover.

> If all does not go well, however, the firm can quickly end up in bankruptcy . . . . If the bidder overpays, or if some unexpected change—anything from an increase in the cost of oil to a downturn in sales—cuts into the firm's revenues, the firm will default on its debt obligations.  After a takeover, there often is very little margin for error.

*Debt's Dominion* at 214.

(2)  The Movants' motion to dismiss insofar as premised on the
contention that that the Creditor Trust failed satisfactorily to allege a
transfer of property by the Debtors is denied.

(3)  The Movants' motion to dismiss insofar as claims are asserted
against entities that are conduits, nominees, or other non-beneficial
holders is granted.

(4)  The Movants' motion to dismiss insofar as claims are asserted
against LBO Lenders is granted.

(5)  The Movants' motion to dismiss Count II, alleging intentional
fraudulent transfer, is granted.  Leave to replead Count II is granted.

The Court's Chambers will set an on-the-record status conference with the parties
to address what needs to be done next.


SO ORDERED.


Dated: New York, New York            _s/Robert E. Gerber____
       January 14, 2014              United States Bankruptcy Judge

-65-